The Law Office of Ryan Lozar, P.C.
305 Broadway, 10th Floor, New York, NY 10007
Tel: (310) 867-1562; Alternate Tel: (646) 666-8262; Fax (877) 666-4456
ryanlozar@gmail.com
www.ryanlozar.com



OCTOBER 16, 2017

**Re:** <u>Bridgeforth, et al., v. City of N.Y., et al.</u>, No. 16 Civ. 273 (WHP)

Dear Judge Pauley:

I represent Plaintiffs in the above-captioned Section 1983 case. I write to respond to the Defendants' motion for a pre-motion conference in support of their proposed summary judgment motion. The Court has scheduled a related conference on October 20, 2017, at 11:00 a.m.

**I.  Background Facts.**

The following facts are taken from the evidentiary record.[1] The genesis of this case was a 911 call placed by a woman named Necola on October 9, 2014, at around 2:30 a.m., reporting that Plaintiffs had imprisoned her in their home at 1430 Amsterdam Avenue, Apt. 3C. Necola placed the call from a payphone in front of the building, and reported to the audibly incredulous 911 operator that although she had managed to escape, a girl was "stuck inside" Apt. 3C in the same predicament. According to Necola, Plaintiffs had guns and knives and had imprisoned Necola "to make [her] a prostitute."

Defendant and non-party officers immediately responded to the scene, secured the perimeter of the building to assure that none of the perpetrators of the reported crime would escape or remove evidence from a back window, and knocked on Apt. 3C's door. Meanwhile, Necola reported that Plaintiffs handcuffed her and the crying young girl—"Gloria"—to a radiator, and that Plaintiffs and others took photos of Necola and Gloria in provocative clothing and states of undress to market them as prostitutes. At least one officer noted that Necola appeared intoxicated. Necola also reported that she and Gloria were forced to go to the bathroom in a bucket while imprisoned, and that Plaintiffs wielded a machete (in addition to the guns and knives reported to the 911 operator).

Eventually, the sleeping occupants of Apt. 3C answered officers' knocks at the door. These individuals were non-parties Eric and Sarah. At the time, Eric and Sarah were watching Plaintiff Jasmine Bridgeforth and Plaintiff Delano Broadus's daughter FB while Bridgeforth and Broadus worked night-shift recycling work at area buildings.

Defendants and non-party officers—including non-party Night Watch Detectives—searched Apartment 3C. That search revealed nothing to corroborate Necola's story. There were no buckets, handcuffs, chains, machetes, guns, or any other contraband. There was no "Gloria" in Apt. 3C, either.

Very early in the incident, the NYPD put out a Level 1 City-wide alert in response to Necola's 911 call instructing officers to be on the lookout for "Gloria." However, within three to four hours of gaining access to Apt. 3C, non-party Night Watch Detectives determined that Gloria did not exist and, at 7:30a.m., the NYPD terminated the Level 1 alert for the fictional character in Necola's story. The Night Watch Detectives determined from building CCTV footage and conversation with Eric and Sarah that Gloria did not exist.

---

[1] Because this is a response to a pre-motion conference letter motion, I will not file all supporting exhibits here as I would in full briefing. However, I will bring the material to the October 20, 2017, conference in the event the Court requests review prior to ordering briefing on some or all of Defendants' proposed summary judgment motion. In the alternative, on the Court's instruction I will file a supplement with the exhibits prior to the conference.

At approximately 8:00 a.m.—thirty (30) minutes after Necola's story had been discredited and the Level 1 alert had been terminated—Bridgeforth and Broadus returned home from work. Bridgeforth and Broadus found Defendants and other officers throughout Apt. 3C, still searching Apt. 3C for evidence that was never found and which, by that point, there was no probable cause to think existed. FB was gone and an ACS case opened.

Despite conclusions that Necola lied, Defendants arrested Bridgeforth and Broadus anyway. Defendants had already arrested Sarah and Eric, ordered FB into state custody, and arrested Plaintiff David Fairfax when he arrived in front of 1430 Amsterdam Avenue (whereupon Necola reported that he had been one of her captors, too).

Defendant Rafael Sanchez was Plaintiffs' arresting officer. He unreasonably arrested them despite Necola's uncorroborated and affirmatively disproven story. Defendant John Zerafa, a Vice Detective, similarly ignored the Night Watch Detectives' investigation and findings. Zerafa interrogated Plaintiffs at length at the precinct. As October 9, 2014, wore on, Sanchez and Zerafa continued to learn more and more facts that further undermined Necola's already-shattered credibility, yet unreasonably continued Plaintiffs' unprivileged detention and caused still further rights violations.

