Confidential Material

FAMILY COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY      PART 6

-----------------------X

IN THE MATTER OF:

    ACS-NY,

                Petitioner,

                                          Docket No.:
                                          NN-45041-14

        Vs.

    JASMINE BRIDGEFORTH and DELANO BROADUS,

                Respondents.

-----------------------X

                May 13, 2015

HELD AT:         FAMILY COURT OF THE STATE OF NEW YORK
                 NEW YORK COUNTY
                 CITY OF NEW YORK
                 60 Lafayette Street
                 New York, NY 10013

BEFORE:         HONORABLE EMILY M. OLSHANSKY,
                 Judge

APPEARANCES:    ELIZABETH VERILLO, ESQ.
                 Attorney for the Petitioner

                 JESSICA WEIDMANN, ESQ.
                 Attorney for the Respondent Father

                 TEGHAN DELANE, ESQ.
                 MS. ASHLEY, ESQ.
                 DANIEL DIETZ, ESQ.
                 Attorneys for the Respondent Mother

                 MELISSA FRIEDMAN, ESQ.
                 RENEE MITTLER, ESQ.
                 Attorneys for the Children

TRANSCRIBER:    LOUISA RETTLER

PLAINTIFF'S EXHIBIT 63 6-10-17cA

PROCEEDINGS                          12
Confidential Material

1           THE COURT:  Okay.  Yes?

2           MS. VERILLO:  Your Honor, and at this time

3   I would call Officer Rafael Sanchez.

4           THE COURT:  Very well.

5           THE CLERK:  Officer, you're reminded you're

6   still under oath.  Please restate your name for the

7   record.

8           OFC. SANCHEZ:  Officer Rafael Sanchez.

9           THE COURT:  Good afternoon, Officer.

10          OFC. SANCHEZ:  Good afternoon, Your Honor.

11          THE COURT:  You may inquire, Ms. Verillo.

12          R A F A E L   S A N C H E Z, having been

13  first duly sworn, testified as follows:

14  DIRECT EXAMINATION

15  BY MS. ELIZABETH VERILLO

16      Q:  Officer Sanchez, by whom are you employed?

17      A:  The New York City Police Department.

18      Q:  Okay.  And what precinct do you work at?

19      A:  Police Service Area 6.

20      Q:  Okay.  And how long have you been employed with

21  the NYPD?

22      A:  Approximately nine years.

23      Q:  And how long have you been with PSA6?

24      A:  Since 2007.

25      Q:  And prior to that where were you working at?

DIRECT EXAMINATION OF R. SANCHEZ BY E. VERILLO      13

1    A:    Police Service Area 5.

2    Q:    And can you just explain what PSA6--what areas

3    that you serve?

4    A:    The New York City Housing Authority Buildings

5    within the confines of PSA6 in three different precincts.

6    Q:    And specifically do you serve the Housing and

7    Development?

8    A:    Yes.

9    Q:    And what shift do you typically work at?

10   A:    11:15 in the evening by 0750 in the morning.

11   Q:    And turning your attention to the October 9th,

12   2014 were you working on that date?

13   A:    Yes.

14   Q:    And was anyone else working with you on that

15   date?

16   A:    Yes.

17   Q:    And who was working with you?

18   A:    Officer Kahn.

19   Q:    And on that date did you respond to a call to

20   1430 Amsterdam Avenue, Apartment 3C?

21   A:    Yes.

22   Q:    And approximately what time did you respond to a

23   call to that address?

24   A:    Around 2:50 in the morning.

25   Q:    Okay.  And what type of call was it that you

DIRECT EXAMINATION OF R. SANCHEZ BY E. VERILLO      14

1    were responding to?

2                    MS. WEIDMANN:  Objection.

3                    THE COURT:  Overruled.

4        A:   An assault in progress.

5        Q:   And do you recall approximately how long it took

6    for you to get to that address?

7        A:   About 10 minutes.

8        Q:   So you got to the apartment at about 3:10 a.m.

9    Can you describe what you saw when you first arrived?

10       A:   When I arrived at the location, the 3rd floor of

11   the said building, Officer Roark and Lieutenant Gunther

12   was--they were with the caller Nicola Simms.

13                    MS. WEIDMANN:  Objection.

14                    THE COURT:  Overruled.

15       A:   And the caller they called via 911 call, she was

16   crying frantic and anxious.

17       Q:   Okay.  So can you first, did you have an

18   opportunity to observe the woman who was identified as Ms.

19   Simms, did you have an opportunity to see her physical

20   appearance?

21       A:   Yes.

22       Q:   And what did you observe?

23       A:   She was crying.  She had swelling to the left

24   side of her face.

25                    THE COURT:  I'm sorry, Officer.  You said

1   she had what on the left side of her face?

2   A:   Swelling to the left side of her face.

3          THE COURT:  Thank you.

4          MS. WEIDMANN:  Objection, Your Honor, I'm

5   objecting to this line of questioning as there is no

6   connection made to the parties involved in this case.

7   And I don't believe that there can be a non-hearsay

8   basis connection drawn.

9          THE COURT:  I guess overruled subject to

10  connection.  I'm assuming it must have something to

11  do with the parties and if there can't be then I'll

12  grant it.  You can continue, Officer.

13  A:   So she had swelling to the left side of her

14  face, swelling to the left side of the lip and a small

15  laceration to the inside of her lip as well as redness to

16  the left eye.

17  Q:   And you previously touched on this, but you also

18  had an opportunity to observe her demeanor, is that

19  correct?

20  A:   Yes.

21  Q:   And can you explain for the court what it is

22  that you observed?

23  A:   She was crying and yelling, it was very

24  difficult to calm her down.

25  Q:   And at that time did she make any statements?

Confidential Material

1   A:   Yes.

2   Q:   And what were those statements?

3              MS. WEIDMANN:   Objection.

4              THE COURT:   What's the objection?

5              MS. WEIDMANN:   Hearsay.

6              MS. VERILLO:   Your Honor, I would make the

7   argument that this out of court statement is properly

8   admissible under the excited utterance exception.

9   The Officer has established that he had observed the

10  person who has made the out of court statement to be

11  upset, frantic, to have an injury and there would be

12  a presumption underlying that this person lacked

13  reflective capacity to determine that those

14  statements would be untruthful.

15             THE COURT:   So, Officer, this was how long

16  after you received the initial call when you made

17  these observations?

18  A:   The initial call when I responded was around

19  2:50 in the morning and so this was approximately 10 to 15

20  minutes afterward when I was at the scene.

