Exhibit 53

Sanchez Testimony

<u>People v. Manzano</u>

SANCHEZ - DIRECT - WARSHAWER

1          MR. WALTERS:  Objection to what he believes.

2     Speculation.  Objection.

3          THE COURT:  Sustained.

4     Q.   Please just tell us what you saw, Officer Sanchez.

5          Did you at some point lose sight of Officer Holland?

6     A.   Yes.

7     Q.   What direction was he going in before you lost sight

8     of him?

9     A.   All I remember is he was pulling, he was pulling the

10    defendant.  He was pulling him back like towards the curb.

11    Q.   Towards the sidewalk?

12    A.   Yes.

13    Q.   You have now described that you again confronted the

14    defendant as he made what you were calling an aggressive

15    gesture.

16         Can you please describe what happened after that?

17    A.   After that I was trying to maintain control of him by

18    holding his upper arms and he was -- he was trying to swing at

19    me but my left arm continued to pare, but he couldn't get full

20    range of motion.

21         So all of a sudden I felt a tug on the right side of

22    my body and the next thing I know my firearm is diagonally to

23    the right of me behind the defendant.

24    Q.   When you felt this tug, where were you looking?

25    A.   Where I was looking exactly, I couldn't tell you.

SMD

<u>Officer Sanchez – Direct – People</u>                    43

1          MR. WARSHAWER:  May I, Judge?

2          THE COURT:  Yes, you may.

3     Q    Officer Sanchez, we have gotten to the point you now

4  see your weapon on the ground.  Can you tell us what happened

5  after that?

6     A    After I saw my weapon on the ground, I knew I needed to

7  re-holster it as soon as possible.  I started seeing a crowd

8  form up around myself and the defendant, so I managed to place

9  the defendant off balance and we both fell to the ground face to

10  face, me being on the ground and the defendant over me.

11          So, at this point the defendant, he's kneeling kind of

12  hovering over me and I still have some control, so with my left

13  hand on his upper right arm and I'm trying to reach with my

14  right arm towards my firearm, he looks back towards the firearm

15  and starts to head in that general direction where I pull him

16  closer to me to try to reach my firearm.

17          My grip loosened up on his upper right arm and he was

18  able to stand, stand his body up erect a little bit more

19  managing to actually hit me in the face on my left side of the

20  chin with his right fist.  I brought him in closer, managed to

21  recover my firearm.

22          At which point I was attempting to place my firearm in

23  the holster.  Since my grip had loosened up, the defendant now

24  stood kneeling down erect over me attempting to swing again at

25  my face while I'm on the ground my back on the sidewalk.  So, at

<u>Officer Sanchez - Direct - People</u>                    46

1   with the assistance of some other officers, placed him under

2   arrest by placing handcuffs on him.

3       Q    I am sorry to jump back a little bit.  Which hand did

4   you have your weapon in?

5       A    I had my weapon in the right hand.

6       Q    Which side of the head would you say you struck the

7   defendant on?

8       A    On the left side.

9       Q    You made what gesture with your hand?  Is that just

10  behind the ear?

11      A    I believe when I struck him, just behind the ear.

12      Q    Do you know approximately how many times you struck the

13  defendant with your hand once you got the gun back?

14      A    I struck him once and then he paused and he tried to

15  strike me again and the second time that I struck him I don't

16  know how many times I hit him.

17      Q    Do you know about how long you were on the ground once

18  you got your firearm back in your hands?

19      A    Once I got the firearm back, I don't know how long I

20  was on the ground.

21      Q    You said there was a period before you struck the

22  defendant a number of times with the gun he went forward?

23      A    He raised his head, looked forward, went to stand up

24  and then fell forward over me.

25      Q    What did you do immediately after that?

Officer Sanchez - Direct - People                54

1     A     No.

2     Q     Were any of these pictures taken at the hospital before

3  you went to the precinct?

4     A     No.

5     Q     Were any photos taken at the precinct?

6     A     No.

7     Q     Were any photos taken at the hospital?

8     A     No.

9     Q     Where were these photos taken?

10    A     They were taken at home.

11    Q     Who took these photos?

12    A     I did.

13    Q     You set up a tripod to take these pictures?

14          MR. WARSHAWER:  Objection.  This is voir-dire.  He

15  can cross later.

16    Q     You held a camera and took pictures of your various

17  parts of your body?

18    A     Yes.

19    Q     You are not sure?

20    A     I used a camera.  I don't believe I used a cell phone--

21  a tripod I mean.

22    Q     You held the camera out in your hand?

23    A     Yes.

24    Q     And took pictures?

25    A     Yes.

PL530

<u>Officer Sanchez - Direct - People</u>                55

1    Q    And was anyone around you when you did this?

2    A    No.

3    Q    Any dates on these?

4    A    I'm not sure.  They were sent immediately after when I

5    got home because Officer Rourke she needed the photos so I took

6    the pictures and e-mailed it to her with the NYPD e-mail that

7    she had.

8    Q    There are no dates on these?

9    A    Not that I can see.

10   Q    There is no e-mail insignia on these?

11   A    That you would have to ask her.

12            MR. WALTERS:  Your Honor, I have no objections to

13       these photos.

14            THE COURT:  No objection to them coming in?

15            MR. WALTERS:  No, your Honor, for whatever it is

16       worth.

17            THE COURT:  We will mark them later.

18            (People's Exhibits 1 through 10 were received in

19       evidence, today's date.)

20   DIRECT EXAMINATION (Continued)

21   BY MR. WARSHAWER:

22   Q    Officer Sanchez, you discussed one of those injuries

23   which related to your knee?

24   A    Yes.

25   Q    Can you discuss these later injuries following the days

<u>Officer Sanchez -Cross - People</u>                     94

1  long did that last?

2      A    When the individual in the vehicle approached us around

3  3:45 and I was in the ambulance, maybe around like 4 a.m. or

4  4:15 a.m.

5      Q    About twenty minutes?

6      A    I believe so.

7      Q    The point in time the anonymous contacted you, you get

8  right to the scene, it is no more than four or five seconds;

9  isn't that right?

10     A    How many seconds, I couldn't tell.

11     Q    How long would it take in a speeding police car to go,

12 I don't know, half a block, how long would that take, literally

13 seconds?

14     A    A few seconds.

15     Q    A few seconds, okay.

16          You get out of your car and you grab Mr. Manzano,

17 right?

18     A    Correct.

19     Q    How long were you rolling around on the ground fighting

20 Mr. Manzano?

21     A    I don't know.

22     Q    Could you estimate?

23     A    No, I cannot.

24     Q    So, you are telling this jury, no, you can't really

25 estimate how long the whole rolling around thing took until the

<u>Officer Sanchez –Cross – People</u>                95

1   time he was handcuffed, right?  You are telling this jury you

2   don't know how long this was?

3       A    We just said like about fifteen or twenty minutes

4   because the individual came around 3:40, 3:45 and I was in the

5   ambulance approximately around 4 a.m., 4:15 or so.

6       Q    So, in other words, you were on the ground -- you were

7   on that ground with Mr. Manzano in these maybe one or two

8   incidents for fifteen minutes?

9       A    I would say so between that time frame.

10      Q    Sir, you were on the ground with Mr. Manzano rolling

11  around in the street for about fifteen minutes by yourself,

12  right?

13      A    I was struggling with the defendant by myself, yes.

14      Q    And of that fifteen minutes, Officer Holland came to

15  your rescue, what, three seconds to pull Mr. Manzano off, one

16  second, two seconds, three seconds and the rest of the time your

17  partner didn't come to your rescue for ten, fifteen minutes

18  while you are on the floor; is that what you are telling this

19  jury?

20      A    What I am saying is I was preoccupied with the

21  defendant, most likely.  I can't speak for Officer Holland, he

22  was probably preoccupied with the other individual.

23      Q    While you are on the floor, police car lights on,

24  fifteen minutes no Mr. Holland -- no Officer Holland, no other

25  policemen are remotely concerned about you and what is going on?

1    Q    Was there that struggle he can't pull him, he is

2  pulling and pushing, he is pulling and pushing?

3    A    He is pulling him.

4    Q    He pulled him and pulled him up, that's it, that's five

5  seconds, right?

6    A    If you want to say five seconds, sure.

7    Q    Your recollection is what we are talking about in this

8  courtroom.

9         When Officer Holland came to help you, he pulled Mr.

10  Manzano up off you?

11   A    Yes.

12   Q    Do you know how long that took?

13   A    No.

14   Q    When he pulled Mr. Manzano up, did he have his baton

15  out?

16   A    Not that I could see.

17   Q    When he started striking Mr. Manzano with the baton

18  about the head, did you see?

19        MR. WARSHAWER:  Objection, Judge.  There is no

20     testimony about this at this point.

21        THE COURT:  Sustained.

22   Q    Did you ever see Officer Holland striking Mr. Manzano

23  about the head and the body with a baton or an asp or some kind

24  of billy club about the head?

25   A    No.

1      Q    And is that because you had tunnel vision and you just

2  didn't see anything except the back of Mr. Manzano's head?

3      A    During which incident?

4      Q    Well, we are talking about two incidents.  We are

5  talking two?

