UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

JASMINE BRIDGEFORTH, DELANO
BROADUS, and DAVID FAIRFAX,

                               Plaintiffs,

                   -against-

CITY OF NEW YORK, NYPD Officer JOHN
ZERAFA, Tax No. 919893, individually, NYPD
Officer RAFAEL SANCHEZ, Shield No. 12327,
individually, NYPD  Officer MOHAMMED
KHANG, Shield No. 18729, individually, NYPD
Sergeant DEMETRIOUS LEE, Shield No. 3087,
individually, NYPD Deputy Inspector LUIS
DESPAIGNE, individually, and JOHN/JANE
DOE POLICE OFFICERS 1-5, individually,

                               Defendants.

------------------------------------------------------- x

    :
    :
    :
    :
    :
    :
    :
    :
    :

**LOCAL RULE 56.1 STATEMENT IN
SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS'
SUMMARY JUDGMENT MOTION**

¶¶ 1-240

(Supplemental 56-1 with ¶¶ 241-248)

No. 16 Civ. 273 (WHP) (SDA)

Plaintiffs Jasmine Bridgeforth, Delano Broadus and David Fairfax submit this statement

pursuant to Rule 56.1 of the Local Civil Rules in support of his opposition to Defendants'

summary judgment motion.  As required by the Local Rules and the Court's Individual Rules,

Plaintiffs herein respond to Defendants' Rule 56.1 statement using numbered paragraphs that

correspond to the numbered paragraphs in Defendants' Rule 56.1 statement.  Then, from the end

of those paragraphs, Plaintiffs add their own numbered paragraphs with uncontested facts further

supporting their arguments that there are genuine issues of material fact precluding summary

judgment.

**Defendants' Paragraph 1.**

      Plaintiffs Jasmine Bridgeforth, Delano Broadus, and David Fairfax filed a First Amended

Complaint on or about April 29, 2016 against Defendants City of New York, Detective John

Zerafa, and Police Ofificer Rafael Sanchez, Police Officer Mohammed Khan, Sergeant

Demetrios Lee, and Mr. Luis Despaigne. (See First Amended Complaint, filed on April 29,

2016) (hereinafter "Am. Compl.," annexed to the Bardauskis Decl. as "Exhibit C," see also Civil

Docket Report, annexed to the Bardauskis Decl. as Exhibit "E," at Document No. 18).

**Plaintiffs' Responsive Paragraph 1.**

Admitted.

**Defendants' Paragraph 2.**

On October 9, 2014, at approximately 2:33 a.m., complaining victim Sims made a 911

call, which was transmitted as a 10-34, or "assault in progress." (See NYPD Complaint Follow-

Up Informational (hereinafter "Opening/Callout DD5"), dated October 14, 2014, pertaining to

Plaintiffs' arrest on October 9, 2014, annexed to the Bardauskis Decl. as Exhibit "S"; NYPD

Sprint Report pertaining to October 9, 2014, annexed to the Bardauskis Decl. as Exhibit "T").

**Plaintiffs' Responsive Paragraph 2.**

Admitted in part, denied in part. Admitted that 10-34 was one of the transmissions.

Denied insofar as other transmissions stated that Sims had just escaped a prostitution operation,

that there was a girl still being held as a sex-trafficking prisoner, and that Sims' captors had

guns, knives and chains. Exh. 6 (911 call); Exh. 22 at D90 (dispatch transmissions re: weapons),

D80-D85 (dispatch transmissions re: Level 1 search for missing girl); Exh. 43 at D343 (Zerafa

swearing under oath that Sanchez told him he responded to a call about a young girl being held

prisoner).

**Defendants' Paragraph 3.**

On October 9, 2014, in making her report, Sims told police officers that she had gone to

1430 Amsterdam Avenue, Apartment 3C - Bridgeforth's apartment - to party and that she had

been held at knifepoint by Broadus (specifically that Broadus put a knife to her neck), that she

been made to wear provocative clothing in order to be made into a prostitute, that she was

2

handcuffed to a radiator in a bedroom, along with a naked black female named "Gloria, " who appeared to be a teenager. (NYPD Omniform Arrest Report pertaining to Plaintiff Jasmine Bridgeforth's October 9, 2014 arrest. Arrest Report No. M14688580 (hereinafter "Bridgeforth Arrest Report") and Omnifonn Arrest Complaint (hereinafter "Bridgeforth Complaint Report"), Complaint No. 2014-026-03122, collectively annexed to the Bardauskis Decl. as Exhibit "P;" NYPD Omnifonn Arrest Report pertaining to Plaintiff Delano Broadus' arrest on October 9, 2014, Arrest No. M14688589 (hereinafter "Broadus Arrest Report") and NYPD Omniform Arrest Complaint (hereinafter "Broadus Complaint Report"), Complaint No. 2014-026-03123, collectively annexed to the Bardauskis Decl. as Exhibit "R;" Opening/Callout DD5, Exhibit "S" to the Bardauskis Decl. ; Transcript of the Deposition of Police Officer Rafael Sanchez, taken on April 17, 2017, (hereinafter "Sanchez Dep."), annexed to the Bardauskis Declaration as Exhibit "J", at 27-28:25-16).

**Plaintiffs' Responsive Paragraph 3.**

Denied that this fact is material and undisputed when considered in isolation.  Sims reported and Defendants learned contradictory facts demonstrating that Sims was lying, at times prior to Defendants' arrest and detention of Plaintiffs.  See Pl. 56.1 ¶¶ 82-84 (when Defendants responded to Sims' 911 call that she had "just" escaped Plaintiffs who held her naked/partially undressed, Sims was fully clothed wearing shirt, sweatshirt, hat and sneakers); ¶¶ 112-16 (NYPD determining prior to Plaintiffs' arrests that Gloria did not exist and that Sims invented her); ¶¶ 137-139 (Sims admitting hours into event that she was Broadus' girlfriend and that she lived in Apt. 3C with Plaintiffs).

**Defendants' Paragraph 4.**

3

At the time of the reporting, Sims also alleged that she was told she needed to make hits on Craigslist, or else she was going to be sent to Hunts Point. (Opening/Callout DD5, Exhibit "S" to the Bardauskis Decl.; Sanchez Dep., Exhibit "J" to the Bardauskis Decl., at 27- 28:25-16).

**Plaintiffs' Responsive Paragraph 4.**

Denied that this fact is material and undisputed when considered in isolation. After Defendants seized electronic devices from Apt. 3C that would have photos of Sims for Craigslist as she claimed, Defendants did not take any steps to examine the electronic devices' content to see if it was true. Five months later ADA Nolan had the devices' contents examined and they contained no such evidence. See ¶¶ 163, 172 (Zerafa leaving the devices without searching them, and ADA Nolan having them searched five months later and finding "nothing related to prostitution within the electronics").

**Defendants' Paragraph 5.**

Hunts Point is an area known for prostitution. (Opening/Callout DD5, Exhibit "S" to the Bardauskis Decl.; Sanchez Dep., Exhibit "J" to the Bardauskis Decl., at 35:21-25).

**Plaintiffs' Responsive Paragraph 5.**

Denied that this fact is material and undisputed when considered in isolation. See ¶ 5.

**Defendants' Paragraph 6.**

Sims indicated that three males and two females were present in Bridgeforth's apartment during the time that she was held, including Bridgeforth and a French woman. (Deposition of Delano Broadus, taken on April 4, 2017 (hereinafter "Broadus Dep."), annexed to the Bardauskis Decl. as Exhibit "Q" at 49:7-13, 52-53:20-13, 63:13-20; 52-53:20-13; Transcript of the Deposition of Jasmine Bridgeforth, taken on September 13, 2017 (hereinafter "Bridgeforth Dep."), annexed to the Bardauskis Decl. as Exhibit "F," at 31:5-7; Sanchez Dep., annexed to the Bardauskis Declaration as Exhibit "J," at 27-28:25-16; 29:15-23; 35:5-25; 36:2-7; Transcript of

the Deposition of Detective John Zerafa, taken on April 25, 2017, (hereinafter "Zerafa Dep."),

annexed to the Bardauskis Declaration as Exhibit "I", at 17:8-24; Transcript of the Deposition of

non-party Lieutenant Michael Guenther, taken on June 7, 2017, (hereinafter "Guenther Dep."),

annexed to the Bardauskis Declaration as Exhibit "K", at 5:12-23, 8-9:17-22, 13:10-22).

**Plaintiffs' Responsive Paragraph 6.**

Denied that this fact is material and undisputed when considered in isolation. Sims later

told Defendants that Fairfax and Kirkland were present in Apt. 3C but did not do anything. As a

result, Kirkland was solely arrested for Obstructing Governmental Administration because he did

not answer the door for police quickly enough, and Fairfax asked Defendants why they were

arresting him when Sims announced in front of them that Fairfax had not done anything. See ¶¶

101, 106-07.

**Defendants' Paragraph 7.**

Sims alleged that Fairfax was also present inside the subject apartment at 1430

Amsterdam Avenue during the time of the acts alleged and that he refused to allow her to leave

as she was held by knifepoint. (NYPD Omniform Arrest Report pertaining to Plaintiff David

Fairfax's arrest on October 9, 2014, Arrest Nos. M14688550 and M14688561 (hereinafter

"Fairfax Arrest Report"); NYPD Omniform Arrest Complaint (hereinafter "Fairfax Complaint

Report No. 2014-026-03115"), Complaint No. 2014-026-03115; and NYPD Omniform Arrest

Complaint (hereinafter "Fairfax Complaint Report No. 2014-026-03113"), Complaint No. 2014-

026-03113, collectively annexed to the Bardauskis Decl. as Exhibit "O."

**Plaintiffs' Responsive Paragraph 7.**

Denied. See ¶ 6.

**Defendants' Paragraph 8.**

5

Sims also stated to police that Broadus and Bridgeforth punched her repeatedly with a closed fist, resulting in swelling to the left side of her lip, as well as a laceration and injury to her left eye. (Bridgeforth Dep., Exhibit "F" to the Bardauskis Decl., at 26:20-24; Bridgeforth Arrest Report and Bridgeforth Complaint Report, Exhibit "P" to the Bardauskis Decl.; Broadus Arrest Report, Broadus Complaint Report, and NYPD Domestic Incident Report ("Broadus DIR") pertaining to Plaintiff Delano Broadus' October 9, 2014 arrest, collectively annexed as Exhibit "R" to the Bardauskis Decl.; NYPD Aided Report for Necola Sims, as reported on October 9, 2014, annexed to the Bardauskis Decl. as Exhibit "U").

**Plaintiffs' Responsive Paragraph 8.**

Denied that this fact is material and undisputed when considered in isolation. Defendants apparently did not themselves believe this at the time due to Sims' changing story because although Bridgeforth's arrest charges were originally entered as including assault, this was later crossed off of the command log and Bridgeforth's arrest report only had a reckless endangerment of a child arrest charge. Exh. 2 (arrest charge is reckless endangerment of a child); Exh. 42 (crossing out assault charge from those listed for Bridgeforth in the command log); see ¶¶ 212-216 (Sanchez failed to preserve his scratch reports as required, which records would have provided contemporaneous accounts of the evolution of Sims' story as he wrote it down); compare Exh. 13 at D43 (showing Sanchez originally arrested Bridgeforth for endangerment at 810) with Exh. 13 at D47-48 (showing Sanchez later changed it to include assault at 1818) with Exh. 13 at D48 (showing Sanchez later changing it back to endangerment alone at 2027) with Exh. 2 at D11 (showing Sanchez entered only endangerment on final, computerized arrest report).

**Defendants' Paragraph 9.**

6

Bridgeforth and Sims had a physical altercation on October 8, 2014, described as a "fist fight" by Plaintiff Broadus, as a result of which Bridgeforth had a swollen hand. (Bridgeforth Dep., Exhibit "F" to the Bardauskis Decl., at 26:4-24; Broadus Dep., Exhibit "G" to the Bardauskis Decl., at 41-43:22-2; Relevant Excerpts of Memobook of Police Ofificer Rafael Sanchez (hereinafter "Sanchez Memobook") for October 9, 2014, annexed to the Bardauskis Decl. as Exhibit "Z;" Sanchez Dep., Exhibit "J" to the Bardauskis Decl., at 98-99:24-17; 100-101:11-18).

**Plaintiffs' Responsive Paragraph 9.**

Admitted in part, denied in part. Admitted as to the altercation, about which Defendants had no contemporaneous knowledge. Denied as to Defendants' claim today that Bridgeforth's hand was swollen. See ¶¶ 67 (describing Sims leaping at Bridgeforth when Sims discovered Bridgeforth and Broadus together, and Broadus having to separate them), 176 (ADA Nolan producing DTP letters to Sanchez and stating that the DA's Office declined to prosecute Plaintiffs on any charge relating to Sims' complaint).

**Defendants' Paragraph 10.**

Sims further reported to police that Plaintiffs Bridgeforth and Broadus had a child less than four years of age, who was present in the apartment. (Broadus Arrest Report, Exhibit "R" to the Bardauskis Decl.; Bridgeforth Arrest Report, Exhibit "P" to the Bardauskis Decl.; Broadus Dep., Exhibit "G" to the Bardauskis Decl., at 39-40:24-4).

**Plaintiffs' Responsive Paragraph 10.**

Admitted. It was in the context of this child's ACS case that Defendant Sanchez affirmatively and maliciously lied under oath multiple times. See Pl. 56.1 ¶¶ 195-211.

**Defendants' Paragraph 11.**

Following Plaintiffs' arrests, it was determined that "Gloria" did not exist. (NYPD Unusual Occurrence Report, Exhibit "M" to the Bardauskis Decl.; Guenther Dep., Exhibit "K" to the Bardauskis Decl., at 54-55:8-17, 56 6-11; Sanchez Dep., Exhibit "J" to the Bardauskis Decl., at 143:16-25).

**Plaintiffs' Responsive Paragraph 11.**

Admitted with necessary emphasis that this was a determination arising from an NYPD investigation; that this determination was not just that Gloria did not exist, but that Sims had lied; and that the determination that Sims lied to the NYPD was made prior to Defendants arresting Plaintiffs. Exh. 22 (search for Gloria called off at 7:30 a.m.); Exh. 47 (stating Gloria was invented); Exh. 42 (Plaintiffs arrested at 8:10 a.m.); see Pl. 56.1 ¶¶ 112-121.

**Defendants' Paragraph 12.**

On October 9, 2014, at approximately 2:50 a.m., in response to the 911 call and the account provided by Sims, Officers Sanchez and Khan, and Sergeant Lee arrived at Bridgeforth's apartment. (Sanchez Memobook, Exhibit "Z" to the Bardauskis Decl; Relevant Excerpts of Memobook of Sergeant Demetrios Lee (hereinafter "Lee Memobook") for October 9, 2014, annexed to the Bardauskis Decl. as Exhibit "CC;" Relevant Excerpts of Memobook of Police Officer Mohammed Khan (hereinaflter "Khan Memobook") for October 9, 2014, annexed to the Bardauskis Decl. as Exhibit "BB").

**Plaintiffs' Responsive Paragraph 12.**

Admitted with necessary emphasis that Defendants arrived at Apt. 3C within fifteen minutes of Sims' 911 call, secured Apt. 3C's door, began surveillance of its perimeter to assure that no one secretly removed evidence from Apt. 3C before police entry—evidence like "Gloria," bathroom buckets, machetes, guns, chains, handcuffs, etc. Then, when Defendants entered Apt. 3C within ten minutes of their arrival, none of that evidence was found anyway.

Later, NYPD reviewed CCTV footage to assure that no one secretly removed Gloria from Apt. 3C before police entry and found that no one had.   See Pl. 56.1 ¶¶ 74-77, 89-90, 93-97, 111.

**Defendants' Paragraph 13.**

Police Officer Sanchez, non-party Lieutenant Guenther, and several non-party police officers from NYPD Police Service Area 6 (hereinafter "PSA 6") and the 26th Precinct knocked on Bridgeforth's door, loudly, for an extended period of time, and after receiving no response, the NYPD's Emergency Services Unit (hereinafter "ESU") was called. (NYPD Unusual Occurrence Report, Exhibit "M" to the Bardauskis Decl. ; Sanchez Dep., Exhibit "J" to the Bardauskis Decl., at 37-40:6-20; 51:7-16; Guenther Dep., Exhibit "K" to the Bardauskis Decl., at 14:19-25; 15:22-24; 16-17:12-4; 21:4-17).

**Plaintiffs' Responsive Paragraph 13.**

Denied.  The "extended" period of time was about ten minutes from the time Defendants began knocking.  Defendant Sanchez and other police arrived at 2:50 a.m., their "loud" knocking did not stir neighbors, and a sleepy Hau Sans opened the door to Apt. 3C ten minutes later.  Pl. 56.1 ¶¶ 89.

