UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

JASMINE BRIDGEFORTH, DELANO
BROADUS, and DAVID FAIRFAX,

Plaintiffs,

-against-

CITY OF NEW YORK, NYPD Officer JOHN
ZERAFA, T ax No. 919893, individually, NYPD
Officer RAFAEL SANCHEZ, Shield No. 12327,
individually, NYPD Officer MOHAMMED
KHANG, Shield No. 18729, individually, NYPD
Sergeant DEMETRIOUS LEE, Shield No. 3087,
individually, NYPD Deputy Inspector LUIS
DESPAIGNE, individually, and JOHN/JANE
DOE POLICE OFFICERS 1-5, individually,

Defendants.

------------------------------------------------------------------------ x

**DEFENDANTS' RESPONSES
AND OBJECTIONS TO
PLAINTIFFS'
SUPPLEMENTAL
STATEMENT OF FACTS**

No. 16 Civ. 273 (WHP) (SDA)

      Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1

of the Local Rules of the United States District Courts for the Southern and Eastern

Districts of New York, Defendants City of New York, Detective John Zerafa, Police

Officer Rafael Sanchez, Police Officer Mohammed Khan, Sergeant Demetrios Lee, and

Retired Deputy Inspector Luis Despaigne (hereinafter referred to collectively as

"Defendants"), by their attorney, Zachary W. Carter, Corporation Counsel of the City of

New York, submit this Counterstatement to Plaintiffs' Supplemental Statement of Facts

Pursuant to Local Rule 56.1 ("Defs. 56.1"), dated March 3, 2018.[1]

---

[1] Defendants contend that plaintiffs' Supplemental Statement of Facts should be disregarded for the reasons
set forth in Point I of Defendants' Reply Memorandum of Law in Further Support of their Motion for
Summary Judgment, dated March 26, 2018. Notwithstanding, Defendants provide the following responses.

## PLAINTIFFS' SUPPLEMENTAL STATEMENT OF FACTS

52.   Broadus and Bridgeforth were a couple for many years. In 2010 they had a

daughter named "FB." Bridgeforth Tr. 8:18-20.

### DEFENDANTS' RESPONSE:

> Disputed[2] and object insofar as the statement does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion in violation of Local Rule 56.1(b) and, accordingly, should be disregarded by the Court.

53.   Broadus and Bridgeforth separated and in 2014 had shared custody of FB. In June

of that year, Bridgeforth successfully applied to lease Apt. 3C at 1430 Amsterdam Avenue

in NYCHA's Manhattanville Houses. Exh. 7 (part of Bridgeforth's June 2014 application

acknowledging window-guard requirement for tenants with children under age ten); Exh. 9

(showing Apt. 3C's location in the building floor plan, and Apt. 3C's own layout); Exh. 10

(photos of Apt. 3C's kitchen, living room, entrance, and bedroom); Exh. 35 at 10-11

(Family Court Order regarding shared custody).

### DEFENDANTS' RESPONSE:

> Object, as this statement improperly contains multiple facts, in violation of Local Civil Rule 56.1(b). Additionally, whether or not plaintiffs Broadus and Bridgeforth separated and/or had joint custody of F.B. in 2014 is not material to the resolution of Defendants' summary judgment motion; accordingly, this statement does not set forth additional material facts and is therefore in violation of Local Civil Rule 56.1(b) and should be disregarded. In any event, Defendants do not dispute that Bridgeforth was the legal leaseholder at 1430 Amsterdam Avenue, Apt. 3C.

---

[2] Plaintiff Bridgeforth testified that she did not date Plaintiff Broadus consistently for very long before they would break up. See Transcript of the Deposition of Jasmine Bridgeforth, dated September 13, 2017 (hereinafter "Bridgeforth Dep."), annexed to the Bardauskis Decl. as Exhibit "F," at 37:18-21). And, Broadus testified that prior to the incident, he and Bridgeforth were not dating, and he had not seen her for approximately one year leading up to the subject incident. See Transcript of the Deposition of Delano Broadus, dated April 4, 2017 (hereinafter "Broadus Dep."), annexed to the Bardauskis Decl. as Exhibit "G," at 32-33:21-18.

54.    Bridgeforth signed NYCHA paperwork acknowledging that NYCHA was required by law to install window guards in Apt. 3C to protect against child-fall risk. This was due to the fact that FB was under ten years old. Exh. 7 (window guard form); Exh. 8 (collection of window-guard regulatory material published by City Defendant online); Exh. 10 at 4.

**DEFENDANTS' RESPONSE:**

> **Undisputed only as to the fact that that Bridgeforth signed NYCHA paperwork. Further, object insofar as this statement mischaracterizes the evidence and does not set forth additional material facts and is therefore in violation of Local Civil Rule 56.1(b).**

55.    In the summer of 2014, Broadus had a girlfriend named Necola Sims. Bridgeforth met her and the women were on good terms. Bridgeforth Tr. 21:7-8, 24:9-24 (describing her good relationship with Sims); Exh. 13 at D45 (Sims telling police that Broadus was her boyfriend).

**DEFENDANTS' RESPONSE:**

> **Undisputed that Broadus testified that he was dating Necola Sims. However, dispute that Bridgeforth and Sims were "on good terms." Bridgeforth Dep., Exhibit "F" to the Bardauskis Decl., at 25:20-25 (Bridgeforth testified that she had only met Sims a "few times" and that both women were having a romantic relationship with Plaintiff Broadus at the same time, which "wasn't nice."). Further, object as the statements do not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b), and should be disregarded.**

56.    In September 2014, Bridgeforth and FB moved into Apt. 3C. At about the same time, she learned that Broadus and Sims did not have a regular place to live. She learned that the same was true for Broadus' "nephew" (term of endearment, no blood relation) David Fairfax and his then-girlfriend Sarah Hau Sans. The two couples - Broadus and Sims, and Fairfax and Hau Sans - helped one another. Bridgeforth knew Fairfax and Hau

Sans both, and asked Hau Sans to baby sit FB various times during the summer of 2014.

Bridgeforth Tr. 19:1-14, 21:7-12; Fairfax Tr. 46:6-7 (testifying that he called Broadus'

girlfriend Sims "mama" because they had met when they were homeless and she had been

a maternal figure to him); id. at 42:5 (Broadus an uncle figure).

**DEFENDANTS' RESPONSE:**

> **Object as this statement improperly contains multiple facts, and does not set forth additional facts that are material to the resolution of defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b) and, accordingly, should be disregarded. Further, object as the cited testimony does not support the purported statement.**

57.     Bridgeforth invited the two couples to stay with her and FB in Apt. 3C. FB had

particular affection for her babysitter Hau Sans. Bridgeforth Tr. 21:7-12; id. at 24:9-24

(describing her good relationship with Sims); id. at 29:15-16 (describing that FB and Hau

Sans got along well).

**DEFENDANTS' RESPONSE:**

> **Object insofar as this statement improperly contains multiple facts, and does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b) and, accordingly, should be disregarded. Nonetheless, it is undisputed that Bridgeforth so testified.**

58.     Bridgeforth and FB kept the bedroom for themselves, and the others slept in the

living room. Broadus Tr. 36:17.

**DEFENDANTS' RESPONSE:**

> **Object insofar as this statement does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b), and should be disregarded. Nonetheless, undisputed that Broadus so testified.**

59.     Sims put the Time Warner bill in her name, and Time Warner installed a device on

Apt. 3C's front and bathroom door as a child-proofing measure for three-year-old FB's

safety, who was tall enough to reach doorknobs. Bridgeforth Tr. 24: 17-19; id. at 26:6-27; Exh. 24 (Time Warner cable bill in Sims' name); Exh. 41 (Zerafa hand notes noting "Cable").

**DEFENDANTS' RESPONSE:**

> **Disputed insofar as the statement mischaracterizes the record and is misleading in that Plaintiffs cite to exhibits which do not evince that any cable company installed any device(s) for the purported safety of F.B. Further, object as this statement improperly contains multiple facts.**

60. Broadus earned money sorting, bagging and selling recyclables. He had arrangements with various commercial and residential buildings where staff granted him collection access on certain nights of the week. Broadus Tr. 23:15-23; id. at 41:10-21 (explaining that once Broadus sorted and bagged four thousand pieces of recyclables, he notified the recycling center to send a collection truck); Exh. 10 at 5-6 (photo of representative bag-and-sort).

**DEFENDANTS' RESPONSE:**

> **Undisputed that Plaintiff Broadus so testified. However, object as this statement improperly contains multiple facts, none of which are material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b), and accordingly, should be disregarded.**

61. Bridgeforth helped Broadus with his recycling work at times. When she did, Hau Sans babysat FB as she had before moving in. Exh. 2 at D5 (Sims telling police that Broadus worked recycling); Zerafa Tr. 87:19-25, 88:6-9 (testifying that he learned during investigation that Hau Sans lived in Apt. 3C, was from France, and babysat FB, and stating that he found it strange that someone from France would live at 1430 Amsterdam Avenue); Broadus Tr. 40:24-41:3.

**DEFENDANTS' RESPONSE:**

> Undisputed that Broadus testified that Plaintiff Bridgeforth would help him with "bottles and cans." However, disputed insofar as the materials cited do not support the statement that non-party Sara Hau-Sans ("Hau-Sans") babysat F.B. "as she had before moving in." Further, object as this statement does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b), and should be disregarded.

### October 8, 1014, Events – Sims Becomes Upset And Leaves

62.     On October 8, 2014, at around 6:30 p.m. or 7:00 p.m., the group made and ate a dinner of meatloaf, mashed potatoes and gravy. There were leftovers. Broadus Tr. 26:22-23; Bridgeforth Tr. 18:2-11.

**DEFENDANTS' RESPONSE:**

> Object insofar as what Plaintiffs ate for dinner does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b), and should be disregarded. Further, dispute that the materials cited support the statement, as there is no mention of what Plaintiffs purportedly ate for dinner in the testimony cited.

63.     Sims had been drinking all day that day and was noticeably intoxicated. Broadus Tr. 37:4-8, 38:13-22; Bridgeforth Tr. 20:23-25; Exh. 32 at D140.

**DEFENDANTS' RESPONSE:**

> Undisputed that Plaintiffs testified that Sims had been drinking. However, dispute Plaintiffs' characterization of Sims as being noticeably intoxicated. See Transcript of the Deposition of Police Officer Rafael Sanchez, taken on April 17, 2017, (hereinafter "Sanchez Dep."), annexed to the Bardauskis Declaration as Exhibit "J", at 30-31:24-4; 144:15-23. Further, object to the extent that this statement contains improper argument and/or credibility assessments, in violation of Local Civil Rule 56.1(b).

64. Shortly after dinner, Sims left Apt. 3C to visit friends. Broadus Tr. 38:23-39:2.

**DEFENDANTS' RESPONSE:**

> **Undisputed that Plaintiff so testified.  However, object insofar as this statement does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b), and should be disregarded.**

65.    Broadus and Bridgeforth were planning to go to work. Hau Sans had agreed to babysit FB. Another friend of the group, Eric Kirkland, had had dinner with the group in Apt. 3C and planned to stay with Hau Sans. Bridgeforth Tr. 19:21-20:7, 29:14-30:4.

**DEFENDANTS' RESPONSE:**

> **Object insofar as this statement improperly contains multiple facts, and does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b), and should be disregarded.  Further object insofar as insofar as the materials cited do not support the statement, and is misleading.  However, undisputed insofar as Plaintiffs Bridgeforth and Broadus testified to leaving the apartment in the evening to collect cans.  See Bridgeforth Dep., Exhibit "F" to the Bardauskis Decl., at 29-30:1-8; Broadus Dep., Exhibit "G" to the Bardauskis Decl., at 40-41:14-3.**

66.    Broadus and Bridgeforth had begun to have an affair since Broadus and Sims moved in. Before leaving for work, and while Sims was out, Broadus and Bridgeforth went into the bedroom. Hau Sans, Kirkland and FB remained in the living room. Zerafa Tr. 87:19-25, 88:6-9 (testifying that he learned during investigation that Hau Sans lived in Apt. 3C, was from France, and babysat FB); Broadus Tr. 44:2-5, 47:17-48:9

**DEFENDANTS' RESPONSE:**

> **Object insofar as this statement improperly contains multiple facts, and does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b), and should be disregarded.  Further object insofar as insofar as the materials cited do not support the statement, mischaracterizes Detective Zerafa's testimony, and to the extent that the statement is misleading.  Undisputed insofar as plaintiffs Broadus and Bridgeforth testified to having sex in the bedroom of Apartment**

**3C on the date of the subject incident. <u>See</u> Bridgeforth Dep., Exhibit "F" to the Bardauskis Decl., at 88-89:24-8; Broadus Dep., Exhibit "G" to the Bardauskis Decl., at 42:3-10.**

67.     Sims came home unexpectedly, opened the bedroom door, and found Broadus and Bridgeforth in *flagrante*. Sims leapt angrily at Bridgeforth and Broadus had to physically separate them. Sims left Apt. 3C upset. Broadus Tr. 46:10-23; Bridgeforth Tr. 25:14-16, 68:21- 22.

**<u>DEFENDANTS' RESPONSE:</u>**

> **Undisputed that Plaintiffs so testified. However, object insofar as the statement is misleading and mischaracterizes the record; as the complaining victim reported to police that Broadus and Bridgeforth punched her repeatedly with a closed fist, resulting in swelling to the left side of her lip, as well as a laceration and injury to her left eye. <u>See</u> Defs. 56.1, at ¶8.**

68.     Fairfax visited Apt. 3C and briefly spoke to Broadus as Sims left upset. At the time, Fairfax did not know the full details regarding what had happened. Fairfax Tr. 39:15- 40:3.

**<u>DEFENDANTS' RESPONSE</u>:**

> **Undisputed that Fairfax so testified. However, object insofar as this statement mischaracterizes the record and is misleading insofar as it suggests that Plaintiff Fairfax was not present at the apartment earlier in the evening, but rather only "visited Apartment 3C" to briefly speak to Plaintiff Broadus. In fact, plaintiff Fairfax testified that he was "staying there" for a couple of months leading up to the subject incident, and had been sleeping in the living room. <u>See</u> Transcript of the Deposition of Plaintiff David Fairfax, taken on March 31, 2017, (hereinafter "Fairfax Dep."), annexed to the Bardauskis Decl. as Exhibit "H," at 31:1-4; 32:11-17); Plaintiffs' Supplemental Statement of Facts, at ¶62.**

69.     Shortly after dinner, Sims left Apt. 3C to visit friends. Broadus Tr. 38:23-39:2.

**DEFENDANTS' RESPONSE**:

> **Disputed and objection as this statement is entirely duplicative of Paragraph 64 of Plaintiffs' Supplemental Statement of Facts. Defendants refer the Court to their Response to Paragraph 64, <u>supra</u>.**

70.     After Sims left, Broadus and Bridgeforth got ready to do bottles and cans. They left sometime around 10:00 p.m. Hau Sans and Kirkland remained in Apt. 3C with FB, who was already in bed when Broadus and Bridgeforth left for work. Broadus Tr. 40:14-41:3; Bridgeforth Tr. 20:1-2.

**DEFENDANTS' RESPONSE:**

> **Undisputed only as to the facts that Bridgeforth and Broadus left Apt. 3C at some point to collect bottles and cans, and that FB was alone in the apartment with Hau Sans and Kirkland. Further object insofar as the materials cited do not support the statement, as neither Broadus nor Bridgeforth testified that they left the apartment around 10:00 p.m. See Broadus Dep., Exhibit "G" to the Bardauskis Decl., at 40:17-19 ("I can't give you a specific time; sometime after dinner."); Bridgeforth Dep., Exhibit "F" to the Bardauskis Decl., at 20:1-2 ("everything happened I remember the situation FB had to be in bed by 9, bath by 8, dinner at 7.").**

71.     Fairfax left Apt. 3C, too. Fairfax Tr. 40:4-19.

**DEFENDANTS' RESPONSE:**

> **Undisputed insofar as Plaintiff Fairfax so testified to leaving the apartment. However, objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b). Accordingly, this statement should be stricken from the record and/or disregarded.**

### Sims' 911 Call From A Payphone In Front Of 1430 Amsterdam Avenue

72.     At 2:33 a.m. Sims went to a payphone in front of 1430 Amsterdam Avenue, called 911 and told the operator that she had "just" run out of an apartment on the third floor of that building where "they were holding me hostage." <u>Exh. 6</u> at 2; <u>id</u> (audio); <u>Exh. 22</u> at D90; Sanchez Tr. 33:9-12 (the pay phone was on Amsterdam Avenue across the street

from 1430 Amsterdam Avenue between 131 and 133rd); <u>Exh. 48</u> at 1 (aerial map); Zerafa

Tr. 60:13-14.

**DEFENDANTS' RESPONSE:**

> **Undisputed insofar as Sims made a 911 call to police regarding the incident.[3] However, object to the extent that Plaintiffs rely upon a transcription of the 911 audio call, which was prepared by Plaintiffs and was not prepared in the ordinary course of business by the NYPD. <u>See</u> Plaintiffs' Exhibit 6.**

73.     In the 911 call, Sims reported that her captors had guns, knives, chains and other

weapons. <u>Exh. 6</u> at PL8-9 ("They got everything up in there.", 7:15-17 ("They got guns,

knives, chains, they got everything."), 8:10-14 (Q: "You said .. they have weapons ... " A:

"Correct."); <u>id.</u> (audio).