## II.     False Arrest and Unreasonably Excessive Detention

Defendants' motion for a pre-motion conference states that they are entitled to summary judgment because officers relied on Necola's accusation. However, it is settled that "[w]hen information is received from a putative victim . . ., probable cause exists . . . unless the circumstances raise doubt as to the person's veracity. Sanders v. City of NY, 2015 WL 1469514, at *8 (EDNY Jan. 7, 2015) (citing Curley v. Vill. of Suffern, 268 F.3d 65, 70 (2d Cir. 2001)). Here, it is not just that circumstances raised doubt as to Necola's truthfulness; it had been determined by the NYPD that she lied. Gloria had been invented, and the NYPD was so sure of this fact, it called off efforts to find the fictitious character. In addition, Apt. 3C was devoid of anything else that corroborated Necola's disproven account—there were no handcuffs, machetes, bathroom buckets, or any other alleged or unalleged contraband.

Not only did Defendants arrest Plaintiffs after learning that Necola's story was a lie, they then caused them to endure unreasonably excessive detention for roughly thirty-eight more hours as any purported cause continued to dissipate as Necola's story changed still further. Defendants never asked her to swear to any one version of her allegations. Finally, on October 10, 2014, around midday, the New York County District Attorney's Office told Sanchez that Plaintiffs would not be prosecuted. On receiving the news that Plaintiffs would not be charged, Sanchez simply left rather than taking that reasonable opportunity to prevent the continuation of their now inarguably unprivileged confinement. Plaintiffs remained jailed for roughly four (4) more hours before they were released.

On these facts, Plaintiffs arguably have a summary judgment motion of their own on their false arrest and unreasonably excessive detention claims. If the Court permits a briefing schedule, Plaintiffs request cross-motion practice. Instead, Plaintiffs ask that the Court deny Defendants' request to brief summary judgment and set a trial date.

### III. Unlawful Search.

Defendants first argue that Plaintiffs' unlawful search claims fail because Defendants had the authority to search Plaintiffs' bodies pursuant to lawful arrest. Insofar as Plaintiffs argue that they were falsely arrested as discussed in Section II, Defendants' argument fails.

Next, Defendants argue that they performed a lawful warrantless search of Apt. 3C pursuant to what they call "plain view doctrine." Insofar as Defendants' search of Apt. 3C began somewhere around 4:00 a.m., and was still ongoing with numerous officers four hours later when Bridgeforth and Broadus returned home from work (which, again, was after Necola's story had been affirmatively discredited by detectives through facts collected during police investigation), this is a very long plain-view search, to say nothing of the fact that it continued beyond the point when Defendants' probable cause dissipated.

Third, Defendants argue that their renewed search of Apt. 3C on October 9, 2014, after Zerafa applied for and obtained a search warrant, was privileged as a matter of law. However, the corrected-affidavit doctrine controls the issue, and this record establishes an issue of fact thereunder, if not summary judgment for Plaintiffs. See McColley v. Cty. of Rensselaer, 740 F.3d 817, 823 (2d Cir. 2014) (holding that when a plaintiff shows that a search warrant applicant omitted material information from an affidavit, or materially misrepresented facts therein, the plaintiff may meet his burden of defeating the presumption of probable cause that warrants normally establish; then, the "corrected affidavit" doctrine applies and permits a jury to consider whether a magistrate would have found probable cause from the corrected application). For example, Zerafa's search-warrant application once again repeated Necola's allegations about Gloria without bothering to mention that investigating detectives determined that Gloria never existed. Incredibly, Zerafa's application also misrepresented that he reasonably believed that Apt. 3C contained sex-trafficking and kidnapping evidence such as handcuffs, chains, ropes, knives, machetes, and more, without mentioning that officers had earlier already performed a four-hour-long warrantless search of Apt. 3C for these items with negative results.