21             THE COURT:   I think overruled.  I mean I

22  think additional questions will clarify whether it

23  was an excited utterance or it wasn't.  So I guess

24  subject to--I would deny the objection subject to

25  renewal as the facts are developed.

**Ubiqus/Nation-Wide Reporting & Convention Coverage**
61 Broadway – Suite 1400, New York, NY 10006
Phone: 212-346-6666 • Fax: 888-412-3655

PL00093

1    Q:   Officer Sanchez, so can you state what the

2   person had said to you on that date?

3    A:   Yes.  She said that she was held inside the

4   apartment against her will tied to a radiator by

5   handcuffs.  Forced to dress in provocative clothing and

6   she was getting pictures taken of her.  And that she was

7   told that if she doesn't make any hits that they were

8   going to send her to Huts Point.

9          THE COURT:  I'm sorry, Officer.  She was

10          told if she doesn't make any hits then--

11    A:   Yes, on Craigslist.

12          THE COURT:  Okay.  And what was the second

13          half of the sentence, then what would happen?

14    A:   Then she would be--if she doesn't make any hits

15   then she would be sent to Huts Point.

16          MS. WEIDMANN:  I am objecting to that as a

17          double hearsay statement.

18          THE COURT:  Overruled.

19    Q:   And did this individual also report whether

20   there was anyone else in the apartment?

21    A:   Yes.

22          THE COURT:  I'm sorry.  Would you repeat

23          that, Ms. Verillo?

24    Q:   Did this individual report whether there was

25   anyone else in this apartment?

Ubiqus/Nation-Wide Reporting & Convention Coverage
61 Broadway – Suite 1400, New York, NY 10006
Phone: 212-346-6666 * Fax: 888-412-3655

PL00094

1    A:  Yes.

2    Q:  And what did she say?

3    A:  She stated that there was another female, 17

4  years of age, also currently tied up in the apartment by

5  the name of Gloria.  And there was a 4-year-old child by

6  the name of F.   .  And there was Broadus, Delano, Ms.

7  Bridgeforth, Eric Kirkland, Sarah Housends [phonetic].

8  And if I can utilize my memo book to get the fifth name?

9          THE COURT:  You have something that will

10   refresh your recollection?

11    A:  Yes.

12          THE COURT:  And what is that?

13    A:  It's my memo book.

14          THE COURT:  Very well.

15    A:  And David Fairfax.

16    Q:  Now did there come a time when you--prior to

17  ever having access to the apartment, did there come a time

18  when you learned who lived in the apartment?

19    A:  Yes.

20    Q:  And how is it that you came to know who lived in

21  the apartment?

22    A:  Through the Housing Wheel.

23    Q:  And what is the Housing Wheel.

24    A:  The Housing Wheel is located at 1 Police Plaza.

25  It's a--for this particular instance they retain a record

1   of who lives in the apartments in housing developments.

2       Q:   And is that something that you usually use in

3   your regular course of business as a police officer with

4   PSA6?

5       A:   Yes.

6       Q:   And so who is it that you learned lived in the

7   apartment?

8              MS. WEIDMANN:   Objection.

9              THE COURT:   What's the objection?

10             MS. WEIDMANN:   It's hearsay.

11             THE COURT:   Overruled.

12      Q:   And who did you - - was living in that

13  apartment?

14      A:   Ms. Bridgeforth.

15      Q:   And while you were at the apartment did there

16  come a time when you attempted to gain entry into that

17  apartment?

18      A:   Yes.

19      Q:   And how was it that you yourself or also your

20  colleagues tried to gain access into that apartment?

21      A:   We were using the knocker on the door as well as

22  saying that it's the police we need to open--we need the

23  door open so that we can do a wellness check.  When that

24  failed then we would use out batons to knock louder.  And

25  eventually we called the assistance of the emergency

Case 1:16-cv-00273-WHP-SDA   Doc #: 98-38   Filed 03/03/18   Page 10 of 44 Page ID #: 1509

1    service unit.

2        Q:   Okay.  And did there come a time when you

3    eventually were able to gain access to the apartment?

4        A:   Yes.

5        Q:   To your knowledge how long did it take for NYPD

6    to gain access to the apartment?

7        A:   Lieutenant Gunther was present at the location

8    knocking before I was.  And it probably about an hour,

9    hour and a half total time.

10                MS. WEIDMANN:  Objection.

11                THE COURT:  Were you present at that time?

12       A:   Yes, at the latter part.  Because I also was

13   knocking on the door attempting to have the door open.

14                MS. WEIDMANN:  I think the testimony

15            establishes that the witness doesn't have personal

16            knowledge of the length of time.  He was there for a

17            portion of time.

18                THE COURT:  Officer, are you saying an hour

19            and a half from when until when?  The last thing

20            actually being when the door opened but what was the

21            first thing?

22       A:   The call originally came over much sooner than I

23   had responded because it was originally picked up by the

24   26th Precinct sector.  And they originally went over

25   there.  We also had a unit in the area.  My supervisor

1    Lieutenant Gunther he was at the scene for most of the

2    time as well.

3              MS. VERILLO: Your Honor, I would state

4    that he is - - the original portion of him not being

5    present when they started to gain access, he learned

6    of that knowledge through his business duty.  His

7    officers reported that to him.  And I would state

8    that that would be admissible.

9              MS. WEIDMANN:  What hearsay exception

10    specifically is being applied?  I don't hear that--

11    there's not a general exception that there was a busy

12    duty to report between colleagues.  I think that Ms.

13    Verillo is referring specifically to the rule with

14    respect to business records but that doesn't apply

15    here.

16              THE COURT:  Sustained as to the hour and a

17    half.

18              MS. WEIDMANN:  Your Honor, I would also

19    renew my objection with respect to the statements of

20    the alleged caller based on Officer Sanchez's

21    testimony just now that the call had previously come

22    in to another unit.  I no longer think that it is

23    clear that there was only a 10 to 15-minute time

24    period between when the incident reported and when

25    the alleged caller made these statements.

Ubiqus/Nation-Wide Reporting & Convention Coverage
61 Broadway – Suite 1400, New York, NY 10006
Phone: 212-346-6666 * Fax: 888-412-3655

PL00098

1      MS. VERILLO:  Your Honor, I would note that

2  case law establishes that time is not necessarily the

3  only consideration with regard to hearsay.  I would

4  argue that Officer Sanchez was on the scene in the

5  short amount of time.  The fact that people were

6  there does not necessarily delay the time in which he

7  heard these statements being made.  But I think more

8  importantly his testimony about the declarant's

9  demeanor and how she was acting when those statements

10  were made and to corroborate that where the injuries

11  that were also observed.