6      A    One in the street and one on the sidewalk.

7      Q    Okay.  Let's deal with the street.  In the street, Mr.

8  Manzano, according to you, grabbed your testicles?

9      A    When Officer Holland was pulling him off.

10     Q    Grabbed your testicles, right?

11     A    Yes.

12     Q    And administered some pain to you, right?

13     A    Yes.

14     Q    Wasn't even looking at you, just reached behind and

15  grabbed your testicles, right?

16     A    Yes.

17     Q    And you screamed; didn't you?

18     A    Yes.

19     Q    And Officer Holland just walked away, is that your

20  testimony, with you screaming in excruciating pain, Officer

21  Holland walked away from you and you didn't see him again until

22  a couple of minutes later while Mr. Manzano is squeezing your

23  testicles; is that your testimony, sir?

24     A    He didn't walk away, he went to engage someone else on

25  the sidewalk.

1   repeatedly punched you in the face?

2          MR. WARSHAWER:  Objection, Judge, it's for the

3   jury to remember what they heard yesterday.

4          THE COURT:  Sustained.

5   Q.   You told this jury that Mr. Manzano repeatedly punched

6   you in the face; right?

7   A.   Yes.

8   Q.   And by that you mean that he grazed you while you were

9   holding his arms, (indicating); right?  While you're holding his

10  arms, he grazed you; right?

11  A.   At one instance, yes.

12  Q.   While you're holding his arms; right?

13  A.   Yes.

14  Q.   And in another instance he actually got a full swing

15  and hit you dead on; right?

16  A.   Yes.

17  Q.   And was your face swollen?

18  A.   No.

19  Q.   Did you tell anyone that you had a swollen face?

20  A.   No.

21  Q.   Now, you testified to this jury - and I tried to

22  demonstrate as best I could - that on both times that you had

23  physical contact with Mr. Manzano, you fell backwards with him;

24  correct?

25  A.   Yes.

                              A. L.

138

SANCHEZ - CROSS - WALTERS

1  Q.   But somehow the construction of this case is that --

2           MR. WARSHAWER:  Objection, Judge, construction of

3  what?

4           MR. WALTERS:  That's bad wording there.

5           THE COURT:  Rephrase your question.

6           MR. WALTERS:  Yes, indeed.

7           THE COURT:  Sustained.

8           MR. WARSHAWER:  Thank you.

9  Q.   You injured your knee but your knee never made contact

10 with the ground, only your hind part, correct?

11 A.   Yes.

12 Q.   Now, while you are, on both occasions, holding Mr.

13 Manzano, did you all ever roll?  You know what rolling means,

14 right?

15 A.   Yes.

16 Q.   Did you all ever roll over or was it merely just on

17 the back, grab, on the back, hug?

18      Was there any rolling going on?

19 A.   No.

20 Q.   That was a no, wasn't it?

21 A.   Yes.

22 Q.   And if Officer Holland says that you all were rolling

23 on the ground, Officer Holland is either making that up or he is

24 mistaken, correct?

25 A.   I can't tell what Officer Holland -- I don't know what

SMD

PL614

143

SANCHEZ - CROSS - WALTERS

1   what I saw was two individuals hitting an individual on the
2   ground.
3       Q.   And if Officer Holland saw something totally and
4   utterly different, he would be mistaken or you would be
5   mistaken?
6               MR. WARSHAWER:  Objection, Judge.  The
7       prospective testimony of someone else, what are we doing?
8               THE COURT:  Sustained.
9       Q.   Now, you went to the hospital at St. Luke's, right?
10      A.   Yes.
11      Q.   And you went the hospital at St. Luke's after you
12  helped get Mr. Manzano in an ambulance where you saw him
13  bleeding profusely, correct?
14      A.   After I got him onto the stretcher.
15      Q.   Right.  That's the only time that you saw that he was
16  bleeding?
17      A.   No.  I saw that he was bleeding after I hit him and he
18  fell over me and I got up, reholstered my firearm and noticed
19  that there was blood on my forearms.  And I looked at the
20  defendant and noticed that there was blood on the back of his
21  head.
22      Q.   Well, you just now, two seconds ago, said you hit him,
23  you saw blood, right?
24           But in truth of fact, you hit him multiple times, so
25  many times with the butt of that gun you can't even count the

SMD

SANCHEZ - CROSS - WALTERS

1   number of times that you struck him on the back of his head;

2   isn't that right?

3        A.   I can't recall the amount of times that I struck him.

4        Q.   Because we use the word multiple times, right?

5        A.   Yes.

6        Q.   And it wasn't enough to just strike him on the back of

7   the head with a heavy metallic object.  You did it multiple

8   times, right?

9        A.   To get him off me, yes.

10       Q.   And where was Officer Holland?

11       A.   I do not know.

12       Q.   You went to the hospital at St. Luke's, right?

13       A.   Yes.

14       Q.   And you told them about your ailment, right?

15       A.   Yes.

16            MR. WALTERS:  Your Honor, I ask that the

17       certified medical records from St. Luke's Hospital be

18       received in evidence as Defense D in evidence.

19            MR. WARSHAWER:  For purposes of certification we

20       should probably use the original.

21            THE COURT:  Yes.

22            Any objection?

23            MR. WARSHAWER:  I join in that application to

24       enter them under CPLR 45.18; self-authenticating.

25            (Whereupon, Defendant's Exhibit D, is received in

SMD

145

SANCHEZ - CROSS - WALTERS

1    evidence, as of this date.)

2    Q.   I am sorry, Officer --

3    A.   Yes.

4    Q.   -- did you tell your fellow officer Rourke that as a

5    result of what happened with Mr. Manzano, that your face was

6    swollen?

7    A.   No, I told her that he hit me on my left chin.

8    Q.   Was your face swollen?

9    A.   Not that I recall.  I don't believe so.

10   Q.   So if she wrote your face was swollen as a result of

11   injury, was she just exaggerating, making it up, embellishing?

12        MR. WARSHAWER:  Objection.  If you want to -- can

13   we just step up.

14        THE COURT:  Step up.

15        (Whereupon, a discussion is held at the bench off

16   the record.)

17        THE COURT:  We are going to take a five-minute

18   recess at this time.

19        Please do not discuss this case among yourselves

20   or with anyone else.  Five minutes.

21        (Whereupon, the jury exits the courtroom.)

22        (Whereupon, a five-minute recess is taken.)

23        THE COURT:  Okay, bring in the jurors.

24        THE COURT OFFICER:  Jurors entering.

25        (Whereupon, the jurors enter the courtroom.)

SMD

160

SANCHEZ - CROSS - WALTERS

1   now?  Did he say he saw that?  Can you ask him if he saw it?

2                 THE COURT:  Sustained.

3                 MR. WALTERS:  I will straighten the question out.

4   Q.    Even though Officer Holland may have been a foot from

5   you --

6                 MR. WARSHAWER:  Objection, may have been.

7                 THE COURT:  Sustained.

8   Q.    Did Officer Holland -- he never helped you on the

9   second go round when you were retrieving the gun?  You never saw

10  him at all?

11  A.    I never saw him at all.

12  Q.    And if he was striking Mr. Manzano, you just never saw

13  that?

14  A.    I didn't even know where he was, so how could I see

15  him.

16  Q.    Did you see anyone helping you by striking Mr.

17  Manzano?  Not Officer Holland, anyone?

18  A.    No.

19  Q.    You went to the hospital at St. Luke's, right?

20  A.    Yes.

21  Q.    Did you mention your knee at any time that you were in

22  the hospital?

23  A.    Yes.

24  Q.    Did you say to the doctor, my knee is hurt?

25  A.    Yes.

SMD

P.O. Sanchez - Recross - Mr. Wal

1  so you translated "might have," assumed that h

2  my gun?

3      A.  Yes.

4      Q.  Is that right?  Is that right?

5      A.  I said yes.

6      Q.  Is that a -- a leap or an exaggeration in any sense --

7      A.  No.

8      Q.  -- coming from assume or might to he grabbed my gun?

9  That's what you told Officer Rourke, right?

10     A.  I told Officer Rourke that he -- Officer Rourke asked

11 me if he -- if I actually saw him grab my firearm, and I

12 explained to her that, no, I did not see him, but there was a

13 high chance, possibility that he could have because it was

14 diagonally to his rear, to his left-hand side.

15     Q.  So you got technical like that with Officer Rourke when

16 she asked you what happened, and she translated what you said --

17             MR. WARSHAWER:  Objection.

18             MR. WALTERS:  I'm sorry?

19             MR. WARSHAWER:  She translated?

20     Q.  (Con't.) You told her he grabbed my gun, quote,

21 unquote; right?

22     A.  Yes.

23     Q.  And that's what she presumably wrote down?

24             MR. WARSHAWER:  Objection.

25     Q.  (Con't.) Right?

                      A. L.

194

SANCHEZ - RECROSS - WALTERS

1      Q.   I understand but my question is, did the hospital take

2   any photos?

3      A.   The hospital did not.

4      Q.   And at the precinct when you are with your commanding

5   officers, did you take your shirt off and say, look how I was

6   injured, get the Polaroid so we can have positive proof?  Did

7   that happen?

8      A.   No.

9      Q.   So the only time that pictures were taken is when you

10  go home and take the pictures yourself?

11     A.   Yes.

12     Q.   And neither the police surgeons, the hospital, or the

13  precinct commanders, no one thought and you didn't think to ask

14  them to take pictures of your injuries?.