**Defendants' Paragraph 14**

After ESU was called, but before they arrived, non-party Sara Hau-Sans voluntarily opened the door and permitted officers to "look around." (Am. Compl., Exhibit "C" to the Bardauskis Decl., at 24; Sanchez Memobook, Exhibit "Z" to the Bardauskis Decl.).

**Plaintiffs' Responsive Paragraph 14.**

Admitted in part, denied in part.  Admitted that Hau Sans voluntarily opened the door to Apt. 3C.  Denied that Hau Sans gave officers consent to perform an hours-long warrantless search of Apt. 3C's appliances, cabinets, closets, papers, and more under the label "wellness check" relating to Gloria and FB.  Finally, this paragraph must include the necessary clarification

9

that Defendant Sanchez removed Hau Sans from Apt. 3C within minutes of her opening the door, whereupon he immediately handcuffed and arrested her in the hallway. See Pl. 56.1 ¶ 15 (explaining that the "wellness check" for FB and "Gloria" extended beyond FB's removal from the building and NYPD's determination that Gloria, as a fictional character, did not need her wellness verified); ¶ 90 (Hau Sans ordered into hallway, handcuffed and arrested within minutes of opening door).

**Defendants' Paragraph 15.**

In light of Sims' account, officers searched the apartment to ensure the safety of the child and "Gloria," who were allegedly inside the apartment. (Sanchez Dep., Exhibit "J" to the Bardauskis Decl., at 48:21-23; 50:4-9; 142-143:23-11; Sanchez Memobook, Exhibit "Z" to the Bardauskis Decl.; Guenther Dep., Exhibit "K" to the Bardauskis Decl., at 15:8-21; 25:9-12).

**Plaintiffs' Responsive Paragraph 15.**

Denied. Defendant Sanchez, Defendant Khan, Defendant Lee and other officers were not searching Apt. 3C without a warrant until 8:00 a.m. or later to ensure FB's safety when FB was no longer in Apt. 3C or even the building by 5:00 a.m. Similarly, Defendants were not searching Apt. 3C without a warrant until 8:00 a.m. or later to ensure Gloria's safety because Defendants knew by 7:32 a.m. that Gloria as a fictional character did not have safety concerns. Pl 56.1 ¶ 92 (FB transported to St. Luke's at approximately 5:00 a.m.); ¶¶ 93-94 (Sanchez searching and photographing Apt. 3C before Plaintiffs' arrests); ¶¶ 112-13 (Gloria does not exist and Level One Mobilization to find her terminated); ¶ 119 (finding more than five officers, Defendant Sanchez among them, in Apt. 3C at 8:00 a.m.).

**Defendants' Paragraph 16.**

Officers observed F.B., who was approximately three years old, inside of Bridgeforth's apartment with non-parties Hau-Sans and Kirkland. F.B.'s parents - Bridgeforth and Broadus -

10

were not in the apartment. (Am. Compl., Exhibit "C" to the Bardauskis Decl., at 25; Relevant

Excerpts of Memobook of non-party Police Ofificer Kelly Rourke, (hereinafter "Rourke

Memobook") for October 9, 2014, annexed to the Bardauskis Decl. as Exhibit "DD"; Bridgeforth

Dep., Exhibit "F" to the Bardauskis Decl., at 82:7-16; 84:1-3; Sanchez Dep., Exhibit "J" to the

Bardauskis Decl., at 55-56:10-7; 136:2-24; NYPD Unusual Occurrence Report, Exhibit "M" to

the Bardauskis Decl. ; Broadus Dep., Exhibit "G" to the Bardauskis Decl., at 40:14-25;

Transcript of the Deposition of Plaintiff David Fairfax, taken on March 31, 2017, (hereinafter

"Fairfax Dep."), annexed to the Bardauskis Decl. as Exhibit "H," at 41:23-25).

**Plaintiffs' Responsive Paragraph 16.**

Admitted in part, denied in part.  The fact is admitted.   The materiality of Bridgeforth

and Broadus having arranged for FB to have a babysitter while they were at work is disputed.

**Defendants' Paragraph 17.**

At approximately 5:17 a.m. on October 9, 2014, FB was transported to St. Luke's

Hospital for a wellness check, and was later placed in the custody of the New York City

Administration for Children's Services ("ACS"), a non-party to this suit. (Rourke Memobook,

Exhibit "DD" to the Bardauskis Decl.; Broadus Dep., Exhibit "G" to the Bardauskis Decl.; at

51:13-18; Bridgeforth Dep., Exhibit "F" to the Bardauskis Decl.; at 32:16-22).

**Plaintiffs' Responsive Paragraph 17.**

Admitted with the necessary clarification that (1) St. Luke's cleared FB as being

medically and physically well with no injuries, and (2) FB's placement in ACS custody was

driven in part by Defendant Sanchez and non-party Rourke's affirmative and knowingly false

statements to ACS regarding their observations at Apt. 3C.  See Pl. 56.1 ¶ 92 (FB cleared as well

with no injuries); ¶¶ 195-211 (Sanchez's various sworn lies to ACS).

**Defendants' Paragraph 18.**

Handwritten pieces of paper containing directions to the Harlem Vista Hotel, a well-known location for prostitution, postcard flyers for hourly rates of rooms, and two cell phones were recovered from the window sill of Plaintiff Bridgeforth's bedroom, and vouchered by Officer Sanchez as investigatory items. (NYPD Property Clerk Invoices, Invoice Nos. 1000562052 and 1000561836, pertaining to Plaintiffs' October 9, 2014 arrests, and including copies of notes themselves, annexed to the Bardauskis Decl. as Exhibit "V"; Sanchez Dep., Exhibit "J" to the Bardauskis Decl., at 74-75:6-6).

**Plaintiffs' Responsive Paragraph 18.**

Admitted in part, denied in part.  Denied to the extent that the postcard flyers are for real estate broker services with monthly and weekly rental rates, information about applicant qualifications, and moving company services. See Pl. 56.1 ¶ 99.

**Defendants' Paragraph 19.**

Detective Zerafa was not present during the first entry into Bridgeforth's apartment, and had no contact whatsoever with the complaining victim, Plaintiffs, or any nonparties until after Plaintiffs' arrests. (Zerafa Dep., Exhibit "I" to the Bardauskis Decl., at 14- 16:12-5; Relevant Excerpts of Memobook of Detective John Zerafa (hereinafter "Zerafa Memobook") for October 9, 2014 incident, annexed to the Bardauskis Decl. as Exhibit "AA"; Bridgeforth Arrest Report, Exhibit "P" to the Bardauskis Decl. ; Broadus Arrest Report, Exhibit "R" to the Bardauskis Decl.; Fairfax Arrest Report, Exhibit "0" to the Bardauskis Decl.).

**Plaintiffs' Responsive Paragraph 19.**

Admitted with the necessary clarification that the record amply demonstrates that Defendant Zerafa received debriefings and notifications from Sanchez, Guenther, Despaigne and others involved from the incident's inception.  This information sharing began early and remained regular throughout Zerafa's actions in this case. See Pl. 56.1 ¶ 116 (unusual incident

report re: Gloria being a fictional character and Sims' lie transmitted to Zerafa from Guenther); ¶¶ 124-28 (debriefings and notifications for Zerafa involving Sanchez, Guenther, and others involved from the incident's inception); ¶¶ 129-40 (Zerafa present at PSA6 and performing hours-long interrogations with Sanchez, who was involved from the incident's inception, when Sims reveals that Broadus is her boyfriend); ¶¶ 157-59 (Zerafa working directly on search-warrant matters with Despaigne, who was involved in the incident from its inception); Exh. 41 (Zerafa's notes, which cite to people he interviewed, list Lt. Guenther and Defendant Sanchez on the first page).

**Defendants' Paragraph 20.**

Deputy Inspector Despaigne was not present during the first entry into Bridgeforth's apartment, and was not involved in the arrests of Plaintiffs. (Bridgeforth Arrest Report, Exhibit "p" to the Bardauskis Decl. ; Broadus Arrest Report, Exhibit "R" to the Bardauskis Decl. ; Fairfax Arrest Report, Exhibit "0" to the Bardauskis Decl. ; Guenther Dep., Exhibit "K" to the Bardauskis Declaration, at 39:10-20).

**Plaintiffs' Responsive Paragraph 20.**

Admitted that Despaigne was not physically present during the first entry into Apt. 3C, denied that he was not involved in Plaintiffs' arrests. Defendant Despaigne's involvement in the incident touched arrests, investigations, searches and more. Other Defendants consulted and/or directly worked with him on various tasks to perpetuate the case. A jury could easily infer Despaigne's involvement in Plaintiffs' arrests and searches. See Pl. 56.1 ¶ 101 (Despaigne directing Sanchez to arrest non-party and how to charge him); ¶ 102 (Despaigne directing Guenther to continue investigation despite early facts contradicting Sims' statement); ¶¶ 157-59 (Despaigne executed the search warrant with Zerafa and was considered the search-team leader).

**Defendants' Paragraph 21.**

13

On October 9, 2014, at approximately 8:10 a.m., Bridgeforth was arrested by Police Officer Sanchez at her apartment on charges of Endangering the Welfare of a Child. (N.Y Penal Law 260. 10 (01)). (Bridgeforth Arrest Report, Exhibit "P" to the Bardauskis Decl.).

**Plaintiffs' Responsive Paragraph 21.**

Admitted in part, denied in part.  Admitted that Defendant Sanchez arrested Bridgeforth, denied as to which Sims allegation motivated the arrest insofar as Sims' claims changed over time.  The record's fact issue on this point is discussed in part supra, ¶ 8.  See Pl. 56.1 ¶ 133 (Defendants interrogated Plaintiffs for hours about various offense ideas they were investigating including drug trafficking, kidnapping, rape, false imprisonment); Exh. 12 (sex trafficking investigation); Exh. 21 (Miranda warnings); Exh. 42 (crossing out initial assault and false imprisonment charges from Bridgeforth's command log entry).

**Defendants' Paragraph 22.**

On October 9, 2014, at approximately 8:10 a.m., Broadus was arrested by Police Officer Sanchez at Bridgeforth's apartment on charges of Unlawful Imprisonment in the First Degree (N.Y. Penal Law 136. 10); Endangering the Welfare of a Child CN.Y. Penal Law 260. 10 (01); and Assault with Intent to Cause Physical Injury (N.Y. Penal Law 120.00(01)). (Broadus Arrest Report, Exhibit "R" to the Bardauskis Decl.).

**Plaintiffs' Responsive Paragraph 22.**

Admitted in part, denied in part.   Admitted that Defendant Sanchez arrested Broadus, denied as to which Sims allegation motivated the arrest insofar as Sims' claims changed over time.  See Pl. 56.1 ¶ 21.

**Defendants' Paragraph 23.**

On October 9, 2014, Fairfax was arrested by Police Officer Sanchez on charges of Unlawful Imprisonment in the First Degree. (N.Y. Penal Law 136. 10), and Criminal Contempt

14

in the Second Degree (N.Y. Penal Law 215.50(06)). (Fairfax Arrest Report, Exhibit "0" to the Bardauskis Decl. ).

**Plaintiffs' Responsive Paragraph 23.**

Admitted in part, denied in part.   Admitted that Defendant Sanchez arrested Fairfax, denied as to which Sims allegation motivated the arrest insofar as Sims' claims changed over time. See Pl. 56.1 ¶ 21.   In addition, as to the contempt charge, for which ADA Nolan indicated at least one necessary element was missing.   Pl. 56.1 ¶ 165 (Nolan stating decline to prosecute on any charge); ¶ 169 (Nolan stating that the contempt charge was missing a necessary element (at least one)).  Finally, it must be clarified that Defendant Sanchez did not add the contempt charge with the missing element until after Fairfax had already been jailed for approximately fourteen hours in connection with the incredible Sims allegations.  Pl. 56.1 ¶ 49.

**Defendants' Paragraph 24.**

Bridgeforth never spoke to any officer prior to being arrested. (Bridgeforth Dep., Exhibit "P" to the Bardauskis Decl., at 89:17-19).

**Plaintiffs' Responsive Paragraph 24.**

Admitted with necessary clarification that Plaintiffs were all interrogated at length at PSA6, Bridgeforth included, beginning roughly twenty minutes after Defendant Sanchez arrested Bridgeforth at Apt. 3C.  Pl. 56.1 ¶ 34 (admitting that Zerafa began interrogating Plaintiffs at 8:30 a.m.); Pl 56.1 ¶¶ 129-37; Exh. 13 at D45; Exh. 42 (Bridgeforth logged at PSA6 at 8:25 a.m.).

**Defendants' Paragraph 25.**

Bridgeforth never communicated that Sims allegedly saw her and Broadus having sex until after she was questioned at the precinct following her arrest. (Bridgeforth Dep., Exhibit "P"

to the Bardauskis Decl., at 88-89:22-8; Guenther Dep., Exhibit "K" to the Bardauskis Decl., at 10:14-20).

**Plaintiffs' Responsive Paragraph 25.**

Admitted with material clarification stated in Pl. 56.1 ¶ 24, which is that Defendants knew this starting approximately thirty minutes from Bridgeforth's arrest. See Exh. 13 at D45 (Sanchez begins paperwork with Sims relating specifically to newly learned facts that Sims was Broadus' girlfriend, was living in Apt. 3C, had discovered affair, etc., by 11:00 a.m.).

**Defendants' Paragraph 26.**

Prior to being arrested and being transported to the precinct, Broadus did not inform police officers of his relationship history with Sims, or any other details related to Sims. (Broadus Dep., Exhibit "G" to the Bardauskis Decl., at 51-52:13-9).

**Plaintiffs' Responsive Paragraph 26.**

Admitted with all material clarifications made supra.  See Pl. 56.1 ¶¶ 24-25.

**Defendants' Paragraph 27.**

Detective Zerafa, Officer Khan, Sergeant Lee, or Deputy Inspector Luis Despaigne, did not arrest Plaintiffs or the non-parties. (Zerafa Memobook, Exhibit "AA" to the Bardauskis Decl.; Khan Memobook, Exhibit "BB" to the Bardauskis Decl.; Lee Memobook, Exhibit "CC" to the Bardauskis Decl.).

**Plaintiffs' Responsive Paragraph 27.**

Admitted in part, denied in part.  Admitted that Defendant Sanchez was called the "arresting officer" on the "PSA6 collar" and he was the individual who received eighteen hours of overtime in cash for processing it.   Denied that Defendant Officer Khan did not participate in the arrests because he was Defendant Sanchez's partner and was personally involved, for example, transporting the Plaintiffs to PSA6 as arrestees.  Denied that Defendant Sergeant Lee

16

did not participate because he was PSA6's Integrity Control Officer on the scene and was personally involved in the investigation giving rise to the arrest, for example interviewing Sims and ignoring her observed intoxication and lies to approve Plaintiffs' arrests regardless. Denied that Defendant Deputy Inspector Despaigne did not participate because he was PSA6's Commanding Officer and was personally involved in directing arrests despite the lack of cause, directing Plaintiffs' detentions for investigation after Sims' lies were known, and directing searches and personally participating in a search after Sims' lies were known and with knowledge that Defendant Zerafa's search-warrant application omitted material information. Pl. 56.1 ¶ 86 (Lee observing Sims' intoxication and remaining part of the team at arrest scene through discovery of Sims' lies and through and including Plaintiffs' arrests despite Sims' known lack of credibility); ¶ 121 (Khan transporting the arrested Broadus to PSA6 from arrest scene where Khan had been for hours); ¶ 124 (Sanchez took "collars" but it was a specialized Vice matter requiring coordination); ¶ 162 (Sanchez received over eighteen hours of overtime in cash relating to Plaintiffs' arrests and detention on October 9, 2014).

**Defendants' Paragraph 28.**

On October 9, 2014, at approximately 11:00 a.m., Police Officer Sanchez reinterviewed Sims. (Sanchez Memobook, Exhibit "Z" to the Bardauskis Decl.).

**Plaintiffs' Responsive Paragraph 28.**

Admitted with material clarification that the reason Defendant Sanchez did this was because he had learned that Sims lied to NYPD for eight hours about knowing Apt. 3C's occupants only "in passing" as "loose acquaintances." Sims admitted that Broadus was her boyfriend, that she lived in Apt. 3C, and more. Pl. 56.1 ¶ 87 (Sims' original version); ¶¶ 135-40 (revelation of Sims' lie).

**Defendants' Paragraph 29.**

17

On October 9, 2014, Detective John Zerafa interviewed Sims in regard to her being a victim of possible sex trafficking. ("Opening/Callout DD5", Exhibit "S" to the Bardauskis Decl.).

**Plaintiffs' Responsive Paragraph 29.**

Admitted with material clarification that Defendant Zerafa's interview continued to elicit stories from Sims that were already disproven and which he knew about, i.e., the invented character Gloria and the "piss buckets" that were not in Apt. 3C. See Pl. 56.1 ¶ 19.