**DEFENDANTS' RESPONSE:**

> **Undisputed.  However, object to the extent that Plaintiffs rely upon a transcription of the 911 audio call, which was prepared by Plaintiffs and was not prepared in the ordinary course of business by the NYPD. <u>See</u> Plaintiffs' Exhibit 6.**

74.     Sims told the 911 operator no less than five times that she had 'just' run out of the

building, where her captors tried to make her a prostitute along with a young girl who

remained a prisoner inside. <u>Exh. 6</u> at 3:3-5 ("I <u>just</u> ran out of the house they were holding

me hostage in.") (emphasis added), 3:7-9 (same), 4:24-25 ("The emergency is I <u>just</u> was

held as a hostage.") (emphasis added), 6:5-7 ("It <u>just</u> happened.") (emphasis added); <u>id.</u> at

5:8-10 ("[T]here's a girl stuck up there."), 5:13-15 ("And there's a girl that was with me

up there too."), 7:17-18, 8:8-9 ("There's a girl stuck in there.").

---

[3] Defendants also note that this statement does not controvert the statement set forth in Paragraph 12 of Defendants' 56.1 and, as such, does not set forth additional material facts.

**DEFENDANTS' RESPONSE:**

> **Undisputed insofar as Sims made a 911 call to police regarding the incident. However, object to the extent that Plaintiffs rely upon a transcription of the 911 audio call, which was prepared by Plaintiffs and was not prepared in the ordinary course of business by the NYPD. Further object insofar as the original 911 audio recording is not entirely audible and, as such, this statement is misleading and/or speculative insofar as Sims purportedly told the 911 operator "no less than five times" that the incident had "just" happened.**

## Police Arrive Within Fifteen Minutes Of Sims' 911 Call. Secure Apt. 3C's Door And Watch The Perimeter Of 1430 Amsterdam Avenue

75.    Dispatch began to transmit details about Sims' 911 call to police immediately, _i.e._, the fact that she had been beaten 'just now' by people who were "inside" the apartment and who had weapons, etc. Exh. 22 at D90.

**DEFENDANTS' RESPONSE:**

> **Undisputed insofar as the 911 dispatch operator transmitted details concerning the allegations that Sims reported to 911 call. However, objection as this statement improperly does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

76.    The first responding police officers arrived roughly ten to fifteen minutes later. Exh. 1 (2:30a.m.); Exh. 2 (same); Exh. 3 (same); Exh. 32 at D145 (noting 2:35 a.m. arrival), D403 (noting 2:48 a.m. arrival on scene); see id. at D139 (2:50 am arrival); id. at Dl45 (stating the call to the location came at 2:35 a.m.); id. at D266 (2:50 a.m. arrival).

**DEFENDANTS' RESPONSE:**

> **Undisputed that NYPD officers responded to the scene. However, object as this statement does not controvert the statements set forth in Paragraph 12 of Defendants' 56.1 and, as such, does not set forth additional material facts.**

77.    Defendant Officer Rafael Sanchez, Sanchez's partner Defendant Officer Mohammed Khan, Defendant Officer Demetrious Lee, non-party Lt. Michael Guenther,

non-party Officer Kelly Rourke, non-party Officer Fontaine, and non-party Officer Kramel were among the first on the scene. Sanchez Tr. 24:24-25:2, 25:23-24 (Guenther and Rourke already on the scene when Sanchez and Khan arrived); Exh. 32.

**DEFENDANTS' RESPONSE:**

> **Undisputed that the above-referenced officers responded to the scene. However, object as this statement does not controvert the statements set forth in Paragraph 12 of Defendants' 56.1 and, as such, does not set forth additional material facts.**

78.    Upon arrival, NYPD secured the door to Apt. 3C, secured the perimeter of 1430 Amsterdam Avenue, and surveilled Apt. 3C's windows to see if there were any lights on inside and to see if anyone attempted to escape through a window. Guenther Tr. 16:14:24.

**DEFENDANTS' RESPONSE:**

> **Undisputed insofar as non-party Lieutenant Guenther testified that, as he and other officers continued to knock on the door, they also at some point went to the window to see if there were any lights on in the apartment, or any movement, and further testified that he did not recall if there were either. Object insofar as it does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b). Further object insofar as Plaintiffs mischaracterize the record as the materials cited do not support the statement.**

### Sims Tells Law Enforcement What They Will Find Inside Apt. 3C: A Teen SexTrafficking Victim Named "Gloria," Handcuffs, Chains, A Machete, A Blue Bucket For Prisoners' Human Waste, And More

79.    Sims reported to Defendant Sanchez and other responding police that her captors held Sims and a teen girl named Gloria together and they were either chained or handcuffed to a radiator in Apt. 3C. Sanchez Tr. 28:8-9 (testifying that Sims said she was chained to radiator with a teen girl named Gloria); Guenther Tr. at 9:20-22 (testifying that Sims said she was chained to the radiator); Exh. 23 at 093 (Sanchez photo captions stating

that Sims said she was handcuffed to radiator); <u>Exh. 32</u> at D140 (Defendant Lee writing

that Sims and Gloria had been held naked and chained).

**DEFENDANTS' RESPONSE:**

> **Undisputed that complaining victim Sims reported to officers that she and another girl purportedly named Gloria were held in the apartment and either chained or handcuffed to a radiator.**

80.     Sims told police that Gloria had her toenails painted purple and/or that she was

wearing Hello Kitty socks. <u>Exh. 32</u> at D138 (Defendant Lee noting that Gloria was

reported to have purple-painted toenails); <u>id.</u> at D146 (non-party Rourke writing that

Gloria was reported as being naked save for Hello Kitty socks).

**DEFENDANTS' RESPONSE:**

> **Undisputed.**

81.     Sims reported to law enforcement that her captors had weapons including a

machete that was held to her neck. <u>Exh. 43</u> at ¶ 2.b., 6 (search warrant application stating

that Zerafa had cause to believe he would find a machete inside Apt. 3C); <u>Exh. 44</u> (ADA

Nolan hand notes from October 9, 2014, meeting with Sims stating "machete to neck");

Zerafa Tr. 113:21- 22.

**DEFENDANTS' RESPONSE:**

> **Undisputed only insofar as Sims reported that her "captors" had weapons. However, disputed insofar as the materials cited do not support the statement that Sims reported having a machete held to her neck. Plaintiffs' Exhibit 43, which is a copy of the NYPD search warrant application for Apartment 3C of 1430 Amsterdam, does not specifically state that Detective Zerafa had "cause to believe he would find a machete inside Apt. 3C." Further, Plaintiffs' <u>Exh.</u> 44, the handwritten note of ADA Nolan does not state "machete to neck," but, rather indicates "knife to neck." Detective Zerafa's deposition testimony as cited does not state that Sims reported a machete (or even knife) was held to her neck.**

- 13 -

82.    Sims reported to law enforcement that her captors forced Sims and Gloria to go to the bathroom in a blue bucket while they were chained up. Exh. 44 at D332 ("blue bucket"); Zerafa Tr. 18:4-7, 35:10-13.

**DEFENDANTS' RESPONSE:**

> **Undisputed that Sims reported that she and Gloria were made to go to the bathroom in a blue bucket. However, disputed insofar as the materials cited do not fully support the statement. Exhibit 44 at D332 only notes "blue bucket" and nothing more. Further, object insofar as this statement does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b), and should be disregarded.**

83.    Sims reported to Defendant Sanchez and other responding police officers that her captors kept Sims and Gloria naked or in provocative clothing and were taking photographs of them in these states of undress. Sanchez Tr. 20:9-13, 28:9-10 (testifying that Sims was forced to wear provocative clothing); id. at 35:5-10; Guenther Tr. at 9:20-22 (testifying that Sims said she was chained to the radiator); Exh. 32 at D140 (Defendant Lee writing that Sims and Gloria had been held naked and chained).

**DEFENDANTS' RESPONSE:**

> **Undisputed insofar as Sims alleged to police officers that she was forced to wear provocative clothing.**

84.    Sims reiterated to police that she had "just" escaped from Apt. 3C and that Gloria was still inside chained naked to the radiator. Guenther Tr. at 10:23-25 (testifying that Sims reported being held "most recently" and being afraid for Gloria who was still inside); Exh. 43 ¶ 6; Zerafa Tr. 58:16-20; see Guenther Tr. at 10:23-25, 13:13-15, 13:19-22.

**DEFENDANTS' RESPONSE:**

> **Undisputed only insofar as Sims alleged to non-party Lieutenant Guenther that "Gloria" was being held naked. However, disputed insofar as the materials cited do not support that Sims reiterated that**

> she had "just" escaped. See e.g. Transcript of the Deposition of non-party Lieutenant Michael Guenther, taken on June 7, 2017, (hereinafter "Guenther Dep."), annexed to the Bardauskis Declaration as Exhibit "K", at 10:23-25 ("She said she was in the room *most recently*[.]".

85.   When NYPD responded to the 911 call, they did not find Sims in a state of undress. They found Sims fully clothed and wearing normal clothing that included a T-shirt, hooded sweatshirt, baseball hat, and black Nike sneakers. Sanchez Tr. 30:20 (testifying that when he arrived on the scene shortly after Sims' 911 call, Sims was "clothed fully"); Exh. 32 at D146 (describing Sims' clothes); Guenther Tr. at 9:16.

**DEFENDANTS' RESPONSE:**

> **Undisputed that Sims was clothed at the time that she spoke to police.**

86.   Sims told Defendants and other officers that she had been a prisoner of Plaintiffs' sex-trafficking operation for approximately six hours - from approximately 7:30 p.m. on October 8, 2014, through the time she escaped and called 911 on October 9, 2014, at 2:33 a.m. Exh. 1 at D4 (complaint against Broadus indicating the crime began at 7:30 p.m. on October 8, 2014); Exh. 2 at D14 (complaint against Bridgeforth, same); Exh. 3 at D27 (complaint against Fairfax, same); Exh. 4 at D113 (complaint against Hau Sans, same); Exh. 30 (DA's Office decline-to-prosecute letters stating that the Plaintiffs' arrest charges arose from an offense occurring on October 8, 2014, beginning at approximately 7:30 p.m.).

**DEFENDANTS' RESPONSE:**

> **Undisputed only insofar that the cited materials reflect an alleged start time as to the incident as approximately 7:30 p.m.**

87.   At least two officers -- Defendant Demetrious Lee, who worked as PSA6's Integrity Control Officer at the time, and later Defendant John Zerafa - found Sims to

appear intoxicated. Exh. 32 ast D140 (Defendant Sgt. Lee's memo book); Exh. 47 (noting

Lee's status as "ICO"); Zerafa Tr. 86:14; Broadus Tr. 63:5-12; Fairfax Tr. 45:24-46:3; id.

at 83:2-5; Bridgeforth Tr. 68:17-20.

**DEFENDANTS' RESPONSE:**

> **Disputed, and object as this statement improperly contains argument
> and speculation, the materials cited do not support the statement,
> plaintiffs mischaracterize the record, and the statement is misleading.
> For example, Detective Zerafa testified that he never was at the
> location, never "got up close to her," and that at the time he was
> talking to her, he did not recall her seeming intoxicated. Zerafa Dep.,
> Exh. "I" to the Bardauskis Decl., at 86:3-20.**

88.     Sims told Defendants and other officers that she knew her kidnappers in passing.

She maintained this story for eight hours, when she admitted at PSA6 that she was actually

Broadus' girlfriend and had been living in Apt. 3C. Sanchez Tr. 28:4-6, 28:4-8, 28:25

(testifying that she was approached by an individual in the lobby of 1430 Amsterdam

Avenue, invited to Apt. 3C for a party, then taken inside Apt. 3C at knifepoint); id. at 72:2-

3, 73:6-7 (Sanchez testifying that for many hours Sims characterized her kidnappers as

"loose acquaintances"); Guenther Tr. 9:25-10:4, 23:10-22 (testifying that he did not recall

Sims telling police that she was in a relationship with Broadus), 67:16-21 (testifying that

Sims told him that she knew Apt. 3C's occupants "in passing" and that he did not know

that she had been Broadus's girlfriend), 87:7-9 (Guenther testifying that he never learned

until his deposition that Sims lived in Apt. 3C).

**DEFENDANTS' RESPONSE:**

> **Disputed and object insofar as the materials cited do not fully support
> this statement, and Plaintiffs mischaracterize the record. Police Officer
> Sanchez never testified that "for many hours Sims characterized her
> kidnappers as loose acquaintances," but rather only that the
> relationship between Plaintiff Broadus and Sims had "not been cast as
> a domestic issue" and he was not initially aware of any romantic**

history between the two. <u>See</u> Sanchez Dep., Exhibit "J" to the Bardauskis Decl., at 70-72:21-7. **Further non-party Lieutenant Guenther never testified that he learned at his deposition that Sims had been living in Apartment 3C.**

<u>**Hau Sans Opens The Door To Apt. 3C When The Police Knock, And Police Find Nothing That Sims Said They Would Inside: No Gloria, No Machetes, No Bathroom Buckets, No Chains, No Handcuffs. No Guns. Etc.**</u>

89.     Shortly after arriving at the scene, police knocked on the door to Apt. 3C "several times." Although there was no immediate response from inside Apt. 3C, the police's presence and knocks did not stir neighbors, either. Guenther Tr. 21:6-22; Sanchez Tr. 40:13-17.

**DEFENDANTS' RESPONSE:**

> **Undisputed only insofar as the police knocked on the door of Apt. 3C several times.  However, disputed insofar as Plaintiffs mischaracterize the record, as non-party Lieutenant Guenther and Police Officer Sanchez only testified that they <u>did not remember</u> any neighbors coming out due to any noise caused by the knocking. See Guenther Dep., Exhibit "K" to the Bardauskis Decl., at 21:6-22; see also Sanchez Dep., Exhibit "J" to the Bardauskis Decl., at 40:13-17.**

90.     Sometime around 3:00 a.m. - less than thirty minutes after Sims called 911 and roughly fifteen minutes after police arrived at the scene - Hau Sans voluntarily opened the door to Apt. 3C in response to the knocks. Guenther Tr. 21:6-10; Sanchez Tr. 40:19-20; <u>id.</u> at 63:14 (Sanchez at deposition stating from his memo book that Hau Sans opened the door to police at 3:00 a.m.); <u>Exh. 13</u> at D43 (Sanchez's memo book noting that Hau Sans voluntarily opened Apt. 3C's door to police at 3:00 a.m.).

**DEFENDANTS' RESPONSE:**

> **Undisputed only insofar as non-party Hau-Sans voluntarily opened the door to Apartment 3C at approximately 3:00 a.m.**

91.     Defendant Sanchez observed that Hau Sans "looked like she just woke up." Defendant Sanchez asked Hau Sans about Gloria, and Hau Sans said that there was no one

named Gloria there. Sanchez then asked Hau Sans to step into the hallway. She did, and Sanchez arrested her. This was minutes after she opened the door. Sanchez wrote Hau Sans' arrest charges as false imprisonment. NY Pen. L. 135.05 (unlawful imprisonment); Sanchez Tr. 41:2-14, 41:22-42:2, 42:13-19, 46:20-23; Exh. 4 (Hau Sans' arrest and complaint reports showing arrest charge and listing Sanchez as arresting officer); Exh. 30 at D367 (DA's Office document declining to prosecute Hau Sans' unlawful imprisonment arrest charge); Exh. 42 at D365 (PSA6 command log entry showing Hau Sans' unlawful imprisonment arrest charge and listing Sanchez as arresting officer).

**DEFENDANTS' RESPONSE:**

> **Object, as this statement improperly contains multiple facts. Nevertheless, undisputed that Police Officer Sanchez was assigned as the arresting officer for non-party Hau-Sans, who was arrested at 1430 Amsterdam Avenue on October 9, 2014.**

92.     Defendant Sanchez proceeded to enter Apt. 3C and found Kirkland sitting on a bed in the living room. Officer Rourke found FB sleeping inside the bedroom. Sanchez Tr. 43:19-20, 47:20-25, 56:8-14.

**DEFENDANTS' RESPONSE:**

> **Undisputed; however, object as this statement does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

93.     Officer Rourke removed FB from Apt. 3C and took her to St. Luke's Hospital for medical and physical examination, where FB was cleared and found without injury. Sanchez Tr. 43:19-20, 47:20-25, 56:8-14; Exh. 32 (Rourke memo book transporting FB to St. Luke's); Exh. 34 at D161 (St. Luke's finding FB clear and without injury).