Remarkably, the record shows that Sanchez and Zerafa themselves did not even believe the story they were allegedly acting on. The ill-gotten search warrant authorized the collection of DNA evidence from Apt. 3C. Zerafa spent roughly thirty (30) minutes on its execution and took none. The ill-gotten search warrant also authorized the seizure and examination of electronic devices, as Necola said Plaintiffs forced her and Gloria to take photographs for use on prostitution Web sites. One can only imagine the value of a single photographic image of Gloria to a sincere investigation to find her and other trafficking victims. Defendants put the devices unexamined in long-term storage.[2]

### IV. Fabrication of Evidence.

Defendants' first argument with respect to Plaintiffs' fabrication-of-evidence claim appears to be that Sanchez and Zerafa never forwarded fabricated evidence to the District Attorney's Office. First, Sanchez and Zerafa did knowingly forward false evidence to the DA's Office. That is what this case is about, and what is discussed at length supra. Sanchez knew that Necola had lied, yet he arrested

---

[2] Five months later, in Spring 2015, under unclear circumstances and stale-to-non-existent authority, the electronic devices were suddenly taken out of storage and searched with negative results.

Plaintiffs for sex trafficking and false imprisonment and knowingly forwarded this false information to the DA's Office as though it were true. So, too, did Zerafa forward known false information to the DA's Office. He did this most concretely in the search warrant application. The DA's Office had to review and approve that document, which Zerafa gave to the DA's Office while Plaintiffs were already in custody and with extremely serious charges pending against them. Zerafa's repetition of this known false information supported and strengthened Sanchez's own fabrications. Sanchez and Zerafa's reasonable colleagues—and their reasonable conclusion that Necola was an unreliable and incredible complainant—stand as comparators showing Sanchez and Zerafa's misconduct in this respect.

Next, Defendants argue that Plaintiffs cannot sustain a fabrication-of-evidence claim because they never appeared before a judge or jury. Defendants cite to no case law for this proposition, and their own recitation of the elements of this claim demonstrates that there is no such requirement. On the contrary, the fabrication-of-evidence claim references the right "not to be deprived of liberty on the basis of false evidence fabricated by a government officer." Zaffrey v. Coffey, 221 F.3d 342, 355 (2d Cir. 2000). That is precisely what occurred here. Plaintiffs were jailed as Defendants pushed the prosecutor's office to charge Plaintiffs with offenses on the basis of factual presentations provided by Defendants that the Defendants knew were false.

## V.     Monell.

Defendants incredibly argue that Plaintiffs' Monell claim must be dismissed. I say "incredibly" in the various senses of that word because of a discovery issue that Defendants have manipulated and now seek to exploit. As the Court may recall, on June 30, 2017, I filed a motion seeking a FRCP 37 Order compelling Defendants to produce relevant IAB and CCRB files.

The very brief background to that motion, as the Court may remember, is that prior to the motion, I had agreed to initially inspect "summary sheets" to the files because I agreed, where appropriate, to narrow Plaintiffs' requests. I did in fact perform that inspection, but Defendants gave me so few summary sheets of such inscrutable substance (the allegations and the dispositions were often unclear if not completely missing), it was a wasted effort. Plaintiffs' June 30, 2017, motion for a FRCP 37 Order followed.

In Defendants' response to that motion, and argument at the Court's related July 13, 2017, conference, Defendants stated that I was unreasonable and made the motion prematurely. The Court stated that the files should be produced, and Defendants agreed. The Court's and my reliance on Defendants' represented mooted the motion. Since then, Defendants have led me to believe that they were readying the files for production. In light of these representations, and the fact that Defendants chided me at the July 13, 2017, conference for being untrusting and premature in filing a FRCP 37(a) motion for this material, I have awaited compliance. Earlier today, Defendants told me for the first time that I may set up a time to inspect the files at their offices, while at the same time asking the Court for a summary judgment briefing schedule.

Setting aside the unfairness that Defendants' about-face represents in light of the above history, Defendants' much-delayed and novel reversion to "inspection only" at the precise moment they initiate dispositive motion practice is baffling and unworkable. After representing to the Court and to me that they would produce these records in order to moot a discovery motion that would subject them to sanctions for non-compliance, Defendants have withheld the records, suddenly stating (only to me, but

not the Court) that they have now decided to provide me with only a few hours to look at them. Accordingly, I ask that the Court direct Defendants to produce this material in its entirety forthwith.

## VI.     Conclusion.

Finally, I note that Defendants' motion for a pre-motion conference argues that summary judgment should enter against certain Named Defendants on certain claims (for example, Defendants argue that direct fabrication-of-evidence claims against Defendants Khang, Lee and Despaigne should be dismissed). I offered to withdraw many if not all of these claims months ago. Defendants never responded, and now present the issue as a dispute for the Court. I will gladly explain in greater which Defendants/claims need not be the subject of motion practice during the October 20, 2017, conference, of which Defendants are already aware.

Sincerely,

*Ryan Lozar*

Ryan Lozar
Attorney for Plaintiffs