12      THE COURT:  I'm maintaining prior ruling

13  which is at this moment denied subject to renewal

14  after the facts are further explored.  I mean I think

15  there are numerous factors, the time, the condition

16  of the declarant.  So as the facts are further

17  developed we may renew your objection.

18      Q:  Officer Sanchez, are you aware--withdrawn.  So

19  turning your attention to what we were previously

20  discussing you had stated that at some point NYPD was able

21  to gain access into the apartment.  Is that correct?

22      A:  Yes.

23      Q:  Okay.  And when you were able to enter the

24  apartment what is that you observed?

25      A:  First we went in to the kitchen then the living

Ubiqus/Nation-Wide Reporting & Convention Coverage
61 Broadway – Suite 1400, New York, NY 10006
Phone: 212-346-6666 • Fax: 888-412-3655

PL00099

1    room and the bedroom and the bathroom in the back.

2        Q:   And first with regard to the kitchen was there

3    anything--can you describe what you saw?

4        A:   The--inside the cabinets and the refrigerator it

5    was just empty, very few food items.

6        Q:   Did you not see any--

7                MS. WEIDMANN: [Interposing] Objection as to

8        relevance.

9                THE COURT:  Overruled.

10       Q:   Did you have an opportunity to look in cabinets

11   and also refrigerator in the kitchen?

12       A:   Yes.

13       Q:   And you stated there was also a bedroom that you

14   were able to observe?

15       A:   Yes.

16       Q:   And what is it that you saw when you went into

17   the bedroom?

18       A:   Some high heels on the floor, two mattresses in

19   the room and a closet full of clothes.  And windows with

20   key locks on them as well as a smaller window on the side

21   of the room that had, like, welded bars on the window.

22       Q:   And were there any other personal items that you

23   observed when you went in the bedroom?

24       A:   Yes, there was Ms. Bridgeforth's medication as

25   well as some handwritten notes.

DIRECT EXAMINATION of R. SANCHEZ BY E. VERILLO     24

1     Q:   And can you--did you have an opportunity to see

2     those handwritten notes?

3     A:   Yes.

4     Q:   And can you describe what you saw?

5             MS. WEIDMANN:  Objection.

6             THE COURT:  Are you asking what the note

7     said or--be more specific.

8             MS. VERILLO:  Yes, Your Honor.

9             THE COURT:  Sustained.

10    Q:   Is there anything else in the apartment that you

11    were able to observe?

12    A:   Yes.  The key locks on the window as well as

13    door sensors on the main door and the bedroom door.

14    Q:   And how were you aware that they were motion

15    sensors?

16    A:   There was a monitor and a hard drive in the

17    living room.  And whenever the door was opened or closed,

18    whether in the--the main door or the bedroom door it would

19    indicate that that particular door was open.

20    Q:   And specifically with regard to your

21    observations of the locks and the bars on the window, in

22    your professional knowledge is that something that you

23    typically see in NYCHA apartment buildings?

24            MS. WEIDMANN:  Objection.

25            THE COURT:  Can you just repeat was it--

1  would you repeat the end of the question?  I didn't

2  hear it.

3         MS. VERILLO:  I asked specifically with

4  regard to what he observed on the window locks and

5  also the bars is that something that you typically

6  see through his professional knowledge working for

7  the NYPD that serves housing developments.  That was

8  a long way to say it.

9         THE COURT:  Maybe you could ask it a

10  different way or restate it.

11         MS. VERILLO:  Okay.

12  Q:   Through your professional knowledge is there--

13  withdrawn.  Is it typical for NYCHA apartments to have the

14  key locks and the welded bars on the window?

15         MS. WEIDMANN:  Objection.

16  THE COURT:  Sustained.

17         MS. VERILLO:  Your Honor, I would state

18  that through the initial testimony we've established

19  that Officer Sanchez has been employed with the NYPD,

20  specifically with PSA6 for seven years.  He serves

21  NYCHA housing developments, in particular the

22  development where this incident occurred.  And it is

23  relevant to the allegations that are in the petition.

24         THE COURT:  Sustained.

25  Q:   And while you were in the apartment did you

1    observe any items that would belong to a child?

2        A:    Just a stroller in the bedroom.

3        Q:    And did there come a time you were aware that

4    there was a child that was in the apartment?

5        A:    Yes.

6        Q:    And do you know what happened to that child?

7        A:    She was transported by Officer Roark with the

8    ambulance to St. Luke's Hospital.

9        Q:    Now did there come a time when the respondent

10   father returned to the apartment that you were at?

11       A:    Yes.

12       Q:    And can you identify in this courtroom the

13   respondent father Mr. Delano Broadus?

14       A:    Yes.

15       Q:    And can you indicate for the Court who that

16   person is?

17       A:    He's sitting to my right-hand side wearing a

18   gray suit, a white shirt and a gray and blue tie.

19               MS. VERILLO:   And I would just ask that the

20       record reflect that the Officer has identified Mr.

21       Broadus.

22               THE COURT:   For the record the Officer has

23       identifying the respondent father.

24       Q:    And at approximately what time did Mr. Broadus

25   come to the apartment?

1      A:    Approximately 7:00 in the morning.

2      Q:    And do you recall if anyone was with him at the

3  time?

4      A:    Yes, Ms. Bridgeforth.

5      Q:    And do you see Ms. Bridgeforth as well in the

6  courtroom?

7      A:    Yes.

8      Q:    And can you indicate who Ms. Bridgeforth is?

9      A:    She's sitting to my right-hand side wearing a

10  gray top, glasses and reddish hair.

11              MS. VERILLO:  Your Honor, I ask that the

12          record reflect that--

13              THE COURT:  For the record the Officer is

14          identifying the respondent mother.

15      Q:    When the respondents came back to the apartment

16  did Mr. Broadus ask about his daughter the subject child

17  F    ?

18      A:    No.

19              MS. VERILLO:  Your Honor, I have no further

20          questions.

21  CROSS EXAMINATION

22  BY MS. JESSICA WEIDMANN

23      Q:    Officer Sanchez, you've testified that the

24  alleged caller told you that inside the apartment was

25  another young woman who was tied up.  When you entered the

26

Confidential Material

1    apartment did you encounter anyone tied or restrained?

2        A:   No.

3        Q:   And when you entered the apartment where was

4    Faith?

5        A:   I did not see F     because I was in the living

6    room.

7        Q:   At no time did you see F    ?

8        A:   No.

9        Q:   And you also never observed chains on the walls

10   of the apartment, is that correct?