15     A.   The hospital documented it in their reports that are

16  in evidence and it is not normal standard procedure, aside from

17  domestic violence incidents, to take photos of injuries.

18     Q.   So if somebody got a black eye in a hospital, you are

19  telling me that hospital personnel or law enforcement would not

20  deem it fit to take a picture of the injury?

21     A.   Correct.

22     Q.   Okay.

23     A.   Unless it was a domestic violence incident.

24         MR. WALTERS:  Your Honor, mercifully, I don't

25     believe I have any more questions.

SMD

PL670

Exhibit 53

Holland Testimony

People v. Manzano

195

SANCHEZ – RECROSS – WALTERS

1      THE COURT:  People?

2      MR. WARSHAWER:  One second, Judge.

3      (Whereupon, there is a pause in the proceedings.)

4      MR. WARSHAWER:  No, your Honor, I have nothing

5  further.

6      THE COURT:  Thank you.

7      You are excused.

8      (Whereupon, the witness is excused.)

9      THE COURT:  Call your next witness.

10      MR. WARSHAWER:  People call Officer William

11  Holland.

12      (Whereupon, the witness takes the stand and is

13  sworn by the Clerk of the Court.)

14      THE COURT OFFICER:  In a loud, clear voice, state

15  your name, spelling your last name for the record, shield

16  number and present command.

17      THE WITNESS:  Police Officer William Holland,

18  12905, PSA-6.

19      MR. WARSHAWER:  May I?

20      THE COURT:  Yes, you may.4.

21  P O L I C E  O F F I C E R  W I L L I A M  H O L L A N D, called

22  as a witness, on behalf of the People, having been first duly

23  sworn by the Clerk of the Court, was examined and testified as

24  follows:

25  DIRECT EXAMINATION

SMD

210

HOLLAND - DIRECT - WARSHAWER

1   Q.   How did you pull him off Officer Sanchez?

2   A.   I don't really recall.  I think I pulled him by his

3   back.  Again, not 100 percent positive.

4   Q.   You are reaching with two hands and grabbing with your

5   hands?

6   A.   That's how I would normally do it, yes.

7   Q.   Not what you normally would do.  Do you remember what

8   you did in this case?

9   A.   Not 100 percent.

10   Q.   About how long did you pull the defendant off Officer

11   Sanchez for?

12   A.   Not 100 percent sure, but maybe a few seconds.  I

13   don't really know how long it took.

14   Q.   The first time you were involved with this defendant,

15   can you please just, as best you can, detail what steps you

16   remember taking and how long it took.

17   A.   I remember pulling him off of Officer Sanchez.

18   Officer Sanchez I believe got back on his feet.  And then I am

19   not too sure but I went back, I turned back towards the crowd

20   that was forming.

21   Q.   What did you do at that point?

22   A.   I can't really remember if I was keeping the crowd

23   back or I separated other people that were trying to get at each

24   other.  Again, not 100 percent sure.

25   Q.   Did you turn away from Officer Sanchez?

SMD

211

HOLLAND - DIRECT - WARSHAWER

1     A.   I believe so, yes.

2     Q.   Why did you do that?

3     A.   Because there is a crowd forming and if we are both

4  occupied with one thing, we can be attacked from behind.

5     Q.   Okay.  What happened when you went to go deal with the

6  crowd?

7     A.   I called for backup a second time.  I believe that was

8  that time.

9     Q.   Again, that's the same motion with the radio?

10    A.   Yes.

11    Q.   Was that also an 85 or 13?

12    A.   I didn't say 85 or 13.  Basically I went over saying,

13  central, I need those units.  In other words, I need those cars

14  to come.

15    Q.   Basically emphasizing the communication you put over

16  there before?

17    A.   Yes.

18    Q.   Then what?

19    A.   I looked back towards Officer Sanchez.  I saw that he

20  was on the ground again.  This time I saw a firearm.

21    Q.   You say you saw he was on the ground again.  Are you

22  sure he was on the ground the second time?

23    A.   He was towards the ground, yes.

24    Q.   Do you know where he was in relation to the sidewalk,

25  the street and the crowd at that point?

SMD

212

HOLLAND - DIRECT - WARSHAWER

1    A.   I cannot remember now, not 100 percent sure.

2    Q.   Just to be clear, timeline-wise, before you saw him on

3 the ground a second time, had you already dealt with the crowd

4 or is this before that?

5    A.   I went back towards the crowd and then it was after

6 that.

7    Q.   So it was incident one, you pulled the person off, go

8 back to the crowd on the radio, then incident two and you see

9 your partner on the ground?

10    A.   Yes.

11    Q.   Please take us from there and tell us what happens.

12    A.   I see a firearm like struggling between the two of

13 them.  I can't tell who is holding.  I can't tell whose firearm

14 it is.  I just see a firearm.  I go for my ASP and I start

15 hitting the defendant.

16    Q.   Let me stop you there.  You say you see a firearm?

17    A.   Yes.

18    Q.   Was it physically attached to anyone?

19    A.   No.

20    Q.   Okay.

21    A.   It was either being held with their bodies somehow.  I

22 saw pretty much a loose firearm that could have been held in

23 someone's hand.  I don't really recall.

24    Q.   Are you sure it was a firearm?

25    A.   Yes.

SMD

214

HOLLAND − DIRECT − WARSHAWER

1    something.  What did you hit him with?

2        A.    Expandable baton.

3        Q.    Can you please tell the ladies and gentlemen of the

4    jury −− is there another name for that?

5        A.    ASP.

6        Q.    ASP?

7        A.    Yes.

8        Q.    What is it made out of?

9        A.    Some kind of metal.

10       Q.    How do you deploy that baton?

11       A.    We have to like hit it forward.

12       Q.    Swing it forward?

13       A.    Yes.

14       Q.    With your arm in a baseball motion?

15       A.    You kind of got to snap to get it to open up.

16       Q.    It opens up?

17       A.    Yes.

18       Q.    You did it with your hand?

19       A.    Yes.

20       Q.    Does it lock into place?

21       A.    If you open it up hard enough, yes.

22       Q.    How long is it once you open it?

23       A.    I would say maybe three feet, not too sure.

24            THE COURT:  Approach for a moment.

25            (Whereupon, a discussion is held at the bench off

SMD

216

HOLLAND - DIRECT - WARSHAWER

1   elbow?

2       A.   Yes.

3       Q.   What areas are you trained to aim for on a person you

4   are using an ASP on?

5       A.   We are trained in kind of steps.  Between elbows and

6   shoulders.  Elbows and shoulders, I mean.

7       Q.   Are you trained to use it on a similar region in the

8   leg?

9       A.   Yes.  You use it on the muscular portion of the leg

10  and then the bony portions, which would be the knee.

11      Q.   The muscular portion and then the bony portion?

12      A.   Yes.

13      Q.   What's the difference between when you use ASP on the

14  muscle versus the joint?

15      A.   It depends on how bad the situation is getting.

16      Q.   So it would escalate from first the muscle and then

17  the joint?

18      A.   Yes.

19      Q.   Okay.  Now, on July 2nd, 2011, as someone was

20  wrestling with your partner, do you know where your ASP actually

21  struck?

22      A.   I do not know.

23      Q.   Do you know which part of the defendant was facing you

24  as you were swinging the ASP?

25      A.   They were kind of moving around so I can't really tell

SMD

P.O. Holland - Direct - Mr. Warshawer                218

1    Q.   Did you ever aim for his head?

2    A.   No.

3    Q.   As you sit here now, do you know if you hit him in the

4 head?

5    A.   No.

6    Q.   You don't know?

7    A.   I do not know.

8    Q.   Do you know how many times in total you hit the

9 defendant with the asp?

10   A.   I do not remember.

11   Q.   During the time you were hitting the defendant with the

12 asp, what was he doing?

13   A.   He was on the ground.  I don't know -- I can't really

14 recall if he was still fighting.  It seemed like it was coming

15 to an end.

16   Q.   Coming to an end?

17   A.   Yes.

18   Q.   When did you stop hitting the defendant with the asp?

19   A.   Pretty much when it was all said and done.

20   Q.   When you say "all said and done," what happened before

21 you stopped?

22   A.   Like we started to get control of him.  Officer Sanchez

23 started getting control of him.

24   Q.   Did you see if he moved, the defendant?

25   A.   No, I don't remember.

A. L.

1    Q.   Could you see if your partner, Officer Sanchez, was

2  able to strike the defendant?

3    A.   I wasn't able to see that, no.

4    Q.   What were you looking at as you were swinging the asp?

5    A.   More approaching officers.

6    Q.   Where were they coming from?

7    A.   They were running down from the south.  So coming --

8  running north towards us.

9    Q.   They were running north towards you?

10    A.   Yeah, they were coming more from, say, 126th towards

11  us.

12    Q.   About how long after you had initially put over the

13  first 1085 were those officers running up towards you?

14    A.   I'm not a hundred percent sure how many minutes.

15    Q.   You're not a hundred percent sure?

16    A.   No, not a hundred percent sure.

17    Q.   What happened after you started swinging the asp?

18    A.   Then the other officers came, and we had him in

19  handcuffs.

20    Q.   About how many officers in total?

21    A.   When we first got him in handcuffs, I would say there

22  was four, but I'm not a hundred percent sure if there were more

23  behind me or not.