**Defendants' Paragraph 30.**

During Zerafa's interview of Sims, she provided a description of the subject location and evidence that might be found there. (NYPD Memorandum re: Search Warrant Request Application, annexed to the Bardauskis Decl. as Exhibit "W").

**Plaintiffs' Responsive Paragraph 30.**

Admitted with the material clarification that by the time of this interview on the morning of October 9, 2014, Defendant Zerafa knew that Sims had lied and in fact lived in Apt. 3C, and with the material clarification that by the time of the interview Defendant Zerafa knew that the "evidence" that Sims suggested might be in Apt. 3C was not there. Pl. 56.1 ¶ 19, ¶¶ 93-97 (NYPD Officers including Defendants observed no machetes, guns, knives, chains, handcuffs, buckets, Gloria, etc. inside Apt. 3C between arrival and Plaintiffs' arrests, and Sanchez photos showed that it was a room in disarray).

**Defendants' Paragraph 31.**

Sims further stated to Detective Zerafa, in sum and substance, that Broadus told Sims and "Gloria," "You two bitches are gonna be my new bitches" and that they would be taken to Hunts Point if they did not earn enough. (Opening/Callout DD5, annexed to the Bardauskis Decl. as Exhibit "S;" Broadus DIR, Exhibit "R" to the Bardauskis Decl. ).

**Plaintiffs' Responsive Paragraph 31.**

18

Admitted with the material clarification that when Sims reported this Zerafa already knew that Sims had lied about Gloria. Zerafa also already knew that Sims had lied about the handcuffs, chains, buckets, machetes, guns, and other items would be found in Apt. 3C (they had not been). Zerafa also already knew that Sims had lied about only knowing Plaintiffs in passing when in fact she lived in Apt. 3C and Broadus was her boyfriend. See Pl. 56.1 ¶¶ 19, 30, 93-97; see also Pl. 56.1 ¶ 34 (Zerafa began interrogating Plaintiffs at 8:30 a.m.), ¶¶ 135-36 (Plaintiffs stating that Sims lived in Apt. 3C and was Broadus' girlfriend); ¶¶ 137-38 (Sanchez confronting Sims about relationship lie); see also Pl. 56.1 ¶¶ 27, 87 (Sanchez began new paperwork at 11:00 a.m. relating to the newly discovered Sims lie that she was Broadus' girlfriend).

**Defendants' Paragraph 32.**

Sims further stated to Detective Zerafa, in sum and substance, that she escaped and called 911 when she was uncuffed in order to go to the bathroom. (Opening/Callout DD5, Exhibit "S" to the Bardauskis Decl.).

**Plaintiffs' Responsive Paragraph 32.**

Admitted with the material clarification that Zerafa knew at the time of Sims' report that she had falsely reported being kept naked or in a state of undress, yet had been found fully clothed; that she had invented Gloria; that she lied about machetes, buckets, guns, knives, handcuffs, and chains; that when Sims managed to escape, she stopped at a payphone in front of the building to call 911 with no apparent fear that the people who had kidnapped her were on her heels; and more. See Pl. 56.1 ¶ 3, ¶¶ 82-84 (when Defendants responded to Sims' 911 call that she had "just" escaped Plaintiffs who held her naked/partially undressed, Sims was fully clothed wearing shirt, sweatshirt, hat and sneakers); ¶¶ 112-16 (NYPD determining prior to Plaintiffs' arrests that Gloria did not exist and that Sims invented her).

**Defendants' Paragraph 33.**

19

Detective Zerafa transported Sims to the New York County District Attorney's Office
("DANY") to be interviewed by the prosecutor assigned to the case. (Zerafa Memobook, Exhibit
"AA" to the Bardauskis Decl.; Zerafa Dep., Exhibit "I" to the Bardauskis Decl., at 28:5- 15;
67:2-24; NYPD Complaint Follow-Up Informational (hereinafter "Search Warrant Application
DD5"), dated October 20, 2014, pertaining to Plaintiffs' arrest on October 9, 2014, annexed to
the Bardauskis Decl. as Exhibit "W").

**Plaintiffs' Responsive Paragraph 33.**

Admitted with the material clarification that he did this knowing that Sims was lying.
Sims did not testify under oath before the magistrate who weighed Defendant Zerafa's search
warrant application.  And Defendant Zerafa's search warrant application was rife with material
false statements and material omissions.  Pl. 56.1 ¶¶ 28-32 (numerous examples of known lies at
the time of Zerafa's presentation of Sims to the DA's Office), ¶ 141 (Sims did not testify under
oath before magistrate); Exh. 27 (same); Exh. 43 (search warrant application); Pl. 56.1 ¶ 36
(detailing the many material omissions in Zerafa's search warrant application).

**Defendants' Paragraph 34.**

On October 9, 2014, at approximately 8:30 a.m., Det. Zerafa interviewed Plaintiffs at the
precinct, as well as non-parties Sara Hau-Sans and Eric Kirkland, following their arrests. (Zerafa
Dep., Exhibit "I" to the Bardauskis Decl., at 14-16:12-5; Zerafa Memobook, Exhibit "AA" to the
Bardauskis Decl. ).

**Plaintiffs' Responsive Paragraph 34.**

Admitted.

**Defendants' Paragraph 35.**

Officers Sanchez and Khan, Sergeant Lee, and/or Deputy Inspector Despaigne, did not
participate in the questioning of Bridgeforth, Broadus, or Fairfax. (Sanchez Dep., Exhibit "J" to

the Bardauskis Decl., at 71:4-9; Sanchez Memobook, Exhibit "Z" to the Bardauskis Decl.; Khan

Memobook, Exhibit "BB" to the Bardauskis Decl. ; Lee Memobook, Exhibit "CC" to the

Bardauskis Decl. ).

**Plaintiffs' Responsive Paragraph 35.**

Admitted in part, denied in part.  Admitted as to Khan, Lee and Despaigne.  Denied as to

Defendant Sanchez.  Defendant Sanchez's memo book notes that he was at PSA6 during

Plaintiffs' interrogations, and Plaintiffs testified that Defendant Sanchez was involved.  Pl. 56.1

¶ 131 (stating Sanchez in room), ¶¶ 137-38 (Sanchez confronting Sims regarding her

relationship with Broadus based on Plaintiffs' answers during questioning); Exh. 13 at D45

(Sanchez noting involvement); Exh. 21 (Plaintiffs' interrogation warnings with Sanchez

handwriting).

**Defendants' Paragraph 36.**

On October 9, 2014, in reliance upon Sims' account, Detective Zerafa obtained a search

warrant to search Bridgeforth's apartment.  The search warrant was issued by the Honorable

Steven M. Statsinger of the Criminal Court of the State of New York, New York County, bearing

search warrant number 1066-2014. (Search Warrant, Criminal Court of the State of New York,

New York County, #1066-2014, annexed to the Bardauskis Decl. as "Exhibit X").

**Plaintiffs' Responsive Paragraph 36.**

Admitted in part, denied in part.  Admitted that Defendant Zerafa obtained the search

warrant using an application containing pieces and parts from Sims' changing stories, denied that

this was "Sims' account" because Sims had lied and changed her story so many times.  Because

Zerafa knew that much of what Sims had said was proven false, he also knew that the search

warrant application contained material false statements and material omissions and therefore

provided no constitutional privilege to search Apt. 3C.

21

For example, Defendant Zerafa swore in the application that Sims saw a young female sex prisoner at Apt. 3C but omitted from the application that NYPD investigation had long before determined that "Gloria" did not exist. Exh. 43; Pl. 56.1 ¶¶ 3, 11, 29, 32.

Defendant Zerafa swore in the application that handcuffs, chains, ropes and machetes were likely to be found in Apt. 3C but omitted from the application that NYPD's lengthy warrantless search earlier that morning had long before determined that these items were not in Apt. 3C. Exh. 43; Pl. 56.1 ¶¶ 12, 30-32.

Defendant Zerafa swore in the application that Sims reported that Broadus threatened her with a machete to her neck but omitted from the application that he knew there was no machete in Apt. 3C due to negative results from that morning's lengthy warrantless search. Exh. 43.

Defendant Zerafa swore in the appli cation that Sims stated to him that she knew Broadus "for some time" but omitted from the application that Sims lied to NYPD for eight hours that she knew him only in passing before finally admitting when confronted with the truth that Broadus was her boyfriend and that she lived with him and the other occupants of Apt. 3C. Exh. 43; Pl. 56.1 ¶¶ 28, 31.

Defendant Zerafa swore in the application that Sims ran out of the apartment and out of the building and called 911 from a payphone "near the building" but omitted that the payphone was directly across the street from the building. Exh. 43; Pl. 56.1 ¶ 34.

Defendant Zerafa omitted from the application that Sims appeared intoxicated. Exh. 43; Pl. 56.1 ¶ 86.

Defendant Zerafa omitted from the application that Sims told 911 and police that she had "just" escaped Apt. 3C where she had been kept naked or in a state of undress, yet she was fully clothed with multiple layers when police arrived. Exh. 43; Pl. 56.1 ¶¶ 3, 32.

**Defendants' Paragraph 37.**

22

The search warrant did not contain any mention of locks, bars, or sensors installed by Plaintififs Bridgeforth and Broadus. (Search Warrant, Exhibit "X" of the Bardauskis Decl. ).

**Plaintiffs' Responsive Paragraph 37.**

Admitted with the material clarification that this appears meant to suggest that Defendant Zerafa's search warrant application was sound because it stopped short of falsely mischaracterizing quotidian childproofing tools as evidence of sex trafficking.  Plaintiffs dispute that Zerafa's restraint in this regard legitimizes his search warrant application.  Pl. 56.1 ¶ 36, ¶ 126 (Zerafa testifying that housing locations sometimes have child bars on them).

**Defendants' Paragraph 38.**

On October 9, 2014, at approximately 9:45 p.m., Detective Zerafa and members of the NYPD Vice Major Case/Human Trafficking Team executed a search warrant at Bridgeforth's apartment in regard to a sex trafficking investigation. (NYPD Complaint Follow Up Informational (hereinafter "Search Warrant Execution DD5"), dated October 23, 2014, pertaining to Plaintiffs' arrest on October 9, 2014, annexed to the Bardauskis Decl. as Exhibit "W"; Zerafa Memobook, Exhibit "AA" to the Bardauskis Decl.).

**Plaintiffs' Responsive Paragraph 38.**

Admitted with the material clarification that Defendant Despaigne was part of the team executing the warrant, and that the team did not take any photos or video inside, did not collect fingerprints, hair, DNA or any other human biological material to test, and left in thirty minutes. Pl. 56.1 ¶¶ 39, 98, 159; Exh. 26 (Defendants' Admission No. 3).

**Defendants' Paragraph 39.**

Police Officers Sanchez and Khan, and Sergeant Lee were not present during the execution of the search warrant. (Sanchez Memobook, Exhibit "Z" to the Bardauskis Decl.; Khan

Memobook, Exhibit "BB" to the Bardauskis Decl.; Lee Memobook, Exhibit "CC" to the Bardauskis Decl. ).

**Plaintiffs' Responsive Paragraph 39.**

Admitted. However, one Defendant was present—Defendant Despaigne, who was the leader of the search warrant execution tactical plan. Exh. 16-17

**Defendants' Paragraph 40.**

A laptop and three cell phones were recovered from Bridgeforth's apartment during the execution of the search warrant. (Search Warrant Execution DD5, Exhibit "W" to the Bardauskis Decl. ; Zerafa Dep., Exhibit "I" to the Bardauskis Decl., at 41-42:23-17).

**Plaintiffs' Responsive Paragraph 40.**

Admitted with the material clarification that although the warrant authorized Defendant Zerafa to seize and examine these devices as potential criminal evidence, Defendant Zerafa only took them but never submitted them for examination. Instead, Zerafa closed the case. In May 2015, ADA Nolan had the devices searched and there was no relevant evidence on them. Pl. 56.1 ¶¶ 163, 172; Exh. 12 at D38 (falsely stating that Zerafa delivered the devices to Computer Crimes, and closing the case to negative results).

**Defendants' Paragraph 41.**

Wigs, keys, and cell phones were recovered and vouchered by Detective Zerafa as investigatory items. (NYPD Property Clerk Invoices, Invoice No. 1000562006; pertaining to Plaintiffs' October 9, 2014 arrests, annexed to the Bardauskis Decl. as Exhibit "Q"; Am. Compl., Exhibit "C" to the Bardauskis Decl., at p4).

**Plaintiffs' Responsive Paragraph 41.**

Admitted that Defendant Zerafa seized a set of keys, cell phones and two wigs owned by Bridgeforth, an African American woman, as evidence of sex trafficking.

24

**Defendants' Paragraph 42.**

No weapons, chains, or handcuffs were found in the subject apartment. (Guenther Dep.,
Exhibit "K" to the Bardauskis Decl., at 31:11-21; Zerafa Dep., Exhibit "I" to the Bardauskis
Decl., at 27:15-23; 45:10-14).

**Plaintiffs' Responsive Paragraph 42.**

Admitted.

**Defendants' Paragraph 43.**

DANY declined to prosecute Plaintiffs' criminal cases on October 10, 2014. (District
Attorney of the County of New York Declination of Prosecution Forms, annexed to the
Bardauskis Decl., as Exhibit "Y").

**Plaintiffs' Responsive Paragraph 43.**

Admitted with the material clarification that ADA Nolan did not find Sims to be a
credible witness, and with the material clarification that ADA Nolan issued related DTP letters to
Defendant Sanchez on October 10, 2014, at approximately 2:00 p.m.  Defendant Sanchez then
left without seeing to Plaintiffs' release, and Plaintiffs remained jailed for an additional five
hours before they were released.  See Pl. 56.1 ¶ 167 (Nolan did not find Sims credible), ¶ 168
(Sanchez received the letters at 2:00 p.m.), ¶ 175 (Sanchez did nothing with the letters), ¶¶ 175-
76 (Plaintiffs remained jailed five hours longer), ¶ 194 (Plaintiffs released five hours later).

**Defendants' Paragraph 44.**

Plaintiffs never went before a judge with respect to their arrests. (Bridgeforth Dep.,
Exhibit "#" to the Bardauskis Decl., at 64:3-6; Broadus Dep., Exhibit "#" to the Bardauskis
Decl., at 64:7-20; Fairfax Dep., Exhibit "H" to the Bardauskis Decl., at 57:12-15).

**Plaintiffs' Responsive Paragraph 44.**

Admitted.

**Defendants' Paragraph 45.**

Plaintiff Bridgeforth was the tenant of record on the lease for 1430 Amsterdam Avenue, Apartment 3C on October 9, 2014; she and her daughter (hereinafter "F.B.") were the only individuals listed on the lease at the time of the underlying incident. (Bridgeforth Dep., Exhibit "F" to the Bardauskis Decl. at 9:3-4; Applicable Excerpts ofNYCHA Lease Agreement pertaining to Plaintiff Bridgeforth at 1430 Amsterdam Avenue, Apartment #3C, (hereinafter "Lease Agreement") annexed to the Bardauskis Decl. as Exhibit "L;" NYPD Unusual Occurrence Report, Exhibit "M" to the Bardauskis Decl.).

**Plaintiffs' Responsive Paragraph 45.**

Admitted.

**Defendants' Paragraph 46.**

The aforementioned lease agreement explicitly states that the residence "shall be used solely as a residence for the Tenant and the members of the Tenant's household (i.e., those named in the signed application... or authorized by the Landlord and/or Managing Agent)," which only was Plaintiff Bridgeforth and her daughter. (Lease Agreement, Exhibit "L" to the Bardauskis Decl. ).

**Plaintiffs' Responsive Paragraph 46.**

Admitted but with the material clarification that NYCHA is an independent agency that is not a party to this case and for which Corporation Counsel is not its legal representative. Defendants do not claim that at the time of the incident, NYCHA had threatened any action or taken any action against Bridgeforth, any Plaintiff or non-party suggesting that NYCHA would construe Bridgeforth or anyone as having violated lease terms.

**Defendants' Paragraph 47.**

Prior to the date of the incident, Fairfax, as well as, non-parties Sara Hau-Sans and Eric Kirkland, were guests who had been sleeping in the living room of Bridgeforth's one bedroom apartment. (Bridgeforth Dep., Exhibit "F" to the Bardauskis Decl., at 74:2-4, 84-85:20- 9; Fairfax Dep., Exhibit "H" to the Bardauskis Decl., at 32:11-17; Broadus Dep., Exhibit "G" to the Bardauskis Decl., at 12:18-24).

**Plaintiffs' Responsive Paragraph 47.**

Admitted that Fairfax and Hau Sans lived at Apt. 3C prior to the date of the incident.

**Defendants' Paragraph 48.**

Neither Fairfax, nor non-parties Hau-Sans and Kirkland, paid rent or any bills for Bridgeforth's apartment. (Bridgeforth Dep., Exhibit "F" to the Bardauskis Decl., at 86-87:19-6).