**DEFENDANTS' RESPONSE:**

> **Undisputed. However, object as this statement does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b), and should be disregarded.**

94.     Defendant Sanchez and other officers then began to search Apt. 3C--under the bed, inside closets, inside the refrigerator, inside cabinets, through papers, and more. Sanchez Tr. 50:11-51:4; id. at 87:25-88:3, 93:8-12 (stating that the warrantless search and photography of Apt. 3C occurred while it was still dark out in those early hours of the incident on October 9, 2014); Broadus Tr. 86:6-19 (noting Sanchez's subsequent admissions that his warrantless search of Apt. 3C also included the refrigerator and kitchen cabinets); Exh. 38 at PL100 (Sanchez Family Court testimony about early-morning fridge and cabinet searches).

**DEFENDANTS' RESPONSE:**

> **Admit that a safety and wellness check was performed inside of Apt. 3C after police officers were voluntarily permitted to enter the apartment. However, dispute that the testimony cited supports the statement that Police Officer Sanchez searched "inside closets, inside the refrigerator, inside cabinets, through papers, and more." Defendants refer the Court to the evidence cited by plaintiff for a full and accurate recitation of its contents. Further object as this statement improperly contains multiple facts, contains improper argument, and does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

95.     Defendant Sanchez took photographs of Apt. 3C during that early warrantless search, which show no handcuffs or chains on the radiator or elsewhere, no bucket for human waste, no machete, no guns, no knives, or anything else that Sims told police they would find inside. Sanchez Tr. 88:6, 87:25-88:3, 92:4-6, 93:8-12 (testifying that the sun hadn't come up yet that morning when he took the photos); id at 94:5-11 (testifying that he

saw no chains and that the radiator did not look like anyone had been chained to it); id. at 94:23-95:5 (testifying that he took a picture of a closet because it had clothing in it, but that he did not observe any clothing on the scene that was provocative); Exh. 23 (indicating that the photos were loaded by 8:00 a.m.); see Sanchez Tr. 93:24-94:5, 139:19-23, 145:6-10; Guenther Tr. 29:13-14, 30:4-17, 31:9-18, 31:19-21 (Guenther testifying that the only handcuffs in Apt. 3C were the ones he had brought with him); Exh. 23; Exh. 26 (Defendants' Admission No. 1).

**DEFENDANTS' RESPONSE:**

> **Undisputed only insofar as Defendant Sanchez testified that he took photographs at the subjection location, and that he did not observe handcuffs or chains near the radiator, or any damage to the radiator, nor any provocative clothing. However, object as this statement improperly contains multiple facts, argument, and mischaracterizes the record. Defendants refer the Court to the evidence cited by plaintiff for a full and accurate recitation of its contents. Further object insofar as the materials cited do not controvert the statement set forth in Paragraph 42 of Defendants' 56.1, and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

96.    The search performed by Defendant Sanchez and other police revealed "no sign of Gloria" inside Apt. 3C. Sanchez Tr. 50:25-51 :4, 139:22-23; Guenther Tr. 24:19-20, 29:6-8, 31:22-32:4; Exh. 23 (Sanchez photos); Exh. 47 (investigators concluding that Gloria was a fictional character).

**DEFENDANTS' RESPONSE:**

> **Admit that Gloria was not present at the time that Police Officer Sanchez first entered Apt. 3C.**

97.    Inside Apt 3C, the radiator did not appear to have any marks or damage on it that would indicate that humans had been handcuffed or chained to it, and the Sanchez photos show none. Sanchez Tr. 94:6-11; Exh. 23.

**DEFENDANTS' RESPONSE:**

> Undisputed only insofar as the radiator did not appear to have any marks on it or damage to it; however, object, as this statement contains speculation and/or argument as to whether the lack of marks and/or damage indicated that a human had not been handcuffed to it.

98.     Lieutenant Guenther testified that he entered the bedroom where the sex-trafficking/hostage situation had allegedly taken place, and "it was just the room was in disarray." Guenther Tr. 25:2-5; Exh. 9 at 4 (bedroom labeled "GM," possibly for "Grand Master"); Exh. 23 at D101-104 (photographs taken by Defendant Sanchez during the warrantless search of Apt. 3C).

**DEFENDANTS' RESPONSE:**

> Admit that Lieutenant Guenther testified that he asked Sims to escort him into the room where she was allegedly held, that she pointed it out and it had "the clothes on the floor, like she explained" and that the room "was a complete mess, and that was the extent of the apartment that I can remember." See Guenther Dep., Exhibit "K" to the Bardauskis Decl., at 24-25: 11-5..

99.     During Sanchez's warrantless search of Apt. 3C early on October 9, 2014, he seized cell phones, two postcards and two pieces of paper. He later vouchered them. Sanchez Tr. 73:16-74:9; Exh. 29 at D126 (vouchering items around 7:00 pm on October 9, 2014), D128 (same); Exh. 14 (Zerafa memo book noting that search warrant application process concluded around 7:25 pm and that the search warrant was executed in thirty minutes from 9:45 pm to 10:15pm); Zerafa Tr. 80:7-18.

**DEFENDANTS' RESPONSE:**

> Objection, as this statement improperly contains multiple facts, argument, and does not set forth additional facts that are material to Defendants' summary judgment motion, and is therefore in violation of Local Civil Rule 56.1(b). Nevertheless, undisputed that Police Officer Sanchez vouchered such items.

100.    One of the postcards was a promotional postcard from Susman Realty Company advertising 1, 2 and 3 bedroom apartments for rent in Bronx, Manhattan and Brooklyn and noted that the company was seeking tenants who were working, eligible for Section 8 and/or eligible for RAP Program. Sanchez Tr. 74:14-20; Exh. 84 at D415-16. The second postcard was a promotional postcard from K&K Room Finders advertising it room-rental and local-moving services. Id, at D417-18.

**DEFENDANTS' RESPONSE:**

> **Disputed, and object insofar as the materials cited do not support the statement and to the extent Plaintiffs mischaracterize the record. Police Officer Sanchez vouchered handwritten pieces of paper containing directions to the Harlem Vista Hotel – which is known for prostitution – and postcard flyers reflecting weekly rental prices. Sanchez Dep., Exhibit "J" to the Bardauskis Decl., at 74:12-20; 74-75:25-6. Further, object as Plaintiffs cite to "Exhibit 84," which does not exist.**

101.    Defendant Sanchez arrested Kirkland, but not for false imprisonment like Hau Sans. This was because Sims told Defendant Sanchez that although Kirkland had been present in Apt. 3C when she was chained to the radiator for hours, according to Sims, Kirkland "didn't do anything." Sanchez Tr. 53:12-15, 55:2-3.

**DEFENDANTS' RESPONSE:**

> **Objection, as this statement contains multiple facts and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b). Nevertheless, undisputed that Police Officer Sanchez was assigned as the arresting officer for non-party Kirkland at 1430 Amsterdam Avenue on October 9, 2014, and that Defendant Sanchez testified that Sims advised him that non-party Kirkland was present in the apartment, but did not actively participate in the events of which she complained.**

102.    Defendant Sanchez called PSA6 Commanding Officer, Defendant Deputy Inspector Luis Despaigne, to ask him how to handle Sims' statement that Kirkland was

there but not responsible. Defendant Despaigne told Defendant Sanchez to arrest Kirkland

for Obstructing Governmental Administration for failure to open the door sooner when

police knocked. Sanchez handcuffed and arrested Kirkland. NY Pen. L 195.05; Sanchez

Tr. 51:10-16; Exh. 5 (Kirkland's arrest and complaint reports showing OGA charge and

listing Sanchez as arresting officer); Exh. 30 at D366 (DA's Office document declining to

prosecute Kirkland's OGA arrest charge); Exh. 42 at D365 (PSA6 command log entry

showing Kirkland's OGA arrest charge and listing Sanchez as his arresting officer).

**DEFENDANTS' RESPONSE:**

> **Undisputed insofar as non-party Kirkland was arrested. However, disputed and object insofar as the testimony cited does not support the statement, and mischaracterizes the record as the cited testimony does not support Plaintiffs' contention that Defendant Sanchez called Defendant Despaigne for this reason. Defendants refer the Court to the testimony cited by plaintiffs for a full and accurate recitation of its contents. Further object insofar as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, and therefore is in violation of Local Civil Rule 56.1(b).**

103.   Lt. Guenther also called Defendant Deputy Inspector Luis Despaigne, the PSA6

Commanding Officer, to explain that NYPD had found no Gloria, no guns, no machetes,

no handcuffs, no chains, no bathroom buckets, etc., inside Apt. 3C. Defendant Despaigne

responded that investigation should continue and to call Vice. Guenther Tr. 40:4-11,

53:14-17.

**DEFENDANTS' RESPONSE:**

> **Disputed. Object insofar as the cited materials do not support the statement, and plaintiffs mischaracterize the record. Lt. Guenther testified, "the information I relayed to Deputy Inspector Despaigne led him to believe it sounded like a sex trafficking situation." See Guenther Dep., Exhibit "K" to the Bardauskis Decl., at 40:4-6. When asked whether he informed Deputy Inspector Despaigne that there was no Gloria and no chains, Lt. Guenther testified, "I relayed everything to him." Id., at 53:14-17.  The cited materials make no mention of any**

guns, machetes, handcuffs, or bathroom buckets, as Plaintiffs inaccurately state.

## Fairfax Returns To 1430 Amsterdam Avenue And Is Arrested Walking On The Sidewalk Outside

104.    At around 4:45a.m., Fairfax walked along the side of 1430 Amsterdam Avenue, and he saw Sims talking outside with non-party Police Officer Kramel. When Sims saw Fairfax "walking down the pathway [in front of] 1430 Amsterdam Avenue" she said he was involved in the incident. Exh. 32 at D311; Exh. 42 at D247 (Fairfax delivered to the PSA6 for arrest processing by 5:15a.m.); Fairfax Tr. 45:13-16.

**DEFENDANTS' RESPONSE:**

> **Undisputed insofar as complaining victim Sims identified plaintiff Fairfax outside of 1430 Amsterdam Avenue and informed non-party Police Officer Jonathan Kramel that Fairfax had been involved in the subject incident.**

105.    Defendant Sanchez immediately handcuffed and arrested Fairfax and other officers congregated as Fairfax was handcuffed. Exh. 3 at D109 to D135; Fairfax Tr. 86:7-10; Sanchez Tr. 62:13-15.

**DEFENDANTS' RESPONSE:**

> **Undisputed insofar as Police Officer Sanchez arrested and handcuffed Plaintiff Fairfax.**

106.    While Fairfax was handcuffed and in Defendant Sanchez's custody, Sims began to hit, yell and spit at Fairfax. Sanchez let Sims do this to the handcuffed Fairfax and did not stop her. Fairfax Tr. 82:17-84: 16; id. at 84:1-16 (clarifying that Sims repeatedly "mushed," or aggressive tapped Fairfax's head).

**DEFENDANTS' RESPONSE:**

> **Undisputed only insofar as Plaintiff Fairfax so testified. However, object as this statement does not set forth additional facts that are**

material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b), and should be disregarded.

107.   Fairfax still did not know why he had been arrested. It was evident that Sims had told police to arrest him, and he asked Sims why. Sims said that Fairfax "didn't do it" but that Fairfax had spoken to Broadus. Defendant Sanchez and a group of other officers were present when Sims stated this, and heard it. Fairfax Tr. 46:1-2, 86:7-10.

**DEFENDANTS' RESPONSE:**

> **Disputed and object as this statement improperly contains speculation and argument, and does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b), and should be disregarded.**

108.   Defendant Sanchez and another officer transported Fairfax to PSA6. In the vehicle, Fairfax asked how he could be arrested on the basis of a Sims complaint if Sims had just said that Fairfax did not do anything. Fairfax Tr. 53:7-15; id. at 66:14-18 (testifying as to his confusion about the arrest when Sims said that Fairfax did not do anything, but Defendant Sanchez still arrested him).

**DEFENDANTS' RESPONSE:**

> **Undisputed only insofar as Fairfax was transported to PSA6 and that he so testified. However, object, as this statement does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b), and should be disregarded.**

109.   Defendant Sanchez left Fairfax's questions unanswered, dropped Fairfax off at PSA6, then returned to 1430 Amsterdam Avenue. Defendant Sanchez was back at 1430 Amsterdam Avenue by around 5:40a.m. Sanchez Tr. 63:4-8; Exh. 42 at D247 (command log, Fairfax arrival at 5:15 a.m.).

**DEFENDANTS' RESPONSE:**

> **Object insofar as this statement improperly contains argument, and does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, and is therefore in violation of Local Civil Rule 56.1(b), and should be disregarded. Nevertheless, undisputed that plaintiff Fairfax arrived at PSA 6 at approximately 5:15 a.m., and that Police Officer Sanchez resumed patrol at 1430 Amsterdam at approximately 5:40 a.m.**

### Police Put Out A City .. Wide "Level One" Mobilization Looking For Gloria

110.   Initially, NYPD treated Gloria as a missing person. At around 5:25a.m., non-party Lt. Guenther activated a City-wide "Level One" mobilization directing officers on duty to be on the lookout for Gloria. Guenther Tr. 45:2-10; Exh. 22 at D80-81; Exh. 28 at D369 (Guenther memo book).

**DEFENDANTS' RESPONSE:**

> **Undisputed that on October 9, 2014, at approximately 5:25 a.m., a Level One mobilization was activated for "Gloria," a potential missing person.**

111.   Meanwhile, two "Night Watch Detectives"-Guzman and Dean-were investigating Sims' claims. Guzman and Dean were on the scene by 5:30 a.m. Exh. 32 at D312 (Dean noting arrival at 5:30 a.m.); Exh. 13 at D43 (Sanchez noting he began interacting with Dean and Guzman at the scene around 6:00 a.m.).

**DEFENDANTS' RESPONSE:**

> **Undisputed insofar as the materials cited reflect that non-parties Dean and Guzman were on the scene at approximately 5:30-6:00 a.m.**

112.   Among other things, Dean and Guzman's investigation involved the review of NYCHA CCTV camera footage for 1430 Amsterdam Avenue and interviews with Hau Sans and Kirkland. Exh. 26 (Defendants' Admission No.5); Exh. 47 (unusual incident report); Exh. 31.

**DEFENDANTS' RESPONSE:**

> Objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b). Accordingly, these "facts" should be stricken from the record and/or disregarded by the Court.

> Nonetheless, undisputed that non-party NYPD Night Watch detectives Dean and Guzman reviewed NYCHA CCTV footage for 1430 Amsterdam, and that they also interviewed non-parties Hau-Sans and Kirkland.

### NYPD Detectives Complete Their Investigation, Conclude That Sims Lied About Gloria, And The City-Wide Level One Mobilization For Gloria Is Terminated 7:30 a.m.

113.    On October 9, 2014, by 7:30a.m., Detectives Dean and Guzman's investigation determined that Sims lied about Gloria. <u>Exh. 47</u>.

**DEFENDANTS' RESPONSE:**

> Objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b). Accordingly, these "facts" should be stricken from the record and/or disregarded by the Court.

> Nonetheless, undisputed that non-party NYPD Night Watch detectives Dean and Guzman assisted in an investigation and determined that "Necola Sims' account of what transpired was embellished by adding a fictitious female named Gloria to her encounter." Pls. Exh. 47.

114.    On October 9, 2014, at 7:32a.m. the Level One Mobilization that was being transmitted on dispatch to find Gloria was terminated. This was within two hours of its activation. Guenther Tr. at 61:7-11; <u>Exh. 22</u> at D85 (Level 1 termination begins at 7:32), D86-87 (Level 1 cancellation transmitted on dispatch for all city zones); <u>Exh. 26</u> (Defendants' Admission No.4).

**DEFENDANTS' RESPONSE:**

> Objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of

**Local Civil Rule 56.1(b). Accordingly, these "facts" should be stricken from the record and/or disregarded by the Court.**

**Nonetheless, undisputed that a Level One Mobilization was activated at approximately 5:22 a.m., and was terminated at approximately 7:35 a.m. on October 9, 2014.**

115.    No complaint report was ever written documenting "Gloria" as a missing person, although this is normal procedure in connection with Level 1 activations. Guenther Tr. 57:15- 20, 58:5-11.

**DEFENDANTS' RESPONSE:**

> **Admit that a complaint report was not prepared pertaining to Gloria. However, dispute Plaintiffs' characterization that such a report was "normal procedure." See Guenther Dep., Exh. "K" to the Bardauskis Decl., at 58:5-11 ("Yes, it is a procedure to fill out a report claiming someone is missing. But unfortunately, at this point in time, to fill out the report you need to be the relative or someone married to the person, and I don't think there was anybody at this point in time that could state that.").**

116.    No one ever investigated "Gloria" as a missing person again. Zerafa Tr. 25:6-10.

**DEFENDANTS' RESPONSE:**

> **Disputed, and Object, as this statement does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b), and should be disregarded.[4]**

117.    Lt. Guenther wrote an "unusual incident report" that morning for the Chief of the NYPD. In it, Guenther wrote that Sims reported to police that she only known her captors "in passing," that NYPD detectives concluded "that a girl named Gloria did not exist" and that "[i]t is believed that Necola Sims embellished her account of the details that occurred

---

[4] Defendants also note that it is unclear what plaintiff means by no one ever investigated Gloria as a missing person "again." The testimony cited is as follows: Q: I know that you were not involved in a search for Gloria's missing person and I know at least that first day you were not investigating Gloria's missing person, but do you know if anyone on your team was involved in a search or had begun investigating Gloria's missing person? A: As a missing person, no, not that I believe. See Zerafa Dep., Exh. "I" to the Bardauskis Decl., at 25:2-10.

inside of the apartment." Lt Guenther sent notifications of his unusual incident report to

Defendant Deputy Inspector Luis Despaigne and Defendant Vice Defendant John Zerafa.