11       A:   Correct.

12       Q:   Did you take photos of the apartment?

13       A:   Yes.

14       Q:   When you entered the apartment there were also

15   other adults present, is that correct?

16       A:   Yes.

17       Q:   And to your knowledge the decision to take F

18   to St. Luke's was considered a precautionary measure

19   correct?

20                MS. VERILLO:  Objection.

21                THE COURT:  Did you take F     to St.

22   Luke's?

23       A:   I did not.  Officer Roark did.

24                THE COURT:  Sustained.

25       Q:   Was it your decision for F     to be transported

Ubiqus/Nation-Wide Reporting & Convention Coverage
61 Broadway – Suite 1400, New York, NY 10006
Phone: 212-346-6666 • Fax: 888-412-3655

PL000105

1    to St. Luke's?

2        A:    No.

3                    MS. WEIDMANN:   Just a moment, Your Honor.

4                    THE COURT:   Sure.

5        Q:    Approximately what time of day was it when F

6    was transported out of the apartment?

7        A:    That I couldn't tell you.   Officer Roark took

8    her.

9        Q:    For what period of time were you present in the

10   apartment?

11                   THE COURT:   I'm sorry just - -.

12       Q:    For what period of time were you present in the

13   apartment?

14       A:    I was in the apartment from approximately--the

15   whole incident took place from about 3:00 in the morning

16   to 8:00 in the morning.   But there were also other

17   incidents that happened where I left the apartment to

18   apprehend someone.

19       Q:    So approximately 3:00 a.m. to 8:00 a.m. at the

20   apartment, is that correct?

21       A:    That I was--

22       Q:    [Interposing] That you were present at the

23   apartment.

24       A:    Yes.

25       Q:    Officer Sanchez, did you speak with the District

1    Attorney's Office following this incident?

2         A:   Yes.

3         Q:   And to your knowledge were charges pursued

4    against Mr. Broadus?

5                    MS. VERILLO:  Objection.

6                    THE COURT:  Sustained.

7         Q:   Were you ever called to be involved further in a

8    criminal matter regarding Mr. Broadus?

9         A:   Repeat please.

10        Q:   Were you ever called upon to be further involved

11   in a criminal matter regarding Mr. Broadus?

12                   MS. DELANE:  Objection.

13                   THE COURT:  Sustained.

14                   MS. WEIDMANN:  Let me just have a moment.

15                   THE COURT:  Sure.

16                   [END MAN-PART6_20150513-1441_Part1]

17                   [START MAN-PART6_20150513-1520_Part2]

18                   THE COURT:  Back on the record.

19                   MS. WEIDMANN:  I have no further questions

20        for this witness.  I would ask to renew my objection

21        regarding the statements allegedly made by the

22        alleged caller, Nicola.  The officer testified that

23        when he entered the apartment he did not in fact see

24        someone chained.  The assumption of the exception to

25        the hearsay rule for excited utterances is that a

Confidential Material

1   person would be more likely to be presenting a

2   truthful account under those circumstances but the

3   evidence demonstrates that the statements were not in

4   fact credible.  And based upon that, I would argue

5   that they should not be admissible and are hearsay.

6           THE COURT:  Yes?

7           MS. VERILLO:  Your Honor, I mean I would

8   just respond and say that the key admissibility

9   requirement for excited utterance exception is that

10  the statement must be made while the declarant was

11  under the influence of a startling event.  I think

12  that the description that the officer gave is

13  substantiates that the declarant was as she presented

14  the injury, she was hard to come down, she was

15  screaming, she was crying.  She was very upset.

16  Additionally, Your Honor, there is going to be

17  further testimony that is elicited with regard to the

18  subject child statements that will further

19  corroborate the statements that were made by the

20  declarant.

21          THE COURT:  Anything that any--part one

22  thought I'm having is people should just submit case

23  law on the--I mean, it's a complicated issue what is

24  and what isn't an excited utterance.  The law is not

25  that clear and so again my thought is to ask that the

Ubiqus/Nation-Wide Reporting & Convention Coverage
61 Broadway – Suite 1400, New York, NY 10006
Phone: 212-346-6666 * Fax: 888-412-3655

PL000108

Confidential Material

1    attorneys submit case law prior to the next adjourn

2    date and I'll rule on it.  Again so many of the

3    factual scenarios are so specific to those facts and

4    I think it would be more helpful if people just

5    provided me whatever case law they think is relevant

6    and we could maybe set the same date as for the

7    submission of the records.  I think 5/22.  And again

8    it doesn't have to be a formal memorandum.  Just

9    whatever could be just, you know, a short--you could

10   hand me all your cases or short written okay?  So I

11   would--yes?

12              MS. WEIDMANN:  Your Honor, I do just have

13   one or two additional questions.

14              THE COURT:  Okay sure.

15              MS. WEIDMANN:  - - to know.

16              THE COURT:  Yes, go ahead.

17       Q:   Officer Sanchez, when you first arrived to the

18   case address and spoke with the woman you encountered,

19   that you identified as Nicola, did you stand in close

20   proximity to her?

21       A:   Yes.

22       Q:   And did you smell alcohol on her?

23       A:   Not that I could smell, I didn't notice any

24   smell of alcohol.

25              MS. WEIDMANN:  I have no further questions.

Case 1:16-cv-00273-WHP-SDA   Doc #: 98-38   Filed 03/03/18   Page 23 of 44 Page ID #: 1522

1   CROSS EXAMINATION

2   BY MS. MELISSA FRIEDMAN

3       Q:   Officer Sanchez, you've been working in NYCHA

4   housing for approximately seven years?  Since 2007?

5       A:   No, it's closer to nine.  I have been working

6   with PSA6, Police Service Area 6 since 2007.

7       Q:   Isn't it true that key locked windows and welded

8   windows are not typical in NYCHA housing?

9                   MS. WEIDMANN:  Objection.

10                  THE COURT:  Sustained.

11      Q:   Have you ever seen key locked windows or welded

12  windows in other NYCHA housing?

13      A:   No.

14                  MS. WEIDMANN:  Objection.

15                  THE COURT:  Sustained.

16                  MS. WEIDMANN:  I'm asking that the

17      Officer's response be stricken from the record.

18                  THE COURT:  Granted.

19      Q:   Officer Sanchez, are you familiar with the rules

20  and regulations of NYCHA housing?

21      A:   Yes.

22      Q:   Isn't it true that key locks on windows or

23  welded bars would be fire hazards?