24    Q.   Was there more than just yourself and Officer Sanchez?

25    A.   Yes.

*A. L.*

P.O. Holland - Direct - Mr. Warshawer          221

1   Q.   What did you do with the defendant after you saw the
2   ambulance?
3   A.   We carried him over to the gurney.
4   Q.   To the gurney?
5   A.   Yes.
6   Q.   What happened then?
7   A.   Then we separated.  I guess they put him in the
8   ambulance, and then we went to another ambulance.
9   Q.   When you say "we went to another ambulance," who was
10  that?
11  A.   Me and Officer Sanchez.
12  Q.   Why did you go to the ambulance?
13  A.   We were covered in blood.  Officer Sanchez was -- had a
14  little bit of pain.
15  Q.   What's the worry that you have if you're covered in
16  blood?
17  A.   Any kind of diseases, possible diseases.
18  Q.   Were you treated?
19  A.   Yes.
20  Q.   For what?
21  A.   We were treated for possible HIV infections, hepatitis.
22  Q.   What does that treatment involve for you?
23  A.   I had to take a pill, I believe it was twice or three
24  times a day, every day for a month.
25  Q.   What does that pill make you feel like?

                        A. L.

P.O. Holland - Cross - Mr. Walters          232

1    Q.  Well, tell us what you saw.

2    A.  I saw him fighting.  It looked like he needed more

3 assistance.

4    Q.  Okay.

5    A.  So --

6    Q.  Fighting how?

7    A.  They were like fighting.  I'm not a hundred percent

8 sure if they were throwing fists.  They were like wrestling.

9    Q.  They were on the ground, or were they standing off in

10 boxing mode?

11    A.  From what I recall, I believe they were on the ground.

12 I'm not a hundred percent.

13    Q.  And when they were on the ground, who was on top of

14 who?

15    A.  I'm not a hundred percent sure on that either.

16    Q.  What did you do?

17    A.  That's when I went over to help Officer Sanchez.

18    Q.  Help him how?

19    A.  By trying to pull the defendant off of him.

20    Q.  And did you do that?

21    A.  I believe so, yes.

22    Q.  And how did you pull him up?

23    A.  Just -- I would normally just grab him.  I don't

24 remember exactly how I grabbed him, where I grabbed him, but I

25 would normally just grab him, pull up.

A. L.

1  Q.   And you pulled him up and did what with him?

2  A.   When I believed Officer Sanchez had him under control,

3  I went over to the crowd.

4  Q.   When you pulled him up, what did you do with him?

5  A.   I would say I let go of him.

6  Q.   Excuse me?

7  A.   I would say I let go of him.

8  Q.   You pulled him up so he was standing?

9  A.   I don't know if he was standing or on his knees.  I

10  don't recall.

11  Q.   So you pull him up.  You don't know whether you pulled

12  him all the way up or whether he was still on the ground; right?

13  A.   Not 100-percent sure.

14       THE COURT:  Will you make a narrative record

15  describing what you are doing and what he's agreeing to,

16  what you're not agreeing to.

17       MR. WALTERS:  Yes, your Honor.

18  Q.   You pulled Mr. Manzano up by his back or his arms;

19  right?

20  A.   Yes.

21  Q.   And you pulled him towards you; right?

22  A.   Yes.

23  Q.   And when you pulled him towards you, did you just drop

24  him on the floor?

25  A.   I don't really remember.

A. L.

1    Q.   So I really can't ask you much because you don't

2  remember what happened here, is that your testimony?

3    A.   The little things, I don't remember.

4    Q.   Well, if your partner is on the ground in a wrestling

5  match with someone, are you saying that you don't remember any

6  of it really?

7    A.   I remember them on the ground fighting.  That's what I

8  remember.

9    Q.   And when you pull him up, you just let him go?

10    A.   I don't remember exactly what I did.

11    Q.   Would it be fair to say that when you pull him up you

12  let him go because you thought things were under control?

13    A.   Yes.

14    Q.   Did you hear Officer Sanchez say he's squeezing my

15  testicles and I am in pain?

16    A.   No, I did not hear that.

17    Q.   Well, what immediately happened after you pulled

18  Mr. Manzano up?

19    A.   I'm not 100-percent sure, but I believe I turned back

20  towards the crowd.

21    Q.   Was the crowd on the sidewalk?

22    A.   They were -- I'm not 100-percent sure, sidewalk,

23  street.  They were coming.

24          THE COURT:  Approach for a moment.

25          (Witness leaves witness stand)

*A. L.*

1           (Whereupon, an off-the-record discussion is held

2       at the bench between the Court and attorneys)

3           (Witness resumes witness stand)

4       Q.   When you grabbed Mr. Manzano, you then went to deal

5   with the crowd?

6       A.   I believe I turned towards the crowd, yes.

7       Q.   When you say "turned towards the crowd," did you

8   physically walk over to the crowd?

9       A.   I don't recall if I had to walk.  I don't recall if I

10  just turned around.

11      Q.   Would it be fair to say that you would be within four

12  or five feet of your partner?

13      A.   Approximately, not 100-percent.

14      Q.   Do you recall what Mr. Manzano did after you pulled him

15  up?

16      A.   I don't remember, no.

17      Q.   Did you ever see Mr. Manzano run to the sidewalk?

18      A.   No.

19      Q.   Run to the sidewalk, you never saw that?

20      A.   No.

21      Q.   Did you ever see Mr. Manzano moving away from

22  Officer Sanchez with either right hand or left hand or both

23  hands in the air running towards somebody on the sidewalk,

24  literally right by you?

25      A.   No.

                        A. L.

1    Q.   As far as you know, that never happened?

2    A.   I didn't see it.  I never said it didn't happen.

3    Q.   When you pick Mr. Manzano up, he wasn't on the

4    sidewalk, was he?

5    A.   I don't remember.

6    Q.   And you don't know whether you were holding the crowd

7    or whether you were just looking at the crowd, you don't

8    remember that?

9    A.   I don't remember that, no.

10    Q.   So the next significant thing that you do know is that

11    at some point you glanced over to your partner, and he was on

12    the ground again; right?

13    A.   Yes.

14    Q.   And what was he doing?

15    A.   They were fighting again.

16    Q.   Were they rolling?

17    A.   I don't recall.  I'm not 100-percent sure if they were

18    rolling, if they were moving side to side.  I don't remember.

19    Q.   Did you ever write down any renditions of that evening?

20    A.   No, just the incident that happened and going to the

21    hospital.

22    Q.   Do you recall seeing a gun?

23    A.   Yes.

24    Q.   When you saw the gun on the floor, did you immediately

25    bolt towards the gun to grab it and secure it?

A. L.

P.O. Holland - Cross - Mr. Walters                  237

1       A.   I saw the gun on -- during the fight.  I don't recall
2    if it was definitely on the ground.  I couldn't tell if somebody
3    was holding it; but, no, I did not dive towards the gun.
4       Q.   So you see a gun on the ground; right?
5       A.   I don't know if it was definitely on the ground.  I saw
6    a gun within reachable distance.  I couldn't tell if somebody
7    was holding it or not.  It was dark.
8       Q.   When you see the gun, what do you do?
9       A.   Then that's when I realized they were still fighting,
10   and I hit him with the asp.
11      Q.   While you're hitting him with the asp, do you look
12   around for the gun that you just saw?
13      A.   No.
14      Q.   Dangerous item; right?
15      A.   Yes.
16      Q.   If somebody grabs it, bad things can happen; right?
17      A.   Yes.
18      Q.   And you're hitting Mr. Manzano with the asp multiple
19   times, and you're ignoring the presence of an unsecured firearm?
20      A.   I guess so, yeah.
21      Q.   Now, while you're hitting Mr. Manzano with that asp,
22   what is Officer Sanchez doing?
23      A.   He was fighting with Mr. Manzano.
24      Q.   Fighting how?
25      A.   They were rolling around on the ground.

                              *A. L.*

P.O. Holland - Cross - Mr. Walters                    238

1       Q.   Well, were they throwing punches at each other?

2       A.   I can't say.  I don't remember if they were throwing

3   punches, if they were wrestling, if they were kicking.  I don't

4   remember.

5       Q.   Now, from the point in time that you pulled out your

6   baton, there was an unsecured weapon in the area; right?

7       A.   Yes.

8       Q.   And you didn't take your eye off Mr. Manzano until he

9   was handcuffed; right?

10      A.   I'm not 100-percent sure if I looked away from him -- I

11  looked away from him before he was handcuffed because that's

12  when I saw the other officers responding.  After that, I'm not

13  sure.

14      Q.   At the time that you're hitting him with the asp,

15  you're right there --

16      A.   Looking down, yes.

17      Q.   Until he gets handcuffed; right?

18      A.   Yeah, pretty much.

19      Q.   Now, between the time that you're hitting him, did you

20  ever see Officer Sanchez grab the gun and strike Mr. Manzano

21  about the head multiple times while you are standing right

22  there?

23      A.   No.

24      Q.   Did you see his arms swing with anything?

25      A.   I saw them rolling around.  Both their bodies were

                          A. L.

P.O. Holland - Cross - Mr. Walters                     239

1  swinging.  I don't know exactly what was going on.

2      Q.   What, if anything, did you hear Mr. Manzano say during

3  this entire incident?

4      A.   I didn't hear anything.

5      Q.   When he was being struck by you, did he at least cry

6  out?