**Plaintiffs' Responsive Paragraph 48.**

Admitted with the clarification that they made other contributions to the household's welfare, for example, Hau Sans shared in child care responsibilities relating to FB.  Pl. 56.1 ¶¶ 16, 57, 61, 65-66.

**Defendants' Paragraph 49.**

At the time of Plaintifif Fairfax's arrest, he had an active order of protection against him by non-party Sarah Hau-Sans, which he violated by being in the subject apartment with non-party Hau-Sans on October 9, 2014, the date of his arrest in the instant action. (Fairfax Dep., Exhibit "H" to the Bardauskis Decl., at 47-48:25-11; Order of Protection, Criminal Court, County of New York, Docket No. 2014NY074846, issued by the Hon. Robert M. Mandelbaum on September 30, 2014, annexed to the Bardauskis Declaration as Exhibit "N").

**Plaintiffs' Responsive Paragraph 49.**

Admitted in part, denied in part.  Denied because Fairfax did not violate the Order.  The DA's Office found that as to Defendant Sanchez's allegation on that charge in particular, the

necessary element of a violation was not present. Exh. 30 at D142. Although Plaintiffs contend that the contempt charge is thus immaterial to the case, it is material to note that Defendant Sanchez did not propose this rejected arrest charge against Fairfax until October 9, 2014, at 7:30 p.m. By that time, Fairfax had already been detained on the Sims allegation without cause for fourteen hours. Exh. 1D at D33.

**Defendants' Paragraph 50.**

Fairfax had been homeless at the time of his October 9, 2014 arrest, and had only been recently been staying at Plaintiff Bridgeforth's apartment on a temporary basis. (Fairfax Arrest Reports, Exhibit "0" to the Bardauskis Decl. ; Bridgeforth Dep., Exhibit "F" to the Bardauskis Decl, at 73:17-22).

**Plaintiffs' Responsive Paragraph 50.**

Admitted in part, denied in part. Denied that a person is "homeless" if s/he does not own title to a piece of real property or hold a lease in his/her name corresponding to a piece of real property. Denied that "homelessness" by Defendants' implied definition can give rise to any probable cause to arrest relevant in this case. Admitted that Bridgeforth invited Fairfax to stay at Apt. 3C, and that at the time of the incident Fairfax had recently been staying there. Pl. 56.1 ¶¶ 47, 58.

**Defendants' Paragraph 51.**

Bridgeforth had key locks on windows, window bars, and sensors installed on the doors of her apartment. (Sanchez Dep., Exhibit "J" to the Bardauskis Decl., at 91:3-10; 96- 97:24-6; 14-20; 98:2-16; Bridgeforth Dep., Exhibit "F" to the Bardauskis Decl., at 26:4-15).

**Plaintiffs' Responsive Paragraph 51.**

Admitted with material clarification. The locks and window guards were NYCHA fixtures. The window guards were required by law for homes with children under the age of ten

28

to protect against fall risks.  When Sims subscribed to Time Warner cable (the bill was in her name), that company offered and installed the sensors as additional childproofing for families with children tall enough to reach doorknobs.  Pl. 56.1 ¶ 59.

## PLAINTIFFS' SUPPLEMENTAL STATEMENT OF FACTS

### Plaintiffs Live Together At 1430 Amsterdam Avenue, Apt. 3C With Broadus' Then-Girlfriend Necola Sims

52.     Broadus and Bridgeforth were a couple for many years.  In 2010 they had a daughter named "FB."  Bridgeforth Tr. 8:18-20.

53.     Broadus and Bridgeforth separated and in 2014 had shared custody of FB.  In June of that year, Bridgeforth successfully applied to lease Apt. 3C at 1430 Amsterdam Avenue in NYCHA's Manhattanville Houses.  Exh. 7 (part of Bridgeforth's June 2014 application acknowledging window-guard requirement for tenants with children under age ten); Exh. 9 (showing Apt. 3C's location in the building floor plan, and Apt. 3C's own layout); Exh. 10 (photos of Apt. 3C's kitchen, living room, entrance, and bedroom); Exh. 35 at 10-11 (Family Court Order regarding shared custody).

54.     Bridgeforth signed NYCHA paperwork acknowledging that NYCHA was required by law to install window guards in Apt. 3C to protect against child-fall risk.  This was due to the fact that FB was under ten years old.  Exh. 7 (window guard form); Exh. 8 (collection of window-guard regulatory material published by City Defendant online); Exh. 10 at 4.

55.     In the summer of 2014, Broadus had a girlfriend named Necola Sims. Bridgeforth met her and the women were on good terms.  Bridgeforth Tr. 21:7-8, 24:9-24

29

(describing her good relationship with Sims); Exh. 13 at D45 (Sims telling police that Broadus was her boyfriend).

56.     In September 2014, Bridgeforth and FB moved into Apt. 3C. At about the same time, she learned that Broadus and Sims did not have a regular place to live. She learned that the same was true for Broadus' "nephew" (term of endearment, no blood relation) David Fairfax and his then-girlfriend Sarah Hau Sans. The two couples—Broadus and Sims, and Fairfax and Hau Sans—helped one another. Bridgeforth knew Fairfax and Hau Sans both, and asked Hau Sans to baby sit FB various times during the summer of 2014. Bridgeforth Tr. 19:1-14, 21:7-12; Fairfax Tr. 46:6-7 (testifying that he called Broadus' girlfriend Sims "mama" because they had met when they were homeless and she had been a maternal figure to him); id. at 42:5 (Broadus an uncle figure).

57.     Bridgeforth invited the two couples to stay with her and FB in Apt. 3C. FB had particular affection for her babysitter Hau Sans. Bridgeforth Tr. 21:7-12; id. at 24:9-24 (describing her good relationship with Sims); id. at 29:15-16 (describing that FB and Hau Sans got along well).

58.     Bridgeforth and FB kept the bedroom for themselves, and the others slept in the living room. Broadus Tr. 36:17.

59.     Sims put the Time Warner bill in her name, and Time Warner installed a device on Apt. 3C's front and bathroom door as a child-proofing measure for three-year-old FB's safety, who was tall enough to reach doorknobs. Bridgeforth Tr. 24:17-19; id. at 26:6-27; Exh. 24 (Time Warner cable bill in Sims' name); Exh. 41 (Zerafa hand notes noting "Cable").

60.     Broadus earned money sorting, bagging and selling recyclables. He had arrangements with various commercial and residential buildings where staff granted him collection access on certain nights of the week. Broadus Tr. 23:15-23; id. at 41:10-21

(explaining that once Broadus sorted and bagged four thousand pieces of recyclables, he notified the recycling center to send a collection truck); Exh. 10 at 5-6 (photo of representative bag-and-sort).

62. Bridgeforth helped Broadus with his recycling work at times.  When she did, Hau Sans babysat FB as she had before moving in.  Exh. 2 at D5 (Sims telling police that Broadus worked recycling); Zerafa Tr. 87:19-25, 88:6-9 (testifying that he learned during investigation that Hau Sans lived in Apt. 3C, was from France, and babysat FB, and stating that he found it strange that someone from France would live at 1430 Amsterdam Avenue); Broadus Tr. 40:24-41:3.

## October 8, 2014, Events—Sims Becomes Upset And Leaves

62. On October 8, 2014, at around 6:30 p.m. or 7:00 p.m., the group made and ate a dinner of meatloaf, mashed potatoes and gravy.  There were leftovers.  Broadus Tr. 26:22-23; Bridgeforth Tr. 18:2-11.

63. Sims had been drinking all day that day and was noticeably intoxicated.  Broadus Tr. 37:4-8, 38:13-22; Bridgeforth Tr. 20:23-25; Exh. 32 at D140.

64. Shortly after dinner, Sims left Apt. 3C to visit friends.   Broadus Tr. 38:23-39:2.

65. Broadus and Bridgeforth were planning to go to work.  Hau Sans had agreed to babysit FB.  Another friend of the group, Eric Kirkland, had had dinner with the group in Apt. 3C and planned to stay with Hau Sans.  Bridgeforth Tr. 19:21-20:7, 29:14-30:4.

66. Broadus and Bridgeforth had begun to have an affair since Broadus and Sims moved in.  Before leaving for work, and while Sims was out, Broadus and Bridgeforth went into the bedroom.  Hau Sans, Kirkland and FB remained in the living room.  Zerafa Tr. 87:19-25,

88:6-9 (testifying that he learned during investigation that Hau Sans lived in Apt. 3C, was from France, and babysat FB); Broadus Tr. 44:2-5, 47:17-48:9

67.     Sims came home unexpectedly, opened the bedroom door, and found Broadus and Bridgeforth in flagrante.  Sims leapt angrily at Bridgeforth and Broadus had to physically separate them.  Sims left Apt. 3C upset.  Broadus Tr. 46:10-23; Bridgeforth Tr. 25:14-16, 68:21-22.

68.     Fairfax visited Apt. 3C and briefly spoke to Broadus as Sims left upset.  At the time, Fairfax did not know the full details regarding what had happened.  Fairfax Tr. 39:15-40:3.

69.     After Sims left, Broadus and Bridgeforth got ready to do bottles and cans.  They left sometime around 10:00 p.m.  Hau Sans and Kirkland remained in Apt. 3C with FB, who was already in bed when Broadus and Bridgeforth left for work.  Broadus Tr. 40:14-41:3; Bridgeforth Tr. 20:1-2.

70.     Fairfax left Apt. 3C, too.  Fairfax Tr. 40:4-19.

## Sims' 911 Call From A Payphone In Front Of 1430 Amsterdam Avenue

71.     At 2:33 a.m. Sims went to a payphone in front of 1430 Amsterdam Avenue, called 911 and told the operator that she had "just" run out of an apartment on the third floor of that building where "they were holding me hostage."   Exh. 6 at 2; id (audio); Exh. 22 at D90; Sanchez Tr. 33:9-12 (the pay phone was on Amsterdam Avenue across the street from 1430 Amsterdam Avenue between 131st and 133rd); Exh. 48 at 1 (aerial map); Zerafa Tr. 60:13-14.

72.     In the 911 call, Sims reported that her captors had guns, knives, chains and other weapons.  Exh. 6 at PL8-9 ("They got everything up in there."), 7:15-17 ("They got guns, knives,

chains, they got everything."), 8:10-14 (Q: "You said . . they have weapons . . ." A: "Correct."); id. (audio).

73.      Sims told the 911 operator no less than five times that she had "just" run out of the building, where her captors tried to make her a prostitute along with a young girl who remained a prisoner inside.  Exh. 6 at 3:3-5 ("I just ran out of the house they were holding me hostage in.") (emphasis added), 3:7-9 (same), 4:24-25 ("The emergency is I just was held as a hostage.") (emphasis added), 6:5-7 ("It just happened.") (emphasis added); id. at 5:8-10 ("[T]here's a girl stuck up there."), 5:13-15 ("And there's a girl that was with me up there too."), 7:17-18, 8:8-9 ("There's a girl stuck in there.").

## Police Arrive Within Fifteen Minutes Of Sims' 911 Call, Secure Apt. 3C's Door And Watch The Perimeter Of 1430 Amsterdam Avenue

74.      Dispatch began to transmit details about Sims' 911 call to police immediately, i.e., the fact that she had been beaten "just now" by people who were "inside" the apartment and who had weapons, etc.  Exh. 22 at D90.

75.      The first responding police officers arrived roughly ten to fifteen minutes later. Exh. 1 (2:30 a.m.); Exh. 2 (same); Exh. 3 (same); Exh. 32 at D145 (noting 2:35 a.m. arrival), D403 (noting 2:48 a.m. arrival on scene); see id. at D139 (2:50am arrival); id. at D145 (stating the call to the location came at 2:35 a.m.); id. at D266 (2:50 a.m. arrival).

76.      Defendant Officer Rafael Sanchez, Sanchez's partner Defendant Officer Mohammed Khan, Defendant Officer Demetrious Lee, non-party Lt. Michael Guenther, non-party Officer Kelly Rourke, non-party Officer Fontaine, and non-party Officer Kramel were

33

among the first on the scene.  Sanchez Tr. 24:24-25:2, 25:23-24 (Guenther and Rourke already

on the scene when Sanchez and Khan arrived); Exh. 32.

     77.     Upon arrival, NYPD secured the door to Apt. 3C, secured the perimeter of 1430

Amsterdam Avenue, and surveilled Apt. 3C's windows to see if there were any lights on inside

and to see if anyone attempted to escape through a window.  Guenther Tr. 16:14:24.

### Sims Tells Law Enforcement What They Will Find Inside Apt. 3C:  A Teen Sex-Trafficking Victim Named "Gloria," Handcuffs, Chains, A Machete, A Blue Bucket For Prisoners' Human Waste, And More

     78.     Sims reported to Defendant Sanchez and other responding police that her captors

held Sims and a teen girl named Gloria together and they were either chained or handcuffed to a

radiator in Apt. 3C.  Sanchez Tr. 28:8-9 (testifying that Sims said she was chained to radiator

with a teen girl named Gloria); Guenther Tr. at 9:20-22 (testifying that Sims said she was

chained to the radiator); Exh. 23 at D93 (Sanchez photo captions stating that Sims said she was

handcuffed to radiator); Exh. 32 at D140 (Defendant Lee writing that Sims and Gloria had been

held naked and chained).

     79.     Sims told police that Gloria had her toenails painted purple and/or that she was

wearing Hello Kitty socks.  Exh. 32 at D138 (Defendant Lee noting that Gloria was reported to

have purple-painted toenails); id. at D146 (non-party Rourke writing that Gloria was reported as

being naked save for Hello Kitty socks).

     80.     Sims reported to law enforcement that her captors had weapons including a

machete that was held to her neck.  Exh. 43 at ¶ 2.b., 6 (search warrant application stating that

Zerafa had cause to believe he would find a machete inside Apt. 3C); Exh. 44 (ADA Nolan hand

notes from October 9, 2014, meeting with Sims stating "machete to neck"); Zerafa Tr. 113:21-22.

81.     Sims reported to law enforcement that her captors forced Sims and Gloria to go to the bathroom in a blue bucket while they were chained up. Exh. 44 at D332 ("blue bucket"); Zerafa Tr. 18:4-7, 35:10-13.

82.     Sims reported to Defendant Sanchez and other responding police officers that her captors kept Sims and Gloria naked or in provocative clothing and were taking photographs of them in these states of undress. Sanchez Tr. 20:9-13, 28:9-10 (testifying that Sims was forced to wear provocative clothing); id. at 35:5-10; Guenther Tr. at 9:20-22 (testifying that Sims said she was chained to the radiator); Exh. 32 at D140 (Defendant Lee writing that Sims and Gloria had been held naked and chained).

83.     Sims reiterated to police that she had "just" escaped from Apt. 3C and that Gloria was still inside chained naked to the radiator. Guenther Tr. at 10:23-25 (testifying that Sims reported being held "most recently" and being afraid for Gloria who was still inside); Exh. 43 ¶ 6; Zerafa Tr. 58:16-20; see Guenther Tr. at 10:23-25, 13:13-15, 13:19-22.

84.     When NYPD responded to the 911 call, they did not find Sims in a state of undress. They found Sims fully clothed and wearing normal clothing that included a T-shirt, hooded sweatshirt, baseball hat, and black Nike sneakers. Sanchez Tr. 30:20 (testifying that when he arrived on the scene shortly after Sims' 911 call, Sims was "clothed fully"); Exh. 32 at D146 (describing Sims' clothes); Guenther Tr. at 9:16.

85.     Sims told Defendants and other officers that she had been a prisoner of Plaintiffs' sex-trafficking operation for approximately six hours—from approximately 7:30 p.m. on October 8, 2014, through the time she escaped and called 911 on October 9, 2014, at 2:33 a.m. Exh. 1 at D4 (complaint against Broadus indicating the crime began at 7:30 p.m. on October 8, 2014);

Exh. 2 at D14 (complaint against Bridgeforth, same); Exh. 3 at D27 (complaint against Fairfax, same); Exh. 4 at D113 (complaint against Hau Sans, same); Exh. 30 (DA's Office decline-to-prosecute letters stating that the Plaintiffs' arrest charges arose from an offense occurring on October 8, 2014, beginning at approximately 7:30 p.m.).

86.     At least two officers—Defendant Demetrious Lee, who worked as PSA6's Integrity Control Officer at the time, and later Defendant John Zerafa—found Sims to appear intoxicated.  Exh. 32 ast D140 (Defendant Sgt. Lee's memo book); Exh. 47 (noting Lee's status as "ICO"); Zerafa Tr. 86:14; Broadus Tr. 63:5-12; Fairfax Tr. 45:24-46:3; id. at 83:2-5; Bridgeforth Tr. 68:17-20.