Exh. 47.

**DEFENDANTS' RESPONSE:**

> **Undisputed that non-party Guenther drafted an unusual incident report. However, object insofar as this statement improperly contains multiple facts, argument and credibility assessments, and does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b), and should be disregarded.**

**Bridgeforth and Broadus Return From Work After NYPD Detectives Determined Sims Lied, Find Police Still Searching Apt. 3C, And Are Immediately Arrested**

118.    At approximately 8:00 a.m., Bridgeforth and Broadus returned to 1430 Amsterdam

Avenue. Broadus Tr. 50:2-25; Exh. 13 D43 (Sanchez memo book noting that by 8:10 a.m.

Broadus and Bridgeforth had been arrested at Apt. 3C).

**DEFENDANTS' RESPONSE:**

> **Undisputed that on October 9, 2014, Plaintiffs Bridgeforth and Broadus were arrested at approximately 8:10 a.m. at 1430 Amsterdam, Apartment 3C.**

119.    On the third floor, Bridgeforth and Broadus saw police officers in the hallway. This

was more than five hours after Sims had called 911 at 2:33 a.m. and after NYPD

Detectives had already determined that Sims had lied to NYPD about Gloria and other

allegations. Broadus Tr. 50:15-20; Bridgeforth Tr. 30:15-16; Zerafa Tr. 60:13-14 (noting

2:33 a.m. 911 call); Exh. 22 at D85 (noting that the Level One termination began to be

issued around 7:30 a.m.).

**DEFENDANTS' RESPONSE:**

> **Disputed and objection insofar as this statement improperly contains multiple facts, argument, and is misleading as the materials cited do not support the purported statement; specifically the cited testimony as**

it relates to Detective Zerafa merely confirms that a 911 call was made at approximately 2:33 a.m., and nothing more.

Further object insofar as this statement does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b), and should be disregarded.

120.    Broadus and Bridgeforth entered Apt 3C, and found more than five officers inside, including Defendant Sanchez. Broadus Tr. 50:23-25; id. at 54:23-55:15 (Broadus remembering Sanchez specifically being present at the time Broadus and Bridgeforth arrived at Apt. 3C and at the time of their arrests because Broadus later saw Sanchez again at a Family Court proceeding where Sanchez gave sworn testimony); Bridgeforth Tr. 30:15-16.

**DEFENDANTS' RESPONSE:**

Disputed and objection insofar as the materials cited do not support the statement, and the statement is misleading and mischaracterizes Plaintiff Broadus' testimony.   Further object insofar as this statement does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b), and should be disregarded.

121.    According to Defendant Sanchez, "the first thing that actually came out from [Broadus'] mouth... was 'Where's my daughter." Sanchez Tr. 129:13-16; see Broadus Tr. 51 : 16-20 (confirming same}.

**DEFENDANTS' RESPONSE:**

Objection insofar as this statement does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b), and should be disregarded.

122.    Sanchez searched, handcuffed and arrested Bridgeforth and Broadus within minutes of their arrival at Apt. 3C. Defendant Khan and Defendant Sanchez then

transported arrestees Broadus, Bridgeforth, Kirkland and Hau Sans to PSA6 for detention. Broadus Tr. 57:8- 14; Bridgeforth Tr. 57:21-58:2; Exh. 42 at D365; Broadus Tr. 58:15; Sanchez Tr. 63:14-19 (arrests at approximately 8:10 a.m.); Exh. 32 at D267 (Khan transporting Broadus and Kirkland after being on arrest scene with Sanchez since the partners' arrival).

**DEFENDANTS' RESPONSE:**

> **Admit only that Police Officer Sanchez was assigned as the arresting officer for plaintiffs Bridgeforth and Broadus, and that Bridgeforth, Broadus, Kirkland, and Hau-Sans, were transported to PSA 6. However, object insofar as the materials cited do not support the statement and mischaracterizes the record in describing Plaintiffs Bridgeforth and Broadus as being arrested "minutes after their arrival," when neither plaintiff could specifically testify as to when they returned to the apartment.**

123. At PSA6, Bridgeforth broke down and all the arrestees listened to her crying hysterically in her cell. Broadus Tr. 61:7-14 (Bridgeforth crying profusely); Fairfax Tr. 57:24- 58:1 (Bridgeforth crying hysterically).

**DEFENDANTS' RESPONSE:**

> **Objection, as whether or not plaintiff Bridgeforth was "crying hysterically" while in a cell at PSA 6  does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, and therefore is in violation of Local Civil Rule 56.1(b), and should be disregarded.**

### Vice Detective Zerafa Responds, Is Debriefed And Investigates

124. Between 8:00 a.m. and 8:30 a.m., Defendant John Zerafa of NYPD's Vice Unit began investigating the incident. Zerafa Tr. 56:2-6; Exh. 12 at D36.

**DEFENDANTS' RESPONSE:**

> **Undisputed that Detective Zerafa, assigned to the NYPD Vice Unit, responded to PSA 6 in regard to interviewing a victim at approximately 8:00 a.m. See Defs. 56.1, at ¶29.**

125.    Defendant Officer Sanchez, Lieutenant Guenther, the Night Watch Detectives and other PSA6 ·officers debriefed Defendant Zerafa. Guenther Tr. 73: 12-16; id. at 82:19-83:25 (Guenther testifying that because Defendant Sanchez took Plaintiffs as a "PSA 6 collar," in his experience NYPD Vice would aid in the arrest due to the need for specialized knowledge about evidence specific to sex trafficking that a novice officer would not have); Zerafa Tr. 14:21-22, 15:17-19, 20:17-21:3, 83:7-20; Sanchez Tr. 63:10-11 (noting Dean and Guzman on the scene while Sanchez was on the scene at approximately 6:00 a.m.); id. at 129:16-19 (testifying that Dean, Guzman and Sanchez were all still together at Apt. 3C at approximately 8:00 a.m. when Bridgeforth and Broadus returned from work); Exh. 13 at D42 (Sanchez noting Dean and Guzman in his notes); id. at D45 (Sanchez noting his October 9, 2014, 8:45 a.m. debriefing with Vice Detectives Zerafa and Munoz, Plaintiffs and non-party arrestees); id. at D46 (Sanchez noting his work with Vice Detectives on October 9, 2014, 1 :30 p.m., showing them photographs that he took during a warrantless search of Apt. 3C earlier that morning prior to Vice's arrival); id. at D46 (Sanchez noting he worked alongside Vice around 3:30 p.m. as they continued to interrogate Plaintiffs); id. at D47 (Sanchez noting that Vice told him to prepare arrest paperwork while Zerafa went to DA's Office to seek search warrant).

**DEFENDANTS' RESPONSE:**

> **Dispute, and object, insofar as this statement improperly contains multiple facts, and the materials cited do not support the statement, and thus the statement is misleading and mischaracterizes the record. For example, non-party Lieutenant Guenther did not testify to him or any other officer "debriefing" Detective Zerafa in the cited testimony. The cited testimony as it relates to Detective Zerafa generally states that he met Police Officer Sanchez at PSA 6, where he was given a brief overview of the alleged events.**

126.   Through these debriefings, Defendant Zerafa learned about the early-morning warrantless search of Apt. 3C and the fact that Defendant Sanchez and other officers found nothing Sims said would be there. Zerafa also looked at the Sanchez photos, and saw no Gloria, no machete, no guns, no knives, no handcuffs, no chains, no bathroom bucket, etc. Exh. 13 at D46 (Sanchez showing Vice the photos); Exh. 23 (the photos); Exh. 26 (Defendants' Admission No. 1).

**DEFENDANTS' RESPONSE:**

> **Objection as this statement improperly contains argument, and the materials cited do not support the statement. Further object insofar as the statement mischaracterizes the record, and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

> **Object insofar that the statement does not clarify what is meant by "debriefings" and/or identify a timeframe for the purported debriefings. Nonetheless, Defendants admit that no handcuffs, machetes, guns, chains, or buckets were recovered from the apartment.**

127.   When asked at deposition about the Sanchez photographs of the child-safe window guards in Apt. 3C, Zerafa testified that "sometimes housing locations, they have child bars, you know, on them." Zerafa Tr. 100:8-10.

**DEFENDANTS' RESPONSE:**

> **Admit that Detective Zerafa testified that "sometimes housing locations, they have child bars, you know, on them." However, object insofar as the purported statement mischaracterizes the context of the testimony.[5]**

---

[5] See Zerafa Dep., Exh. "I" to the Bardauskis Decl., at 99-100:17-12 (Q: Generally speaking, Defendants' 98 thorugh 105, I would like you to look at photos taken of the apartment. And to the extent that the photos refresh your recollection of what you saw that day, if you could tell me whether or not there is anything in these photos that you perceived as evidence of sex trafficking in Apartment 3C? A: Maybe not on its own, but maybe in the accumulative effect of it. Just looking back on it now, there is—this looks like some kind of sensor on the door. I don't know. Q: Defendants' 99? A: Yes, I'm sorry, also the bars on the window; you know, sometimes housing locations, they have a child bars, you know, on them. But if you are saying in and of itself on its own, on its own face, I don't know.)

128.    Defendant Zerafa learned that Night Watch Detectives Dean and Guzman had concluded that Sims had lied after investigation that included reviewing CCTV footage, interviewing adult occupants in Apt. 3C, and more. Exh. 26 (Defendants' Admission No. 5); Exh. 47 (notification to Zerafa); Exh. 41 (first entries in Zerafa's hand notes indicate conversations with Guenther and Sanchez).

**DEFENDANTS' RESPONSE:**

> **Objection as this statement improperly contains improper argument, and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b). Nevertheless, undisputed insofar as at some point Detective Zerafa learned that it was determined that Gloria was a fictitious female, as embellished by Sims.**

129.    Defendant Zerafa knew that the NYPD terminated the Level One Mobilization treating Gloria as a missing person as opposed to a fictional character invented by Sims. Exh. 22 (Event Chronology Report); Exh. 47 (Zerafa received notification).

**DEFENDANTS' RESPONSE:**

> **Objection as this statement improperly contains improper argument and speculation, and therefore is in violation of Local Civil Rule 56.1(b),and should be disregarded.  Admit only that the Level One Mobilization was terminated and that Detective Zerafa became aware of that fact.**

### Plaintiffs And Non-Party Arrestees Are Interrogated For An Eight-Hour Span At PSA6

130.    At PSA6 beginning at 8:45a.m., Defendant Zerafa, non-party Detective Munoz, and Defendant Sanchez debriefed and interrogated Plaintiffs and non-parties separately for hours and, for some of them, multiple times. Plaintiffs all signed Miranda waivers and sat for these interrogations. Sanchez Tr. 66:5-9, 68:11-15; Exh. 13 at D45; Exh. 21 (Miranda warnings signed by Plaintiffs from Sanchez's memo book); Zerafa Tr. 16:3-22; Zerafa Tr.

88:23-89:4 (testifying Hau Sans was concerned about FB); see Exh. 13 at D45

(interrogations begin 8:45 a.m.),

**DEFENDANTS' RESPONSE:**

> **Admit that Plaintiffs and the non-party arrestees were questioned at PSA6. However, dispute that plaintiff were questioned for hours and, further, object as the materials cited do not support the purported statement; for example, Detective Zerafa did not testify that he interrogated Plaintiffs and non-parties for hours; in fact, he testified that he could not remember if they were lengthy conversations. See Zerafa Dep., Exh. "I" to the Bardauskis Decl., at 16:3-7. Defendants further object insofar as this statement does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, and accordingly is in violation of Local Civil Rule 56.1(b), and should be disregarded.**

131.   Broadus was put in an interrogation room or office for one to two hours, during

which time Defendants kept Broadus' hand handcuffed to a metal gate at head level. He

lost circulation as a result and he suffered ill effects in that hand for a number of days

thereafter. Sanchez did not "begin" Broadus' arrest paperwork until roughly 5:00p.m. Exh.

13 at D47; Broadus Tr. 52:11-18, 62:6-10, 71:7-8.

**DEFENDANTS' RESPONSE:**

> **Disputed and objection, insofar as the materials cited do not support the statement as Police Officer Sanchez's memobook entry does not specifically reflect when arrest paperwork and processing for Plaintiff Broadus "began," but only rather when certain paperwork was prepared. Further object insofar as this statement does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, and accordingly is in violation of Local Civil Rule 56.1(b), and should be disregarded.**

132.   For Fairfax's first interrogation, Defendant Sanchez put him alone in a room for

questioning for about an hour, and also left Fairfax with his hand cuffed to a gate above his

head the entire time. At 3:30 p.m.-ten hours after Fairfax arrived at PSA6, he was

interrogated again. It was not until around 5:00 p.m. that Sanchez was told to "begin"

- 35 -

arrest processing. Fairfax Tr. 48:14-15, 49:14 (testifying that his arresting officer-Sanchez-handcuffed his hand above his head in the back room); id. at 55:1-2, 55:21-56:4; id. at 80:16-24.

**DEFENDANTS' RESPONSE:**

> **Undisputed that Fairfax so testified. However, object, as this statement does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, and accordingly is in violation of Local Civil Rule 56.1(b), and should be disregarded.**

133.    Bridgeforth was also placed in a room for questioning by Defendant Zerafa and others, and cuffed to a chair. She was interrogated two times. The second time was at approximately 3:45p.m. Sanchez did not begin her arrest paperwork until nearly 5:00p.m., roughly nine hours after she was arrested and brought to PSA6. Exh. 13 at D47; Bridgeforth Tr. 61:1-9.

**DEFENDANTS' RESPONSE:**

> **Admit only that Bridgeforth was questioned at PSA6. However, disputed and objection, insofar as the materials cited do not support the statement, and plaintiffs mischaracterize the record, as Police Officer Sanchez's memobook entry does not specifically reflect when arrest paperwork for Plaintiff Bridgeforth first "began," but only rather when certain paperwork was prepared.**
>
> **Further object insofar as this statement does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, and accordingly is in violation of Local Civil Rule 56.1(b), and should be disregarded.**

134.    Defendant Zerafa and the others asked Plaintiffs about being "pimps," kidnapping, rape, Gloria, drug trafficking, sex trafficking, false imprisonment, and more. Broadus Tr. 52:20-54:10; id. at 56:16-25 (Broadus complaint re cuffed hand); id. at 63:17-18; Fairfax Tr. 48:17-49:8; id at 81:11-82:8; Bridgeforth Tr. 56:14.

**DEFENDANTS' RESPONSE:**

> Disputed and objection, as this statement contains multiple facts, and does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, which is in violation of Local Civil Rule 56.1(b), and should be disregarded.

135.    All Plaintiffs consistently stated that they had no idea who "Gloria" was and that she did not exist. Zerafa Tr. 26:21-23, 63:4-8.

**DEFENDANTS' RESPONSE:**

> Admit only that Detective Zerafa testified that he believed the arrestees denied that Gloria existed, and that no one could confirm the identity of Gloria. See Zerafa Dep., Exh. "I" to the Bardauskis Decl., at 26:21-23; 63:4-8. However, object as this statement does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b), and should be disregarded.

136.    During questioning, Plaintiffs learned that Sims had told NYPD that she knew the occupants of Apt. 3C only in passing. Plaintiffs told Defendants that Sims was Broadus' girlfriend, that Sims lived in Apt. 3C, that Sims' name was on the Time Warner cable bill to prove it, and more. Plaintiffs also told Defendants about the Broadus/Bridgeforth affair, Sims' discovery of it, and more. Broadus Tr. 53:20-21, 54:7-10; Bridgeforth Tr. 89:3-90:14; Exh. 24.

**DEFENDANTS' RESPONSE:**

> Disputed, and objection insofar as the materials cited do not support the statement, and Plaintiffs mischaracterize and speculate on the record. Further object insofar as the statement improperly contains and speculation, and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).
>
> Nonetheless, undisputed that Sims' name appeared on a Time Warner bill produced by Plaintiffs during the course of this litigation, and that Sims had at one point informed officers that she knew the occupants of Apartment 3C in passing. Also undisputed that Plaintiffs Broadus and

> **Bridgeforth testified that the cable bill was in Sims' name. However, Plaintiff Bridgeforth never spoke to any officers prior to her arrest and only advised officers of the relationship between Sims and Broadus, and the fact that Sims walked in on Bridgeforth and Broadus having sex well after she was arrested, at the precinct. Likewise, Broadus never informed officers of any such relationship until after arrested. See Defs. 56.1, at ¶24-26.**

137.    Another subject of Defendants' questioning had to do with the dinner that the group cooked together the night of October 8, 2014, in Apt. 3C, which was also evidence of Sims' residence in Apt. 3C which she had previously hidden. Defendants asked Broadus and Bridgeforth questions regarding the dinner of meatloaf, mashed potatoes and gravy that the group cooked together, including who (including Sims) cooked which dishes. Broadus Tr. 53:22-54:6; Bridgeforth Tr. 60:19-25; Exh. 44 at D331 (ADA Nolan notes from October 9, 2014, interview with Sims mentioning ''mashed potatoes'').