24                  MS. WEIDMANN:  Objection.

25                  THE COURT:  I don't know how I can say that

1   that's relevant.  If somebody has an argument to why

2   it's relevant, either what is common place in NYCHA

3   housing or rules and regulations I could reconsider

4   it.  But--

5           MS. FRIEDMAN:  We argue that it further

6   shows that the complainant was being held captive at

7   the time, the initial Ms. Simms who was spoken to.

8   And also that it's a fire hazard for a 4-year-old

9   child living in the home.

10          MS. WEIDMANN:  Your Honor, that is so

11  entirely speculative.  I mean it requires multiple

12  jumps.  I don't think it establishes a relevant

13  connection between - -.

14          MS. VERILLO:  Your Honor, but I don't think

15  that that necessarily makes the testimony

16  inadmissible.  I think that the Court could then

17  weight the evidence.  It doesn't make his answer

18  inadmissible.

19          THE COURT:  I will sustain the objection.

20  We just changing--do you want to put your appearance

21  on the record or?

22          MS. ASHLEY GEORGER:  Yes please.

23          THE COURT:  Okay.

24          MS. GEORGER:  Ashley Georger [phonetic],

25  Neighborhood Defender Services.

1                    THE COURT:  Okay.

2                    MS. GEORGER:  I'm stepping in and taking one

3       for a few moments here.

4                    THE COURT:  Okay thank you.

5                    MS. WEIDMANN:  No further questions, Your

6       Honor.

7                    THE COURT:  Ms. Verillo?

8                    MS. VERILLO:  Your Honor, I don't have any

9       further questions of this witness.

10                   THE COURT:  Okay.  Officer, thank you very

11      much for your time.  Take care.

12                   OFC. SANCHEZ:  Thank you, Your Honor.  You

13      too.

14                   THE COURT:  Have a good day.  Yes, Ms.

15      Verillo?

16                   MS. VERILLO:  Your Honor, at this time I

17      would call Mr. Joshua Davis to the stand.

18                   THE COURT:  Very well.

19                   THE CLERK:  You're reminded you're still

20      under oath.  Please restate your name for the record.

21                   MR. DAVIS:  Joshua Davis.

22                   THE COURT:  Good afternoon, Mr. Davis.

23                   MR. DAVIS:  Good afternoon.

24                   THE COURT:  Ms. Verillo, you may inquire.

25                   MS. VERILLO:  Thank you.

PROCEEDINGS
Confidential

36

1           J O S H U A   D A V I S, having been first

2       duly sworn, testified as follows:

3   DIRECT EXAMINATION

4   BY MS. ELIZABETH VERILLO

5       Q:   Mr. Davis, where are you employed?

6       A:   I'm employed by the New York City Administration

7   for Children Services.

8       Q:   And in what capacity are you employed there?

9       A:   I'm a child protective specialist.

10      Q:   And are you familiar with the Bridgeforth

11  Broadus family?

12      A:   Yes.

13      Q:   And how is it that this family came to your

14  attention?

15      A:   On October the 9th, 2014, I received an oral

16  report of transmittal from the New York State Central

17  Registrar in regards to incidents involving Ms.

18  Bridgeforth and Mr. Broadus.

19          MS. VERILLO:  Your Honor, at this time, I'd

20      ask that these documents be marked with Petitioner's

21      One and Petitioner's Two.  There are two ORTs.  Would

22      you like me to hand those at the same time?

23          THE COURT:  Okay.

24          MS. VERILLO:  Okay.

25          THE COURT:  The Court will mark them as

DIRECT EXAMINATION OF J. DAVIS BY E. VERILLO 37

1    Petitioner's One and Two for identification and we'll

2    do it chronologically.  If they're the same--

3              MS. VERILLO: [Interposing] Yeah.  They're

4    the same date but there is two different times.

5              THE COURT: Okay.  So I'm going to hand them

6    to the officer and whichever came first in time will

7    be one and the other will be two.

8              MS. VERILLO:  Okay.

9    Q:   Mr. Broadus, can you--I apologize, Mr. Davis.

10   Can you just identify what time both reports came in?

11   A:   The first report was called in by Officer

12   Sanchez at 4:50 a.m.  The second report was called in by

13   an EMS worker P    L    [phonetic] at 6:50 a.m.

14   Q:   And with regard to the first one, you already

15   stated this was called in by Officer Sanchez and can you

16   just state where he is employed?

17   A:   Oh Officer, it says Officer Sanchez is employed

18   by the New York City Police Department Public Service area

19   six.

20   Q:   And who is this report with regard to?

21   A:   The report is regard--is in regards to Ms.

22   Bridgeforth and Mr. Broadus.

23             MS. VERILLO:  Your Honor, I would ask at

24   this time that Petitioner's One be admitted into

25   evidence.

Ubiqus/Nation-Wide Reporting & Convention Coverage
61 Broadway – Suite 1400, New York, NY 10006
Phone: 212-346-6666 * Fax: 888-412-3655

PL000114

DIRECT EXAMINATION OF J. DAVIS BY E. VERILLO 38

1    MS. WEIDMANN:  Your Honor, I am objecting to

2    the narrative and miscellaneous information portions

3    of the ORT on hearsay basis.

4    THE COURT:  Would you just hand me the--

5    thank you. On both of them or--both?

6    MS. WEIDMANN:  Well I think only one has

7    been moved into evidence but I will have the same

8    objection to Petitioner's Two.

9    THE COURT: Okay.

10   MS. VERILLO:  Your Honor, the caseworker did

11   already identify that the second report was called in

12   by a mandated reporter so I would ask at the time

13   that be admitted into evidence as Petitioner's One.

14   THE COURT:  Okay.

15   MS. WEIDMANN: Your Honor, under the case

16   law, - - it is not sufficient just for the reporter

17   to be a mandated reporter.  There has to be a

18   [Background Noise] of a business duty to report and

19   that is not indicated by the record.

20   THE COURT:  So let's just do them one at a

21   time.  I'm sorry there is one at 4:50. So why don't

22   we talk about the one at 4:50 first.  And that will

23   be one for identification.  And the other will be two

24   for identification.  And so the narrative portion and

25   Ms. Verillo, you're saying that since it came from a

**Ubiqus/Nation-Wide Reporting & Convention Coverage**
61 Broadway – Suite 1400, New York, NY 10006
Phone: 212-346-6666 • Fax: 888-412-3655

PL000115

DIRECT EXAMINATION of J. DAVIS BY E. VERILLO 39

1   police officer that it's satisfies the--

2          MS. VERILLO: [Interposing] Yes, Your Honor,

3   under 1046 that these documents are admissible into

4   evidence as they have come from mandated reporters.