7      A.   I didn't hear anything.

8      Q.   So he's just being hit, and he's just mum as mum can

9  be; right?

10     A.   I didn't hear anything.  It doesn't mean he didn't say

11 anything.

12     Q.   But you're right there in a position to hear; right?

13     A.   But I didn't hear anything.

14     Q.   Would you conclude that he didn't say anything at all

15 while he was being struck by you?

16     A.   I can't say that.

17     Q.   You're just saying that you couldn't hear it though

18 you're right next to him?

19     A.   I couldn't hear it.

20     Q.   Can we see your asp?

21     A.   Yes.

22          MR. WALTERS:  Your Honor, with the sergeant's

23     permission can I publish that to the jury?  We can have it

24     deemed marked for identification and give it back to him.

25          THE COURT:  Yes.

                         A. L.

245

HOLLAND - CROSS - WALTERS

1    THE COURT:  Okay.

2    Q.   You pulled him off once and then you went to his aid

3    with the baton the second time?

4    A.   Yes.

5    Q.   Did you read your grand jury minutes?

6    A.   Yes.

7    Q.   Okay.

8    A.   Today, no.

9    Q.   Are you familiar with them?

10   A.   I don't remember most of them, no.

11   Q.   Here is another question.  Did you arrest anybody?

12   A.   I didn't.

13   Q.   For disorderly conduct, for fighting, for being overly

14   aggressive?

15   A.   Me personally, no.

16   Q.   Well, the guy that you were holding before you helped

17   get Mr. Manzano off your partnere, no summons?

18   A.   No.

19   Q.   Did you tell him, see you later buddy, leave the area?

20   A.   No, no.

21   Q.   Did you ever see anybody in between the parked cars

22   get up and brush themselves off?

23   A.   No.

24   Q.   All of the two actions took place literally within

25   five feet of the patrol car, right?

SMD

247

HOLLAND - CROSS - WALTERS

1    Q.   It would be literally on 127th Street and 7th Avenue?

2    A.   In that vicinity, yes.

3    Q.   All ambulances came to your car, right?

4    A.   Around my car.

5    Q.   Around your car?

6    A.   Yes.

7    Q.   You didn't look down the street towards the Harlem

8  Lanes and see any ambulance, right?

9    A.   Not that I can recall, no.

10   Q.   Well, you looked down the block, didn't you?

11   A.   Yes.

12   Q.   Did you see any ambulances down the block as you can

13 recall?

14   A.   I don't remember.

15   Q.   Is it true every question I ask you, you are basically

16 going to say you don't remember?

17           MR. WARSHAWER:   Objection.

18           THE COURT:   Sustained.

19   Q.   If you would have seen Officer Sanchez using his

20 service revolver to crack Mr. Manzano's head open, you would say

21 you don't remember that, right?

22   A.   I didn't see it.

23   Q.   You didn't see it?

24   A.   No.

25   Q.   In this courtroom Officer Sanchez says he did --

SMD

PL723

248

HOLLAND - CROSS - WALTERS

1      MR. WARSHAWER:  Objection, Judge.

2      THE COURT:  Have him finish the question, then

3   make the objection.

4      MR. WARSHAWER:  I don't think he should hear the

5   question, Judge.

6   Q.   Officer Manzano -- Officer Manzano.

7      MR. WALTERS:  It is getting late, your Honor,

8   sorry.

9   Q.   Officer Sanchez admits to hitting him multiple times

10  with a gun --

11     MR. WARSHAWER:  Objection.

12     THE COURT:  Sustained.

13     MR. WARSHAWER:  I asked counsel to refrain from

14  saying to one witness what another witness said under oath.

15     THE COURT:  Sustained.  Sustained.

16  Q.   What happens to an officer who tells supervisors that

17  another officer was doing something bad?  What happens to that

18  officer?  Does he get ostracized?

19  A.   They can get in trouble.

20  Q.   They can get in trouble for squealing on another

21  officer, can't they?

22  A.   It depends.  I can't say how other officers would

23  judge that person.

24     THE COURT:  Approach.

25     (Whereupon, a discussion is held at the bench off

SMD

HOLLAND - RECROSS - WALTERS

1    Q.    Did you make all the entries on that document?

2    A.    From this "To certify that I" down.  At the top,

3    PSA-6, 28, that doesn't look like my handwriting and 1222.

4    Q.    Are you under a business duty to maintain those

5    records and keep that form and make sure they are maintained

6    properly?

7    A.    No.

8              MR. WARSHAWER:  I don't see how we have the

9         foundation for this, Judge.

10   RECROSS-EXAMINATION

11   BY MR. WALTERS: (Continued)

12   Q.    When you or fellow members are injured in the course

13   of your duty as a police officer, is it your duty to fill out

14   such a report?

15   A.    As a witness statement, if he is injured and I am

16   there, yes.

17             MR. WALTERS:  I ask it to be moved into evidence.

18             THE COURT:  Is it part of the ordinary course of

19        business by the New York City Police Department -- do they

20        use it?  Is it part of their regular paperwork?

21             THE WITNESS:  Regular paperwork, only if someone

22        gets injured.

23             THE COURT:  If someone gets injured this is what

24        you fill out and you are familiar with it?

25             THE WITNESS:  Yes.

SMD

261

HOLLAND - RECROSS - WALTERS

1      THE COURT:  It will be admitted as Defendant's E.

2      MR. WARSHAWER:  Over objection.

3      (Whereupon, Defendant's Exhibit E, is received in

4  evidence, as of this date.)

5      Q.   Now, you are looking at what has been identified as

6  Defendant's E in evidence.

7      A.   Yes.

8      Q.   That's a document you signed, right?

9      A.   Yes.

10     Q.   And that is a document that asks what happened, right?

11     A.   Yeah, it asks for a brief statement of what happened.

12     Q.   And in that statement is there anything at all about a

13  gun?

14     A.   No.

15     Q.   Why not?

16     A.   Because it asks for a brief statement of what led to

17  the injuries of an officer.  It doesn't want the statements in

18  the case.

19     Q.   So you would omit the fact that a gun was taken from

20  an officer?

21     A.   The gun didn't lead up to his injuries, the fight did.

22     Q.   And anywhere in that paper does it indicate that on

23  two separate occasions you went to the aid of that officer?

24     A.   No.

25     Q.   It only says one time, right?

SMD

PL737

262

HOLLAND - RECROSS - WALTERS

1    A.    Yes.

2    Q.    In fact, it was two times, right?

3    A.    Yes.

4    Q.    And when you went in the grand jury you only indicated

5    that there was one fight, right?

6    A.    Yes.

7          MR. WARSHAWER:  Objection, form, omission.

8          THE COURT:  Sustained.

9    Q.    How many times did you go to his aid?

10   A.    Twice.

11   Q.    Twice.  You put that in that document?

12   A.    No.

13         MR. WARSHAWER:  Objection.

14         THE COURT:  I will allow the question.

15   Q.    Did you put that in that document?

16   A.    No?

17   Q.    Because it is only a brief statement, right?

18   A.    Yes.

19   Q.    You testified in the grand jury, didn't you?

20   A.    Yes.

21         THE COURT:  Page, date, lay the foundation.

22   Q.    Page 24, grand jury minutes, line 19.

23         THE COURT:  Date?

24         MR. WARSHAWER:  July 7, 2011.

25   Q.    Okay.

SMD

263

HOLLAND - RECROSS - WALTERS

1     "Question:  At that time can you please briefly

2  and in substance describe for the members of the grand jury

3  what happened.

4     "Answer:  We were notified by a passing civilian

5  there was a riot going on in the next corner.  We get there.

6  We see groups of people fighting.  We both exit the vehicle

7  and try to break up one fight.  He pulls away one guy, I

8  pull away another.

9     "I am holding one guy up against the car when I

10  notice he is still fighting on the ground.  I see a gun so I

11  immediately ran to assist him."

12     Do you recall being asked that question and giving that

13  answer?

14     A.   Yes.

15     Q.   In that answer you describe one fight, right?

16     A.   Yes.

17     Q.   Not a fight, you leave, then see another fight, right?

18     A.   Yes.

19     Q.   You only describe one fight, right?

20     A.   Yes.

21     Q.   How many fights were there?

22     A.   Two.

23     Q.   When you went to the grand jury how many did you

24  describe?

25     A.   One.

SMD

HOLLAND - RECROSS - WALTERS

1    Q.    Why did you add an additional fight when you came to

2    trial?

3                MR. WARSHAWER:   This is my objection to

4        impeachment by omission.

5                THE COURT:   Sustained.

6    Q.    Did you avoid talking about the whole incident?

7    A.    Avoid talking to?

8    Q.    To the grand jury.

9    A.    Yeah, they asked me for a brief, brief statement.   To

10   briefly describe it.

11   Q.    Now, you testified earlier that you saw a gun on the

12   ground, right?

13   A.    I saw a gun.   I don't know exactly where it was.   If

14   it was on the ground, if it was on them, if it was being held.

15   I don't really remember.

16   Q.    Did you ever see the gun in anyone's hand?

17   A.    I don't recall.

18   Q.    You don't recall or you don't recall seeing it in

19   anyone's hands?

20   A.    I don't recall seeing it in anyone's hands.   I

21   remember hands being around it.

22   Q.    You remember hands being around it?

23   A.    Which are in grabbable reach of it.

24   Q.    You recall being asked this question and giving this

25   answer.   Page 21, same grand jury.