87.     Sims told Defendants and other officers that she knew her kidnappers in passing. She maintained this story for eight hours, when she admitted at PSA6 that she was actually Broadus' girlfriend and had been living in Apt. 3C.  Sanchez Tr. 28:4-6, 28:4-8, 28:25 (testifying that she was approached by an individual in the lobby of 1430 Amsterdam Avenue, invited to Apt. 3C for a party, then taken inside Apt. 3C at knifepoint); id. at 72:2-3, 73:6-7 (Sanchez testifying that for many hours Sims characterized her kidnappers as "loose acquaintances"); Guenther Tr. 9:25-10:4, 23:10-22 (testifying that he did not recall Sims telling police that she was in a relationship with Broadus), 67:16-21 (testifying that Sims told him that she knew Apt. 3C's occupants "in passing" and that he did not know that she had been Broadus's girlfriend), 87:7-9 (Guenther testifying that he never learned until his deposition that Sims lived in Apt. 3C).


**Hau Sans Opens The Door To Apt. 3C When The Police Knock, And Police Find Nothing That Sims Said They Would Inside:  No Gloria, No Machetes, No Bathroom Buckets, No Chains, No Handcuffs, No Guns, Etc.**

36

88.      Shortly after arriving at the scene, police knocked on the door to Apt. 3C "several times." Although there was no immediate response from inside Apt. 3C, the police's presence and knocks did not stir neighbors, either.    Guenther Tr. 21:6-22; Sanchez Tr. 40:13-17.

89.      Sometime around 3:00 a.m.—less than thirty minutes after Sims called 911 and roughly fifteen minutes after police arrived at the scene—Hau Sans voluntarily opened the door to Apt. 3C in response to the knocks. Guenther Tr. 21:6-10; Sanchez Tr. 40:19-20; id. at 63:14 (Sanchez at deposition stating from his memo book that Hau Sans opened the door to police at 3:00 a.m.); Exh. 13 at D43 (Sanchez's memo book noting that Hau Sans voluntarily opened Apt. 3C's door to police at 3:00 a.m.).

90.      Defendant Sanchez observed that Hau Sans "looked like she just woke up." Defendant Sanchez asked Hau Sans about Gloria, and Hau Sans said that there was no one named Gloria there.  Sanchez then asked Hau Sans to step into the hallway.  She did, and Sanchez arrested her.  This was minutes after she opened the door.  Sanchez wrote Hau Sans' arrest charges as false imprisonment.  NY Pen. L. 135.05 (unlawful imprisonment); Sanchez Tr. 41:2-14, 41:22-42:2, 42:13-19, 46:20-23; Exh. 4 (Hau Sans' arrest and complaint reports showing arrest charge and listing Sanchez as arresting officer); Exh. 30 at D367 (DA's Office document declining to prosecute Hau Sans' unlawful imprisonment arrest charge); Exh. 42 at D365 (PSA6 command log entry showing Hau Sans' unlawful imprisonment arrest charge and listing Sanchez as arresting officer).

91.      Defendant Sanchez proceeded to enter Apt. 3C and found Kirkland sitting on a bed in the living room.  Officer Rourke found FB sleeping inside the bedroom.  Sanchez Tr. 43:19-20, 47:20-25, 56:8-14.

92.      Officer Rourke removed FB from Apt. 3C and took her to St. Luke's Hospital for medical and physical examination, where FB was cleared and found without injury.  Sanchez Tr.

37

43:19-20, 47:20-25, 56:8-14; <u>Exh. 32</u> (Rourke memo book transporting FB to St. Luke's); <u>Exh.</u>
<u>34</u> at D161 (St. Luke's finding FB clear and without injury).

93.     Defendant Sanchez and other officers then began to search Apt. 3C—under the
bed, inside closets, inside the refrigerator, inside cabinets, through papers, and more.  Sanchez
Tr. 50:11-51:4; <u>id.</u> at 87:25-88:3, 93:8-12 (stating that the warrantless search and photography of
Apt. 3C occurred while it was still dark out in those early hours of the incident on October 9,
2014); Broadus Tr. 86:6-19 (noting Sanchez's subsequent admissions that his warrantless search
of Apt. 3C also included the refrigerator and kitchen cabinets); <u>Exh. 38</u> at PL100 (Sanchez
Family Court testimony about early-morning fridge and cabinet searches).

94.     Defendant Sanchez took photographs of Apt. 3C during that early warrantless
search, which show no handcuffs or chains on the radiator or elsewhere, no bucket for human
waste, no machete, no guns, no knives, or anything else that Sims told police they would find
inside.  Sanchez Tr. 88:6, 87:25-88:3, 92:4-6, 93:8-12 (testifying that the sun hadn't come up yet
that morning when he took the photos); <u>id</u> at 94:5-11 (testifying that he saw no chains and that
the radiator did not look like anyone had been chained to it); <u>id.</u> at 94:23-95:5 (testifying that he
took a picture of a closet because it had clothing in it, but that he did not observe any clothing on
the scene that was provocative); <u>Exh. 23</u> (indicating that the photos were loaded by 8:00 a.m.);
<u>see</u> Sanchez Tr. 93:24-94:5, 139:19-23, 145:6-10; Guenther Tr. 29:13-14, 30:4-17, 31:9-18,
31:19-21 (Guenther testifying that the only handcuffs in Apt. 3C were the ones he had brought
with him); <u>Exh. 23</u>; <u>Exh. 26</u> (Defendants' Admission No. 1).

95.     The search performed by Defendant Sanchez and other police revealed "no sign
of Gloria" inside Apt. 3C.  Sanchez Tr. 50:25-51:4, 139:22-23; Guenther Tr. 24:19-20, 29:6-8,
31:22-32:4; <u>Exh. 23</u> (Sanchez photos); <u>Exh. 47</u> (investigators concluding that Gloria was a
fictional character).

96.     Inside Apt. 3C, the radiator did not appear to have any marks or damage on it that would indicate that humans had been handcuffed or chained to it, and the Sanchez photos show none. Sanchez Tr. 94:6-11; Exh. 23.

97.     Lieutenant Guenther testified that he entered the bedroom where the sex-trafficking/hostage situation had allegedly taken place, and "it was just the room was in disarray." Guenther Tr. 25:2-5; Exh. 9 at 4 (bedroom labeled "GM," possibly for "Grand Master"); Exh. 23 at D101-104 (photographs taken by Defendant Sanchez during the warrantless search of Apt. 3C).

98.     During Sanchez's warrantless search of Apt. 3C early on October 9, 2014, he seized cell phones, two postcards and two pieces of paper. He later vouchered them. Sanchez Tr. 73:16-74:9; Exh. 29 at D126 (vouchering items around 7:00pm on October 9, 2014), D128 (same); Exh. 14 (Zerafa memo book noting that search warrant application process concluded around 7:25pm and that the search warrant was executed in thirty minutes from 9:45pm to 10:15pm); Zerafa Tr. 80:7-18.

99.     One of the postcards was a promotional postcard from Susman Realty Company advertising 1, 2 and 3 bedroom apartments for rent in Bronx, Manhattan and Brooklyn and noted that the company was seeking tenants who were working, eligible for Section 8 and/or eligible for RAP Program. Sanchez Tr. 74:14-20; Exh. 84 at D415-16. The second postcard was a promotional postcard from K&K Room Finders advertising it room-rental and local-moving services. Id. at D417-18.

100.    Defendant Sanchez arrested Kirkland, but not for false imprisonment like Hau Sans. This was because Sims told Defendant Sanchez that although Kirkland had been present in Apt. 3C when she was chained to the radiator for hours, according to Sims, Kirkland "didn't do anything." Sanchez Tr. 53:12-15, 55:2-3.

101.    Defendant Sanchez called PSA6 Commanding Officer, Defendant Deputy Inspector Luis Despaigne, to ask him how to handle Sims' statement that Kirkland was there but not responsible.  Defendant Despaigne told Defendant Sanchez to arrest Kirkland for Obstructing Governmental Administration for failure to open the door sooner when police knocked.  Sanchez handcuffed and arrested Kirkland.  NY Pen. L 195.05; Sanchez Tr. 51:10-16; Exh. 5 (Kirkland's arrest and complaint reports showing OGA charge and listing Sanchez as arresting officer); Exh. 30 at D366 (DA's Office document declining to prosecute Kirkland's OGA arrest charge); Exh. 42 at D365 (PSA6 command log entry showing Kirkland's OGA arrest charge and listing Sanchez as his arresting officer).

102.    Lt. Guenther also called Defendant Deputy Inspector Luis Despaigne, the PSA6 Commanding Officer, to explain that NYPD had found no Gloria, no guns, no machetes, no handcuffs, no chains, no bathroom buckets, etc., inside Apt. 3C.  Defendant Despaigne responded that investigation should continue and to call Vice.  Guenther Tr. 40:4-11, 53:14-17.

**Fairfax Returns To 1430 Amsterdam Avenue And Is Arrested**
**Walking On The Sidewalk Outside**

103.    At around 4:45 a.m., Fairfax walked along the side of 1430 Amsterdam Avenue, and he saw Sims talking outside with non-party Officer Kramel.  When Sims saw Fairfax "walking down the pathway [in front of] 1430 Amsterdam Avenue" she said he was involved in the incident.  Exh. 32 at D311; Exh. 42 at D247 (Fairfax delivered to the PSA6 for arrest processing by 5:15 a.m.); Fairfax Tr. 45:13-16.

40

104. Defendant Sanchez immediately handcuffed and arrested Fairfax and other officers congregated as Fairfax was handcuffed. Exh. 3 at D109 to D135; Fairfax Tr. 86:7-10; Sanchez Tr. 62:13-15.

105. While Fairfax was handcuffed and in Defendant Sanchez's custody, Sims began to hit, yell and spit at Fairfax. Sanchez let Sims do this to the handcuffed Fairfax and did not stop her. Fairfax Tr. 82:17-84:16; id. at 84:1-16 (clarifying that Sims repeatedly "mushed," or aggressive tapped Fairfax's head).

106. Fairfax still not know why he had been arrested. It was evident that Sims had told police to arrest him, and he asked Sims why. Sims said that Fairfax "didn't do it" but that Fairfax had spoken to Broadus. Defendant Sanchez and a group of other officers were present when Sims stated this, and heard it. Fairfax Tr. 46:1-2, 86:7-10.

107. Defendant Sanchez and another officer transported Fairfax to PSA6. In the vehicle, Fairfax asked how he could be arrested on the basis of a Sims complaint if Sims had just said that Fairfax did not do anything. Fairfax Tr. 53:7-15; id. at 66:14-18 (testifying as to his confusion about the arrest when Sims said that Fairfax did not do anything, but Defendant Sanchez still arrested him).

108. Defendant Sanchez left Fairfax's questions unanswered, dropped Fairfax off at PSA6, then returned to 1430 Amsterdam Avenue. Defendant Sanchez was back at 1430 Amsterdam Avenue by around 5:40 a.m. Sanchez Tr. 63:4-8; Exh. 42 at D247 (command log, Fairfax arrival at 5:15 a.m.).

**Police Put Out A City-Wide "Level One" Mobilization Looking For Gloria**

41

109. Initially, NYPD treated Gloria as a missing person.   At around 5:25 a.m., non-party Lt. Guenther activated a City-wide "Level One" mobilization directing officers on duty to be on the lookout for Gloria.  Guenther Tr. 45:2-10; Exh. 22 at D80-81; Exh. 28 at D369 (Guenther memo book).

110. Meanwhile, two "Night Watch Detectives"—Guzman and Dean—were investigating Sims' claims.  Guzman and Dean were on the scene by 5:30 a.m.  Exh. 32 at D312 (Dean noting arrival at 5:30a.m.); Exh. 13 at D43 (Sanchez noting he began interacting with Dean and Guzman at the scene around 6:00 a.m.).

111. Among other things, Dean and Guzman's investigation involved the review of NYCHA CCTV camera footage for 1430 Amsterdam Avenue and interviews with Hau Sans and Kirkland.  Exh. 26 (Defendants' Admission No. 5); Exh. 47 (unusual incident report); Exh. 31.

**NYPD Detectives Complete Their Investigation, Conclude That Sims Lied About Gloria, And The City-Wide Level One Mobilization For Gloria Is Terminated 7:30 a.m.**

112. On October 9, 2014, by 7:30 a.m., Detectives Dean and Guzman's investigation determined that Sims lied about Gloria.  Exh. 47.

113. On October 9, 2014, at 7:32 a.m. the Level One Mobilization that was being transmitted on dispatch to find Gloria was terminated.  This was within two hours of its activation.  Guenther Tr. at 61:7-11; Exh. 22 at D85 (Level 1 termination begins at 7:32), D86-87 (Level 1 cancellation transmitted on dispatch for all city zones); Exh. 26 (Defendants' Admission No. 4).

114.   No complaint report was ever written documenting "Gloria" as a missing person, although this is normal procedure in connection with Level 1 activations.  Guenther Tr. 57:15-20, 58:5-11.

115.   No one ever investigated "Gloria" as a missing person again.  Zerafa Tr. 25:6-10.

116.   Lt. Guenther wrote an "unusual incident report" that morning for the Chief of the NYPD.  In it, Guenther wrote that Sims reported to police that she only known her captors "in passing," that NYPD detectives concluded "that a girl named Gloria did not exist" and that "[i]t is believed that Necola Sims embellished her account of the details that occurred inside of the apartment."  Lt Guenther sent notifications of his unusual incident report to Defendant Deputy Inspector Luis Despaigne and Defendant Vice Defendant John Zerafa.  Exh. 47.

## Bridgeforth and Broadus Return From Work After NYPD Detectives Determined Sims Lied, Find Police Still Searching Apt. 3C, And Are Immediately Arrested

117.   At approximately 8:00 a.m., Bridgeforth and Broadus returned to 1430 Amsterdam Avenue.  Broadus Tr. 50:2-25; Exh. 13 D43 (Sanchez memo book noting that by 8:10 a.m. Broadus and Bridgeforth had been arrested at Apt. 3C).

118.   On the third floor, Bridgeforth and Broadus saw police officers in the hallway. This was more than five hours after Sims had called 911 at 2:33 a.m. and after NYPD Detectives had already determined that Sims had lied to NYPD about Gloria and other allegations.  Broadus Tr. 50:15-20; Bridgeforth Tr. 30:15-16; Zerafa Tr. 60:13-14 (noting 2:33 a.m. 911 call); Exh. 22 at D85 (noting that the Level One termination began to be issued aroudn 7:30 a.m.).

119.   Broadus and Bridgeforth entered Apt. 3C, and found more than five officers inside, including Defendant Sanchez.  Broadus Tr. 50:23-25; id. at 54:23-55:15 (Broadus

remembering Sanchez specifically being present at the time Broadus and Bridgeforth arrived at Apt. 3C and at the time of their arrests because Broadus later saw Sanchez again at a Family Court proceeding where Sanchez gave sworn testimony); Bridgeforth Tr. 30:15-16.

120.    According to Defendant Sanchez, "the first thing that actually came out from [Broadus'] mouth . . . was 'Where's my daughter.'" Sanchez Tr. 129:13-16; see Broadus Tr. 51:16-20 (confirming same).

121.    Sanchez searched, handcuffed and arrested Bridgeforth and Broadus within minutes of their arrival at Apt. 3C. Defendant Khan and Defendant Sanchez then transported arrestees Broadus, Bridgeforth, Kirkland and Hau Sans to PSA6 for detention. Broadus Tr. 57:8-14; Bridgeforth Tr. 57:21-58:2; Exh. 42 at D365; Broadus Tr. 58:15; Sanchez Tr. 63:14-19 (arrests at approximately 8:10 a.m.); Exh. 32 at D267 (Khan transporting Broadus and Kirkland after being on arrest scene with Sanchez since the partners' arrival).

122.    At PSA6, Bridgeforth broke down and all the arrestees listened to her crying hysterically in her cell. Broadus Tr. 61:7-14 (Bridgeforth crying profusely); Fairfax Tr. 57:24-58:1 (Bridgeforth crying hysterically).

## Vice Detective Zerafa Responds, Is Debriefed And Investigates

123.    Between 8:00 a.m. and 8:30 a.m., Defendant John Zerafa of NYPD's Vice Unit began investigating the incident. Zerafa Tr. 56:2-6; Exh. 12 at D36.