**DEFENDANTS' RESPONSE:**

> **Objection as this statement contains argument and does not set forth additional facts that are material to the resolution of Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b), and should be disregarded.**

**Sims Admits To Defendants That She Was Broadus' Girlfriend And Lived In Apt. 3C For The First Time Nearly Eight Hours After Calling 911**

138.    Defendant Sanchez then asked Sims about Plaintiffs' statements that she was Broadus' girlfriend. Sims admitted that she was Broadus' girlfriend. Sanchez Tr. 71:10-15; Exh. 13 at 045; Exh. 43 at ¶ 6.

**DEFENDANTS' RESPONSE:**

> **Undisputed that, well after Plaintiffs were arrested, at approximately 11:00 a.m., during a re-interview of complaining victim Sims, Police Officer Sanchez first learned that she had previously been romantically involved with Plaintiff Broadus. See Sanchez Dep., Exhibit "J" to the Bardauskis Decl., at 70-72:9-3.**

- 38 -

139.    Sims' admission that she was romantically involved with Broadus came roughly

eight hours after the 911 call. Up until Sims' admission, she had relayed her story to

Defendant Sanchez and others as though Apt. 3C's occupants were "loose acquaintances,"

and her complaint was never viewed as having a domestic-relations aspect to it. Sanchez

Tr. 72:2-3, 73:6-7 (testifying that Sims had always characterized her kidnappers as "loose

acquaintances").

**DEFENDANTS' RESPONSE:**

> **Undisputed that Police Officer Sanchez testified that the relationship
> between Sims and Broadus had "not been casted as a domestic issue."
> See Sanchez Dep., Exhibit "J" to the Bardauskis Decl., at 72:-3.
> Undisputed that Police Officer Sanchez further testified, "the way
> [Sims] had related it to me, it was kind of, from my understanding,
> loose acquaintances." Id., at 73:6-7.**

140.    Defendant Zerafa knew that Sims changed her original story regarding Broadus-

loose acquaintance to months-long boyfriend-at PSA6 from Plaintiffs and Sims'

admission. Exh. 13 at D45 (Sims asked to fill out a Domestic Incident Report when she

admitted for the first time eight hours after calling 911 that Broadus was her boyfriend); id.

at D45, D47 (Sanchez referencing prisoner "debriefings" and Zerafa's requests to re-

interrogate); Exh. 21 (Plaintiffs' interrogation warnings); Exh. 24 (Time Warner cable bill

in Sims' name); Exh. 41 (Zerafa hand notes referencing "Cable"); Exh. 47 (unusual

incident report stating that Sims reported knowing Plaintiffs only in passing).

**DEFENDANTS' RESPONSE:**

> **Disputed and objection as this statement improperly contains multiple
> facts and argument, in violation of Local Civil Rule 56.1(b).**

141.    By 11:00 a.m., Sanchez began to re-interview Sims at PSA6 in connection with the

new revelation that Broadus was Sims' boyfriend in order to complete new paperwork

specific to those facts. Sanchez Tr. 70:9-15 (testifying that the reason he reinterviewed Sims when he learned for the first time that she was in a relationship with Broadus); Exh. 13 at D45 (Sanchez memo book: "re-interview [complaining victim] Sims, Necola ..• she was formerly intimate with Delano Broadus"); id. (referencing domestic-incident report).

**DEFENDANTS' RESPONSE:**

> **Undisputed only as to the fact that Sims was re-interviewed by Police Officer Sanchez. Further, object as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b), and should be disregarded. Further object insofar as the materials cited do not support the statement, specifically with regard to the cited deposition testimony of Police Officer Sanchez.**

142.    Defendants never asked Sims to sign a sworn statement committing to any single version of events. Sims never signed any such document or gave oral testimony under oath about the incident. Exh. 27 (Zerafa transcript where he alone swears to the truth of the warrant application's contents before the magistrate); Zerafa Tr. 31 :22-32:25; Exh. 36 (Admission No. 2 stating that Defendants do not possess any writing by Sims).

**DEFENDANTS' RESPONSE:**

> **Undisputed only insofar as Sims did not sign a sworn statement pertaining to her allegations to the police. However, object as this statement improperly contains multiple facts and argument, and does not set forth additional facts material to the resolution of Defendants' summary judgment motion in violation of Local Civil Rule 56.1(b).**

143.    Defendants altered Plaintiffs' arrest charges as Sims altered her story. When Bridgeforth arrived at PSA6 she was lodged as having been arrested for reckless endangerment of FB, unlawful imprisonment and assault. At some point the latter two charges were crossed out and Bridgeforth's arrest paperwork was completed only with an endangerment charge. Exh. 2; Exh. 42 at D248

**DEFENDANTS' RESPONSE:**

> **Disputed and objection, as this statement improperly contains argument and speculation, in violation of Local Civil Rule 56.1(b).**

> **Nonetheless, undisputed that Plaintiff's Bridgeforth arrest report only reflects the charge of Endangering the Welfare of a Child, P.L. §260.10(01)).**

### Defendant Zerafa Takes Sims To DA's Office To Prepare Warrant Application And Neglects To Share Material Information Regarding Case With The ADA

144.    At some point that day, despite knowing that Sims repeatedly lied to him and other police, Defendant Zerafa began planning to apply for a search warrant to search Apt. 3C again based on Sims' disproven allegations, and took Sims to the DA's Office to draft the affidavit. Nolan Tr. 23:8-13; Zerafa Tr. 28:11-20, Exh. 12 at D249.

**DEFENDANTS' RESPONSE:**

> **Undisputed only as to the fact that Detective Zerafa's secured a search warrant for Bridgeforth's apartment.  Defendants dispute and object the remainder of the statement as it improperly contains argument and speculation, in violation of Local Civil Rule 56.1(b), and should be stricken from the record and/or disregarded by the Court.**

145.    Zerafa did not seek departmental approval for the warrant application prior to preparing and submitting it to the DA's Office and then a magistrate. Exh. 15 (search warrant application request dated October 10, 2014, the day after the warrant had already been obtained and executed, and the same day the investigation concluded with negative results and Plaintiffs released).

**DEFENDANTS' RESPONSE:**

> **Disputed and objection, as this statement improperly contains argument and speculation, in violation of Local Civil Rule 56.1(b), and should be stricken from the record and/or disregarded by the Court. Further object insofar as the materials cited do not support the statement, and plaintiffs mischaracterize the record. Defendants refer the Court to the evidence cited by plaintiffs for a full and accurate recitation of its contents.**

- 41 -

146.   ADA Nolan and her supervisor met with Sims. Later, ADA Nolan and her supervisor would decline to prosecute any charges relating to the incident. ADA Nolan's notes show that Sims reported that Sims and Plaintiffs did "everything together, every day"-a sea change from Sims' previous story that she knew Plaintiffs in passing-and that Sims put the Time Warner cable bill in her name. Nolan Tr.32:24-33:5 (identifying hand notes as hers from Sims interview); id. 55:20-24 (testifying that she and her supervisor made decision not to prosecute Plaintiffs and non-parties in connection with Sims' complaint); Exh. 24; Exh. 44 at D331 (Nolan interview notes from October 9, 2014, meeting with Sims mentioning "cable under name").

**DEFENDANTS' RESPONSE:**

> **Undisputed only as to the fact that ADA Nolan met with Sims and that the prosecutor's office declined to prosecute plaintiffs. Nonetheless, object to the remainder of this statement as it improperly contains speculation and multiple facts, and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b). Accordingly, these "facts" should be stricken from the record and/or disregarded by the Court. Further object insofar as the materials cited do not support the statement, and Plaintiffs mischaracterize the record. Defendants refer the Court to the evidence cited by plaintiffs for a full and accurate recitation of its contents.**

147.   Defendant Zerafa did not tell ADA Nolan that Sims previously told police that she knew Apt. 3C's occupants only in passing. Exh. 47; Sanchez Tr. 71:10-15.

**DEFENDANTS' RESPONSE:**

> **Disputed, and objection as this statement improperly contains speculation, in violation of Local Civil Rule 56.1(b). Further object insofar as the materials cited do not support the statement, and Plaintiffs mischaracterize the record. Defendants refer the Court to the evidence cited by Plaintiffs for a full and accurate recitation of its contents.**

148.    Sims told ADA Nolan that she and/or Gloria were screaming in Apt 3C, but Defendant Zerafa did not tell ADA Nolan that neighbors did not report any such disturbance. Exh. 33 at D331; Sanchez Tr. 166:22-25; Guenther Tr. at 21:18-22:5.

**DEFENDANTS' RESPONSE:**

> **Disputed, and objection as this statement improperly contains speculation, and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).    Further object insofar as the materials cited do not support the statement, and Plaintiffs mischaracterize the record. Defendants refer the Court to the evidence cited by Plaintiffs for a full and accurate recitation of its contents.**

149.    Sims repeated to ADA Nolan the story about the bucket that she and Gloria were forced to go to the bathroom in. Exh. 44 at D332; see id. at D325 (another ADA's notes regarding same).

**DEFENDANTS' RESPONSE:**

> **Objection as this statement improperly contains speculation, and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).    Further object insofar as the materials cited do not support the statement, and Plaintiffs mischaracterize the record.    Defendants refer the Court to the evidence cited by plaintiffs for a full and accurate recitation of its contents.**
>
> **Nonetheless, undisputed that Sims informed the Office of the District Attorney that she was made to urinate in a bucket.**

150.    Zerafa did not tell ADA Nolan that NYPD detectives, after an investigation, concluded that Sims had lied about Gloria and that Gloria did not exist, and that a Level One mobilization for Gloria had been terminated as a result. Nolan Tr. 27:6-25.

**DEFENDANTS' RESPONSE:**

> **Disputed, and objection as this statement improperly contains multiple facts and speculation, in violation of Local Civil Rule 56.1(b).    Further object insofar as the materials cited do not support the statement, and**

> **plaintiffs mischaracterize the record.  Defendants refer the Court to the testimony cited by Plaintiffs for a full and accurate recitation of its contents.**

151.    Defendant Zerafa did not tell ADA Nolan about the warrantless search of Apt. 3C and its negative results for Sims' claims. Nolan Tr. 26:5-22, 28:7-13.

**DEFENDANTS' RESPONSE:**

> **Disputed, and objection as the statement improperly contains speculation, and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).  Further object as the materials cited do not support the statement, and Plaintiffs mischaracterize the record.  See Nolan Dep., at 26:5-22 (After being shown an exhibit, ADA Nolan testified that her recollection was not refreshed as to whether or not she viewed photographs taken by Police Officer Sanchez, with Detective Zerafa.); Id., at 28:7-13 (ADA Nolan testified about the absence of a machete and whether that would have affected whether there was reasonable cause to search for that item.)**

152.    ADA Nolan testified at deposition that had she known on October 9, 2014, that Apt. 3C had already been searched and that none of the items listed on the warrant application had been found during that warrantless search, she would have considered that a relevant factor as to whether Sims' allegation of sex trafficking at Apt. 3C was credible at all. Nolan Tr. 28:17- 29:13.

**DEFENDANTS' RESPONSE:**

> **Disputed, and objection as the statement mischaracterizes the record. See Nolan Dep., at 28-29:17-13 (ADA Nolan testified that "it would depend" as to whether such information would be a factor to consider in the case.).**

Defendant Zerafa did not show ADA Nolan the Sanchez photographs taken during the warrantless search. Nolan Tr. 26:5-22, 28:7-13.

**DEFENDANTS' RESPONSE:**

> **Disputed, and objection as the statement improperly contains speculation, and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b). Further object as the materials cited do not support the statement, and Plaintiffs mischaracterize the record. See Nolan Dep., at 26:5-22 (ADA Nolan testified that, after being shown an exhibit, her recollection was not refreshed as to whether or not she viewed photographs taken by Police Officer Sanchez, with Detective Zerafa.)**

153.   ADA Nolan testified at deposition that she would have found the Sanchez photographs she reviewed during the deposition relevant to whether there was reasonable cause to search Apt. 3C for items listed in the application. Nolan Tr. 26:23-27:5, 28:7-16.

**DEFENDANTS' RESPONSE:**

> **Disputed, and objection as the statement improperly contains speculation, and does not set forth additional facts that are material to defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b). Further object as the materials cited do not support the statement, and Plaintiffs mischaracterize the record. The cited testimony is silent as to any mention of photographs taken by Police Office Sanchez. Defendants refer the Court to the evidence cited by plaintiffs for a full and accurate recitation of its contents.**

154.   Defendant Zerafa and ADA Nolan finalized a search warrant application stating that there was cause to believe that evidence of sex trafficking and kidnapping would be found in Apt. 3C including handcuffs, chains, ropes, knives, machetes, and more. Exh. 43.

**DEFENDANTS' RESPONSE:**

> **Disputed, and objection as the statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b). Accordingly, these "facts" should be stricken from the record and/or disregarded by the Court. Further object as the materials cited do not support the statement, and Plaintiffs mischaracterize the record.**
>
> **Nonetheless, undisputed insofar as Defendant Zerafa conferred with ADA Nolan on the preparation of the search warrant affidavit, and that the warrant indicated that there was reasonable cause to believe**

such evidence may be found at the subject location.  <u>See</u> Search Warrant, Criminal Court of the State of New York, New York County, #1066-2014, as Exhibit "X" to the Bardauskis Decl.

## Defendant Zerafa Omits Material Information From The Warrant Application, Swears To Its Veracity In Front Of A Magistrate And Obtains Warrant

155.   Defendant Zerafa presented the application to Judge Steven M. Statsinger of New York County Supreme Court, and swore to its veracity. Defendant Zerafa omitted the following material information: Gloria did not exist; none of the evidence Sims claimed would be in Apt. 3C was there during the warrantless search; Sims lied for eight hours that she knew Plaintiffs in passing when she lived in Apt. 3C and was Broadus' girlfriend; Sims had appeared intoxicated; Sims reported escaping Apt. 3C in a state of undress but was fully dressed when first responders arrived; and more. <u>Exh. 27</u> (application sworn true); <u>Exh. 43</u> (application); Pl. 56.1 ¶¶ 3, 11, 12, 28-32, 34, 86.

**DEFENDANTS' RESPONSE:**

> **Disputed, and objection as this statement improperly contains multiple assertions, and argument, in violation of Local Civil Rule 56.1(b).**

156.   Judge Statsinger issued the requested warrant. <u>Exh. 19</u>.

**DEFENDANTS' RESPONSE:**

> **Undisputed; however, objection as the statement  does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

157.   Defendant Despaigne was the "leader" of the search warrant case as the Commanding Officer of PSA6. Defendant Despaigne knew all investigative findings regarding the Sims complaint and early-morning warrantless search of Apt. 3C, including the Level One termination, negative warrantless search results, and more. <u>Exh. 16</u>; <u>Exh. 17</u>; Guenther Tr. 40:4-11, 53:14-17; Sanchez Tr. 51:10-16.

- 46 -

**DEFENDANTS' RESPONSE:**

> **Objection as this statement contains speculation, improper argument, and mischaracterizes the record. Further object as the testimony cited does not support the statement, and the statement is therefore misleading. Nevertheless, undisputed insofar as Deputy Inspector Despaigne is listed as the "leader" on the warrant notification.**

158.    On October 9, 2014, at about 9:45p.m., Defendant Zerafa, Defendant Deputy Inspector Despaigne, and three other officers went to execute the .search warrant at Apt. 3C. Exh. 16 (tactical plan stating participants); Exh. 17 (notifications naming Despaigne the s/w execution leader); Exh. 32 at D313 (Munoz memo book listing Despaigne, Ferguson, Graves, Zerafa as members of the s/w execution team as in the tactical plan).

**DEFENDANTS' RESPONSE:**

> **Undisputed; however, objection as the statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

159.    The five officers left Apt. 3C within thirty minutes. During those thirty minutes they took no photos or video. They collected no fingerprints, hair, blood or any human biological material for testing. They seized two brown wigs, a set of keys, a laptop and cell phones. Exh. 14 at D53 (9:45 pm until10:15 pm); Nolan Tr. 44:13-6; Exh. 26 (Defendants' Admission No. 3 stating that no fingerprints, handprints, hair, blood, and/or any human biological material was collected during the course of the investigation of Sims' allegations); Exh. 20; Exh. 40; Zerafa 42:2-4.

**DEFENDANTS' RESPONSE:**

> **Undisputed; however, objection as the statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

160.    The search team did not find corroborative evidence of Sims' complaint, i.e., the bathroom bucket, machetes, handcuffs, chains, etc. Zerafa Tr. 45:3-4, 13-14; Exh. 26 (Defendants' Admission No. 1).