5   And that the Court can weigh the--can read that the

6   narratives that are in these documents and weigh the

7   evidence in its final determination but that

8   ultimately these documents are admissible into

9   evidence.

10          MS. WEIDMANN:  Your Honor, I think it's

11   clear what the statements themselves are information

12   which may or may not have been obtained through

13   investigation by all--with other sources.  And there

14   is nothing in the statements that indicate the

15   identity of those sources or that they had a business

16   duty to report.  Or fit into any other hearsay

17   exception.

18          THE COURT:  Well okay so that's again I'm

19   just looking at the one that's been marked as

20   Petitioner's One for identification.  And the first

21   sentence, the first sentence seems to contain legal

22   conclusions and a factual assertion that--because my

23   thought would be to strike the first sentence and I

24   guess I want to hear everybody's response but I think

25   the second sentence about the woman being handcuffed.

DIRECT EXAMINATION OF J. DAVIS BY E. VERILLO  40

1   I believe the officer certainly could have, I mean, I

2   believe the officer made that observation.

3            MS. WEIDMANN:  Your Honor, the officer

4   actually specifically testified that he did not make

5   that observation, that there was not a woman

6   handcuffed when he entered the apartment.  And so I

7   think that actually--

8            THE COURT: [Interposing] You're right.

9            MS. WEIDMANN: --is clearly not based upon

10  personal knowledge.

11           THE COURT:  You're right.  You're right.

12           MS. MITTLER:  Your Honor, however the

13  officer is a mandated reporter.  He had to call in--

14           THE COURT: [Interposing] Right.

15           MS. MITTLER: --this report.

16           THE COURT:  No, I agree.  I agree.  He did--

17  so I think--

18           MS. WEIDMANN: [Interposing] Your Honor, I

19  apologize--

20           THE COURT:  No wait, let me just--

21           MS. WEIDMANN:  Oh I'm sorry.

22           THE COURT: --it's like a foster parent or

23  any other, I think.  But it doesn't satisfy if--so no

24  foundation has to be laid but I think - - still

25  applies.  I think 1046 allows the document to come

Ubiqus/Nation-Wide Reporting & Convention Coverage
61 Broadway – Suite 1400, New York, NY 10006
Phone: 212-346-6666 • Fax: 888-412-3655

PL000117

DIRECT EXAMINATION OF J. DAVIS BY E. VERILLO 41

1    in.  But I don't think that every wording that comes

2    in.  And I think that everything in it has to somehow

3    satisfy some hearsay objection.  I agree that the

4    police officer has a duty to report.  But I think the

5    police officer saying that the parents we rerunning

6    an illegal prostitute ring inside the home, what

7    wasn't consistent with his testimony.  It's not clear

8    what the basis for that assertion is.  And again, I

9    think it still has to satisfy certain basic

10   requirements under Leon R-R and the rest of those

11   cases.  So wait, let me just finish though and then

12   everybody can tell me and say whatever they want.

13   And again, I agree it says the adults had a woman

14   handcuffed to a radiator that wasn't based on his

15   observations.  So it's not clear what it's based on.

16   And it would have to be based on for example, an

17   assertion by a fellow police officer.  But it's not

18   clear that that is and additionally, the portion of

19   the sentence that says there is sexual content

20   happening in the presence of a child, again is not

21   consistent with his testimony and so it--like all of

22   it has to satisfy each statement has to be part of

23   the authorized chain.  So I don't know if for example

24   another officer said sexual content was happening.

25   Or if it was some other source of the information.  I

DIRECT EXAMINATION OF J. DAVIS BY E. VERILLO 42

1    think that is out.  Then it is unknown if the child

2    had been directly involved in the sexual content.  I

3    mean that could come in whatever it means.  And then

4    under miscellaneous information, the current location

5    of the parents is unknown.  That could come in.  At

6    that point the officer says the police are searching

7    for the adults, that could come in.  There were two

8    homeless adults in the home when the police arrived.

9    That could come in.  They are not PLRs.  There are no

10   safety concerns for--I don't know what L-C-P-S means.

11   Is that--

12            MS. VERILLO: [Interposing] Your Honor?  Oh.

13            THE COURT:  And then there is an open case.

14   Again and I don't know what that means.  So that

15   would be my thought.  I don't think I'm explaining

16   this well but everybody knows what I mean.  So a

17   police officer can of course describe anything that

18   he observed.  The police officer could explain what

19   he was told by another mandated source.  Or if

20   another mandated source told another mandated source

21   who told the police officer, that could come in.  But

22   where it's not at all clear what the basis of

23   knowledge is, I believe I'm required to exclude that

24   despite the fact that the report itself comes in and

25   under 1046.  That's my understanding.  I'm totally

DIRECT EXAMINATION OF J. DAVIS BY E. VERILLO 43

1    open to hearing any argument to the contrary.

2            MS. VERILLO:  Your Honor, I believe that the

3    basis for the prostitution statement and the sexual

4    content would have to do with the statement made to

5    him outside of the home, which Officer Sanchez he

6    heard directly where the woman Ms. Simms stated that

7    if she was not having enough hits on Craigslist, she

8    would then be sent elsewhere.  Those hits on

9    Craigslist obviously reference selling the photos of

10   her for advertising them.  And then--and sending her

11   to Huts Point after that.

12           MS. WEIDMANN:  Your Honor, first I don't

13   think that that's clear.  That requires Johnson

14   conclusions but as to what those statements may or

15   may not have meant.  But again, those were not

16   statements by another individual with a business duty

17   to report and that that chain that is required by the

18   case law.  I'd also argue that the statement, there

19   were two homeless adults in the home.  The fact that

20   adults were observed in the home, I see that, Your

21   Honor, might permit that.  However, there is status

22   as homeless adults.  Again I don't know how that

23   information would be gained other than from a hearsay

24   source.

25           THE COURT:  I think that actually so that

DIRECT EXAMINATION OF J. DAVIS BY E. VERILLO  44

1  could be if there are two homeless adults and the

2  officer says who are you.  And they say I'm a

3  homeless adult.  Then it would be hearsay.  So I

4  really, I mean, I think the officer's testimony about

5  what was said to him was what was said to him.  But

6  anyway, so that's my conclusion.  So I'm just going

7  to sentence number one, I would say is out.  Sentence

8  number two is out.  Sentence number three is in.

9  It's the location of the parents being unknown is in.

10  And the police searching, that can come in.  I agree

11  with this, with the--with defense counsel's assertion

12  about the homeless adults and would say that that's

13  out.