SMD

265

HOLLAND - RECROSS - WALTERS

1    "Question:  Did you ever see -- excuse me I take

2    that back.  Where did you see the firearm that you

3    described?

4    "Answer:  It was when they were rolling on the

5    ground, I saw it being held.  I didn't know who was holding

6    it."

7    Do you recall giving that answer?

8    A.    Yes.

9    Q.    Do you recall saying I saw it being held?

10   A.    Yes.

11   Q.    Did you see it being held?

12   A.    Not by hands, like rolling around with them, being

13   held by them.  I don't know exactly whose hand was near it.

14   Q.    You mean the gun was literally on their bodies while

15   they are rolling around?

16   A.    That's what it looked like to me, yes.

17   Q.    It wasn't on the ground, it is on their bodies while

18   they are rolling around?

19   A.    That's what I remember, yes.  Not 100 percent sure.

20             MR. WALTERS:  No further questions, your Honor.

21             MR. WARSHAWER:  I am sorry to prolong this, but I

22   have to clear a couple of things up.

23   REDIRECT EXAMINATION

24   BY MR. WARSHAWER:

25   Q.    Officer, you were asked questions about where you saw

SMD

1              MR. WARSHAWER:  That's all I have, Judge, thank

2       you.

3    RECROSS-EXAMINATION

4    BY MR. WALTERS:

5       Q.   You fill out reports all the time; right?

6       A.   Yes.

7       Q.   Try not to exaggerate; right?

8       A.   Yes.

9       Q.   Try to be complete; right?

10      A.   Yes.

11      Q.   And accuracy is very important; right?

12      A.   Yes.

13      Q.   So that everyone can know what happened; right?

14      A.   Yes.

15      Q.   And when you leave something out, that makes it not

16   accurate; right?

17      A.   Depends what it is.

18      Q.   When you filled this report out, this was an accurate

19   version of what happened?

20      A.   That resulted in his injuries, yes.

21      Q.   And I guess you're not supposed to put in there that I

22   used force to subdue; right?  That's not important; right?

23      A.   No.

24      Q.   And if Officer Sanchez slammed him on the head a couple

25   of times with a gun, that's not important; right?


                            A. L.

P.O. Holland - Recross - Mr. Walters                    272

1       A.   For that report, no.

2       Q.   And it's not important for any report because it is

3   nowhere in the reports; right?  Not one single line says we hit

4   him in the head with a baton or a gun?  That never made its way

5   into the paperwork, did it?

6       A.   Not that I know of.

7       Q.   There you go.

8            MR. WARSHAWER:  All right, Judge.

9            MR. WALTERS:  Nothing further, your Honor.

10           MR. WARSHAWER:  This is why we don't get into

11   paperwork, Judge.  I have nothing more, Judge.

12           THE COURT:  Okay, you may step down.

13           (Witness is excused)

14           THE COURT:  At this time please do not discuss

15   this case among yourselves or with anyone else.  Safe

16   journey home.

17           Before you leave, approach for one moment.

18           (Whereupon, an off-the-record discussion is held

19   at the bench between the Court and attorneys)

20           THE COURT:  Ladies and Gentlemen of the jury, safe

21   journey home.  10 a.m. tomorrow.

22           Please do not discuss this case among yourselves

23   or with anyone else, and we are on time.

24           (Jury leaves the courtroom.)

25           THE COURT:  Okay, 10 a.m. tomorrow.  Safe journey

                             A. L.

Exhibit 53

Rourke Testimony

People v. Manzano

318

ROURKE - WARSHAWER - DIRECT

1    sworn by the Clerk of the Court.)

2            THE COURT OFFICER:  Please be seated.  In a loud,

3    clear voice, state your name and spell your last name for

4    the record.

5            THE WITNESS:  Kelly Rourke.  I am a police

6    officer in PSA-6.  My spelling is R-O-U-R-K-E.

7            THE COURT OFFICER:  Shield number and command.

8            THE WITNESS:  1752 shield number, PSA-6.

9    P O L I C E   O F F I C E R   K E L L Y R O U R K E, called as a

10   witness, on behalf of the People, having been first duly sworn

11   by the Clerk of the Court, was examined and testified as

12   follows:

13   DIRECT EXAMINATION

14   BY MR. WARSHAWER:

15       Q.   Good morning, how are you?

16       A.   Fine, thank you.

17       Q.   Can you please tell the members of the jury about your

18   career in the New York City Police Department; when you started

19   and where you have been assigned.

20       A.   I started about fifteen years ago, a little over.  I

21   started in Spanish Harlem in the 23rd Precinct and then I moved

22   over to the New York City Housing Police.  I worked in all of

23   Manhattan at one point.  Then I worked in the lower east side.

24   I was in the housing bureau, the counter terrorism and training

25   unit.

SMD

ROURKE - WARSHAWER - DIRECT

1    said before, we cover different precincts.  So the radio covers

2    different areas.

3           So I wasn't on the 32nd Precinct division, I was on

4    the 26th.  I am hearing jobs that are coming over this from

5    another precinct.  So I saw people running, other officers

6    running north on 7th.  And, you know, we are no exercise nuts,

7    so they are running for a reason.  We just pursued after them.

8    We got to 127th and 7th from there.

9    Q.   Can you please tell us what you saw when you got to

10   127th Street and 7th Avenue?

11   A.   We saw -- I saw a bunch of officers on the street,

12   close to the west side but on the street.  And I saw several

13   officers attempting to cuff someone.

14   Q.   As you approached them, did you know which officers

15   those were?

16   A.   I knew two of them.

17   Q.   Who were they?

18   A.   Officer Sanchez and Officer Holland.

19   Q.   You said you knew who two of them were.  Were there

20   more than two people trying to handcuff this person?

21   A.   There were about two more.

22   Q.   I would like to digress and ask you to take a look

23   around the courtroom and tell us if you recognize anyone there

24   from that night.

25   A.   I do.  Mr. Manzano is in the purple shirt.

ROURKE - WARSHAWER - DIRECT

1      A.   Yes, usually.  Sometimes you can get an 85 through 911

2   but in this particular case it was from an officer.

3      Q.   Directing your attention again to 127th and 7th

4   Avenue, could you tell us what the sidewalk and street looked

5   like in terms of people as you were there?

6      A.   There was a crowd of maybe ten to fifteen people

7   behind us.  There was a building that was either abandoned or

8   under construction.  It was dark.  And there was people lining

9   that on the sidewalk.  There were people walking back and forth

10  on the sidewalk.

11           And then Mr. Manzano was on the street where cars

12  would be parking but I believe it is a bus stop or something so

13  there were no cars actually there.  But it would be in that lane

14  where a car would park.

15     Q.   That's where you first saw Mr. Manzano as he was being

16  placed in handcuffs?

17     A.   Yes.

18     Q.   Were there any active fights going on as you

19  approached?

20     A.   Officer Holland was holding somebody.  He seemed like

21  that was under some control.  And then we went and it seemed

22  like Officer Sanchez needed a bit more help.

23     Q.   Did you go over to Officer Sanchez?

24     A.   Yes.

25     Q.   Did Officer Holland also go over there?

SMD

1    Mr. Manzano, but I was looking at his arm, Mr. Manzano's arm.  I

2    wasn't looking next to me.

3        Q    Did Officer Holland help cuff Mr. Manzano and your

4    answer is?

5        A    I believe so.

6        Q    And when he went to help cuff Mr. Manzano, did he have

7    his baton out?

8        A    I didn't see any baton.

9        Q    Officer Holland says the baton was used in cuffing?

10                MR. WARSHAWER:  Objection.

11                THE COURT:  Sustained.

12                MR. WARSHAWER:  Again, we are telling one witness

13       what another witness is saying in court.

14       Q    You don't recall Officer Holland helping subdue

15   Mr. Manzano; is that your testimony?

16       A    That is not my testimony.

17       Q    Here's my question.  Did you see Officer Holland

18   helping subdue Mr. Manzano?  Yes or no.

19       A    He was there.  I don't know what his particular role

20   was because I was helping cuff.

21       Q    You were helping cuff?

22       A    Yes.

23       Q    And you were helping cuff and you don't see Officer

24   Holland helping his partner cuff Mr. Manzano?

25       A    What you have to understand is when you are in these

1   tight, tight quarters adrenalin is flying.  My job is to just

2   grab a arm.  We are holding him tight as we can.  Everyone is in

3   tight.  I can't tell you where he is.  I am not looking at other

4   officer's faces.  I am making sure I don't lose his arm.

5        Q    You are in the fray.  You saw Officer Sanchez trying to

6   cuff him, right?

7        A    Yes.

8        Q    And you don't recall Officer Holland being there trying

9   to cuff?

10       A    Officer Holland was to my right as I ran to the ground

11  which is where Officer Sanchez and Mr. Manzano and the other

12  officers were.

13       Q    So, let me see if I have this right.  While Mr. Manzano

14  is being held on the ground, your recollection is that Officer

15  Holland has not arrived yet to Mr. Manzano.  Didn't you say that

16  he was, if I can get this right, holding someone when you got

17  there?  Who was he holding?

18       A    I don't know.

19       Q    That means when you got there and Mr. Manzano is on the

20  floor, Officer Holland is nowhere near Mr. Manzano; is that your

21  testimony, ma'am?