124.    Defendant Officer Sanchez, Lieutenant Guenther, the Night Watch Detectives and other PSA6 officers debriefed Defendant Zerafa. Guenther Tr. 73:12-16; id. at 82:19-83:25 (Guenther testifying that because Defendant Sanchez took Plaintiffs as a "PSA 6 collar," in his experience NYPD Vice would aid in the arrest due to the need for specialized knowledge about

evidence specific to sex trafficking that a novice officer would not have); Zerafa Tr. 14:21-22, 15:17-19, 20:17-21:3, 83:7-20; Sanchez Tr. 63:10-11 (noting Dean and Guzman on the scene while Sanchez was on the scene at approximately 6:00 a.m.); id. at 129:16-19 (testifying that Dean, Guzman and Sanchez were all still together at Apt. 3C at approximately 8:00 a.m. when Bridgeforth and Broadus returned from work); Exh. 13 at D42 (Sanchez noting Dean and Guzman in his notes); id. at D45 (Sanchez noting his October 9, 2014, 8:45 a.m. debriefing with Vice Detectives Zerafa and Munoz, Plaintiffs and non-party arrestees); id. at D46 (Sanchez noting his work with Vice Detectives on October 9, 2014, 1:30 p.m., showing them photographs that he took during a warrantless search of Apt. 3C earlier that morning prior to Vice's arrival); id. at D46 (Sanchez noting he worked alongside Vice around 3:30p.m. as they continued to interrogate Plaintiffs); id. at D47 (Sanchez noting that Vice told him to prepare arrest paperwork while Zerafa went to DA's Office to seek search warrant).

125.   Through these debriefings, Defendant Zerafa learned about the early-morning warrantless search of Apt. 3C and the fact that Defendant Sanchez and other officers found nothing Sims said would be there.  Zerafa also looked at the Sanchez photos, and saw no Gloria, no machete, no guns, no knives, no handcuffs, no chains, no bathroom bucket, etc.  Exh. 13 at D46 (Sanchez showing Vice the photos); Exh. 23 (the photos); Exh. 26 (Defendants' Admission No. 1).

126.   When asked at deposition about the Sanchez photographs of the child-safe window guards in Apt. 3C, Zerafa testified that "sometimes housing locations, they have child bars, you know, on them." Zerafa Tr. 100:8-10.

127.   Defendant Zerafa learned that Night Watch Detectives Dean and Guzman had concluded that Sims had lied after investigation that included reviewing CCTV footage, interviewing adult occupants in Apt. 3C, and more.  Exh. 26 (Defendants' Admission No. 5);

Exh. 47 (notification to Zerafa); Exh. 41 (first entries in Zerafa's hand notes indicate conversations with Guenther and Sanchez).

128.    Defendant Zerafa knew that the NYPD terminated the Level One Mobilization treating Gloria as a missing person as opposed to a fictional character invented by Sims. Exh. 22 (Event Chronology Report); Exh. 47 (Zerafa received notification).

### Plaintiffs And Non-Party Arrestees Are Interrogated For An Eight-Hour Span At PSA6

129.    At PSA6 beginning at 8:45 a.m., Defendant Zerafa, non-party Detective Munoz, and Defendant Sanchez debriefed and interrogated Plaintiffs and non-parties separately for hours and, for some of them, multiple times. Plaintiffs all signed Miranda waivers and sat for these interrogations. Sanchez Tr. 66:5-9, 68:11-15; Exh. 13 at D45; Exh. 21 (Miranda warnings signed by Plaintiffs from Sanchez's memo book); Zerafa Tr. 16:3-22; Zerafa Tr. 88:23-89:4 (testifying Hau Sans was concerned about FB); see Exh. 13 at D45 (interrogations begin 8:45 a.m.), .

130.    Broadus was put in an interrogation room or office for one to two hours, during which time Defendants kept Broadus' hand handcuffed to a metal gate at head level. He lost circulation as a result and he suffered ill effects in that hand for a number of days thereafter. Sanchez did not "begin" Broadus' arrest paperwork until roughly 5:00 p.m. Exh. 13 at D47; Broadus Tr. 52:11-18, 62:6-10, 71:7-8.

131.    For Fairfax's first interrogation, Defendant Sanchez put him alone in a room for questioning for about an hour, and also left Fairfax with his hand cuffed to a gate above his head the entire time. At 3:30 p.m.—ten hours after Fairfax arrived at PSA6, he was interrogated again. It was not until around 5:00 p.m. that Sanchez was told to "begin" arrest processing.

Fairfax Tr. 48:14-15, 49:14 (testifying that his arresting officer—Sanchez—handcuffed his hand above his head in the back room); id. at 55:1-2, 55:21-56:4; id. at 80:16-24.

132.     Bridgeforth was also placed in a room for questioning by Defendant Zerafa and others, and cuffed to a chair.  She was interrogated two times.  The second time was at approximately 3:45 p.m.  Sanchez did not begin her arrest paperwork until nearly 5:00 p.m., roughly nine hours after she was arrested and brought to PSA6.  Exh. 13 at D47; Bridgeforth Tr. 61:1-9.

133.     Defendant Zerafa and the others asked Plaintiffs about being "pimps," kidnapping, rape, Gloria, drug trafficking, sex trafficking, false imprisonment, and more. Broadus Tr. 52:20-54:10; id. at 56:16-25 (Broadus complaint re cuffed hand); id. at 63:17-18; Fairfax Tr. 48:17-49:8; id. at 81:11-82:8; Bridgeforth Tr. 56:14.

134.     All Plaintiffs consistently stated that they had no idea who "Gloria" was and that she did not exist. Zerafa Tr. 26:21-23, 63:4-8.

135.     During questioning, Plaintiffs learned that Sims had told NYPD that she knew the occupants of Apt. 3C only in passing.  Plaintiffs told Defendants that Sims was Broadus' girlfriend, that Sims lived in Apt. 3C, that Sims' name was on the Time Warner cable bill to prove it, and more.  Plaintiffs also told Defendants about the Broadus/Bridgeforth affair, Sims' discovery of it, and more.  Broadus Tr. 53:20-21, 54:7-10; Bridgeforth Tr. 89:3-90:14; Exh. 24.

136.     Another subject of Defendants' questioning had to do with the dinner that the group cooked together the night of October 8, 2014, in Apt. 3C, which was also evidence of Sims' residence in Apt. 3C which she had previously hidden.  Defendants asked Broadus and Bridgeforth questions regarding the dinner of meatloaf, mashed potatoes and gravy that the group cooked together, including who (including Sims) cooked which dishes.  Broadus Tr.

53:22-54:6; Bridgeforth Tr. 60:19-25; Exh. 44 at D331 (ADA Nolan notes from October 9, 2014, interview with Sims mentioning "mashed potatoes").

## Sims Admits To Defendants That She Was Broadus' Girlfriend And Lived In Apt. 3C For The First Time Nearly Eight Hours After Calling 911

137.    Defendant Sanchez then asked Sims about Plaintiffs' statements that she was Broadus' girlfriend.  Sims admitted that she was Broadus' girlfriend.  Sanchez Tr. 71:10-15; Exh. 13 at D45; Exh. 43 at ¶ 6.

138.    Sims' admission that she was romantically involved with Broadus came roughly eight hours after the 911 call.  Up until Sims' admission, she had relayed her story to Defendant Sanchez and others as though Apt. 3C's occupants were "loose acquaintances," and her complaint was never viewed as having a domestic-relations aspect to it.  Sanchez Tr. 72:2-3, 73:6-7 (testifying that Sims had always characterized her kidnappers as "loose acquaintances").

139.    Defendant Zerafa knew that Sims changed her original story regarding Broadus— loose acquaintance to months-long boyfriend—at PSA6 from Plaintiffs and Sims' admission. Exh. 13 at D45 (Sims asked to fill out a Domestic Incident Report when she admitted for the first time eight hours after calling 911 that Broadus was her boyfriend); id. at D45, D47 (Sanchez referencing prisoner "debriefings" and Zerafa's requests to re-interrogate); Exh. 21 (Plaiintiffs' interrogation warnings); Exh. 24 (Time Warner cable bill in Sims' name); Exh. 41 (Zerafa hand notes referencing "Cable"); Exh. 47 (unusual incident report stating that Sims reported knowing Plaintiffs only in passing).

140.    By 11:00 a.m., Sanchez began to re-interview Sims at PSA6 in connection with the new revelation that Broadus was Sims' boyfriend in order to complete new paperwork

specific to those facts.   Sanchez Tr. 70:9-15 (testifying that the reason he reinterviewed Sims when he learned for the first time that she was in a relationship with Broadus); Exh. 13 at D45 (Sanchez memo book: "re-interview [complaining victim] Sims, Necola . . . she was formerly intimate with Delano Broadus"); id. (referencing domestic-incident report).

141.    Defendants never asked Sims to sign a sworn statement committing to any single version of events.  Sims never signed any such document or gave oral testimony under oath about the incident.   Exh. 27 (Zerafa transcript where he alone swears to the truth of the warrant application's contents before the magistrate); Zerafa Tr. 31:22-32:25; Exh. 36 (Admission No. 2 stating that Defendants do not possess any writing by Sims).

142.    Defendants altered Plaintiffs' arrest charges as Sims altered her story.  When Bridgeforth arrived at PSA6 she was lodged as having been arrested for reckless endangerment of FB, unlawful imprisonment and assault.  At some point the latter two charges were crossed out and Bridgeforth's arrest paperwork was completed only with an endangerment charge.  Exh. 2; Exh. 42 at D248.

**Defendant Zerafa Takes Sims To DA's Office To Prepare Warrant Application And Neglects To Share Material Information Regarding Case With The ADA**

143.    At some point that day, despite knowing that Sims repeatedly lied to him and other police, Defendant Zerafa began planning to apply for a search warrant to search Apt. 3C agains based on Sims' disproven allegations, and took Sims to the DA's Office to draft the affidavit.  Nolan Tr. 23:8-13; Zerafa Tr. 28:11-20, Exh. 12 at D249.

144.    Zerafa did not seek departmental approval for the warrant application prior to preparing and submitting it to the DA's Office and then a magistrate.  Exh. 15 (search warrant

49

application request dated October 10, 2014, the day after the warrant had already been obtained and executed, and the same day the investigation concluded with negative results and Plaintiffs released).

145.    ADA Nolan and her supervisor met with Sims.  Later, ADA Nolan and her supervisor would decline to prosecute any charges relating to the incident.  ADA Nolan's notes show that Sims reported that Sims and Plaintiffs did "everything together, every day"—a sea change from Sims' previous story that she knew Plaintiffs in passing—and that Sims put the Time Warner cable bill in her name.  Nolan Tr.32:24-33:5 (identifying hand notes as hers from Sims interview); id. 55:20-24 (testifying that she and her supervisor made decision not to prosecute Plaintiffs and non-parties in connection with Sims' complaint); Exh. 24;  Exh. 44 at D331 (Nolan interview notes from October 9, 2014, meeting with Sims mentioning "cable under name").

146.    Defendant Zerafa did not tell ADA Nolan that Sims previously told police that she knew Apt. 3C's occupants only in passing.  Exh. 47; Sanchez Tr. 71:10-15;

147.    Sims told ADA Nolan that she and/or Gloria were screaming in Apt. 3C, but Defendant Zerafa did not tell ADA Nolan that neighbors did not report any such disturbance. Exh. 33 at D331; Sanchez Tr. 166:22-25; Guenther Tr. at 21:18-22:5.

148.    Sims repeated to ADA Nolan the story about the bucket that she and Gloria were forced to go to the bathroom in.  Exh. 44 at D332; see id. at D325 (another ADA's notes regarding same).

149.    Zerafa did not tell ADA Nolan that NYPD detectives, after an investigation, concluded that Sims had lied about Gloria and that Gloria did not exist, and that a Level One mobilization for Gloria had been terminated as a result.  Nolan Tr. 27:6-25.

150.    Defendant Zerafa did not tell ADA Nolan about the warrantless search of Apt. 3C and its negative results for Sims' claims.  Nolan Tr. 26:5-22, 28:7-13.

151.    ADA Nolan testified at deposition that had she known on October 9, 2014, that Apt. 3C had already been searched and that none of the items listed on the warrant application had been found during that warrantless search, she would have considered that a relevant factor as to whether Sims' allegation of sex trafficking at Apt. 3C was credible at all.  Nolan Tr. 28:17-29:13.

152.    Defendant Zerafa did not show ADA Nolan the Sanchez photographs taken during the warrantless search.  Nolan Tr. 26:5-22, 28:7-13.

153.    ADA Nolan testified at deposition that she would have found the Sanchez photographs she reviewed during the deposition relevant to whether there was reasonable cause to search Apt. 3C for items listed in the application.  Nolan Tr. 26:23-27:5, 28:7-16.

154.    Defendant Zerafa and ADA Nolan finalized a search warrant application stating that there was cause to believe that evidence of sex trafficking and kidnapping would be found in Apt. 3C including handcuffs, chains, ropes, knives, machetes, and more.  Exh. 43.

## Defendant Zerafa Omits Material Information From The Warrant Application, Swears To Its Veracity In Front Of A Magistrate And Obtains Warrant

155.    Defendant Zerafa presented the application to Judge Steven M. Statsinger of New York County Supreme Court, and swore to its veracity.   Defendant Zerafa omitted the following material information:  Gloria did not exist; none of the evidence Sims claimed would be in Apt. 3C was there during the warrantless search; Sims lied for eight hours that she knew Plaintiffs in passing when she lived in Apt. 3C and was Broadus' girlfriend; Sims had appeared intoxicated;

51

Sims reported escaping Apt. 3C in a state of undress but was fully dressed when first resopnders arrived; and more.  Exh. 27 (application sworn true); Exh. 43 (application); Pl. 56.1 ¶¶ 3, 11, 12, 28-32, 34, 86.

156.    Judge Statsinger issued the requested warrant.  Exh. 19.

157.    Defendant Despaigne was the "leader" of the search warrant case as the Commanding Officer of PSA6.  Defendant Despaigne knew all investigative findings regarding the Sims complaint and early-morning warrantless search of Apt. 3C, including the Level One termination, negative warrantless search results, and more.  Exh. 16; Exh. 17; Guenther Tr. 40:4-11, 53:14-17; Sanchez Tr. 51:10-16.

158.    On October 9, 2014, at about 9:45 p.m., Defendant Zerafa, Defendant Deputy Inspector Despaigne, and three other officers went to execute the search warrant at Apt. 3C. Exh. 16 (tactical plan stating participants); Exh. 17 (notifications naming Despaigne the s/w execution leader); Exh. 32 at D313 (Munoz memo book listing Despaigne, Ferguson, Graves, Zerafa as members of the s/w execution team as in the tactical plan).

159.    The five officers left Apt. 3C within thirty minutes.  During those thirty minutes they took no photos or video.  They collected no fingerprints, hair, blood or any human biological material for testing.  They seized two brown wigs, a set of keys, a laptop and cell phones.  Exh. 14 at D53 (9:45pm until 10:15pm); Nolan Tr. 44:13-6; Exh. 26 (Defendants' Admission No. 3 stating that no fingerprints, handprints, hair, blood, and/or any human biological material was collected during the course of the investigation of Sims' allegations); Exh. 20; Exh. 40; Zerafa 42:2-4.

160.    The search team did not find corroborative evidence of Sims' complaint, i.e., the bathroom bucket, machetes, handcuffs, chains, etc.  Zerafa Tr. 45:3-4, 13-14; Exh. 26 (Defendants' Admission No. 1).

52

**Sanchez Earns Eighteen Hours Of Overtime In Cash For His Work Arresting And**

**Detaining Plaintiffs Based Upon Sims' Incredible Allegations**

161.    On October 10, 2014, at approximately 1:20 a.m., Plaintiffs and the non-party arrestees were transported from PSA6 to Manhattan Central Booking.  Sanchez Tr. 150:24-151:5; Exh. 13 at D49; Exh. 42.

162.    On October 10, 2014, at approximately 2:15 a.m., Defendant Sanchez signed out for the first time since he began his tour on October 8, 2014.  Defendant Sanchez racked up eighteen hours and thirty-four minutes of overtime working on Plaintiffs' arrests and detentions, and he was paid for it in cash right then and there.  Sanchez Tr. 152:15-153:3.

**NY County D.A.'s Office Declines To Prosecute Plaintiffs And Non-Party Arrestees, And**

**Issues Related DTP Letters To Defendant Sanchez**

163.    On October 10, 2014, the day after the search warrant execution, Defendant Zerafa went to the DA's Office in the morning and left the electronic devices seized from Apt. 3C with ADA Nolan.  He did not deliver any the laptop or phones to the Computer Crimes Unit for analysis for evidence of sex trafficking despite the fact that the search warrant authorized him to do so.  Exh. 12 at D38; Exh. 19 (warrant authorized electronic search of such devices); Exh. 40 (Zerafa invoices); Nolan Tr. 46:8-9, 56:15-25; Zerafa Tr. 48:3-6, 81:11-17.

164.    Also on October 10, 2014, at about the same time, Sanchez went to visit ADA Nolan about Plaintiffs' charges.  Exh. 13 at D256.

53

165.    The New York County DA's Office declined to prosecute Plaintiffs and non-parties on any charge arising from Sims' 911 call and subsequent reports to Defendants.  Nolan Tr. 50:18-20 ("[W]e were declining to prosecute that charge and anything else related to this arrest number.").