**DEFENDANTS' RESPONSE:**

> **Undisputed only as to the fact that a bathroom bucket, machete, handcuffs, and/or chains were not recovered during a search. However, objection as the statement contains argument and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

**Sanchez Earns Eighteen Hours Of Overtime In Cash For His Work Arresting And Detaining Plaintiffs Based Upon Sims' Incredible Allegations**

161.    On October 10, 2014, at approximately 1:20 a.m., Plaintiffs and the non-party arrestees were transported from PSA6 to Manhattan Central Booking. Sanchez Tr. 150:24-151:5; Exh. 13 atD49; Exh. 42.

**DEFENDANTS' RESPONSE:**

> **Undisputed; however, object as the statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

162.    On October 10, 2014, at approximately 2:15 a.m., Defendant Sanchez signed out for the first time since he began his tour on October 8, 2014. Defendant Sanchez racked up eighteen hours and thirty-four minutes of overtime working on Plaintiffs' arrests and detentions, and he was paid for it in cash right then and there. Sanchez Tr. 152:15-153:3.

**DEFENDANTS' RESPONSE:**

> **Objection as this statement improperly contains speculation and argument, and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b). Accordingly, this statement should be stricken from the record and/or disregarded by the Court**

> **Nonetheless, undisputed that Defendant Sanchez testified that he received 18 hours, 34 minutes of overtime, and received a payment in cash upon ending his tour on October 9, 2014.**

## NY County D.A.'s Office Declines To Prosecute Plaintiffs And Non-Party Arrestees, And Issues Related DTP Letters To Defendant Sanchez

163.    On October 10, 2014, the day after the search warrant execution, Defendant Zerafa went to the DA's Office in the morning and left the electronic devices seized from Apt. 3C with ADA Nolan. He did not deliver any the laptop or phones to the Computer Crimes Unit for analysis for evidence of sex trafficking despite the fact that the search warrant authorized him to do so. Exh. 12 at D38; Exh. 19 (warrant authorized electronic search of such devices); Exh. 40 (Zerafa invoices); Nolan Tr. 46:8-9, 56: 15-25; Zerafa Tr. 48:3-6, 81:11-17.

**DEFENDANTS' RESPONSE:**

> **Undisputed only as to the fact that Detective Zerafa gave the electronic devices recovered during the search to ADA Nolan.  However, objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b), and the materials cited do not support the statement and mischaracterizes the testimony.. Defendants refer the Court to the evidence cited by Plaintiffs for a full and accurate recitation of its contents.**

164.    Also on October 10, 2014, at about the same time, Sanchez went to visit ADA Nolan about Plaintiffs' charges. Exh. 13 at D256.

**DEFENDANTS' RESPONSE:**

> **Undisputed that Officer Sanchez conferred with ADA Nolan regarding the arrests of Plaintiffs.**

165.    The New York County DA's Office declined to prosecute Plaintiffs and nonparties on any charge arising from Sims' 911 call and subsequent reports to Defendants. Nolan Tr.

50:18-20 ("[W]e were declining to prosecute that charge and anything else related to this arrest number.").

**DEFENDANTS' RESPONSE:**

> **Undisputed, however, objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

166. ADA Nolan made the decision to decline to prosecute with her supervisor. Nolan Tr. 55:20-24.

**DEFENDANTS' RESPONSE:**

> **Undisputed that ADA Nolan so testified. However, objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

167. ADA Nolan did not find Sims not to be a credible witness. Nolan Tr. 57:5-6; Sanchez Tr. 159:7-11 (Nolan did not find Sims to be "factual"); id. at 16:22-25 (Nolan "really didn't find [Sims'] allegations to be factual"); id. at 168:24-25 (Nolan told Sanchez that Nolan did not find Sims credible); id. at 169:11-12 (Nolan found Sims "not to be factual'').

**DEFENDANTS' RESPONSE:**

> **Undisputed that ADA Nolan so testified. However, objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

168. ADA Nolan prepared DTP letters for all Plaintiffs and non-parties. ADA Nolan gave them to Defendant Sanchez on October 10, 2014, at approximately 2:00 p.m. Sanchez Tr. 160:21-25 (testifying that Nolan handed him Plaintiffs' and non-parties' DTP paperwork at approximately 2:00p.m.); Exh. 13 at D257 ("14:00: Interview [with ADA

Nolan] ended; cases DP"); Exh. 30 (DTP letters); Exhs. 1B. 1C. 1D (Plaintiffs' OLPAs

noting they ended DTP).

**DEFENDANTS' RESPONSE:**

> **Undisputed that Police Officer Sanchez testified that ADA Nolan came back with the Decline to Prosecute paperwork at approximately 2:00 p.m. on October 10, 2014. However, objection as the statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

169.    The DTP letters indicated that in some instances the Defendants could perform

additional investigation and in others charge elements were missing. Exh. 30 ("further

investigation needed"); id. at D142 ("unable to establish necessary element of the crime").

**DEFENDANTS' RESPONSE:**

> **Undisputed. However, objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

170.    NYPD Patrol Guide No. 208-67--"Follow-up Investigations On 'Decline

Prosecution' Arrest Cases"--describes that "decline prosecution" cases may be re-opened

and prosecuted if follow-up investigation is conducted and specific additional information

is obtained. Exh. 11 at PL190.

**DEFENDANTS' RESPONSE:**

> **Objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b). Nonetheless, undisputed that the NYPD Patrol Guide Section as cited by Plaintiffs so states.**

171.    Defendants never did any additional investigation on the case. Zerafa closed it with

negative results. Sanchez Tr. 171:3-20 (testifying that he did nothing further to

investigate); Exh. 12 at D38 (Zerafa closing case); Exh. 26 (Defendants' Admission No.8).

**DEFENDANTS' RESPONSE:**

> Undisputed that Defendants performed no additional investigation of Ms. Sims's allegations after the New York County District Attorney's Office declined to prosecute Plaintiffs, and non-parties Sarah Hau Sans and Eric Kirkland. However, object, as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).

172.    The electronic devices seized from Apt. 3C were left untouched in ADA Nolan's office for approximately five months. On March 10, 2015, ADA Nolan was going to the Computer Crimes Unit, which determined that there was "nothing related to prostitution contained within the electronics." Nolan Tr. 41:12-16; Exh. 40.

**DEFENDANTS' RESPONSE:**

> Objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).

**Sanchez Fails To Take Steps To Release Plaintiffs After ADA Nolan Presents Him With The DTPs, And Plaintiffs Remain Jailed An Additional Five Hours Before Release**

173.    NYPD Patrol Guide No. 210-13--"Release of Prisoners"--states that when a DA's Office declines prosecution and issues a DTP letter, "members of the service should be guided by Patrol Guide 216-16, 'Release of Prisoners at the Complaint Room at Direction of the Assistant District Attorney.'" Exh. 11 at PL361.

**DEFENDANTS' RESPONSE:**

> Objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b). Nonetheless, undisputed that the NYPD Patrol Guide Section cited by Plaintiffs so states.

174.    NYPD Patrol Guide No. 210-16--"Release of Prisoner at the Complaint Room by Direction of the Assistant District Attorney" -provides that when a DA's Office declines to prosecute an arrestee, the arresting officer must notify and provide copies of the DTP letter

to the Borough Court Section Supervisor. In turn, the Borough Court Section Supervisor, when so notified by the arresting officer, is to direct the "immediate release" of the prisoner if there is no warrant justifying alternate holding. Exh. 11 at PL366 to PL 368; id. at PL367 at ¶ 13 (directing arresting officer to take DTPs to borough court section supervisor); id. at~ 16.a.

**DEFENDANTS' RESPONSE:**

> **Objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b). Nonetheless, undisputed that the NYPD Patrol Guide Section cited by Plaintiffs so states.**

175.    After ADA Nolan handed Defendant Sanchez the DTP letters on October 10, 2014, at approximately 2:00 p.m., he did nothing to facilitate Plaintiffs' and the non-parties' release using the letters or otherwise. When Sanchez was asked if he was surprised that Plaintiffs and the non-parties remained jailed for another five hours after ADA Nolan handed Sanchez the DTP letters, Sanchez said: "If it were me, I wouldn't be none too pleased. I honestly don't know how to respond. Whether it surprises me or not, I don't know. I don't know what kind of sentimental surprise you expect me to express." Sanchez Tr. 163:22-25, 165:5-9.

**DEFENDANTS' RESPONSE:**

> **Objection insofar as this statement improperly contains multiple facts and argument, and does not set forth additional facts that are material to Ddefendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

176.    Plaintiffs remained jailed for another five to six hours after ADA Nolan's delivery of the DTPs to Defendant Sanchez, telling him that Plaintiffs would not be prosecuted for any charge in connection with their October 9, 2014, arrests. Exh. 26 (Defendants'

Admission No.7 stating that Broadus and Fairfax were not released until October 10,2014,

at about 7:00p.m., and that Bridgeforth was not released until approximately one hour after

that).

**DEFENDANTS' RESPONSE:**

> **Undisputed that Plaintiffs were "DP Released" as follows: David Fairfax at 7:02 p.m.; Jasmine Bridgeforth at 8:06 p.m.; and Delano Broadus at 7:00 p.m. However, objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

## The City Defendants' "OLPA" System Does Not Achieve Plaintiffs' Timely Release After ADA Nolan's Issuance Of The DTPs

177.    On April 13, 2017, the City Defendant presented NYPD Lieutenant Chris Czark for

deposition by Plaintiffs' Counsel as a FRCP 30(b)(6) witness in connection with this case

to testify about the City Defendant's OLPA system. Czark Tr. 10:3-11; Exh. 1A (copy of

FRCP 30(b)(6) notice).

**DEFENDANTS' RESPONSE:**

> **Undisputed. However, object insofar as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

178.    The City Defendant has a system called On-Line Prisoners' Arraignment System

("OLPA") designed to track individuals' movement in law enforcement custody from

arrest to arraignment "to make sure that a defendant is arraigned in a timely manner."

Czark Tr. 20:3-10; id. at 9: 11-14 (testifying that the pre-fix "z" in front of OLPA refers to

version of system); Id. at 57:3-7.

**DEFENDANTS' RESPONSE:**

> **Undisputed that such a system exists and that, on April 13, 2017, non-party Lieutenant Chris Czark so testified. However, object insofar as this statement does not set forth additional facts that are material to**

**Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

179.   The OLPAs created for Plaintiffs were pursuant to the OLPA system that City Defendant had in place beginning in January 2009 and which was in effect at the time of their arrests and detention. Czark Tr. 9:15-24.

**DEFENDANTS' RESPONSE:**

> **Undisputed.   However, object insofar as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

180.   The City Defendant's relevant OLPA system promotes timely processing of arrestees by documenting the various steps of the arrest-to-arraignment process in chronological order with time stamps, and by color-coding what steps in an arrest-to-arraignment process still require completion for easy identification. Czark Tr. 19:17-24, 20:3-21:8.

**DEFENDANTS' RESPONSE:**

> **Disputed, as the materials cited do not support the statement, and the cited testimony makes no mention of any "time stamps" or "color coding." Further, object insofar as the statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

181.   The OLPA system's use of color most generally uses the colors red and green. An OLPA's fields are red with the word "Missing" when data is not entered therein. Once data is entered into an OLPA-grid field upon the corresponding step's completion, a time stamp documenting the step's completion appears on the OLPA and the field turns green. The color yellow denotes a field showing that an arrestee has a warrant and signals the need for attention to that. Czark Tr. 21:18-24, 22:2-8, 23:9-11, 33:2-4.

**DEFENDANTS' RESPONSE:**

> Disputed, as the materials cited do not support the statement, and plaintiffs speculate and mischaracterize the testimony as cited. For example, Lieutenant Czark never testified that the OLPA system "use of color most generally uses the colors red and green." Nor does the cited testimony contain the word "missing." Accordingly, defendants refer the Court to the cited portions for a full and accurate recitation of Lieutenant Czark's testimony.

> Further, object insofar as this does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).

182.   Four different government actors' data populates the OLPA system as an arrestee moves through the criminal justice system, and that may be achieved through manual or automatic population of OLPA data. The four different government actors which provide OLPA data are: the NYPD, the DA's Office and the criminal court. Czark Tr. 16:22-17:9 (testifying that an arresting officer's creation of Omniform Arrest Reports and Complaints automatically feeds data into the OLPA); Exh. 1 (example of Omniform Arrest Report and Complaint for Broadus); Czark Tr. 22:18-22 (affirming the four sources of OLPA data).

**DEFENDANTS' RESPONSE:**

> Undisputed that non-party Lieutenant Chris Czark testified that the NYPD, the District Attorney's Office, the court clerk, and the judge have some involvement in the events reflected on the OLPA form. However, object as the materials cited do not support the statement, and Plaintiffs mischaracterize the testimony. Further, object, as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).

183.   In the middle of an OLPA's first page is a grid which tracks the data relevant to a specific arrestee's arrest-to-arraignment processing in chronological order. Czark Tr. 19:1-24; Exh. 1B at D8 (Broadus OLPA-the grid of chronologically tracked events appears on the first page and is four columns and four rows).

**DEFENDANTS' RESPONSE:**

> **Disputed and object, as Plaintiffs mischaracterize the cited testimony insofar. See Czark Dep., 19:11-24 (Lieutenant Czark testified that the OLPA "grid" (Plaintiffs' term) proceeds in chronological order "for the most part, absent exceptional circumstances it should progress in a chronological order, that's the nature of it.") Further, object insofar as this does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

184.    Czark testified about how OLPA works using the Broadus OLPA as an example. Beginning with the first row of the grid, Czark testified about the data that was entered therein for the following events: "Arrest" (autopopulated when Sanchez created Broadus's Omniform Arrest Report, see Exh. 1); "Record Create" (populated when Broadus was fingerprinted on October 9, 2014, at 8:52 p.m.); "NYSID" (populated when Broadus' rap sheet is obtained); and "DNA Banner" (populated by NYPD to confirm that when the rap sheet arrived it was examined to see whether the arrestee is the subject of some order to produce DNA). All of the events in the first row of the Broadus OLPA are NYPD's responsibility for entering. Czark Tr. 22:23- 25:6; Exh. 18 (Broadus OLPA first page with grid, first row).

**DEFENDANTS' RESPONSE:**

> **Objection insofar as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b). Further, object as the statement mischaracterizes some of the testimony insofar as the citations do not match the testimony as stated herein. Accordingly, Defendants refer the Court to the cited portions for a full and accurate recitation of Lieutenant Czark's testimony.**

185.    Czark next testified about the meaning of the second row in the Broadus OLPA exemplar, all of which are "Missing" and colored red (which in black and white can be discerned from the darker shading, according to Czark). The four missing events in the

second row of the Broadus OLPA are: "Paperwork Ready" (populated by the arresting NYPD officer when he has completed all necessary paperwork relating to arrest and is ready to draw up complaint with ADA); "AO Release" (populated by the DA's Office once that office does not need to speak further with the arresting NYPD officer and releases him); "Complaint Sworn" (populated by the DA's Office once the arresting NYPD officer drafts and executed a sworn complaint against an arrestee); and "Complaint Received" (populated by the NYPD in the NYPD's "Complaint Room" when that office receives from the prosecutor the officer-sworn and DA-approved complaint relating to the arrest). Czark Tr. 25:7-27:22; id. at 54:6-8 (describing that the darker-shaded "Missing" fields on the Plaintiffs' OLPAs would be red); Exh. 1B (Broadus OLPA first page with grid, second row).

**DEFENDANTS' RESPONSE:**

> **Objection insofar as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b). Further, the statement mischaracterizes some of the cited testimony. Accordingly, Defendants refer the Court to the cited portions for a full and accurate recitation of Lieutenant Czark's testimony.**

186. Continuing to the third row in the Broadus OLPA grid, Czark next testified that the first three fields have "Missing" information and are marked in red, and the fourth-"Iris Captured"-was completed at around the time of Broadus' arrival in Central Booking. The missing fields in red (darker shading) are: "Breakdown," "Package to Court" and "Docketed" which refer to the preparation of a court package for arraignment on a case for which a complaint was drawn up, its delivery, and docketing, respectively. Czark Tr. 27:23-28:9, 29:14-30:3; id. at 30:17-20 (explaining that a photo of an arrestee's eye is

taken on the arrestee's arrival in Central Booking); Exh. 1B (Broadus OLPA first page
with grid, third row).

**DEFENDANTS' RESPONSE:**

>**Objection insofar as this statement does not set forth additional facts
>that are material to Defendants' summary judgment motion, in
>violation of Local Civil Rule 56.1(b). Further, the statement
>mischaracterizes some of the cited testimony. Accordingly, Defendants
>refer the Court to the cited portions for a full and accurate recitation of
>Lieutenant Czark's testimony.**

187.    Finally, Czark testified about the fourth row of the Broadus OLPA grid and the
time stamps indicating that the three events there were completed for Broadus. These three
events were: "Arraignment Closed," "DP Awaiting," and "DP Released." Exh. 1B
(Broadus OLPA first page with grid, fourth row).