14          MS. VERILLO:  Your Honor, I mean I cannot--

15  the fact that two adults were seen in the home, I

16  think that's certainly that observation can come in.

17  I understand--

18          THE COURT:  [Interposing] I mean I--

19          MS. WEIDMANN:  [Interposing] Your Honor--

20          MS. VERILLO:  --I mean I am arguing that the

21  whole narrative can come in.  I'm following the

22  Court's decision.  I think that the observation of

23  two adults being in the home is something that should

24  still remain in the report.

25          THE COURT:  So you mean so that there were

Ubiqus/Nation-Wide Reporting & Convention Coverage
61 Broadway – Suite 1400, New York, NY 10006
Phone: 212-346-6666 • Fax: 888-412-3655

PL000121

DIRECT EXAMINATION OF J. DAVIS BY E. VERILLO  45

1    two adults, that's fine.  There were two adults in

2    the home.  I mean that's an observation the officer

3    could have made without--

4              MS. WEIDMANN: [Interposing] It's the

5    characterization of the adults--

6              THE COURT: [Interposing] Yeah.

7              MS. WEIDMANN: --that I'm objecting to.

8              THE COURT: I understand.  And I think I

9    would remove, so I would remove the word homeless.

10   They are not PLRs although it's a legal conclusion.

11   He's a police officer and then it's worth what it's

12   worth.  So I would--I guess I would allow it in.

13             MS. WEIDMANN:  I mean again I don't know how

14   the officer even knows their identity, let alone

15   their relationship, their legal relationship to the

16   child.  Other than through a hearsay source.

17             THE COURT: But I think he could reach that

18   conclusion.  I mean in some sense everything that

19   everybody says is in some way traced back to hearsay.

20   But I think the fact that they're not PLRs, I think

21   he could reach that conclusion.

22             MS. WEIDMANN:  Whether a person is a person

23   legally responsible for a child is an in-depth

24   inquiry that a court goes through, what, you know,

25   are they living with the child--

DIRECT EXAMINATION OF J. DAVIS BY E. VERILLO 46

1    THE COURT: [Interposing] Right, I mean I

2    wouldn't--

3    MS. WEIDMANN: --are they providing

4    financial--

5    THE COURT: [Interposing] I agree.

6    MS. WEIDMANN: --for all of those things.

7    THE COURT: I agree.

8    MS. WEIDMANN: And that is all information

9    that would not be obtained other than through the

10   individual.

11   THE COURT: Right, I mean, I agree in a

12   sense but I think, I don't, I'm not taking it for the

13   therefore I am concluding they're not PLRs. But I

14   think the sentence still comes in. And there are no

15   safety concerns, I don't know what it means there are

16   no safety concerns for L-C-P-C. I just--I'll let it

17   in or not but I don't know what it means. And then,

18   and I don't know what the final sentence means but

19   I'm also can let that in. So I think that about the

20   first one. And the child was transported to St.

21   Luke's. And the second one I think we'll get to

22   faster already. No, maybe not. 911 call was

23   received. Okay. I would allow that in. And then

24   the police responded and again whatever this sentence

25   means, they resolved an unknown matter. Okay. F.

Ubiqus/Nation-Wide Reporting & Convention Coverage
61 Broadway – Suite 1400, New York, NY 10006
Phone: 212-346-6666 * Fax: 888-412-3655

PL000123

DIRECT EXAMINATION OF J. DAVIS BY E. VERILLO 47

1   was in the apartment with these three people.  I

2   guess that comes in.  The next sentence about it

3   being unclear about the relationship, I mean again I

4   don't think this goes anywhere but I would allow this

5   in unless there is some particular objection to a

6   particular part of it.

7            MS. WEIDMANN:  Your Honor, just the--

8            THE COURT: [Interposing] Yeah.

9            MS. WEIDMANN: --I believe there is also case

10  law with respect to when statements in an ORT are so

11  vague.

12           THE COURT: Mm-hm.

13           MS. WEIDMANN:  And I do think that this

14  falls under that category.

15           THE COURT:  Which one?  Show me where you

16  mean.

17           MS. WEIDMANN:  Well--

18           MS. MITTLER:  Your Honor, however we have to

19  object because we don't have that case law.  Unless I

20  mean can provide it--

21           MS. WEIDMANN: [Interposing] I - - provide, I

22  think one of the cases is Imani O. and the--

23           THE COURT: [Interposing] No I mean I think

24  that's true of all business records that if it's not

25  clear, it has to be clear what it is.  I mean I could

Case 1:16-cv-00273-WHP-SDA   Doc #: 98-38   Filed 03/03/18   Page 38 of 44 Page ID #: 1537

1    find that in a minute.  So if the description is too

2    vague or can't be read or can't be deciphered, it

3    doesn't come in.  But tell me what you're thinking of

4    in particular here.

5              MS. WEIDMANN:  Just the it is believed that,

6    I mean, that's me--maybe it doesn't matter because

7    it's really meaningless.

8              THE COURT:  Yeah I agree.

9              MS. WEIDMANN:  But…

10             THE COURT:  Yeah I agree.  But I think it

11   comes in.  I mean whatever it, I don't know where it

12   doesn't mean very much.  So this comes in.  Okay.

13   Now further questions?

14             MS. VERILLO:  Okay.

15             [Whereas Petitioner Exhibit 1 was entered

16   into evidence]

17             [Whereas Petitioner Exhibit 2 was entered

18   into evidence]

19   Q:   Mr. Davis, when you received these reports, did

20   you conduct a child protective investigation?

21   A:   Yes.

22   Q:   And what did you do first?

23   A:   So the report was called in the early morning

24   hours as we already stated around 4:50 a.m.  So someone

25   from emergency children services that wasn't - - went to

DIRECT EXAMINATION OF J. DAVIS BY E. VERILLO 49

1    the hospital with F___. And met F__ at the hospital.

2    After that, I got the--it was reported to me, I got it and

3    I spoke to F___ that--on the evening of on the 9th of

4    October.

5        Q:    Okay.  And how old was F__ when you met her?

6        A:    She was two years old, maybe two years and three

7    months.

8        Q:    Was--do you recall her birthdate?

9        A:    I do not.

10       Q:    Is there anything that would refresh your

11   recollection?

12       A:    Yeah, on the Oral Report Transmittal.

13             THE COURT:  Sure, go ahead.  For the records

14       she is handing the witness the documents previously

15       marked as Petitioner's 1 and 2.

16       Q:    Is your recollection refreshed?

17       A:    Yes, the child was three years old.

18       Q:    Okay.  And when you met F__ did you have an

19   opportunity to speak with her?