22       A    My testimony is when I arrived, there had already been

23  an altercation.

24       Q    How do you know?  Hold on.  When you arrived there,

25  there had already been an altercation.  You know that personally

**Rourke - Direct - People**                                 353

1    A    Yes.

2    Q    Not two cuffs, one cuff?

3    A    From what I remember, it was one cuff.

4    Q    Now, you were the arresting officer in this case,

5 right?

6    A    Yes.

7    Q    And everything that you indicated in the charging

8 document or the complaint is a result of what you learned from

9 Officer Sanchez, right?

10   A    Yes.

11   Q    And Officer Holland?

12   A    Yes.

13   Q    Did Officer Sanchez tell you that?

14           MR. WARSHAWER:  Objection, hearsay.

15           MR. WALTERS:  Your Honor, may I have this marked

16   as Defense Exhibit F?

17           THE COURT:  Sustained.

18           MR. WARSHAWER:  I have no objection to it being

19   marked for identification.

20           MR. WALTERS:  Can I have this marked for

21   identification Defendant's F for identification?

22           (Defense Exhibit F was marked for identification,

23   today's date.)

24           (Handing to the witness.)

25   Q    You recognize what has been handed to you as Defense F

<u>Rourke - Direct - People</u>                   354

1   for identification?

2        A    Yes, I do.

3        Q    What do you recognize that to be?

4        A    These are the final charges that are determined by the

5   Assistant District Attorney.

6        Q    And it's also an affidavit, right?

7        A    Yes.

8        Q    And it's an affidavit sworn to by you, right?

9        A    Yes.

10       Q    And you did swear to the truth of that affidavit,

11  right?

12       A    I did.

13       Q    You can put it down.

14            Did Officer Sanchez tell you he observed the defendant

15  pull a gun out of his holster?

16            MR. WARSHAWER:  Objection, hearsay.

17            MR. WALTERS:  Do you want to have a legal

18       discussion, your Honor?

19            THE COURT:  I think we better.

20            MR. WARSHAWER:  We should do this on the record.

21            THE COURT:  Yes.

22            THE COURT:  Please do not discuss this case with

23       anyone else or among yourselves.  Please return at a quarter

24       after 2, 2:15.

25            (Whereupon, the jury was excused from the

## Colloquy

1      MR. WARSHAWER:  Under what theory would you like

2  to move it in?

3          THE COURT:  What is your theory?

4          MR. WALTERS:  Your Honor, that this is a prior

5  inconsistent statement with respect to Sanchez.  Sanchez

6  specifically said I never told her quote unquote never told

7  her that he saw defendant take the loaded service firearm

8  from informant's holster.  Never he specifically said.

9          I asked him numerous times did you tell Officer

10  Rourke that you observed Mr. Manzano take the gun from his

11  holster, grab the gun and he said, no, I told her it was

12  ajar.  I felt something tug and she translated that into he

13  observed Mr. Manzano taking the gun out of the holster.

14          MR. WARSHAWER:  About which, Judge, she can most

15  certainly be impeached.  Did you say this, where did it come

16  from.  The document itself doesn't come in under that.  It

17  is impeachment material.  She can say she did say it.  She

18  can deny saying it.  If she denies it, we will cross that

19  bridge when we come to it.  That is perfectly proper.  That

20  is why it is marked for identification and shown to her.

21          Not every document that a witness can be

22  confronted with comes into evidence and not every single

23  piece of paper in a criminal case becomes a business record

24  exception.  We try cases by filing full sheets. We have

25  testimony people can be impeached by their prior statements.

375

ROURKE - CROSS - WALTERS

1          (Whereupon, the witness is excused.)

2          THE COURT:  Bring in the other witness, please.

3          (Whereupon, the witness resumes the stand.)

4          THE COURT:  You are reminded, Officer Rourke,

5     that you are still under oath.

6          THE WITNESS:  Yes.

7          THE COURT:  Go ahead.

8          MR. WALTERS:  Thank you.

9  P O L I C E   O F F I C E R   R O U R K E, called as a witness, on

10 behalf of the People, having been previously duly sworn by the

11 Clerk of the Court, was examined and continued to testify as

12 follows:

13 CROSS-EXAMINATION

14 BY MR. WALTERS:

15          MR. WALTERS:  Can I see the arrest report in

16     evidence, please.

17          Thank you.

18     Q.   Officer Rourke, I am handing you what is in evidence

19 as People's 15 in evidence.

20     A.   Okay.

21     Q.   You see that?

22     A.   Yes.

23     Q.   And is that an arrest report that you prepared?

24     A.   Yes.

25     Q.   Okay.  Now, I asked you earlier whether you had a

SMD

376

ROURKE - CROSS - WALTERS

1  discussion with Officer Sanchez about all the particulars of

2  this case, right?

3  A.  Yes.

4  Q.  And you said yes, right?

5  A.  Yes.

6  Q.  And did he tell you that he had his gun out and hit

7  Mr. Manzano multiple times in the head?

8  A.  Did Officer Sanchez?

9  Q.  Yes, did he tell you that?

10  A.  No.

11  Q.  He didn't tell you that?  Did you ask him why is Mr.

12  Manzano bleeding so much?

13         MR. WARSHAWER:  I am going to object to some of

14      the hearsay here.

15  Q.  Let me ask you something.  You did see a lot of blood,

16  didn't you?

17  A.  Yes.

18  Q.  In trying to find out what is going on because you are

19  the arresting officer and have to convey information to the

20  District Attorney, you want to know what is going on?

21  A.  Yes.

22  Q.  You asked Officer Sanchez and Officer Holland, how did

23  he get so much blood on him, right?

24  A.  Yeah.

25  Q.  And what did they tell you?

SMD

ROURKE - CROSS - WALTERS

1    A.    They said that during the struggle, during the fight.

2  They weren't sure whether he was bleeding when he started or

3  not, when they intervened in the fight.

4    Q.    Officer Sanchez was drenched in blood, wasn't he?

5    A.    I don't know if I would categorize it as drenched.

6    Q.    You saw a lot of blood coming from where?

7    A.    From Mr. Manzano.

8    Q.    From where on Mr. Manzano?

9    A.    On his face.

10   Q.    On his face?

11   A.    Yes.

12   Q.    On the back?

13   A.    On the back?

14   Q.    On the back of his head, yeah?

15   A.    I didn't really -- he had a cut on his head, but there

16  was so much blood I didn't know where the cut specifically was.

17  I know he was bleeding from the head.

18   Q.    So you could see blood in the front or injuries in the

19  front but not the back?

20   A.    At the scene I couldn't tell where the cut was because

21  he was covered in blood.

22   Q.    Right.

23   A.    Once he received the medical attention, then I could

24  see he had a cut on, I believe, the top of his head.

25   Q.    Do you recall -- this is from January 4th, page 30.

SMD

381

ROURKE - CROSS - WALTERS

1    Q.   What happened during the events leading up to an

2  arrest of which you are going to be assigned to be the arresting

3  officer.

4         Did you say, Officer Holland, what happened?

5    A.   I don't know.

6    Q.   There is lots of blood.  Did you ask him, do you know

7  what happened, how is he bleeding?  Did you ask him that?

8    A.   I did ask him that.

9    Q.   And he said?

10        MR. WARSHAWER:  Objection.

11        THE COURT:  You asked the question.  I will allow

12   the answer.

13   A.   He said during the fight he came up bloody.  I don't

14  remember him specifically telling me that he knew exactly how he

15  received the injury.  But in police work that's not uncommon so

16  I did -- that's not uncommon.  I don't think that's unusual.

17        THE COURT:  I have to caution you, when there is

18   a question asked, only answer the question asked.  Don't

19   give a narrative.  Please just answer the question and

20   nothing further.

21        THE WITNESS:  Yes.

22   Q.   Was force used to subdue Mr. Manzano when he was on

23  the ground?

24   A.   Yes.

25   Q.   You see page 2 of 3?

SMD

PL857

382

ROURKE - CROSS - WALTERS

1    A.    Yes.

2    Q.    Okay.  And do you see in the corner where it says

3  force used?

4    A.    Yes.

5    Q.    And what did you write with respect to force used?

6    A.    I did put none.

7    Q.    And that --

8    A.    That's a mistake.

9    Q.    That's a mistake.  The man is bleeding in the back of

10  the head and you say no force was used in affecting an arrest.

11  Is that your mistake?

12    A.    That is my mistake but I X'd resisting.

13              (Transcript continues on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

SMD

1   automatically.

2       Q    So even when physical force is used, it is going to say

3   none?  That is how all police documents are, they never admit to

4   using physical force?

5               MR. WARSHAWER:  Objection, Judge.

6               THE COURT:  Sustained.

7               MR. WARSHAWER:  She can't state for so many police

8       officers.

9               THE COURT:  Let's refer to this document.

10      Q    You knew physical force was used to subdue Mr. Manzano;

11  didn't you?

12      A    Absolutely.

13      Q    Absolutely.  In fact you testified that you helped in

14  physical force in subduing Mr. Manzano?

15      A    Yes.

16      Q    You held his arms?

17      A    Yes.

18      Q    And while you were holding his arms, what were the

19  other officers doing, like five people holding his arms?

20      A    He has two arms and two legs and his torso.

21      Q    You took -- put in the actual grappling with him to get

22  his arms?