166.    ADA Nolan made the decision to decline to prosecute with her supervisor.  Nolan Tr. 55:20-24.

167.    ADA Nolan did not find Sims not to be a credible witness.  Nolan Tr. 57:5-6; Sanchez Tr. 159:7-11 (Nolan did not find Sims to be "factual"); id. at 167:22-25 (Nolan "really didn't find [Sims'] allegations to be factual"); id. at 168:24-25 (Nolan told Sanchez that Nolan did not find Sims credible); id. at 169:11-12 (Nolan found Sims "not to be factual").

168.    ADA Nolan prepared DTP letters for all Plaintiffs and non-parties.  ADA Nolan gave them to Defendant Sanchez on October 10, 2014, at approximately 2:00 p.m.  Sanchez Tr. 160:21-25 (testifying that Nolan handed him Plaintiffs' and non-parties' DTP paperwork at approximately 2:00 p.m.); Exh. 13 at D257 ("14:00: Interview [with ADA Nolan] ended; cases DP"); Exh. 30 (DTP letters); Exhs. 1B, 1C, 1D (Plaintiffs' OLPAs noting they ended DTP).

169.    The DTP letters indicated that in some instances the Defendants could perform additional investigation and in others charge elements were missing.  Exh. 30 ("further investigation needed"); id. at D142 ("unable to establish necessary element of the crime").

170.    NYPD Patrol Guide No. 208-67--"Follow-up Investigations On 'Decline Prosecution' Arrest Cases"--describes that "decline prosecution" cases may be re-opened and prosecuted if follow-up investigation is conducted and specific additional information is obtained.  Exh. 11 at PL190.

171.    Defendants never did any additional investigation on the case.  Zerafa closed it

with negative results.  Sanchez Tr. 171:3-20 (testifying that he did nothing further to investigate);

Exh. 12 at D38 (Zerafa closing case); Exh. 26 (Defendants' Admission No. 8).

172.    The electronic devices seized from Apt. 3C were left untouched in ADA Nolan's

office for approximately five months.  On March 10, 2015, ADA Nolan was going to the

Computer Crimes Unit, which determined that there was "nothing related to prostitution

contained within the electronics."  Nolan Tr. 41:12-16; Exh. 40.


**Sanchez Fails To Take Steps To Release Plaintiffs After ADA Nolan Presents Him With**

**The DTPs, And Plaintiffs Remain Jailed An Additional Five Hours Before Release**


173.    NYPD Patrol Guide No. 210-13--"Release of Prisoners"--states that when a DA's

Office declines prosecution and issues a DTP letter, "members of the service should be guided

by Patrol Guide 216-16, 'Release of Prisoners at the Complaint Room at Direction of the

Assistant District Attorney.'"  Exh. 11 at PL361.

174.    NYPD Patrol Guide No. 210-16—"Release of Prisoner at the Complaint Room by

Direction of the Assistant District Attorney"—provides that when a DA's Office declines to

prosecute an arrestee, the arresting officer must notify and provide copies of the DTP letter to the

Borough Court Section Supervisor.  In turn, the Borough Court Section Supervisor, when so

notified by the arresting officer, is to direct the "immediate release" of the prisoner if there is no

warrant justifying alternate holding.  Exh. 11 at PL366 to PL 368; id. at PL367 at ¶ 13 (directing

arresting officer to take DTPs to borough court section supervisor); id. at ¶ 16.a.

175.    After ADA Nolan handed Defendant Sanchez the DTP letters on October 10,

2014, at approximately 2:00 p.m., he did nothing to facilitate Plaintiffs' and the non-parties'

release using the letters or otherwise. When Sanchez was asked if he was surprised that Plaintiffs and the non-parties remained jailed for another five hours after ADA Nolan handed Sanchez the DTP letters, Sanchez said: "If it were me, I wouldn't be none too pleased. I honestly don't know how to respond. Whether it surprises me or not, I don't know. I don't know what kind of sentimental surprise you expect me to express." Sanchez Tr. 163:22-25, 165:5-9.

176.    Plaintiffs remained jailed for another five to six hours after ADA Nolan's delivery of the DTPs to Defendant Sanchez, telling him that Plaintiffs would not be prosecuted for any charge in connection with their October 9, 2014, arrests. Exh. 26 (Defendants' Admission No. 7 stating that Broadus and Fairfax were not released until October 10, 2014, at about 7:00 p.m., and that Bridgeforth was not released until approximately one hour after that).


**The City Defendants' "OLPA" System Does Not Achieve Plaintiffs' Timely Release After ADA Nolan's Issuance Of The DTPs**


177.    On April 13, 2017, the City Defendant presented NYPD Lieutenant Chris Czark for deposition by Plaintiffs' Counsel as a FRCP 30(b)(6) witness in connection with this case to testify about the City Defendant's OLPA system.   Czark Tr. 10:3-11; Exh. 1A (copy of FRCP 30(b)(6) notice).

178.    The City Defendant has a system called On-Line Prisoners' Arraignment System ("OLPA") designed to track individuals' movement in law enforcement custody from arrest to arraignment "to make sure that a defendant is arraigned in a timely manner." Czark Tr. 20:3-10; id. at 9:11-14 (testifying that the pre-fix "z" in front of OLPA refers to version of system); id. at 57:3-7.

56

179.    The OLPAs created for Plaintiffs were pursuant to the OLPA system that City Defendant had in place beginning in January 2009 and which was in effect at the time of their arrests and detention.  Czark Tr. 9:15-24.

180.    The City Defendant's relevant OLPA system promotes timely processing of arrestees by documenting the various steps of the arrest-to-arraignment process in chronological order with time stamps, and by color-coding what steps in an arrest-to-arraignment process still require completion for easy identification.  Czark Tr. 19:17-24, 20:3-21:8.

181.    The OLPA system's use of color most generally uses the colors red and green. An OLPA's fields are red with the word "Missing" when data is not entered therein.  Once data is entered into an OLPA-grid field upon the corresponding step's completion, a time stamp documenting the step's completion appears on the OLPA and the field turns green.  The color yellow denotes a field showing that an arrestee has a warrant and signals the need for attention to that.  Czark Tr. 21:18-24, 22:2-8, 23:9-11, 33:2-4.

182.    Four different government actors' data populates the OLPA system as an arrestee moves through the criminal justice system, and that may be achieved through manual or automatic population of OLPA data.  The four different government actors which provide OLPA data are:  the NYPD, the DA's Office and the criminal court.  Czark Tr. 16:22-17:9 (testifying that an arresting officer's creation of Omniform Arrest Reports and Complaints automatically feeds data into the OLPA); Exh. 1 (example of Omniform Arrest Report and Complaint for Broadus); Czark Tr. 22:18-22 (affirming the four sources of OLPA data).

183.    In the middle of an OLPA's first page is a grid which tracks the data relevant to a specific arrestee's arrest-to-arraignment processing in chronological order.  Czark Tr. 19:11-24; Exh. 1B at D8 (Broadus OLPA—the grid of chronologically tracked events appears on the first page and is four columns and four rows).

184.    Czark testified about how OLPA works using the Broadus OLPA as an example.
Beginning with the first row of the grid, Czark testified about the data that was entered therein
for the following events:  "Arrest" (autopopulated when Sanchez created Broadus's Omniform
Arrest Report, see Exh. 1); "Record Create" (populated when Broadus was fingerprinted on
October 9, 2014, at 8:52 p.m.); "NYSID" (populated when Broadus' rap sheet is obtained); and
"DNA Banner" (populated by NYPD to confirm that when the rap sheet arrived it was examined
to see whether the arrestee is the subject of some order to produce DNA).  All of the events in
the first row of the Broadus OLPA are NYPD's responsibility for entering.    Czark Tr. 22:23-
25:6; Exh. 1B (Broadus OLPA first page with grid, first row).

185.    Czark next testified about the meaning of the second row in the Broadus OLPA
exemplar, all of which are "Missing" and colored red (which in black and white can be discerned
from the darker shading, according to Czark).  The four missing events in the second row of the
Broadus OLPA are:  "Paperwork Ready" (populated by the arresting NYPD officer when he has
completed all necessary paperwork relating to arrest and is ready to draw up complaint with
ADA); "AO Release" (populated by the DA's Office once that office does not need to speak
further with the arresting NYPD officer and releases him); "Complaint Sworn" (populated by the
DA's Office once the arresting NYPD officer drafts and executed a sworn complaint against an
arrestee); and "Complaint Received" (populated by the NYPD in the NYPD's "Complaint
Room" when that office receives from the prosecutor the officer-sworn and DA-approved
complaint relating to the arrest).  Czark Tr. 25:7-27:22; id. at 54:6-8 (describing that the darker-
shaded "Missing" fields on the Plaintiffs' OLPAs would be red); Exh. 1B (Broadus OLPA first
page with grid, second row).

186.    Continuing to the third row in the Broadus OLPA grid, Czark next testified that
the first three fields have "Missing" information and are marked in red, and the fourth—"Iris

Captured"—was completed at around the time of Broadus' arrival in Central Booking. The missing fields in red (darker shading) are: "Breakdown," "Package to Court" and "Docketed" which refer to the preparation of a court package for arraignment on a case for which a complaint was drawn up, its delivery, and docketing, respectively. Czark Tr. 27:23-28:9, 29:14-30:3; id. at 30:17-20 (explaining that a photo of an arrestee's eye is taken on the arrestee's arrival in Central Booking); Exh. 1B (Broadus OLPA first page with grid, third row).

187.    Finally, Czark testified about the fourth row of the Broadus OLPA grid and the time stamps indicating that the three events there were completed for Broadus. These three events were: "Arraignment Closed," "DP Awaiting," and "DP Released." Exh. 1B (Broadus OLPA first page with grid, fourth row).

188.    Czark testified that the fourth row's "Arraignment Closed" and "DP Released" fields have matching time stamps because "Arraignment Closed" is a field that documents "anytime the defendant's custody ends, which for an individual released after a decline-to-prosecute decision is the moment "DP Released." Czark Tr. 30:21-31:6; Exh. 1B (Broadus OLPA first page with grid, fourth row).

189.    Before a prisoner can be "DP Released," the DA's Office must give the NYPD relevant paperwork documenting that decision. This is the "DP Awaiting" field and it corresponds to NYPD's possession of that decline-to-prosecute paperwork. Czark Tr. 15:18-25 (testifying that DP Awaiting means NYPD is "waiting to receive the actual decline prosecution paperwork to release the defendant").

190.    Czark testified that the OLPA "DP Awaiting" field "is an important box because [NYPD] would want to release the defendant as soon as possible because once we become aware that the district attorney will not prosecute, it's incumbent on us to release that defendant as soon as reasonably possible." "[I]t would need special attention, you don't want to let a defendant

59

like this slip through the cracks and be waiting there ten hours, whatever, if there's no instant case to be brought." Czark Tr. 37:8-15, 38:7-11.

191.    Apart from the City Defendant's OLPA system's color codes and "Missing" vs. time stamp dichotomy to denote arrest-to-arraignment steps that remain incomplete, the OLPA system does not employ "time goals" or delayed-event alerts for any arrest-to-arraignment step that remains incomplete beyond what is reasonable. Czark Tr. 32:3-18.

192.    Rather than using a time-based alert specific to any one arrest-to-arraignment step, OLPA permits Court Section NYPD Officers to print field-specific OLPA "Chrono" reports.  When an OLPA Chrono report is printed for a specific event field, the first prisoner listed is the prisoner who has been in the OLPA system for the longest period of time.   Czark provided this example:  An NYPD Court Section Supervisor printing an OLPA Chrono report for the "NYSID" field will know that the first prisoner on the list has been in the OLPA system for the longest period of time without the NYPD having received that prisoner's rap sheet.  The first prisoner on the resulting NYSID Chrono would be the prisoner who has been in the arrest-to-arraignment process for the longest period without NYPD having received his/her rap sheet. Czark Tr. 33:23-35:20; id. at 35:19-20 (testifying that for each OLPA data box, "you could pull out a list of just that data").

193.    On the second page of Plaintiffs' OLPAs, where notes are entered about an arrestee, NYPD Sergeant George St. Louis observed on October 10, 2014, at approximately 4:30 p.m. that the Plaintiffs' arrests—for which ADA Nolan gave Sanchez DTP letters two-and-a-half hours earlier—were decline-to-prosecutes. Sgt. St. Louis then appears to have populated time stamps showing that this "DP Awaiting" step was complete within one minute, one minute and ten minutes of his realization for Broadus, Bridgeforth and Fairfax, respectively. Compare Exh. 1B at D9 (Broadus, Note from Sgt. St. Louis), with id. at D8 (time stamping DP Awaiting the

60

same minute as Sgt. St. Louis's Note); compare Exh. 1C at D19 (Bridgeforth, Note from Sgt. St. Louis), with id. at D18 (time stamping DP Awaiting within one minute of the Sgt. St. Louis Note); compare Exh. 1D at D34 (Fairfax, Note from Sgt. St. Louis), with id. at D33 (time stamping DP Awaiting within ten minutes of Sgt. St. Louis's Note).

## Plaintiffs Are Finally Released On October 10, 2014, At Approximately 7:00 p.m., After Having Spent Between Thirty-Five And Thirty-Eight Hours In Custody

194.    Five hours after ADA Nolan's issuance of the DTP letters, and roughly two-and-a-half hours after Sgt. St. Louis's observation that Plaintiffs' arrests were decline-to-prosecutes, Plaintiffs were freed from detention.  At the time of Plaintiffs' eventual release, Broadus had spent 34 hours and 50 minutes in custody relating to his arrest challenged in this litigation, Exh. 1B; Bridgeforth had spent 35 hours and 56 minutes in custody relating to her arrest challenged in this litigation, Exh. 1C; and Fairfax had spent 38 hours and 2 minutes in custody relating to his arrest challenged in this litigation, Exh. 1D.  Exh. 26 (Defendants' Admission No. 7).

## ACS Events, And Sanchez's False Statements To ACS About The October 9, 2014, Events

195.    On October 9, 2014, at approximately 4:50 a.m., Defendant Sanchez called ACS and made an Oral Report Transmission (ORT) stating affirmatively and falsely that Broadus and Bridgeforth "are running an illegal prostitute ring inside the home, in the presence of FB . . . The adults had a women [sic] handcuffed to a radiator . . ."  Exh. 26 (Defendants' Admission 1 stating that no Defendant recovered handcuffs during the investigation of Sims' allegations); Exh. 33 at PL393; Exh. 38 at PL117:1-8 (reading the ORT at a Family Court hearing as

61

potentially stating that Sanchez saw a woman handcuffed to a radiator at Apt. 3C, which the court then noted Sanchez's testimonial clarifications months later contradicted); Exh. 38 at PL121:1-13 (the Family Court excluding Sanchez's ORT from evidence to the extent it purports to establish that Plaintiffs ran a prostitution ring and had a woman chained to their radiator).

196.    By the time Sanchez made the report, he had gained entry to Apt. 3C and observed firsthand that Sims had lied because Apt. 3C contained no Gloria, no woman handcuffed to a radiator, no machete, no bathroom bucket, no guns, no knives, or anything else Sims said would be there.  Pl. 56.1 ¶¶ 30, 94-97.

197.    On October 9, 2014, at approximately 5:42 a.m., non-party NYPD Officer Rourke falsely stated to another ACS worker that "[w]hen the police got to the apartment, they found a woman handcuffed to a radiator in a provocative cloth in the apartment." Exh. 34 at D158 (emphasis added).

198.    On October 9, 2014, at approximately 6:00 a.m., FB was medically/physically cleared and determined to be without injury at St. Luke's Hospital after she was taken there by Officer Rourke for examination.  Exh. 34 at D161; Pl. 56.1 ¶ 17.

199.    FB's removal from Bridgeforth, Broadus and Apt. 3C was reviewed and rejected for Instant Response Team (IRT) handling, which relates to joint investigation of a case by ACS and the NYPD.  Exh. 34 at D161; Exh. 38 at PL135.

200.    On October 9, 2014, at approximately 1:00 p.m., ACS CPS Joshua Davis spoke with Defendant Sanchez by telephone to learn what had happened as ACS weighed FB's removal.  Davis wrote in his notes Defendant Sanchez's report of all of Sims' allegations. Davis' notes say nothing about Sanchez also reporting NYPD detectives' investigative finding that Sims lied to authorities about Gloria, that Sanchez's own search of Apt. 3C had revealed nothing to corroborate Sims' story, and that Sims' credibility that Sims' credibility had by the

time of their conversation been for these and many other reasons damaged. Exh. 34 at D161-62;
Exh. 22 (Level One terminated at approximately 7:35 a.m.); Exh. 24 (Sanchez photos showing
warrantless search revealed no Gloria, no chains, no handcuffs, no bucket, no machete, etc.);
Exh. 26 (Defendants' Admission No. 4 stating that the Level One mobilization for Gloria was
made at approximately 5:22 a.m. on October 9, 2014, and was terminated at approximately 7:35
a.m. roughly two hours later); Exh. 47 (finding Gloria not real by 7:30 a.m.).