**DEFENDANTS' RESPONSE:**

>**Disputed, and object as the material cited (Plaintiffs' Exhibit 1B, which
>is a copy of Plaintiff Broadus' OLPA) does not support the statement,
>and also does not set forth additional facts that are material to
>Defendants' summary judgment motion, in violation of Local Civil
>Rule 56.1(b). Defendants refer the Court to the cited portions for a full
>and accurate recitation of Lieutenant Czark's testimony.**

188.    Czark testified that the fourth row's "Arraignment Closed" and "DP Released"
fields have matching time stamps because "Arraignment Closed" is a field that documents
"anytime the defendant's custody ends, which for an individual released after a decline-to-
prosecute decision is the moment "DP Released." Czark Tr. 30:21-31:6; Exh. 1B (Broadus
OLPA first page with grid, fourth row).

**DEFENDANTS' RESPONSE:**

>**Objection insofar as this statement does not set forth additional facts
>that are material to Defendants' summary judgment motion, in
>violation of Local Civil Rule 56.1(b).**

189.    Before a prisoner can be "DP Released," the DA's Office must give the NYPD

relevant paperwork documenting that decision. This is the "DP Awaiting" field and it

corresponds to NYPD's possession of that decline-to-prosecute paperwork. Czark Tr.

15:18-25 (testifying that DP Awaiting means NYPD is "waiting to receive the actual

decline prosecution paperwork to release the defendant").

**DEFENDANTS' RESPONSE:**

> **Objection insofar as this statement does not set forth additional facts
> that are material to Defendants' summary judgment motion, in
> violation of Local Civil Rule 56.1(b).**

190.    Czark testified that the OLPA "DP Awaiting" field "is an important box because

[NYPD] would want to release the defendant as soon as possible because once we become

aware that the district attorney will not prosecute, it's incumbent on us to release that

defendant as soon as reasonably possible." "[I]t would need special attention, you don't

want to let a defendant like this slip through the cracks and be waiting there ten hours,

whatever, if there's no instant case to be brought." Czark Tr. 37:8-15, 38:7-11.

**DEFENDANTS' RESPONSE:**

> **Undisputed that Lieutenant Chris Czark so testified.    However,
> objection insofar as this statement does not set forth additional facts
> that are material to Defendants' summary judgment motion, in
> violation of Local Civil Rule 56.1(b).**

191.    Apart from the City Defendant's OLPA system's color codes and "Missing" vs.

time stamp dichotomy to denote arrest-to-arraignment steps that remain incomplete, the

OLPA system does not employ "time goals" or delayed-event alerts for any arrest-to-

arraignment step that remains incomplete beyond what is reasonable. Czark Tr. 32:3-18.

**DEFENDANTS' RESPONSE:**

> Disputed and objection, as this statement improperly contains multiple facts, improper argument, and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b). Further object as the statement mischaracterizes the testimony.

192.    Rather than using a time-based alert specific to any one arrest-to-arraignment step, OLPA permits Court Section NYPD Officers to print field-specific OLPA "Chrono" reports. When an OLPA Chrono report is printed for a specific event field, the first prisoner listed is the prisoner who has been in the OLPA system for the longest period of time. Czark provided this example: An NYPD Court Section Supervisor printing an OLPA Chrono report for the "NYSID" field will know that the first prisoner on the list has been in the OLPA system for the longest period of time without the NYPD having received that prisoner's rap sheet. The first prisoner on the resulting NYSID Chrono would be the prisoner who has been in the arrest-to arraignment process for the longest period without NYPD having received his/her rap sheet. Czark Tr. 33:23-35:20; id. at 35:19-20 (testifying that for each OLPA data box, "you could pull out a list of just that data").

**DEFENDANTS' RESPONSE:**

> Objection, as this statement contains multiple facts, improper argument, and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b). Further object as the materials cited do not support the statement and to the extent Plaintiffs mischaracterize the record.

193.    On the second page of Plaintiffs' OLPAs, where notes are entered about an arrestee, NYPD Sergeant George St. Louis observed on October 10,2014, at approximately 4:30 p.m. that the Plaintiffs' arrests-for which ADA Nolan gave Sanchez DTP letters two-and-a-half hours earlier-were decline-to-prosecutes. Sgt. St. Louis then appears to have

populated time stamps showing that this "DP Awaiting" step was complete within one minute, one minute and ten minutes of his realization for Broadus, Bridgeforth and Fairfax, respectively. Compare Exh. 1B at D9 (Broadus, Note from Sgt. St. Louis); with id. at D8 (time stamping DP Awaiting the same minute as Sgt. St. Louis's Note); compare Exh. 1C at D19 (Bridgeforth, Note from Sgt. St. Louis), with id. at DIS (time stamping OP Awaiting within one minute of the Sgt. St. Louis Note); compare Exh. ID at 034 {Fairfax, Note from Sgt. St. Louis), with id. at 033 (time stamping DP Awaiting within ten minutes of Sgt. St. Louis's Note).

**DEFENDANTS' RESPONSE:**

> **Objection and disputed, as this statement contains multiple facts, improper argument, speculation, and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

**Plaintiffs Are Finally Released On October 10. 2014. At Approximately 7:00 p.m ..
After Having Spent Between Thirty-Five And Thirty-Eight Hours In Custody**

194.    Five hours after ADA Nolan's issuance of the DTP letters, and roughly two-and a-half hours after Sgt. St. Louis's observation that Plaintiffs' arrests were decline-to-prosecutes, Plaintiffs were freed from detention. At the time of Plaintiffs' eventual release, Broadus had spent 34 hours and 50 minutes in custody relating to his arrest challenged in this litigation, Exh. 1 B; Bridgeforth had spent 35 hours and 56 minutes in custody relating to her arrest challenged in this litigation, Exh. 1C; and Fairfax had spent 38 hours and 2 minutes in custody relating to his arrest challenged in this litigation, Exh. 1D. Exh. 26 (Defendants' Admission No.7).

**DEFENDANTS' RESPONSE:**

> **Objection and disputed, as this statement contains multiple facts, improper argument, speculation, and does not set forth additional facts**

**that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

**Nevertheless, undisputed that Plaintiffs were released as follows: David Fairfax at 7:02 p.m.; Jasmine Bridgeforth at 8:06 p.m.; and Delano Broadus at 7:00 p.m.**

### ACS Events. And Sanchez,s False Statements To ACS About The October 9. 2014, Events

195.   On October 9, 2014, at approximately 4:50 a.m., Defendant Sanchez called ACS and made an Oral Report Transmission (ORT) stating affirmatively and falsely that Broadus and Bridgeforth "are running an illegal prostitute ring inside the home, in the presence of FB ... The adults had a women [sic] handcuffed to a radiator ... "Exh. 26 (Defendants' Admission 1 stating that no Defendant recovered handcuffs during the investigation of Sims' allegations); Exh. 33 at PL393; Exh. 38 at PL117:1-8 (reading the ORT at a Family Court hearing as potentially stating that Sanchez saw a woman handcuffed to a radiator at Apt. 3C, which the court then noted Sanchez's testimonial clarifications months later contradicted); Exh. 38 at PL121 :1-13 (the Family Court excluding Sanchez's ORT from evidence to the extent it purports to establish that Plaintiffs ran a prostitution ring and had a woman chained to their radiator).

**DEFENDANTS' RESPONSE:**

**Dispute that any allegedly affirmatively false statements were made by Police Officer Sanchez, and objection as this statement contains multiple facts, improper argument, and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b). Further object insofar as the materials cited do not support the statement and mischaracterize the record.[6] Defendants refer the Court to the evidence cited by Plaintiffs for a full and accurate recitation of its contents.**

---

[6] Such records do not contain Police Officer Sanchez's statements verbatim, but rather are a summary of what was reported to the New York City Administration for Children's Services ("ACS"), including the allegations by the complaining victim, and are therefore improper hearsay and not admissible evidence.

196.    By the time Sanchez made the report, he had gained entry to Apt. 3C and observed

firsthand that Sims had lied because Apt. 3C contained no Gloria, no woman handcuffed to

a radiator, no machete, no bathroom bucket, no guns, no knives, or anything else Sims said

would be there. Pl. 56.1 ¶¶ 30, 94-97.

**DEFENDANTS' RESPONSE:**

> **Disputed, and object as this statement contains improper argument
> and does not set forth additional facts that are material to Defendants'
> summary judgment motion, in violation of Local Civil Rule 56.1(b).**

197.    On October 9, 2014, at approximately 5:42 a.m., non-party NYPD Officer Rourke

falsely stated to another ACS worker that "[w]hen the police got to the apartment, they

found a woman handcuffed to a radiator in a provocative cloth in the apartment." Exh. 34

at D158 (emphasis added).

**DEFENDANTS' RESPONSE:**

> **Dispute that any allegedly affirmatively false statements were made by
> non-party Police Officer Rourke, and object as this statement contains
> multiple facts, improper argument, and does not set forth additional
> facts that are material to Defendants' summary judgment motion, in
> violation of Local Civil Rule 56.1(b).  Further object insofar as the
> materials cited do not support the statement and mischaracterize the
> record.[7] Defendants refer the Court to the evidence cited by Plaintiffs
> for a full and accurate recitation of its contents.**

198.    On October 9, 2014, at approximately 6:00a.m., FB was medically/physically

cleared and determined to be without injury at St. Luke's Hospital after she was taken

there by Officer Rourke for examination. Exh. 34 at D 161; Pl. 56.1 ¶ 17.

---

[7] Such evidence does not contain non-party Police Officer Rourke's statements verbatim, but rather is a
summary of the allegations against plaintiffs Bridgeforth and Broadus, and are therefore improper hearsay
and not admissible evidence.

**DEFENDANTS' RESPONSE:**

> Undisputed; however, object as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).

199.   FB's removal from Bridgeforth, Broadus and Apt. 3C was reviewed and rejected for Instant Response Team (IRT) handling, which relates to joint investigation of a case by ACS and the NYPD. Exh. 34 at D161; Exh. 38 at PL135.

**DEFENDANTS' RESPONSE:**

> Disputed that such records state what Plaintiffs allege they state. Objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).

200.   On October 9, 2014, at approximately 1:00 p.m., ACS CPS Joshua Davis spoke with Defendant Sanchez by telephone to learn what had happened as ACS weighed FB's removal. Davis wrote in his notes Defendant Sanchez's report of all of Sims' allegations. Davis' notes say nothing about Sanchez also reporting NYPD detectives' investigative finding that Sims lied to authorities about Gloria, that Sanchez's own search of Apt 3C had revealed nothing to corroborate Sims' story, and that Sims' credibility that Sims' credibility had by the time of their conversation been for these and many other reasons damaged. Exh. 34 at D161-62; Exh. 22 (Level One terminated at approximately 7:35a.m.); Exh. 24 (Sanchez photos showing warrantless search revealed no Gloria, no chains, no handcuffs, no bucket, no machete, etc.); Exh. 26 (Defendants' Admission No. 4 stating that the Level One mobilization for Gloria was made at approximately 5:22 a.m. on October 9, 2014, and was terminated at approximately 7:35 a.m. roughly two hours later); Exh. 47 (finding Gloria not real by 7:30 a.m.).

**DEFENDANTS' RESPONSE:**

> **Disputed that such records state what Plaintiffs allege they state.
> Objection as this statement improperly contains multiple facts and
> improper argument and credibility assessments, and does not set forth
> additional facts that are material to Defendants' summary judgment
> motion, in violation of Local Civil Rule 56.1(b).**

201.   Davis' notes from his conversation with Defendant Sanchez also states that
Sanchez reported at approximately 1:00 p.m. on October 9, 2014, that there were "locks
<u>and chains</u> on all of the windows and doors and gates throughout the apartment." <u>Exh. 34</u>
at D162 (emphasis added). However, Sanchez's photos taken earlier that day show no
chains anywhere, he testified at deposition that there were no chains in Apt. 3C, and
Defendants' Admissions state that Defendants did not recover chains during the
investigation of Sims' allegations. Sanchez Tr. 88:6, 92:4-6, 94:5-11,94:23-95:5 (testifying
that he took photos of Apt 3C before sunrise on October 9, 2014, and that there were no
chains in Apt 3C and the radiator did not look like anyone had been chained to it); <u>Exh. 23</u>
(Sanchez photos showing no chains); <u>Exh. 26</u> (Defendants' Admission No.1 stating no
chains).

**DEFENDANTS' RESPONSE:**

> **Disputed that such records state what Plaintiffs allege they state, and
> objection as this statement contains multiple assertions, improper
> argument, and does not set forth additional facts that are material to
> Defendants' summary judgment motion, in violation of Local Civil
> Rule 56.1(b).**

202.   Davis' notes from his conversation with Defendant Sanchez states that Sanchez
reported at approximately 1:00 p.m. on October 9, 2014, that when Broadus and
Bridgeforth arrived at Apt. 3C that morning, neither one "asked for or acknowledged that
they had a child." <u>Exh. 34</u> at D164. However, Sanchez testified at deposition that "the first

thing that actually came out from [Broadus'] mouth ... was 'Where's my daughter.'"
Sanchez Tr. 129:13-16; see Broadus Tr. 51:16-20 (confirming same); Pl. 56.1 ¶120.

**DEFENDANTS' RESPONSE:**

> **Objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b). Nonetheless, undisputed insofar as non-party Davis' notes so state.**

203.   On October 10, 2014, a Neglect Petition was prepared against Broadus and Bridgeforth citing Defendant Sanchez as describing to ACS that there were "chains hanging from the wall" inside Apt. 3C. This was false. Exh. 35 at PL20; Pl. 56.1 ¶ 201.

**DEFENDANTS' RESPONSE:**

> **Undisputed that a Neglect Petition was prepared. However, object as this statement contains multiple facts, improper argument, and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b). Further object insofar as the materials cited do not support the statement and mischaracterize the record. Defendants refer the Court to the evidence cited by Plaintiffs for a full and accurate recitation of its contents.**

204.   On October 10, 2014, NY County Family Court held a hearing regarding FB's emergency removal from Apt. 3C. Broadus and Bridgeforth were not in attendance because they were still sitting in a jail cell in connection with their arrests. The Court adjourned to a date when Broadus and Bridgeforth could appear. Exh. 37 at PL313-PL320.

**DEFENDANTS' RESPONSE:**

> **Undisputed; however, objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

205.   On October 16, 2014, NY County Family Court held a hearing regarding FB's removal. Broadus and Bridgeforth appeared and were arraigned on the neglect allegations

against them triggered by the October 9, 2014, events and Defendant Sanchez's statements

regarding the same. Exh. 37 atPL321 to PL342.

**DEFENDANTS' RESPONSE:**

> **Undisputed that, on October 16, 2014, a hearing was held in New York County Family Court regarding the potential removal of F.B. from plaintiffs Bridgeforth and Broadus. However, dispute that such hearing was "triggered" by Police Officer's Sanchez's statements. Further, object as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

206.    On May 13, 2015, Defendant Sanchez testified under oath at New York County

Family Court hearing about Sims' allegations against Broadus and Bridgeforth without

himself offering that investigation had shown Sims to be an incredible complainant. It was

only through Plaintiffs' Counsel's cross examination of Sanchez that some of the evidence

undermining Sims' credibility was brought into the record. Exh. 38. passim.

**DEFENDANTS' RESPONSE:**

> **Disputed, and object as this statement contains improper argument, and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

207.    During the May 13, 2015, New York County Family Court hearing, Defendant

Sanchez testified that Apt. 3C had "welded bars" on the windows without noting they

were ordinary window guards that NYCHA installed that he had often seen during his nine

years working as a police officer on the premises of NYCHA properties specifically. Exh.

38 at PL89- 90, PL110 (testifying he worked nine years as a police officers serving

NYCHA buildings); id at PL100 (describing ordinary and required NYCHA window

guards as "welded bars"); see Exh. 7 (NYCHA form completed by Bridgeforth indicating

that law required the installation of the window guards because FB was under ten years

old); <u>Exh. 8</u> (municipal regulations and information about window guards); Sanchez Tr. 89:22-90:9 (testifying that he has seen these NYCHA window guards over the course of his roughly eight years as a PSA officer at the time of the arrests); <u>id.</u> at 90:16-20 (discussing child proofing); <u>Exh. 23</u> (Sanchez photos of the ordinary and required NYCHA window guards in apartments where small children lived); <u>Exh. 126</u> (Zerafa testifying that housing properties have child bars).

**DEFENDANTS' RESPONSE:**

> **Objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b). Further object insofar as the materials cited mischaracterize the record. <u>See</u> Sanchez Dep., Exhibit "J" to the Bardauskis Decl., at 96-97:24-20 (Police Officer Sanchez testified that the bars themselves were not necessarily "peculiar" and "being on the third floor, wouldn't necessarily say it's very odd. But it was, just in combination with those key locks," as he had never in his experience "seen key locks on windows.") Defendants refer the Court to the evidence cited by Plaintiffs for a full and accurate recitation of its contents.**

208.    During the May 13, 2015, New York Family Court hearing, Defendant Sanchez testified that during his warrantless search of Apt. 3C, he went into the refrigerator and kitchen cabinets, and that they were "just empty, very few food items." <u>Exh. 38</u> at PL100. According to Plaintiffs this was false because among other things leftover meatloaf, mashed potatoes, gravy and more from the October 8, 2014, meal were there. Broadus Tr. 26:22-23; Bridgeforth Tr. 18:2-11.