20       A:    Yes, F__ was at the New York City

21   Administration for Children Services Children's Center

22   downtown.  I had never met F__ before.  So I had a

23   female staff member assist with me because we--I didn't

24   really know exactly you know her being comfortable with

25   another person.  So I spoke to her.  I asked her a couple

**Ubiqus/Nation-Wide Reporting & Convention Coverage**
61 Broadway – Suite 1400, New York, NY 10006
Phone: 212-346-6666 * Fax: 888-412-3655

PL000126

DIRECT EXAMINATION OF J. DAVIS BY E. VERILLO 58

1      A:   [Interposing] I don't remember the specific

2  words he--I believe he called me a snake.

3            THE COURT: Okay.  I guess sustained to the

4       extent that it appears to be speculation about the

5       father's state of mind.

6            MS. VERILLO: I have no further questions.

7  CROSS EXAMINATION

8  BY MS. WEIDMANN

9      Q:   Mr. Davis, when this case was initially assigned

10  to you, was it reviewed by yourself and to a team or

11  supervisors?

12     A:   Yes.

13     Q:   What is I-R-T enhancement mean?

14     A:   I-R-T is a, I don't remember the specific--it's

15  an acronym.  I don't remember the specific words.  what

16  happens if there is any sexual, allegation of sexual abuse

17  or severe physical abuse, it's enhanced to work with

18  together with the police department.

19     Q:   And it's true in this case that the case did not

20  qualify for I-R-T enhancement correct?

21     A:   That is not my call to make.  I don't know if it

22  was enhanced or not.  We have a specific team that works

23  with that.

24     Q:   Is there something that would refresh your

25  recollection?

CROSS-EXAMINATION OF J. DAVIS                     59
BY MS. WEIDMANN

1          MS. VERILLO:  Your Honor, I am going to

2     object to this.  I don't see how it's relevant.  Also

3     I don't think that Mr. Davis already testified that

4     he is not aware of whether this determination was

5     made or how it was made.

6          THE COURT:  I'm also I'm a little--I'm not

7     sure what subject we're on but is this relevant?

8          MS. WEIDMANN:  Well there are allegations

9     that a child was exposed to some type of sexual

10    behavior.  And this is a determination as a case

11    planner, case--child protective specialist testified

12    as to whether there was sufficient evidence of sexual

13    abuse to proceed in a particular manner.

14         THE COURT:  Will you just repeat the

15    question?

16         MS. WEIDMANN:  While the question, the

17    initial question was it true that the case did not

18    qualify for IRT enhancement.

19         THE COURT:  Okay.

20         MS. WEIDMANN:  The witnesses said he didn't

21    know.  I asked if something would refresh his

22    recollection.

23         THE COURT:  I don't know if he said he

24    didn't remember.  I think he said he didn't know.  So

25    do you want to just clarify that?  I mean, also--

CROSS-EXAMINATION OF J. DAVIS            60
BY MS. WEIDMANN

1    Q:   [Interposing] Were you at the time aware of

2  whether the case qualified for I-R-T enhancement?

3    A:   At what time?  What do you mean?

4    Q:   At the time that the case was assigned to you

5  and you discussed it with your supervisor.

6    A:   When it was assigned to me on the 9th of

7  October, 2014, I was not aware of that it met the criteria

8  for that.

9    Q:   And at any time subsequent to that during the

10  course of your investigation?

11    A:   Did it meet the criteria?

12    Q:   Yes.

13    A:   No.

14         MS. VERILLO:  Object--Your Honor, I'm going

15  to object to this.  I don't see how this is relevant.

16         THE COURT:  It's sustained.  I also don't

17  know--are you going to call somebody to testify about

18  what I-R-T enhancement means and--

19         MS. WEIDMANN: [Interposing] He testified as

20  to what it meant.

21         THE COURT:  And just what the criteria are

22  and what the process of evaluation is.  And--

23         MS. WEIDMANN: [Interposing] Well I would if

24  this witness could establish that.  I can move on if

25  that is not--

CROSS(Continued)EXAMINATION OF J. DAVIS          61
BY MS. WEIDMANN

1          THE COURT: [Interposing] I mean I think you
2      said you don't know.
3      A:    I don't know what the exactly the criteria is.
4  It's a two over years to work in conjunction with the
5  police department.  When it comes to allegations of sexual
6  abuse or severe physical abuse.
7          THE COURT:  Okay.  And you don't know about
8      how the decision was made in this case?
9      A:    Well when it is enhancement I-R-T, we have a
10  detective assigned.  And then we have a joint
11  investigation.
12          THE COURT:  Okay.  Okay.
13      A:    Now that I'm thinking about it, there was never
14  a detective assigned to this case so it never met the
15  criteria.
16          THE COURT:  Okay.
17          MS. WEIDMANN: Okay.
18          THE COURT:  That answers it right?
19          MS. WEIDMANN:  That's sufficient.  I'll move
20      onto the next.
21          THE COURT:  Okay.  Okay.
22      Q:    You testified that you interviewed Faith on
23  October 9th, 2014.  Do you recall the approximate time of
24  that interview?
25      A:    Yeah 6:00 p.m.

Ubiqus/Nation-Wide Reporting & Convention Coverage
61 Broadway – Suite 1400, New York, NY 10006
Phone: 212-346-6666 * Fax: 888-412-3655

PL000138

CROSS-EXAMINATION OF J. DAVIS                    62
BY MS. WEIDMANN

1     Q:   And that was the same day that F        had been

2     removed from her home in the early hours of that day?

3     A:   Correct.

4     Q:   And you had an opportunity at that time to

5     observe F      's physical appearance correct?

6     A:   Yes.

7     Q:   And you observed no physical sign of harm to

8     F    ?

9     A:   No.

10    Q:   You never actually observed Faith with Mr.

11    Robins correct?

12              THE COURT:  I'm sorry, I just didn't hear

13        it.

14    Q:   You never actually--you never observed F

15    with Mr. Robins correct?

16    A:   Correct.

17    Q:   And when you spoke with F     , she stated that

18    she was familiar with an individual by the name Sarah,

19    correct?

20    A:   Familiar?  I don't know what you mean by that.

21    Q:   She knew someone named Sarah?

22    A:   Yes.

23    Q:   She referred to someone named Sarah?

24    A:   Yes.

25    Q:   And she said that was someone who she knew had

Ubiqus/Nation-Wide Reporting & Convention Coverage
61 Broadway – Suite 1400, New York, NY 10006
Phone: 212-346-6666 * Fax: 888-412-3655

PL000139