23      A    He was already down on the ground.  He was kicking and

24  flailing his arms and twisting and turning.  We were --

25      Q    Who is "We"?

<u>Rourke - Cross - People</u>                                          385

1     A     Myself and the other officers.

2     Q     Which officers?

3     A     Officer Sanchez and I don't know who else.  I know

4  Officer Sanchez was there.

5     Q     Didn't you say Officer Holland earlier?

6     A     I did say Officer Holland.  I earlier testified I

7  couldn't say specifically what he was doing.  I was

8  concentrating on my job, which was the arm.

9     Q     Page 11, January 4, 2012, prior proceeding, line 12.

10  Were you asked this question and did you give this answer:

11          "How many people were involved in handcuffing the

12  defendant?"

13          "Answer:  Probably about four or five."

14          "Question:  Did you later learn who any of those

15  officers were?"

16          "Answer:  Yes."

17          "Question:  Who was involved?"

18          "Answer:  Officer Sanchez was one of them, Officer

19  Holland was another.  I don't know who the others were."

20          Do you recall giving those answers to those questions?

21     A     Yes.

22     Q     And when you were asked who was involved in

23  handcuffing, did you ever say I was?

24              MR. WARSHAWER:  Objection.  That wasn't the

25      question.  The question was did you later learn who any of

PL881

1    Q    Did he use the words swell or swollen?  Those are your

2  words based on your observation, right?

3    A    Well, I didn't write this.

4    Q    As the arresting officer, somebody's injury is so

5  apparent on their face you think to take a picture of his face?

6    A    Who are we talking about?

7    Q    I am talking about Officer Sanchez.  Did you take a

8  picture of his swollen face?  Did you take a picture?

9    A    I didn't take a picture, no.

10    Q    Did anybody in the world other than him take a picture

11  of his face?

12            MR. WARSHAWER:  Objection to what anybody in the

13    world did.

14            THE COURT:  Rephrase it.

15    Q    You are the arresting officer?

16    A    Yes.

17    Q    You are gathering evidence, right?

18    A    Yes.

19    Q    He has some injuries, right?

20    A    Yes.

21    Q    Do you have an iPhone?

22    A    No.

23    Q    Is there a camera on your phone?

24    A    There is.

25    Q    Do you take a picture of injuries that you see in the

<u>Rourke - Cross - People</u>                                    392

1   normal course of police work?

2        A    I didn't at the time.

3        Q    Did you ever take any pictures of any of his injuries?

4        A    I didn't, no.

5        Q    Do you know if anybody else did?

6        A    Officer Sanchez did.

7        Q    Do you know when he did that?

8        A    Once he left.  We had to drive him home.

9        Q    He took pictures at his house?

10       A    Yes.

11       Q    That is what he told you?  You didn't see him take

12  pictures; did you?

13            MR. WARSHAWER:  Objection.

14            THE COURT:  Let her answer the question.

15       A    Did he tell me he was at his house?

16       Q    Did you see him take pictures?

17       A    Yes.

18       Q    He told you he took pictures?

19       A    Yes, and e-mailed them to me.

20            MR. WALTERS:  Can I see the complaint?

21            (Handing to defense counsel.)

22       Q    Can you look at Roman Numeral 5 and Roman Numeral 6?

23  Do you see that?

24       A    Yes.

25       Q    Did Officer Sanchez tell you he observed Mr. Manzano

Exhibit 53

Manzano Testimony

<u>People v. Manzano</u>

<u>Manzano - Direct - Defense</u>                502

1        would like to call Mr. Donald Manzano to the stand.

2    D O N A L D   M A N Z A N O, called as a witness by and on behalf

3        of the Defense at the trial, having been first duly sworn,

4        testified as follows:

5                THE COURT OFFICER:  In a loud and clear voice,

6        state your name for the record.

7                THE WITNESS:  Donald Manzano.

8                MR. WALTERS:  May I inquire, your Honor?

9                THE COURT:  Yes, you may.

10   DIRECT EXAMINATION

11   BY MR. WALTERS:

12       Q    Donald, how old are you?

13       A    27.

14       Q    And are you currently working?

15       A    No, sir.

16       Q    Are you looking for employment?

17       A    Yes, sir.

18       Q    How long have you been looking for employment?

19       A    Two years.

20       Q    Any problems?

21       A    Yes.

22       Q    What are the problems?

23                MR. WARSHAWER:  Objection.

24                THE COURT:  I will allow it.

25       A    Basically, I am not able to get the job because of my

1   criminal background because of this case.

2                MR. WARSHAWER:  Objection.

3   Q     What do you mean by that?

4                THE COURT:  Sustained.

5   Q     Where did you grow up?

6   A     Starrett City, Brooklyn.

7   Q     Now, did you go to high school there?

8   A     Yes, some.  Majority of my years of high school, yes.

9   Q     Did you leave the Brooklyn high school?

10  A     Yes. I went to Arlington, Virginia, Wakefield High

11  School.

12  Q     Did you graduate from Wakefield High School?

13  A     Yes, with a 3.8.

14  Q     What is a 3.8?

15  A     Grade point average.

16  Q     And after leaving high school, did you further your

17  education?

18  A     Yes, sir.

19  Q     And how did you do that?

20  A     I went to Old Dominion University.

21  Q     What was your major area of study at Old Dominion

22  University?

23  A     Mechanical Engineering Technology and a minor in

24  Engineering Management.

25  Q     Did you achieve a degree in that subject?

1   A    Yes, sir.

2   Q    And how long ago was that?

3   A    Approximately two, two and a half years ago.

4   Q    And what did you do after you received a degree in

5   Mechanical Engineering, what did you do after that?

6   A    Looked for a job.

7   Q    Where?

8   A    Just different engineering firms and different places.

9   Q    Did you ever come back to New York?

10  A    Yes, sir.

11  Q    When you came back to New York, where did you go?

12  A    I went back to Starrett City.

13  Q    Who did you live with?

14  A    My mother and my sister.

15  Q    Allow me to turn your attention to July 1st going into

16  July 2nd of the year 2011.  Did you leave Brooklyn to go

17  anywhere?

18  A    Yes, sir.

19  Q    And where did you go?  What was your destination?

20  A    Harlem lanes, 2116 West 127th Street.

21  Q    And Seventh Avenue?

22  A    Yes.

23  Q    Did something happen that night?

24  A    Yes.

25           MR. WALTERS:  Your Honor, can I ask Mr. Manzano to

1    stand up and publish himself to the jury before I get to my

2    next line of questions?

3              MR. WARSHAWER:  I have no objection.

4    Q    Can you step over here near the jury, please.  Can you

5    turn around and point to your head?  What are you pointing to?

6    A    The scar I received that night. (Indicating.)

7    Q    And show the jurors the full circumference of it.

8    (Indicating.)

9              MR. WARSHAWER:  The defendant indicated a scar

10   which goes from the back of his head from ear to ear; is

11   that basically correct?

12             MR. WALTERS:  Yes.

13             THE COURT:  What is its length?

14             MR. WALTERS:  The length of the back of his head.

15   One side to all the way —

16             THE COURT:  Left side of his head behind his ear

17   going down from the top of his ear to his neck,

18   approximately three to four inches.

19             MR. WALTERS:  Going all the way to the other side

20   of his head, your Honor, to about his ear.

21             (Whereupon, the witness retook the witness stand.)

22   Q    You said you went to a place called Harlem Bowling

23   Lanes?

24   A    Yes.

25   Q    Why are you going there?

526

MANZANO - CROSS - WARSHAWER

1   the uptown side?

2        A.   Yes.

3        Q.   That's a yes?

4        A.   Yes.

5        Q.   When you come to, you said the next thing you remember

6   is you are either being placed in handcuffs or in handcuffs.

7   Which was it?

8        A.   I am in handcuffs.

9        Q.   You are fully in handcuffs at this point?

10       A.   Yes.

11       Q.   You are not in the same place where you got hit in the

12   back of the head?

13       A.   I couldn't see.

14       Q.   Couldn't see?

15       A.   No.

16       Q.   Do you know if you were still in that same part of the

17   street?

18       A.   I was -- I can't remember that part.  I couldn't see.

19   I couldn't remember.

20            MR. WARSHAWER:  I would like to show the witness

21       what I am going to ask be marked as People's 19 for

22       identification.  It is grand jury testimony lines 14 through

23       25 on page 46.

24       Q.   You see that?

25       A.   What lines?

527

MANZANO - CROSS - WARSHAWER

1    Q.   14 through the end of the page.

2         Have you read that?

3    A.   Yes.

4    Q.   Now that you have read that portion of People's

5 Exhibit 19 for identification, does that refresh your memory as

6 to where you were?

7    A.   Yes, down the block.

8    Q.   Further down the block, right?

9    A.   Yes.   Toward the corner, though.

10   Q.   Okay.  I will take those back.

11        You weren't in the same spot as you were when you got

12 hit, right?

13   A.   No.

14   Q.   You were somewhere else?

15   A.   Yes.

16   Q.   So I am clear, your testimony before was that you

17 didn't remember where you were, in fact, when you initially got

18 hit in the back of the head?

19   A.   No.

20   Q.   There had been some movement of where you were between

21 the strike to the back of your head and you coming through in

22 handcuffs, right?

23   A.   Yes.

24   Q.   When you were getting hit in the back of your head,

25 did you feel your arms being pulled?

SMD