201.   Davis' notes from his conversation with Defendant Sanchez also states that
Sanchez reported at approximately 1:00 p.m. on October 9, 2014, that there were "locks and
chains on all of the windows and doors and gates throughout the apartment." Exh. 34 at D162
(emphasis added). However, Sanchez's photos taken earlier that day show no chains anywhere,
he testified at deposition that there were no chains in Apt. 3C, and Defendants' Admissions state
that Defendants did not recover chains during the investigation of Sims' allegations. Sanchez Tr.
88:6, 92:4-6, 94:5-11, 94:23-95:5 (testifying that he took photos of Apt. 3C before sunrise on
October 9, 2014, and that there were no chains in Apt. 3C and the radiator did not look like
anyone had been chained to it); Exh. 23 (Sanchez photos showing no chains); Exh. 26
(Defendants' Admission No. 1 stating no chains).

202.   Davis' notes from his conversation with Defendant Sanchez states that Sanchez
reported at approximately 1:00 p.m. on October 9, 2014, that when Broadus and Bridgeforth
arrived at Apt. 3C that morning, neither one "asked for or acknowledged that they had a child."
Exh. 34 at D164. However, Sanchez testified at deposition that "the first thing that actually
came out from [Broadus'] mouth . . . was 'Where's my daughter.'" Sanchez Tr. 129:13-16; see
Broadus Tr. 51:16-20 (confirming same); Pl. 56.1 ¶ 120.

203.    On October 10, 2014, a Neglect Petition was prepared against Broadus and Bridgeforth citing Defendant Sanchez as describing to ACS that there were "chains hanging from the wall" inside Apt. 3C.  This was false.  Exh. 35 at PL20; Pl. 56.1 ¶ 201.

204.    On October 10, 2014, NY County Family Court held a hearing regarding FB's emergency removal from Apt. 3C.   Broadus and Bridgeforth were not in attendance because they were still sitting in a jail cell in connection with their arrests.  The Court adjourned to a date when Broadus and Bridgeforth could appear.  Exh. 37 at PL313-PL320.

205.    On October 16, 2014, NY County Family Court held a hearing regarding FB's removal.  Broadus and Bridgeforth appeared and were arraigned on the neglect allegations against them triggered by the October 9, 2014, events and Defendant Sanchez's statements regarding the same.  Exh. 37 at PL321 to PL342.

206.    On May 13, 2015, Defendant Sanchez testified under oath at New York County Family Court hearing about Sims' allegations against Broadus and Bridgeforth without himself offering that investigation had shown Sims to be an incredible complainant.  It was only through Plaintiffs' Counsel's cross examination of Sanchez that some of the evidence undermining Sims' credibility was brought into the record.  Exh. 38, passim.

207.    During the May 13, 2015, New York County Family Court hearing, Defendant Sanchez testified that Apt. 3C had "welded bars" on the windows without noting they were ordinary window guards that NYCHA installed that he had often seen during his nine years working as a police officer on the premises of NYCHA properties specifically.  Exh. 38 at PL89-90, PL110 (testifying he worked nine years as a police officers serving NYCHA buildings); id. at PL100 (describing ordinary and required NYCHA window guards as "welded bars"); see Exh. 7 (NYCHA form completed by Bridgeforth indicating that law required the installation of the window guards because FB was under ten years old); Exh. 8 (municipal regulations and

information about window guards); Sanchez Tr. 89:22-90:9 (testifying that he has seen these

NYCHA window guards over the course of his roughly eight years as a PSA officer at the time

of the arrests); id. at 90:16-20 (discussing childproofing); Exh. 23 (Sanchez photos of the

ordinary and required NYCHA window guards in apartments where small children lived); Exh.

126 (Zerafa testifying that housing properties have child bars).

208.    During the May 13, 2015, New York Family Court hearing, Defendant Sanchez

testified that during his warrantless search of Apt. 3C, he went into the refrigerator and kitchen

cabinets, and that they were "just empty, very few food items." Exh. 38 at PL100.  According to

Plaintiffs this was false because among other things leftover meatloaf, mashed potatoes, gravy

and more from the October 8, 2014, meal were there.    Broadus Tr. 26:22-23; Bridgeforth Tr.

18:2-11.

209.    During the May 13, 2015, New York Family Court hearing, Defendant Sanchez

testified under oath that Broadus did not ask about FB.  Exh. 38 at PL104.   However, when

Sanchez testified under oath at deposition in this case, he stated that "the first thing that actually

came out from [Broadus'] mouth . . . was 'Where's my daughter.'"  Sanchez Tr. 129:13-16; see

Broadus Tr. 51:16-20 (confirming same); Pl. 56.1 ¶ 120.

210.    During the May 13, 2015, New York Family Court hearing, Defendant Sanchez

repeated Sims' allegation that Plaintiffs took photos of her for uploading to the Internet, but did

not offer that that aspect of Sims' complaint had been abandoned as shown by Defendants'

indifference to searching the electronic devices seized from Apt. 3C to the Computer Crimes

Unit for analysis. Exh. 38 at PL84; Exh. 40; Nolan Tr. 41:12-16; Pl. 56.1 ¶ 172.

211.    On June 10, 2015, the New York County Family Court held that Sims'

statements to NYPD were inadmissible evidence as presented through Sanchez's testimony

because they were hearsay not subject to an excited utterance exception, also noting the absence of physical evidence corroborating Sims' reports.  Exh. 39, passim; id. at PL176.

## Sanchez Failed To Preserve Scratch Reports Created To Document The Government Event That Is Challenged In This Litigation

212.    Scratch reports are handwritten complaint and arrest reports which are later transcribed into a computer.  Sanchez Tr. 148:23-2, 149:11-13; Guenther Tr. 80:4-25.

213.    Once the computerized complaint and arrest reports are completed, the scratch reports are "supposed to be stapled to the computerized copy."  Guenther Tr. 80:4-6, 80:19-20.

214.    An officer "makes several copies" of the scratch and computerized report sets. One set is housed at the officer's command, another copy is sent to the DA's Office, and still other copies may go to other locations.  Guenther Tr. 80:22-25.

215.    Throughout the day on October 9, 2014, as Sanchez interviewed and re-interviewed Sims, Plaintiffs and others, he wrote scratch documents meant to become Plaintiffs' and non-parties' arrest and complaint reports.  Exh. 13 at D47-50.

216.    When Sanchez typed Plaintiffs' and non-parties' arrest and complaint reports, he did not attach the scratch versions and he failed to preserve the scratch records in any way.  Exh. 13 at D48 (21:15 Sanchez memo book noting only that "onlines faxed to ECAB"); Exh. 25 ¶¶ 5, 6-8 (Sanchez statement that he personally either keeps, files or disposes of the scratch reports and that he cannot find any of the scratch reports referenced in his memo book for this case).

## NYPD Complaint Handling

217.    NYPD claims that it "thoroughly and diligently investigates" complaints

involving the conduct of its uniformed and civilian personnel. Exh. 50 at 2.   "[N]o matter how

minor in nature," every complaint is "fully investigated and resolved." Id

218.    When a complaint is received by NYPD's Internal Affairs Bureau, a

determination is made as to whether it will be investigated.  If yes, IAB refers the complaint to

the NYPD's Investigation Review Section ("IRS"), a unit within the Office of the Chief of

Department ("OCD"), for that purpose. Exh. 50 at 4.

219.    Once a complaint reaches its designated command for investigation, the

investigative protocol includes an interview of the complaining witness, an interview of the

subject officer and other officers with relevant information, a review of relevant NYPD records

if necessary, and a review of other evidence that is relevant such as video footage or witness

statements. Exh. 50 at 5.

220.    Investigative steps taken by the investigative command are documented on the

"Disposition and Penalty Form for Outside Guidelines Communications," which is then sent

back to IRS in hard copy for review.  IRS may send a complaint back to the investigating

command for additional work.  Alternatively, if an investigation is fully completed and fully

reviewed, IRS enters information from the hard-copy "Disposition and Penalty Form for Outside

Guidelines Communications" into what is known as the Computer Aided Tracking System

(BCATS). Exh. 50 at 5-6; Exh. 51 at 7.

221.    On February 7, 2017, the City Defendant's NYPD Office of Inspector General

(OIG) published a report entitled "Addressing Inefficiencies in NYPD's Handling of

Complaints: An Investigation of the 'Outside Guidelines' Complaint Process." Exh. 51.

222.    In the Report, among other things, the OIG criticized the NYPD's BCATS

recordkeeping system, which heavily relies on hard-copy recordkeeping and lacks tracking and

analytic capabilities, rendering the NYPD unable to identify potential problems relating to misconduct-complaint investigations and related records.  The Report recommended that the NYPD upgrade BCATS and handle its misconduct-complaint investigations and recordkeeping through improved electronic systems with analytic capabilities.  Broadly speaking, the implementation of OIG's recommendation that NYPD use electronic, analytic systems would improve the number of misconduct complaints that are actually investigated, adequately investigated, and timely investigated.  In addition, implementation of the recommendation would enable reporting on subjects pertaining to NYPD misconduct-complaint handling and the identification of trends or patterns in misconduct-complaint investigations for the NYPD and external stakeholders.  Exh. 51.

223.    On May 8, 2017, the NYPD responded that it is working on addressing or implementing the OIG's recommendations.  Exh. 50.

### The City Defendants' Inefficient Recordkeeping Practices

224.    In this case, Defendants' inability to meet their discovery obligations as to two Defendants' complaint-investigation records highlight how the City Defendant's recordkeeping is inefficient to permit the City Defendant to understand potential risk that any one uniformed officer might pose in terms of the public's civil rights.  Exh. 54 (Sanchez); Exh. 58 (Zerafa).

225.    For Zerafa, Defendants have been unable to produce certain complaint investigation records appearing on his personnel indices.  Defendants have instead produced an affidavit from Sergeant Michael Devine in which he stated that three Zerafa complaint investigation files are lost.  One potential explanation proffered is departmental restructuring.  In sum and substance, Devine appears to say that when Zerafa has in the past worked for a unit that

dissolved, his files may have been left behind in the vacated physical space. Alternatively, Devine posits that when Zerafa's units have dissolved in the past, his files may have been sent to a building in Queens where they were all definitely stored in the basement, and where a subsequent, unexpected flood destroyed everything. Devine's explanation suggests that one thing that never happened was that Zerafa's personnel files were forwarded to whatever command employed him next. Another thing that never happened is digitization. Exh. 59.

226.    For Sanchez, Defendants have been unable or unwilling to produce five IAB log numbers without explanation. These lost or withheld log numbers are IAB Log Nos. 11-27471 and 11-27721 (related), IAB Log Nos. 11-30054, 11-30435 and 13-09797 (related). Exh. 54 at D221-22.

227.    As to five other Sanchez personnel events, Defendants have produced in discovery an affidavit from Defendant Demetrious Lee in his capacity as a PSA6 integrity control officer stating that he had looked for them but cannot find them. Unlike Sgt. Devine, Defendant Lee offers no abandonment or natural-disaster-based hypotheses. Exh. 54; Exh. 55.

228.    In summary, between Sanchez and Zerafa, Defendants have wholly or partially lost complaint investigation records for thirteen different complaints. Pl. 56.1 ¶ 224-27.

## Donald Manzano – Uninvestigated Sanchez Personnel Event

229.    On July 2, 2011, Defendant Sanchez arrested Donald Manzano. A report was made to IAB that Sanchez used excessive force during the arrest. Exh. 55 at D221.

230.    Sworn testimony from Sanchez and his partner that day, non-party Officer William Holland, was that as Sanchez, Holland and non-party Officer Kelly Rourke (the same Rourke in this case) handcuffed Manzano, Sanchez repeatedly struck Manzano with the butt of a

gun and Holland repeatedly beat Manzano with a metal asp. <u>Docket No. 53</u> at PL522 (Sanchez

testifying he doesn't know how many times he hit Manzano with his gun), PL619-20 (Sanchez

stating it was multiple times but he could not recall how many); <u>id.</u> at PL688-89 (Holland

testifying that he started hitting Manzano with asp, which was made of metal, snaps and locks

open, and is three-feet long), PL692-94 (Holland testifying he did not know where on Manzano's

body he hit him with the asp, that he did not know if he hit him in the head, that he did not know

how many times he hit him, and that he stopped hitting him "when it was all said and done"),

PL697 (Holland testifying that afterwards, he and Sanchez were "covered in blood"), PL715

(Holland testifying that he didn't hear Manzano say anything while being beaten).

231.    IAB performed no contemporaneous investigation into the use of force upon

Manzano.  There are index entries showing that a complaint was filed, but no records showing

investigation are available, or at least they have not been produced in discovery.  These are two

of the five missing wholly missing IAB Log Number records referenced <u>supra</u>.  <u>Exh. 54</u> at D221

(index has two entries corresponding to the July 2, 2011, use of force upon Manzano).

232.    On February 26, 2013, <u>People v. Manzano</u> went to trial.  Sanchez testified under

oath that he beat Manzano with the butt of his gun while he, Holland and Rourke handcuffed

him, and Holland testified that he beat Manzano with a metal asp at the same time. <u>Exh. 53</u>; Pl.

56.1 ¶ 218.

233.    Sanchez then testified that he did not see Holland beating Manzano with the asp

while he, Holland and Rourke were handcuffing Manzano despite Holland's testimony that he

did. <u>Exh. 53</u> at PL574 (Sanchez testifying he did not see Holland beating Manzano with the

asp), PL636 (Sanchez testifying that he saw no one, Holland included, striking Manzano).

234.    Holland testified that he did not see Sanchez beating Manzano with the gun while

he, Sanchez and Rourke were handcuffing Manzano despite Sanchez's testimony that he did.

70

Exh. 53 at PL695 (Holland testifying that he could not see if Sanchez was able to strike Manzano while Holland was beating Manzano with the asp), PL714 (Holland testifying that he did not see Sanchez strike Manzano about the head multiple times with it while standing right there), PL723-24 (Holland testifying that he did not see Sanchez use his revolver to crack Manzano's head open, and that an officer who tells supervisors that another officer did something bad can get in trouble).

235.     Rourke testified that force was "absolutely" used on Manzano during the arrest and that Manzano was covered in so much blood she could not tell where it was coming from. However, she testified that she did not see Sanchez or Holland beating Manzano despite their testimony that they were, because she was focused on Manzano's arm. Exh. 53 at PL822 (Rourke stating that as she helped Sanchez and Holland handcuff Manzano she did not see Holland beat Manzano with an asp because she was "looking at [Manzano's] arm, Mr. Manzano's arm. I wasn't looking next to me"), PL852 (Rourke testifying that she saw a lot of blood), PL853 (Rourke testifying that there was so much blood she didn't know where it was coming from, that Manzano was covered in blood), PL860 (Rourke testifying that she was holding Manzano's arms and that force was absolutely used on him).

236.     Later, when Rourke completed arrest paperwork for Manzano, she did not record in the relevant place that officers had used force upon Manzano during his arrest. Rourke testified that her failure to record that force had been used on Manzano was "a mistake." Exh. 53 at PL852 (Rourke testifying that she saw a lot of blood), PL853 (Rourke testifying that there was so much blood she didn't know where it was coming from, that Manzano was covered in blood), PL858 ("I did put none." "That's a mistake.").

237.     Manzano himself testified at grand jury and at his trial, and the jury acquitted him. On March 6, 2013, Manzano called IAB and informed them about Sanchez's and Holland's

71

sworn trial testimony that they beat him with the butt of a gun and an asp, respectively.  The renewed complaint was called a "legacy" case due to its relationship to the previous matter.  Exh. 49 ¶ 22; Exh. 53; Exh. 57 at D451, D453, D455.

238.   The "legacy" complaint was referred to PSA6 and Defendant Luis Despaigne was assigned to investigate it.  Despaigne performed no investigation.  On June 21, 2013, he recommended that the complaint be closed with no further action, stating that the matter "would be investigated and handled by [the] court" and that "[a]ny interviews conducted at the PSA level after the fact are not in the best interest of the department and could interfere with this case."  It is unclear what Despaigne meant insofar as Manzano had been acquitted three months prior and there was no court to "investigate" and "handle" the matter.  Exh. 57 at D451.

239.   On November 26, 2013, Donald Manzano filed a lawsuit against Sanchez, Holland and Rourke alleging violations of his rights, referencing the Sanchez and Holland testimony admitting that they each beat him with blunt objects as they handcuffed Manzano, and Sanchez, Holland and Rourke's sworn testimony that none of them observed any of the others hitting Manzano with blunt objects during the handcuffing.  Docket No. 52.

240.   Manzano was settled for $525,000.00.  Docket No. 52.


DATED:        March 2, 2018
              New York, New York


                        Ryan Lozar  (RL0229)
                        305 Broadway, 14th Floor
                        New York, New York 10007
                        (310) 867-1562

                        *Attorney for Plaintiffs*

72