**DEFENDANTS' RESPONSE:**

> **Disputed and objection as this statement contains improper argument and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

209.    During the May 13, 2015, New York Family Court hearing, Defendant Sanchez

testified under oath that Broadus did not ask about FB. Exh. 38 at PL104. However, when

Sanchez testified under oath at deposition in this case, he stated that "the first thing that

actually came out from [Broadus'] mouth ... was 'Where's my daughter.'" Sanchez Tr.

129:13-16; s Broadus Tr. 51:16-20 (confirming same); Pl. 56.1 ¶ 120.

**DEFENDANTS' RESPONSE:**

> **Objection as this statement improperly contains argument and does
> not set forth additional facts that are material to Defendants' summary
> judgment motion, in violation of Local Civil Rule 56.1(b).   Further,
> Defendants cannot fairly respond to this purported statement of
> material fact since Plaintiff provides no context for the underlying
> circumstances in which Police Officer Sanchez allegedly reported that
> Broadus "did not ask about FB."**

210.    During the May 13, 2015, New York Family Court hearing, Defendant Sanchez

repeated Sims' allegation that Plaintiffs took photos of her for uploading to the Internet,

but did not offer that that aspect of Sims' complaint had been abandoned as shown by

Defendants' indifference to searching the electronic devices seized from Apt. 3C to the

Computer Crimes Unit for analysis. Exh. 38 at PL84; Exh. 40; Nolan Tr. 41:12-16; Pl.

56.1 ¶ 172.

**DEFENDANTS' RESPONSE:**

> **Disputed, with the exception that said court hearing took place;
> however, objection as this statement contains argument, and does not
> set forth additional facts that are material to Defendants' summary
> judgment motion, in violation of Local Civil Rule 56.1(b).**

211.    On June 10, 2015, the New York County Family Court held that Sims' statements

to NYPD were inadmissible evidence as presented through Sanchez's testimony because

they were hearsay not subject to an excited utterance exception, also noting the absence of

physical evidence corroborating Sims' reports. Exh. 39, passim; id. at PL176.

**DEFENDANTS' RESPONSE:**

> Uundisputed. However, objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).

**Sanchez Failed To Preserve Scratch Reports Created To Document The Government Event That Is Challenged In This Litigation**

212. Scratch reports are handwritten complaint and arrest reports which are later transcribed into a computer. Sanchez Tr. 148:23-2, 149:11-13; Guenther Tr. 80:4-25.

**DEFENDANTS' RESPONSE:**

> Disputed to the extent that Plaintiff appears to suggest that "scratch reports" are required. Further, object as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).

213. Once the computerized complaint and arrest reports are completed, the scratch reports are "supposed to be stapled to the computerized copy." Guenther Tr. 80:4-6, 80:19-20.

**DEFENDANTS' RESPONSE:**

> Disputed, and object as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).

214. An officer "makes several copies" of the scratch and computerized report sets. One set is housed at the officer's command, another copy is sent to the DA's Office, and still other copies may go to other locations. Guenther Tr. 80:22-25.

**DEFENDANTS' RESPONSE:**

> Disputed, and object as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).

215.    Throughout the day on October 9, 2014, as Sanchez interviewed and re-interviewed Sims, Plaintiffs and others, he wrote scratch documents meant to become Plaintiffs' and non-parties' arrest and complaint reports. <u>Exh. 13</u> at D47-50.

**DEFENDANTS' RESPONSE:**

> **Undisputed that there are references to "scratch reports" within Police Officer Sanchez's memobook. However, dispute Plaintiffs' characterization of what said reports were "meant to become." Further, object as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

216.    When Sanchez typed Plaintiffs' and non-parties' arrest and complaint reports, he did not attach the scratch versions and he failed to preserve the scratch records in any way.

<u>Exh. 13</u> at D48 (21:15 Sanchez memo book noting only that "onlines faxed to ECAB");

<u>Exh. 25</u> ¶¶ 5, 6-8 (Sanchez statement that he personally either keeps, files or disposes of the scratch reports and that he cannot find any of the scratch reports referenced in his memo book for this case).

**DEFENDANTS' RESPONSE:**

> **Undisputed only as to the fact that there were no scratch copies attached to Plaintiffs' arrest and complaint reports. Further, object as this statement contains argument and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

### NYPD Complaint Handling

217.    NYPD claims that it "thoroughly and diligently investigates" complaints involving the conduct of its uniformed and civilian personnel. <u>Exh. 50</u> at 2. "[N]o matter how minor in nature," every complaint is "fully investigated and resolved." Id.

**DEFENDANTS' RESPONSE:**

> **Objection as this statement contains improper argument and does not set forth additional facts that are material to Defendants' summary**

> **judgment motion, in violation of Local Civil Rule 56.1(b). Nonetheless, undisputed insofar as the NYPD's response to the February 7, 2017 OIG Report, as cited by Plaintiffs, does so state.**

218.    When a complaint is received by NYPD's Internal Affairs Bureau, a determination is made as to whether it will be investigated. If yes, IAB refers the complaint to the NYPD's Investigation Review Section ("IRS"), a unit within the Office of the Chief of Department ("OCD"), for that purpose. Exh. 50 at 4.

**DEFENDANTS' RESPONSE:**

> **Objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

219.    Once a complaint reaches its designated command for investigation, the investigative protocol includes an interview of the complaining witness, an interview of the subject officer and other officers with relevant information, a review of relevant NYPD records if necessary, and a review of other evidence that is relevant such as video footage or witness statements. Exh. 50 at 5.

**DEFENDANTS' RESPONSE:**

> **Objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

220.    Investigative steps taken by the investigative command are documented on the "Disposition and Penalty Form for Outside Guidelines Communications," which is then sent back to IRS in hard copy for review. IRS may send a complaint back to the investigating command for additional work. Alternatively, if an investigation is fully completed and fully reviewed, IRS enters information from the hard-copy "Disposition

,and Penalty Form for Outside Guidelines Communications" into what is known as the Computer Aided Tracking System (BCATS). Exh. 50 at 5-6; Exh. 51 at 7.

**DEFENDANTS' RESPONSE:**

> **Objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

221.   On February 7, 2017, the City Defendant's NYPD Office of Inspector General (OIG) published a report entitled "Addressing Inefficiencies in NYPD's Handling of Complaints: An Investigation of the 'Outside Guidelines' Complaint Process." Exh. 51.

**DEFENDANTS' RESPONSE:**

> **Objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

222.   In the Report, among other things, the OIG criticized the NYPD's BCATS recordkeeping system, which heavily relies on hard-copy recordkeeping and lacks tracking and analytic capabilities, rendering the NYPD unable to identify potential problems relating ·to misconduct-complaint investigations and related records. The Report recommended that the NYPD upgrade BCATS and handle its misconduct-complaint investigations and recordkeeping through improved electronic systems with analytic capabilities. Broadly speaking, the implementation of OIG's recommendation that NYPD use electronic, analytic systems would improve the number of misconduct complaints that are actually investigated, adequately investigated, and timely investigated. In addition, implementation of the recommendation would enable reporting on subjects pertaining to NYPD misconduct-complaint handling and the identification of trends or patterns in misconduct-complaint investigations for the NYPD and external stakeholders. Exh. 51.

**DEFENDANTS' RESPONSE:**

>    **Objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

223.    On May 8, 2017, the NYPD responded that it is working on addressing or implementing the OIG's recommendations. Exh. 50.

**DEFENDANTS' RESPONSE:**

>    **Objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

### The City Defendants' Inefficient Recordkeeping Practices

224.    In this case, Defendants' inability to meet their discovery obligations as to two Defendants' complaint-investigation records highlight how the City Defendant's recordkeeping is inefficient to permit the City Defendant to understand potential risk that any one uniformed officer might pose in terms of the public's civil rights. Exh. 54 (Sanchez); Exh. 58 (Zerafa).

**DEFENDANTS' RESPONSE:**

>    **Disputed, and objection as this statement improperly contains improper argument, and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

225.    For Zerafa, Defendants have been unable to produce certain complaint investigation records appearing on his personnel indices. Defendants have instead produced an affidavit from Sergeant Michael Devine in which he stated that three Zerafa complaint investigation files are lost. One potential explanation proffered is departmental restructuring. In sum and substance, Devine appears to say that when Zerafa has in the past worked for a unit that dissolved, his files may have been left behind in the vacated

physical space. Alternatively, Devine posits that when Zerafa's units have dissolved in the past, his files may have been sent to a building in Queens where they were all definitely stored in the basement, and where a subsequent, unexpected flood destroyed everything. Devine's explanation suggests that one thing that never happened was that Zerafa's personnel files were forwarded to whatever command employed him next. Another thing that never happened is digitization. Exh. 59.

**DEFENDANTS' RESPONSE:**

> **Disputed, and objection as this statement contains improper argument and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

226.   For Sanchez, Defendants have been unable or unwilling to produce five IAB log numbers without explanation. These lost or withheld log numbers are IAB Log Nos. 11-27471 and 11-27721 (related), IAB Log Nos. 11-30054, 11-30435 and 13-09797 (related). Exh. 54 at D221-22.

**DEFENDANTS' RESPONSE:**

> **Disputed, and objection as this statement contains improper argument and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

227.   As to five other Sanchez personnel events, Defendants have produced in discovery an affidavit from Defendant Demetrious Lee in his capacity as a PSA6 integrity control officer stating that he had looked for them but cannot find them. Unlike Sgt. Devine, Defendant Lee offers no abandonment or natural-disaster-based hypotheses. Exh. 54; Exh. 55.

**DEFENDANTS' RESPONSE:**

> **Disputed, and objection as this statement contains improper argument and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

228.    In summary, between Sanchez and Zerafa, Defendants have wholly or partially lost complaint investigation records for thirteen different complaints. Pl. 56.1 ¶ 224-27.

**DEFENDANTS' RESPONSE:**

> **Disputed, and objection as this statement contains improper argument and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

**Donald Manzano - Uninvestigated Sanchez Personnel Event**

229.    On July 2, 2011, Defendant Sanchez arrested Donald Manzano. A report was made to IAB that Sanchez used excessive force during the arrest. Exh. 55 at D221.

**DEFENDANTS' RESPONSE:**

> **Undisputed that such allegation was made to the IAB as pertaining to an unrelated arrest of a non-party on July 2, 2011. However, object as this statement contains improper argument and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).[8]**

230.    Sworn testimony from Sanchez and his partner that day, non-party Officer William Holland, was that as Sanchez, Holland and non-party Officer Kelly Rourke (the same Rourke in this case) handcuffed Manzano, Sanchez repeatedly struck Manzano with the butt of a gun and Holland repeatedly beat Manzano with a metal asp. Docket No. 53 at PL522 (Sanchez testifying he doesn't know how many times he hit Manzano with his gun), PL619-20 (Sanchez stating it was multiple times but he could not recall how many); id. at PL688-89 (Holland testifying that he started hitting Manzano with asp, which was made of metal, snaps and locks open, and is three-feet long), PL692-94 (Holland testifying

---

[8] Defendants note that plaintiffs do not allege any excessive force claims in the subject litigation.

he did not know where on Manzano's body he hit him with the asp, that he did not know if he hit him in the head, that he did not know how many times he hit him, and that he stopped hitting him "when it was all said and done"), PL697 (Holland testifying that afterwards, he and Sanchez were "covered in blood"), PL715 (Holland testifying that he didn't hear Manzano say anything while being beaten).

**DEFENDANTS' RESPONSE:**

> **Objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

231.   IAB performed no contemporaneous investigation into the use of force upon Manzano. There are index entries showing that a complaint was filed, but no records showing investigation are available, or at least they have not been produced in discovery. These are two of the five missing wholly missing IAB Log Number records referenced <u>supra</u>. <u>Exh. 54</u> at D221 (index has two entries corresponding to the July 2, 2011, use of force upon Manzano).

**DEFENDANTS' RESPONSE:**

> **Objection as this statement improperly contains improper argument, and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

232.   On February 26, 2013, <u>People v. Manzano</u> went to trial. Sanchez testified under oath that he beat Manzano with the butt of his gun while he, Holland and Rourke handcuffed him, and Holland testified that he beat Manzano with a metal asp at the same time. <u>Exh. 53</u>; Pl. 56.1 ¶ 218.

**DEFENDANTS' RESPONSE:**

> **Objection as this statement and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

233.    Sanchez then testified that he did not see Holland beating Manzano with the asp while he, Holland and Rourke were handcuffing Manzano despite Holland's testimony that he did. Exh. 53 at PL574 (Sanchez testifying he did not see Holland beating Manzano with the asp), PL636 (Sanchez testifying that he saw no one, Holland included, striking Manzano).

**DEFENDANTS' RESPONSE:**

> **Objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

234.    Holland testified that he did not see Sanchez beating Manzano with the gun while he, Sanchez and Rourke were handcuffing Manzano despite Sanchez's testimony that he did. Exh. 53 at PL695 (Holland testifying that he could not see if Sanchez was able to strike Manzano while Holland was beating Manzano with the asp), PL714 (Holland testifying that he did not see Sanchez strike Manzano about the head multiple times with it while standing right there), PL723-24 (Holland testifying that he did not see Sanchez use his revolver to crack Manzano's head open, and that an officer who tells supervisors that another officer did something bad can get in trouble).

**DEFENDANTS' RESPONSE:**

> **Objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

235.    Rourke testified that force was "absolutely" used on Manzano during the arrest and that Manzano was covered in so much blood she could not tell where it was coming from. However, she testified that she did not see Sanchez or Holland beating Manzano despite their testimony that they were, because she was focused on Manzano's arm. Exh. 53 at PL822 (Romke stating that as she helped Sanchez and Holland handcuff Manzano she did not see Holland beat Manzano with an asp because she was "looking at [Manzano's] arm, Mr. Manzano's arm. I wasn't looking next to me"), PL852 (Rourke testifying that she saw a lot of blood), PL853 (Rourke testifying that there was so much blood she didn't know where it was coming from, that Manzano was covered in blood), PL860 (Rourke testifying that she was holding Manzano's arms and that force was absolutely used on him).

**DEFENDANTS' RESPONSE:**

> **Objection as this statement improperly contains improper argument and credibility assessments, and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

236.    Later, when Rourke completed arrest paperwork for Manzano, she did not record in the relevant place that officers had used force upon Manzano during his arrest. Rourke testified that her failure to record that force had been used on Manzano was "a mistake." Exh. 53 at PL852 (Rourke testifying that she saw a lot of blood), PL853 (Rourke testifying that there was so much blood she didn't know where it was coming from, that Manzano was covered in blood), PL858 ("I did put none." "That's a mistake.").

**DEFENDANTS' RESPONSE:**

> **Objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

237.    Manzano himself testified at grand jury and at his trial, and the jury acquitted him. On March 6, 2013, Manzano called IAB and informed them about Sanchez's and Holland's sworn trial testimony that they beat him with the butt of a gun and an asp, respectively. The renewed complaint was called a "legacy" case due to its relationship to the previous matter. Exh. 49 ¶ 22; Exh. 53; Exh. 57 at D451, D453. 0455.

**DEFENDANTS' RESPONSE:**

>   **Objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

238.    The "legacy" complaint was referred to PSA6 and Defendant Luis Despaigne was assigned to investigate it. Despaigne performed no investigation. On June 21,2013, he recommended that the complaint be closed with no further action, stating that the matter "would be investigated and handled by [the] court" and that "[a]ny interviews conducted at the PSA level after the fact are not in the best interest of the department and could interfere with this case." It is unclear what Despaigne meant insofar as Manzano had been acquitted three months prior and there was no court to "investigate" and "handle" the matter. Exh. 57 at 0451.

**DEFENDANTS' RESPONSE:**

>   **Objection as this statement improperly contains improper argument and credibility assessments, and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

239.    On November 26, 2013, Donald Manzano filed a lawsuit against Sanchez, Holland and Rourke alleging violations of his rights, referencing the Sanchez and Holland testimony admitting that they each beat him with blunt objects as they handcuffed Manzano, and Sanchez's, Holland's and Rourke's sworn testimony that none of them

observed any of the others hitting Manzano with blunt objects during the handcuffing.

Docket No. 52.

**DEFENDANTS' RESPONSE:**

> **Objection as this statement does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

240.   Manzano was settled for $525,000.00. Docket No. 52.

**DEFENDANTS' RESPONSE:**

> **Objection as this statement and does not set forth additional facts that are material to Defendants' summary judgment motion, in violation of Local Civil Rule 56.1(b).**

Dated:        New York, New York
              March 26, 2018

                          ZACHARY CARTER
                          Corporation Counsel - City of New York
                          *Attorney for Defendants*
                          100 Church Street
                          New York, New York 10007
                          (212) 356-3159


                          By: _____

                              Elizabeth Bardauskis
                              *Assistant Corporation Counsel*


TO: Ryan Lozar, Esq. (Via ECF)
    *Attorney for Plaintiffs*
    305 Broadway, 14 Floor
    New York, New York 10007