UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------
                                          :
JASMINE BRIDGEFORTH, *et al.*,            :
                                          :        16cv273
                              Plaintiffs, :
                                          :        OPINION & ORDER
          -against-                       :
                                          :
THE CITY OF NEW YORK, *et al.*,           :
                                          :
                              Defendants. :
                                          :
------------------------------------------

WILLIAM H. PAULEY III, Senior United States District Judge:

       The City of New York (the "City"), Detective John Zerafa, Police Officer Rafael Sanchez, Police Officer Mohammed Khan, Sergeant Demetrios Lee, and former Deputy Inspector Luis Despaigne ("Defendants") move for summary judgment in this action brought by Jasmine Bridgeforth, Delano Broadus, and David Fairfax ("Plaintiffs"). Plaintiffs bring claims of false arrest, excessive detention, fabrication of evidence, unreasonable search, failure to intervene, and municipal liability. For the reasons that follow, Defendants' motion for summary judgment is granted in part and denied in part.

## BACKGROUND

I.    Events Prior to Officers' Arrival

       This case arises out of a chaotic sequence of events at Bridgeforth's one-bedroom apartment where five adults and one toddler resided. (Declaration of Elizabeth Bardauskis in Support of Defendants' Motion for Summary Judgment, ECF Nos. 78–82 ("Bardauskis Decl."), Ex. L.) Bridgeforth shared the apartment with Broadus (her ex-husband), F.B. (their three-year old daughter), Necola Sims (Broadus' new girlfriend), and two other adults—Fairfax and Sara Hau-Sans. (Local Rule 56.1 Statement in Support of Plaintiffs' Opposition to Defendants'

Summary Judgment Motion, ECF No. 100 ("Plaintiffs' 56.1 Statement"), ¶¶ 56–58, 65.)  On the

evening of October 8, 2014, all six were in the apartment, along with another friend, Eric

Kirkland.  (Plaintiffs' 56.1 Statement ¶¶ 62, 65.)

        Although Broadus was dating Sims, he had rekindled his relationship with

Bridgeforth.  (Declaration of Plaintiffs' Counsel Rylan Lozar Relating to Appendices in Support

of Plaintiffs' Opposition to Defendants' Summary Judgment Motion, ECF No. 97 ("Lozar

Appendices Decl."), Ex. 1 ("Broadus Dep."), at 44:2–8; Ex. 3 ("Bridgeforth Dep."), at

25:20–25.)  After a day of drinking, Sims walked in on Broadus and Bridgeforth having sex.

(Broadus Dep., at 44:6–8.)  Sims became enraged, fought with Bridgeforth, and then left the

apartment.  (Broadus Dep., at 42:5–14.)  Later that evening, Sims returned to the apartment, and

Bridgeforth and Broadus left. (Plaintiffs' 56.1 Statement ¶ 69.)  Thereafter, Fairfax and Sims also

went out, leaving F.B., Hau-Sans, and Kirkland alone in the apartment.  (Plaintiffs' 56.1

Statement ¶¶ 69–70.)

II.    <u>Officers' First Search</u>

        At 2:33 a.m., Sims called 911 from a payphone near Bridgeforth's apartment, and

informed the 911 operator that Plaintiffs were holding her against her will and beating her.

(Declaration of Elizabeth Bardauskis in Support of Defendants' Motion for Summary Judgment,

ECF Nos. 78–82 ("Bardauskis Decl."), Ex. S ("NYPD Complaint Follow-up"); Declaration of

Plaintiffs' Counsel Ryan Lozar Relating to Plaintiffs' Opposition to Defendants' Summary

Judgment Motion, ECF No. 98 ("Lozar Decl."), Ex. 6 ("911 Call Transcript").)  She also

reported that Plaintiffs had guns, knives, and chains, and were holding another woman hostage.

(911 Call Transcript, at 5:9–15, 7:15–17.)

Fifteen minutes later, a large contingent of police officers, including Sanchez, Khan, and Lee, arrived at the scene, and interviewed Sims on the street. (Bardauskis Decl., Ex. Z, at DEF43.) Sims reiterated what she had told the 911 operator, including that she had been held at knifepoint and that Plaintiffs were forcing her into prostitution and keeping her handcuffed to a radiator. (Bardauskis Decl., Ex. P ("Bridgeforth Arrest Report"), at DEF11; Ex. R ("Broadus Arrest Report"), at DEF1.) Specifically, Sims stated that Plaintiffs required her to "make hits on Craig's List, or else she was going to be put out at Hunts Point . . . ." (Lozar Appendices Decl., Ex. 4 ("Sanchez Dep."), at 28:10–12.) The officers understood Hunts Point to be an area known for prostitution. (NYPD Complaint Follow-up; Sanchez Dep., at 35:21–25.)

Sims also reported that Bridgeforth "struck her with a closed fist causing physical injury to her left upper lip and eye." (Bridgeforth Arrest Report, at DEF11.) Sims had swelling to her lip and left eye as a result of her earlier fight with Bridgeforth. (Bardauskis, Ex. U ("NYPD Aided Report").) Sims told the police officers that another "naked black female who appeared to be a teenager" named "Gloria" was still handcuffed in the apartment. (NYPD Complaint Follow-up.) Finally, Sims told police that a young child was also in the apartment. (Bridgeforth Arrest Report, at DEF11.) The officers found Sims cogent and credible. (Lozar Appendices Decl., Ex. 6 ("Guenther Dep."), at 22:6–24; Lozar Decl., Ex. 32, at DEF140.)

After speaking with Sims, the officers knocked on Bridgeforth's apartment door. (Bardauskis Decl., Ex. M. ("Unusual Occurrence Report"), at DEF268.) About ten minutes later, Hau-Sans opened the door and allowed the officers in "to look around."[1] (First Amended Complaint, ECF No. 18 ("FAC") ¶ 24; Sanchez Dep., at 40:18–23.) Hau-Sans told police that no one named Gloria was in the apartment. (Sanchez Dep., at 41:9–10.) Police officers took F.B. to

---

[1] As discussed later in this Opinion & Order, Plaintiffs now dispute whether Hau-Sans made this statement.

St. Luke's Hospital for a wellness check, and later placed her in the custody of New York City

Administration for Children's Services.  (Bardauskis Decl., Ex. DD, at DEF145; Bridgeforth

Dep., at 32:16–22.)

   The officers searched Bridgeforth's apartment and found directions to a hotel

known for prostitution and flyers advertising hourly rates for other hotels.  (Bardauskis Decl.,

Ex. V, at PL420–PL421.)  They did not find a woman named Gloria, nor did they find chains,

handcuffs, or weapons.  (Sanchez Dep., at 93:24–94:11; 139:19–23.)

III. Plaintiffs Are Arrested and Questioned

   Three hours later, Fairfax returned to the apartment and was arrested for unlawful

imprisonment and criminal contempt.  (Bardauskis Decl., Ex. O, at DEF27; DEF109.)  Shortly

after that, police officers at the scene initiated a citywide "level one" mobilization search for

Gloria.  (Sanchez Dep., at 142:11–16.)  When Broadus and Bridgeforth returned to the apartment

around 7:00 a.m. after a night of collecting cans, the police arrested them.  (Plaintiffs' 56.1

Statement ¶ 121.)  They charged Bridgeforth with endangering the welfare of a child and

Broadus with endangering the welfare of a child, unlawful imprisonment, and assault.

(Bridgeforth Arrest Report, at DEF11; Broadus Arrest Report, at DEF1.)  The officers also

arrested Hau-Sans and Kirkland.  (Lozar Decl., Exs 4; 5; 30, at DEF366–DEF367.)  A short time

later, the officers determined that "Gloria did not exist" and that "Sims [had] embellished her

account of the details that occurred inside the apartment," including "adding a fictitious female

named Gloria to her encounter."  (Unusual Occurrence Report.)  As a result, the citywide search

was called off.  (Guenther Dep., at 61:8–11.)  By the time the police wrapped up at the

apartment, all the adults except Sims had been arrested and everyone was taken to the precinct.

At the precinct, Detective Zerafa interviewed all six adults.  (Lozar Appendices Decl., Ex. 5 ("Zerafa Dep."), at 14–16; NYPD Complaint Follow-up.)  Sims repeated her earlier allegations.  (Zerafa Dep., at 33:13–35:13; NYPD Complaint Follow-up.)  Zerafa found Sims "upset and . . . frightened."  (Zerafa Dep., at 34:17–18.)  Plaintiffs explained that Sims was actually Broadus' girlfriend and was making up a story to get back at him.  (Broadus Dep., at 53:18–54:10; Bridgeforth Dep., at 89:7–8.)  Eventually, Sims admitted to the police that she was engaged in a romantic relationship with Broadus.  (Sanchez Dep., at 71:12–15.)

IV.   Zerafa Applies for Search Warrant and Conducts Second Search

With the help of an assistant district attorney, Zerafa applied for a warrant to conduct a second search of Plaintiffs' apartment.  (Lozar Decl., Ex. 43 "Search Warrant Affidavit").)  In his affidavit, Zerafa affirmed that there was probable cause that the officers would find handcuffs, chains, weapons, and other items indicative of prostitution.  (Search Warrant Affidavit, at 1–5.)  Zerafa did not disclose in his affidavit that police officers had conducted an earlier search of the apartment and found none of those items except for hotel flyers.  He also did not disclose that Sims lied regarding the existence of Gloria and had admitted to a romantic relationship with Broadus.  (Pls.' 56.1 Statement ¶ 155.)  A magistrate judge granted the search warrant.  (Bardauskis Decl., Ex. X "Search Warrant".)

Around 9:45 p.m., Zerafa, Despaigne, and other non-party officers conducted a second search of Bridgeforth's apartment.  (Bardauskis Decl., Ex. W, at DEF38.)  They recovered a laptop, cell phones, keys, and wigs, but again found none of the items Sims had described.  (See Bardauskis Decl., Ex. Q; Ex. W, at DEF38; Guenther Dep., at 31:11–21.)

V.    Plaintiffs Are Released

On October 10, the District Attorney of the County of New York ("DA") declined to prosecute Plaintiffs.  (Bardauskis Decl., Ex. Y.)  Plaintiffs were released from jail that evening, after having been detained for approximately 36 hours.  (FAC ¶ 40; Lozar Decl., Ex. 26, at 5–6.)

LEGAL STANDARD

"A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law."  McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).  "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists . . . ."  Rodriguez v. City of N.Y., 72 F.3d 1051, 1060–61 (2d Cir. 1995).

If the moving party meets its burden, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) (citation and quotation marks omitted).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. Cty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citation omitted).  In countering a motion for summary judgment, "[t]he non-moving party may not rely on conclusory allegations or unsubstantiated speculation."  Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

Summary judgment is proper "where a defendant . . . reveal[s] that the plaintiff cannot establish an essential element of the claim, on which element the plaintiff has the burden of proof, and the plaintiff has failed to come forth with evidence sufficient to permit a reasonable

juror to return a verdict in his or her favor on that element." In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 509 (2d Cir. 2010) (citation omitted). "In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party." Flanigan v. Gen. Elec. Co., 242 F.3d 78, 83 (2d Cir. 2001).

DISCUSSION

I.    Plaintiffs' Local Rule 56.1 Statement

Local Rule 56.1 requires a party moving for summary judgment to provide "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." (Local Civ. R. 56.1.) The opposing party "shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a short and concise statement of additional facts as to which it is contended that there exists a genuine issue to be tried." (Local Rule 56.1.)

"Local Rule 56.1 is designed to place the responsibility on the parties to clarify the elements of the substantive law which remain at issue . . . ." Monahan v. N.Y.C. Dep't of Corr., 214 F.3d 275, 292 (2d Cir. 2000) (emphasis added). "[P]arties are not permitted to controvert a moving party's material facts with conclusory or unsupported statements . . . ." Loucar v. Bos. Mkt. Corp., 294 F. Supp. 2d 472, 478 (S.D.N.Y. 2003). Moreover, "legal arguments . . . belong in briefs, not Rule 56.1 statements, and so are disregarded in determining whether there are genuine issues of material fact." Alliance Sec. Prods., Inc. v. Fleming Co., 471 F. Supp. 2d 452, 454 (S.D.N.Y. 2007).

In conjunction with their motion for summary judgment, Defendants filed a 13-page statement containing 51 paragraphs. Each paragraph contained one or two sentences. In response, Plaintiffs produced a 72-page tome, larding on 189 additional paragraphs. Many of those paragraphs string together five or more assertions, making it extremely cumbersome for this Court to confirm Plaintiffs' representations. (See e.g., Pls.' 56.1 Statement ¶¶ 56, 90.) An inordinate amount of Plaintiffs' "material facts" are blatantly immaterial to this Court's determinations. (See e.g., Pls.' 56.1 Statement ¶ 57 (F.B. had "particular affection" for her babysitter); ¶ 123 (Bridgeforth cried during the events at issue).)[2] On summary judgment, "[a] fact is material when it might affect the outcome of the suit under the governing law." SEC v. Yorkville Advisors, LLC, 2018 WL 1725555, at *12 (S.D.N.Y. Mar. 29, 2018). Similarly, Plaintiffs' Rule 56.1 statement is rife with speculation unsupported by any underlying documents.

Defendants ask this Court to disregard Plaintiffs' Rule 56.1 statement in its entirety. Although tempting, this Court instead has conducted its own laborious review of the underlying record to verify Plaintiffs' representations.

II.     42 U.S.C. § 1983

Plaintiffs style their first claim as one for a violation of 42 U.S.C. § 1983. (FAC ¶ 60.) The parties do not devote any briefing to this claim for good reason. "Section 1983 is not itself a source of substantive rights but merely provides a method for vindicating federal rights elsewhere conferred." Albright v. Oliver, 510 U.S. 266, 271 (1994) (citation and quotation marks omitted). Accordingly, this Court understands Plaintiffs to be raising § 1983 as a vehicle

---

[2]     The amount of extraneous detail at times borders on the absurd. As one example, Plaintiffs' counsel describes in three separate instances that they ate meatloaf and mashed potatoes for dinner the night before their arrests. (See Pls.' 56.1 Statement, ¶¶ 62, 136, 208.)

for other claims, and not a freestanding claim itself.  For that reason, Plaintiffs' first claim is dismissed.

III.    False Arrest

Plaintiffs assert a claim of false arrest against all Defendants.  Defendants argue they had probable cause.  "The elements of a claim of false arrest under § 1983 are substantially the same as the elements of a false arrest claim under New York law." Hygh v. Jacobs, 961 F.2d 359, 366 (2d Cir. 1992) (citation and quotation marks omitted).  "Under New York law, the elements of a false imprisonment claim are (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." Singer v. Fulton Cty. Sheriff, 63 F.3d 110, 118 (2d Cir. 1995) (citation, quotation marks, and alterations omitted).

"Probable cause is a complete defense to a constitutional claim of false arrest . . . ." Betts v. Shearman, 751 F.3d 78, 82 (2d Cir. 2014).  "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).  In determining probable cause, a court "must consider those facts available to the officer at the time of the arrest and immediately before it." Lowth v. Town of Cheektowaga, 82 F.3d 563, 569 (2d Cir. 1996).  Further, a Court considers "the circumstances from the perspective of an objectively reasonable police officer, recognizing that the officer is entitled to draw reasonable inferences on the basis of his prior experience." United States v. Pabon, 871 F.3d 164, 174 (2d Cir. 2017).

Defendants contend that Sims' detailed account provided probable cause to arrest Plaintiffs, even if their search did not yield everything she had reported.  Plaintiffs counter that Sims was intoxicated and reasonable officers would not have credited her outlandish tale.  But police officers need not assure themselves beyond a doubt that some crime was committed before making an arrest.  Instead, they need only reasonably believe "that some crime <u>may</u> have been committed."  <u>Ackerson v. City of White Plains</u>, 702 F.3d 15, 20 (2d Cir. 2012) (emphasis added, citation omitted); <u>see also</u> <u>Dist. of Columbia v. Wesby</u>, 138 S. Ct. 577, 586 (2018) ("Probable cause 'is not a high bar.'") (citation omitted).

 "[I]nformation gleaned from informants can be sufficient to justify the existence of probable cause."  <u>Panetta v. Crowley</u>, 460 F.3d 388, 395 (2d Cir. 2006).  And "[w]hen information is received from a putative victim or an eyewitness, probable cause exists . . . unless the circumstances raise doubt as to the person's veracity."  <u>Curley v. Vill. of Suffern</u>, 268 F.3d 65, 70 (2d Cir. 2001); <u>Miloslavsky v. AES Eng'g Soc., Inc.</u>, 808 F. Supp. 351, 355 (S.D.N.Y. 1992) ("The veracity of citizen complaints who are the victims of the very crime they report to the police is assumed.").

Here, the responding officers were confronted with serious allegations of kidnapping and forced prostitution possibly involving an underage woman.  Sims' accounts were detailed and consistent.  Although the officers did not find chains or weapons, they did see flyers for hotels known for prostitution.  (<u>See</u> Bardauskis Decl., Ex. V, at PL420–PL421.)  Sims alleged that Plaintiffs were beating her, and from her fight earlier that evening had swelling on her lip and left eye.  (<u>See</u> NYPD Aided Report.)  Sims also correctly described a toddler in Plaintiffs' apartment, providing credence to her assertion of having been there earlier that evening.  (Bridgeforth Arrest Report, at DEF11.)

That not everything Sims had alleged was found in Plaintiffs' apartment did not negate probable cause. See Smith v. City of N.Y., 388 F. Supp. 2d 179, 185 (S.D.N.Y. 2005) (probable cause existed based on rape-victim's identification of the plaintiff even though "doctors . . . did not find any physical evidence that she had been raped"). And "[o]nce officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge, or jury." Krause v. Bennett, 887 F.2d 362, 372 (2d Cir. 1989); see also Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997) (an officer need not "explore and eliminate every theoretically plausible claim of innocence before making an arrest"). Nor must "[p]olice officers . . . conduct an investigation which exculpates an arrestee." Dukes v. City of N.Y., 879 F. Supp. 335, 343 (S.D.N.Y. 1995).

Sims' possible intoxication did not extinguish probable cause. See Curley, 268 F.3d at 70 (complainant's "intoxication alone" did not "cast doubt on his story"); Ricciuti, 124 F.3d at 128 (although plaintiff "loud[ly] protest[ed]" his innocence, police could rely on complainant's "version of events and . . . visible injuries"). This Court notes that besides Plaintiffs' own testimony, the only evidence that Sims was intoxicated comes from one officer who briefly mentioned it in his notes. (See Demetrios Notes, at DEF140.) Plaintiffs admit that Sims' account changed only after they were arrested. They also admit that no one informed the officers of Sims' motive for lying until they were at the police station. (See Bridgeforth Dep., at 89:3–8.)

Plaintiffs argue that although police need not investigate exculpatory evidence, they may not "deliberately disregard facts known to [them]." See Jocks v. Tavernier, 316 F.3d 128, 135–36 (2d Cir. 2003). But there is no evidence that the officers disregarded anything. While they came to realize that Sims fabricated the existence of another woman—Gloria—that

11

did not warrant the conclusion that her entire account of events was fictitious.  In light of Sims'

allegations, it was incumbent on the officers to arrest Plaintiffs and sort things out.  See Martinez

v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000) (plaintiff's arrest was objectively reasonable

because officers could "rely on the victims' allegations that a crime has been committed");

Rennols v. City of N.Y., 2003 WL 22427752, at *4 (E.D.N.Y. Oct. 23, 2003) (the "arresting

officers never deliberately disregarded facts . . . at worse they failed to investigate and learn

facts").

        Additionally, the officers are entitled to qualified immunity.  "Qualified immunity

. . . affords law enforcement officers a broad shield from claims for money damages arising from

the performance of their duties."  Ganek v. Leibowitz, 874 F.3d 73, 80 (2d Cir. 2017).  It

therefore protects "all but the plainly incompetent or those who knowingly violate the law."

Ganek, 874 F.3d at 81 (internal citation and quotation marks omitted).  "Even if probable cause

to arrest is ultimately not found to have existed, an arresting officer will still be entitled to

qualified immunity from a suit for damages if he can establish that there was 'arguable probable

cause' to arrest."  Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004); see Caldarola v.

Calabrese, 298 F.3d 156, 162 (2d Cir. 2002) ("[I]n situations where an officer may have

reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless

entitled to qualified immunity.").

        Qualified immunity applies "where (1) it was objectively reasonable for the

officer to believe there was probable cause to make the arrest, or (2) reasonably competent police

officers could disagree as to whether there was probable cause to arrest."  Ricciuti, 124 F.3d at

128.  Qualified immunity only fails where a police officer's "judgment was so flawed that no

reasonable officer would have made a similar choice."  Lennon v. Miller, 66 F.3d 416, 421 (2d

Cir. 1995).  Considering Sims' serious allegations, consistent narrative, and some corroborating evidence, officers of reasonable competence could certainly disagree on whether there was probable cause.  See Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991).

IV.   Excessive Detention

In their opposition papers, Plaintiffs allege that they were detained for an excessive period of time.  This claim is new and does not appear in the amended complaint. Courts "refus[e] to consider new allegations and claims raised for the first time in an opposition to a motion for summary judgment."  Nassry v. St. Luke's Roosevelt Hosp., 2016 WL 1274576, at *10 (S.D.N.Y. Mar. 31, 2016).  "Such a step is inappropriate at the summary judgment stage, after the close of discovery, without the Court's leave, and in a brief in opposition to a dispositive motion."  Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp., 963 F. Supp. 1342, 1359 (S.D.N.Y. 1997).  Allowing a plaintiff to do so would "make [her] case a moving target and would all but eviscerate [a] defendant['s] opportunity to obtain summary judgment." Petrisch v. HSBC Bank USA, Inc., 2013 WL 1316712, at *11 (E.D.N.Y. Mar. 28, 2013).

Plaintiffs argue they preserved this claim because their complaint alleged that the officers "arrested and/or detained Plaintiffs without probable cause." (FAC ¶ 64; April 6, 2018 Hearing Transcript, ECF No. 119, at 17:10–12.)  Obviously such a passing reference in a section of the pleading titled "False Arrest and Fabrication of Evidence" is insufficient to put Defendants on notice that Plaintiffs planned to raise such a claim.

Even if this Court considered the merits of this claim, detentions under 48 hours are presumptively reasonable unless "the arrested individual can prove that his or her probable cause determination was delayed unreasonably," such as "for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or

13

delay for delay's sake." Cty. of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991); see also Pabon, 871 F.3d at 182–83.

Plaintiffs were incarcerated for approximately 36 hours.  (FAC ¶ 40.)  Most of that time involved the officers' interrogating Plaintiffs, applying for and conducting a second search of Plaintiffs' apartment, and speaking with the DA.  (See Pls.' 56.1 Statement ¶¶ 123–164.)  While Plaintiffs describe those steps as gathering evidence to justify their arrests, as this Court ruled, the officers had probable cause.  That the officers investigated Plaintiffs during their incarceration is precisely why police detain individuals pending arraignment.  See Pabon, 871 F.3d at 183 (police "continuing an ongoing investigation while the arrestee is being held and awaiting a probable cause determination  . . . is ultimately protective of both the defendant's interests in being free from extended seizure . . . and society's interest in the prompt and efficient investigation of crime").

V.       Fabrication of Evidence (Right to a Fair Trial)

Plaintiffs bring a fabrication of evidence claim against Zerafa and Sanchez, alleging they omitted material information from their reports to the DA, which led to Plaintiffs' continued incarceration.  (See FAC ¶ 41.)  "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983."  Ricciuti, 124 F.3d at 130; see also Garnett v. Undercover Officer C0039, 838 F.3d 265, 278 (2d Cir. 2016) ("[T]here is a due process right not to have police deliberately fabricate evidence and use it to frame and bring false charges against an arrestee.")  (citation and quotation marks omitted).  Probable cause to arrest does not preclude such a claim.  See Garnett, 838 F.3d at 277.

The Second Circuit "restricts fair trial claims based on fabrication of information to those cases in which an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." Garnett, 838 F.3d at 279. According to Plaintiffs, Zerafa and Sanchez failed to provide the DA with facts that would have been determinative on whether to prosecute Plaintiffs. A plaintiff may establish that her right to a fair trial was violated by showing the police made "material omissions [which] render an otherwise true statement false." Morse v. Fusto, 804 F.3d 538, 548 (2d Cir. 2015); see Gomez v. City of N.Y., 2017 WL 1034690, at *8 (E.D.N.Y. Mar. 16, 2017) ("To the extent that the Officer [d]efendants misled the State Prosecutors by omitting pertinent information . . . that evidence may be considered 'false.'").

Starting with Detective Zerafa, although a close call, Plaintiffs may be able to establish that he omitted relevant facts from the DA, that those omissions were material, and that they led Plaintiffs to be detained for a longer period of time than they otherwise would have been.

On October 9, Zerafa brought Sims to the DA and spent time discussing the case with Assistant District Attorney Caitlin Nolan. (See Zerafa Dep., at 79:3–24; Lozar Appendices Decl., Ex. 7 ("Nolan Dep."), at 17:23–18:3.) Evidence in this record could support the conclusion that Zerafa knew Sim's allegations were not credible, but neglected to share that information with Nolan. Nolan testified that she did not remember Zerafa informing her that the police had determined Gloria did not exist, nor that Plaintiffs' apartment had been searched and no evidence of sex trafficking was found. (Nolan Dep., at 25:11–15; 26:19–22; 62:3–16.) Nolan considered those factors relevant to probable cause. (Nolan Dep., at 26:23–27:25.)

15

Defendants contend that Plaintiffs fail to show the information that Zerafa presented to the DA would likely influence a jury's verdict because it is hearsay, and therefore would never reach a jury.  Courts have grappled with the meaning of this element.  See Nnodimele v. Derienzo, 2016 WL 337751, at *12 (E.D.N.Y. Jan. 27, 2016) (collecting cases).  But it "is more naturally read as requiring that the fabrication be material—that is, of such a character that it would likely influence a jury's decision if a jury were to consider it."  Nnodimele, 2016 WL 337751, at *12; see also Garnett v. Undercover Officer C0039, 2015 WL 1539044, at *8–9 (S.D.N.Y. Apr. 6, 2015).  "[I]mposing an admissibility requirement would limit the denial of fair trial claim to immunized statements, thereby gutting relief for those deprived of their liberty based on statements made to a prosecutor before trial."  Rodriguez v. City of N.Y., 291 F. Supp. 3d 396, 416 (S.D.N.Y. 2018).  In other words, a plaintiff would be forced to "navigate the Scylla and Charybdis of admissibility and immunity, thus restricting the cause of action to fabricated physical evidence or confessions."  Rucks v. City of N.Y., 96 F. Supp. 3d 138, 150 (S.D.N.Y. 2015).

Defendants also contend that Zerafa could not knowingly omit information from the DA because he was not at the scene of Plaintiffs' arrests or the initial search.  But there is evidence in the record that he was debriefed by the arresting officers.  (See Zerafa Dep., at 14:19–22 (officers informed Zerafa what happened at the scene); 20:17–21:3 (Zerafa briefed by Sanchez); 27:12–14 (Zerafa knew other officers had not found Gloria).)  How much Zerafa knew from those debriefings and his subsequent interrogations of the parties is a question of fact.

Defendants next assert that Plaintiffs suffered no deprivation of liberty.  A plaintiff bringing a right to a fair trial claim need not have been convicted or proceeded to trial.  See Shephard v. Mayer, 2018 WL 679456, at *4 (E.D.N.Y. Jan. 31, 2018); Soomro v. City of

N.Y., 174 F. Supp. 3d 806, 815 (S.D.N.Y. 2016).  She must only have "suffered a deprivation of liberty 'as a result' of the forwarded false information."  Gomez, 2017 WL 1034690, at *9.

   Here, Plaintiffs contend they would have been released from jail nearly a full day earlier had Zerafa been accurate and complete with the DA.  The extra time Plaintiffs spent in jail can be considered a deprivation of their liberty.  See Rodriguez, 291 F. Supp. 3d at 416–17 (deprivation of liberty through plaintiff's "post-arrest, pre-trial detention"); Dowling v. City of N.Y., 2013 WL 5502867, at *7 (E.D.N.Y. Sept. 30, 2013) ("Plaintiff's twenty-four hours in jail, culminating . . . in adjournment in contemplation of dismissal . . . warrant[s] a finding that he was deprived of his liberty."); Henry v. City of N.Y., 2003 WL 22077469, at *4 (S.D.N.Y. Sept. 8, 2003) (deprivation of liberty through incarceration between plaintiff's arrest and release).  And there is a triable issue over whether it was Zerafa's actions, rather than other processes, that produced this delay.  See Walker v. City of N.Y., 2014 WL 12652345, at *9 (E.D.N.Y. Sept. 3, 2014) ("The causation requirement is . . . met if there is sufficient evidence for a jury to determine that the fabricated evidence, as opposed to evidence that supported a finding of probable cause, caused the plaintiff to be deprived of his liberty.").

   Qualified immunity does not bar this claim, as the actions alleged "violat[e] [the plaintiffs'] clearly established constitutional rights, and no reasonably competent police officer could believe otherwise."  Ricciuti, 124 F.3d at 130; see also Garnett, 838 F.3d at 276.  Accordingly, issues of fact preclude summary judgment on this claim.  See Dowling, 2013 WL 5502867, at *7 (explaining that because officer's "report was at best inaccurate in a way likely to increase [p]laintiff's chance of conviction," the "[p]laintiff . . . identified enough disputed evidence to allow his claim to be decided by a jury").

Plaintiffs also bring this claim against Sanchez.  Unlike Zerafa, Sanchez only spoke to Nolan on the morning of October 10, and Nolan issued decline to prosecute letters immediately after that conversation.  (See Sanchez Dep., at 159:20–160:2; 167:13–18 ("When I spoke to ADA Nolan, her mind was pretty made up in regards to how she was going to handle the case.").)  Clearly, this conversation could not have caused any deprivation of liberty. Plaintiffs also aver that Sanchez withheld material information by forwarding certain arrest paperwork to the DA, but not other paperwork suggesting that Sims may have lied.  Plaintiffs continue that if Sanchez had provided those materials, the DA may have determined probable cause did not exist, and thereby declined to prosecute sooner.  But this argument is too speculative to create a genuine issue of fact.  Plaintiffs proffer no legitimate evidence to support this contention.  A court is "to grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." Parker v. Chrysler Corp., 929 F. Supp. 162, 165 (S.D.N.Y. 1996).  Here, Plaintiffs fail to surpass the threshold. Accordingly, Defendants' motion for summary judgment is granted as to Plaintiffs' fabrication of evidence claim against Sanchez.

VI.     Unreasonable Search (First Search)

Plaintiffs bring unreasonable search claims based on both the first and second searches of their apartment.  First, they claim that Sanchez, Khan, and Lee improperly searched Plaintiffs' apartment without a search warrant immediately after speaking with Sims.  In their complaint, Plaintiffs pled that either Hau-Sans or Kirkland "opened the door [to the officers] and allowed the[m] . . .  to look around."  (FAC ¶ 24.)  Defendants contend this provided them consent, rendering their search reasonable.  Plaintiffs now deny that statement was made and

maintain that even if it was, Defendants unreasonably exceeded the scope of the consent provided.

"The core premise underlying the Fourth Amendment is that warrantless searches of a home are presumptively unreasonable." United States v. Simmons, 661 F.3d 151, 156 (2d Cir. 2011). However, "an individual may consent to a search, thereby rendering it reasonable." United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995). The scope of consent is a question of fact. United States v. Gandia, 424 F.3d 255, 265 (2d Cir. 2005). Consent to a search "may be given by a third party who possesses common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Yudong Zhu, 23 F. Supp. 3d 234, 238 (S.D.N.Y. 2014) (citation, quotation marks, and alterations omitted).

Hau-Sans and Kirkland were living in Bridgeforth's apartment and therefore had authority to consent to a search. But questions remain about what was said and whether the officers exceeded the scope of the authorized search. Sanchez testified that when Hau-Sans opened the door, Sanchez asked "who was in the apartment, and if Gloria was in the apartment." (Sanchez Dep., at 41:4–5.) Hau-Sans "denied that anybody by the name of Gloria was in the apartment," and "looked like she just woke up." (Sanchez Dep., at 41:9–10; 14.) Even if Hau-Sans then allowed the officers to "look around," it appears the officers did more than that. Broadus testified later learning that they thoroughly searched the entire apartment, including opening the refrigerator and rifling through cabinets. (See Broadus Dep., at 50:10–11 (kitchen cabinets were open); 86:11–13.)

The Supreme Court has articulated the scope of consent "is that of 'objective' reasonableness–what would the typical reasonable person have understood by the exchange between the officer and suspect?" Florida v. Jimeno, 500 U.S. 248, 251 (1991). "[I]f a court

19

finds that, under the totality of the circumstances, it was objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to conduct the search that was undertaken, there is no Fourth Amendment violation." Handy v. City of New Rochelle, 198 F. Supp. 3d 298, 309 (S.D.N.Y. 2016).  "The scope of a search is generally defined by its express object."  Jimeno, 500 U.S. at 251.

Here, Sanchez explained that the officers were looking for someone named Gloria.  It would be reasonable for the officers to search the rooms and closets in the apartment but not open cabinets and a refrigerator.  See United States v. Turner, 23 F. Supp. 3d 290, 310 (S.D.N.Y. 2014) ("Consent to search an area is distinguishable from consent to search an object or closed container located within that area.").  If the officers were searching for narcotics, opening cabinets and the refrigerator may have been reasonable.  See, e.g., United States v. Camilo, 287 F. Supp. 2d 446, 454 (S.D.N.Y. 2003).  But searching for a human being is different.  "[A]n invitation to enter a house does not authorize an officer to conduct a general search for incriminating materials."  Palmieri v. Kammerer, 690 F. Supp. 2d 34, 47 (D. Conn. 2010).  Nor is it clear that the length of the officers' stay was reasonable.  They were still in Plaintiffs' apartment nearly four hours later when Bridgeforth and Broadus arrived home.  (See Broadus Dep., at 50:23–25, Bridgeforth Dep., at 30:15–16.)

Defendants also assert that only Bridgeforth has standing to bring unlawful search claims, as neither Broadus nor Fairfax were listed on the apartment's lease agreement.  This argument is misplaced.  Standing to assert a Fourth Amendment search claim requires a party to have some "property or possessory interest in the place searched or the items seized."  United States v. Osorio, 949 F.2d 38, 40 (2d Cir. 1991).  "There is no authority for the proposition that one need live in the premises, or exercise control over them, in order to enjoy a privacy interest

20

in those premises." United States v. Hamilton, 538 F.3d 162, 169 (2d Cir. 2008).  Accordingly, even overnight guests typically have a legitimate expectation of privacy.  Minnesota v. Olson, 495 U.S. 91, 96 (1990).  Broadus and Fairfax were more than overnight guests—they were living in Bridgeforth's apartment.  (See Pls.' 56.1 Statement ¶¶ 56–57.)  Accordingly, all three Plaintiffs have standing to bring these claims.

        The Officers are not protected by qualified immunity for the first extended search of the apartment.  Case law existing at the time of the search made clear that consent to enter does not automatically imply consent to search, and consent to search one area does not imply consent to search others.  See Jimeno, 500 U.S. at 251.  Further, "[c]onsent to search an area is distinguishable from consent to search an object or closed container located within that area."  Winfield v. Trottier, 710 F.3d 49, 55 (2d Cir. 2013).  It is unclear whether any reasonable officer would think Hau-Sans consented to the wide ranging protracted search that the officers conducted.  See Schoolcraft v. City of N.Y., 103 F. Supp. 3d 465, 503 (S.D.N.Y. 2015) (denying qualified immunity defense in search of plaintiff's home); Palmieri, 690 F. Supp. 2d at 47.  And again, an issue of fact remains on whether Hau-Sans provided such consent.

VII.    Unreasonable Search (Second Search)

        Plaintiffs also claim that the second apartment search was unlawful.  Police conducted that search pursuant to a warrant issued by a New York state magistrate judge.  (See Search Warrant Affidavit; Search Warrant.)  "A search warrant issued by a neutral and detached magistrate is entitled to substantial deference . . . ."  United States v. Rosa, 11 F.3d 315, 326 (2d Cir. 1993).  Therefore, "a search pursuant to a warrant issued by a judicial officer upon a finding of probable cause is presumptively reasonable."  Ganek, 874 F.3d at 81.  Nevertheless, "[a] plaintiff can demonstrate that her right not to be searched absent a search warrant supported by

probable cause was violated where the officer submitting the probable cause affidavit knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit or omitted material information, and that such false or omitted information was necessary to the finding of probable cause." McColley v. Cty. of Rensselaer, 740 F.3d 817, 823 (2d Cir. 2014) (citation and quotation marks omitted).

        To determine if information was necessary for probable cause, courts "consider a hypothetical corrected affidavit, produced by deleting any alleged misstatements from the original warrant affidavit and adding to it any relevant omitted information." Ganek, 874 F.3d at 82. Plaintiffs allege that Zerafa's search warrant affidavit omitted critical information bearing on Sims' credibility. In that affidavit, Zerafa affirmed there was reasonable cause to believe that Plaintiffs' apartment contained evidence of kidnapping, sex trafficking, and related crimes. (Search Warrant Affidavit, at 1.) As support, Zerafa reiterated Sims' allegations, but did not inform the magistrate judge that officers had concluded that Sims fabricated the existence of "Gloria," that those same officers had searched Plaintiffs' apartment and found no evidence, nor that Sims had admitted to a romantic relationship with Broadus.

        If probable cause is lacking in the hypothetical corrected warrant affidavit, a court considers whether "a similarly situated law enforcement official could have an objectively reasonable—even if mistaken—belief that the corrected affidavit demonstrate[s] the necessary probable cause." Ganek, 874 F.3d at 82; see also Cartier v. Lussier, 955 F.2d 841, 845 (2d Cir. 1992). The Second Circuit recently made clear that in this context probable cause only requires a "fair probability" of criminal conduct, and "does not demand evidence of every element of a crime." See Ganek, 874 F.3d at 86. Even if the omitted information was added to Zerafa's affidavit, reasonable officers could disagree over whether it nevertheless provided probable

cause.  "If there remains an <u>objective</u> basis to support <u>arguable</u> probable cause . . . summary judgment should be granted . . . on the basis of qualified immunity."  <u>Escalera</u>, 361 F.3d at 744 (emphasis added); <u>see</u> <u>Florida v. Harris</u>, 568 U.S. 237, 243 (2013) (probable cause to search does not require "proof beyond a reasonable doubt [or] preponderance of the evidence" but only a 'fair probability") (citations and marks omitted).

As described above, the officers had evidence demonstrating Plaintiffs may have committed a serious crime, including Sims' detailed account.  Objectively, a reasonable officer could find that evidence outweighed the fact that officers did not find most of the physical evidence Sims claimed would be in the apartment and that Sims had embellished her tale.  <u>See</u> <u>Escalera</u>, 361 F.3d at 747 (upholding qualified immunity even though corrected affidavit would reveal informant's psychiatric history and discrepancies in his statement).  Although qualified immunity is lost "[w]here an officer knows, or has reason to know, that he materially misled a magistrate on the basis for finding of probable cause," <u>Golino</u>, 950 F.2d at 871, "a conclusory proffer of an unconstitutional motive should not defeat [a] motion for summary judgment."  <u>Blue v. Koren</u>, 72 F.3d 1075, 1084 (2d Cir. 1995).  Plaintiffs proffer no evidence that Zerafa had a motive to mislead the magistrate judge.  As he testified, he believed Sims was telling the truth when he applied for the warrant.  (Zerafa Dep., at 33:13–35:13.)

VIII.   <u>Failure to Intervene</u>

Plaintiffs bring a failure to intervene claim against those defendants who failed to intercede.  "[L]aw enforcement officials have an affirmative duty to intervene to protect against the infringement of constitutional rights from conduct committed by other officers in their presence."  <u>Curley</u>, 268 F.3d at 72.  "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has

reason to know . . . that any constitutional violation has been committed by a law enforcement official." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994).

A failure to intervene claim does not exist when the underlying constitutional claim has been dismissed. See Bancroft v. City of Mount Vernon, 672 F. Supp. 2d 391, 406 (S.D.N.Y. 2009). This Court therefore cabins its analysis of the failure to intervene claim to Plaintiffs' two surviving claims: (1) Zerafa's denial of the right to a fair trial; and (2) unlawful search as to Sanchez, Khan, and Lee's first search of Plaintiffs' apartment.

Plaintiffs may bring both direct liability and failure to intervene claims against those police officers who participated in the first search. See Lanorith v. Truscelli, 2017 WL 3634600, at *13 (E.D.N.Y. Aug. 22, 2017); Buchy v. City of White Plains, 2015 WL 8207492, at *3 (S.D.N.Y. Dec. 7, 2015) (same). As to the fair trial claim, the communications among Sanchez, Zerafa, and Despaigne prior to Zerafa speaking with the DA remain unclear. Therefore, depending on the evidence adduced at trial, a reasonable jury could find that one or more officers knew of but failed to intervene in a violation of Plaintiffs' rights. See Allen v. City of N.Y., 480 F. Supp. 2d 689, 694–95 (S.D.N.Y. 2007) (denying summary judgment where factual questions remained on ability to intervene).

IX.    Monell Claim

Finally, Plaintiffs bring a Monell claim against the City of New York under two theories. "To hold a municipality liable pursuant to Section 1983 for the conduct of employees below the policymaking level, a plaintiff must demonstrate that the violation of his constitutional rights resulted from the municipality's custom or policy." Smith, 388 F. Supp. 2d at 187–88. A municipal policy or custom can be demonstrated through showing: (1) a formal policy, (2) "actions or decisions made by municipal officials with decision-making authority," (3) practices

so widespread that "they constitut[e] a custom of which policymakers must have been aware," or (4) "a failure to properly train or supervise . . . subordinates, such that the policymakers exercised 'deliberate indifference' to the rights of the plaintiff and others." McLennon v. City of N.Y., 171 F. Supp. 3d 69, 94 (E.D.N.Y. 2016) (collecting cases).

Plaintiffs' Monell theory has shifted radically. Initially, they contended that the NYPD "arrest[s] innocent persons in order to meet 'productivity goals' or arrest quotas . . . professional advancement, overtime compensation, and/or other objectives outside the ends of justice; and[] manufactur[es] false evidence against individuals in . . . a conspiracy to justify [its] abuse of authority in falsely arresting, unlawfully stopping and maliciously prosecuting those individuals." (FAC ¶ 79.) Now Plaintiffs posit two theories: (1) that the City fails to maintain adequate procedures to ensure arrestees are released expeditiously after the DA declines to prosecute; and (2) that the City fails to adequately keep records of and investigate complaints against police officers.

First, Plaintiffs allege a failure to properly train and protect against arrestees waiting in jail despite the DA declining to prosecute. Plaintiffs were incarcerated for five hours after Nolan issued Decline to Prosecute letters. (See FAC ¶ 40; Lozar Decl., Ex. 26, at 5–6.) Plaintiffs float a somewhat ambiguous theory that the City has been indifferent to such a risk and thereby failed to properly train and put adequate procedures in place to safeguard against it.

Establishing "deliberate indifference [to a risk] requires a showing that the official made a conscious choice, and was not merely negligent." Jones v. E. Haven, 691 F.3d 72, 81 (2d Cir. 2012). A plaintiff must demonstrate: (1) that policymakers know "to a moral certainty that employees will confront a given situation; (2) the situation will present "the employee with a difficult choice;" and (3) that "the wrong choice by the city employee will frequently cause the

deprivation of a citizen's constitutional rights." Walker v. City of N.Y., 974 F.2d 293, 297–98

(2d Cir. 1992). To demonstrate that a risk was obvious, a plaintiff must show something akin to

"repeated complaints of civil rights violations." Outlaw v. City of Hartford, 884 F.3d 351, 373

(2d Cir. 2018) (citation omitted).

   "Proof of a single incident of unconstitutional activity is not sufficient to impose

liability . . . unless proof of the incident includes proof that it was caused by an existing,

unconstitutional municipal policy . . . ." Okla. City v. Tuttle, 471 U.S. 808, 823–24 (1985).

Plaintiffs speculate that their length of detention after the DA declined to prosecute is a

widespread occurrence. Cf. Jeanty v. Cty. of Orange, 379 F. Supp. 2d 533, 546 (S.D.N.Y. 2005)

(denying summary judgment where plaintiff "established that there [was] a history of officers

mishandling situations in which force is necessary"). In fact, all they show is that the City has

procedures in place to ensure that it does not happen. (See, e.g., Pls.' 56.1 Statement,

¶¶ 178–180 (describing City's "On-Line Prisoners' Arraignment System," which is used to

ensure prisoners are arraigned in a timely manner).) Plaintiffs argue that because the City put

such procedures in place, a jury could assume that it knew there was a risk of delays. Triable

issues of fact require more than mere conjecture. See Smith, 388 F. Supp. 2d at 188 (granting

summary judgment where record showed a single incident, no evidence of training inadequacies,

and no nexus between inadequacies and constitutional violations).

   There is no evidence that what happened to Plaintiffs stemmed from improper

procedures. That the City's system "is imperfect or not in the precise form [the] plaintiff[s]

would prefer is insufficient to make" a Monell claim. See Reynolds v. Giuliani, 506 F.3d 183,

193 (2d Cir. 2007) (citation omitted).

Plaintiffs' second Monell theory concerns the City's processing and recordkeeping of complaints against New York City police officers.  From the fact that the City was unable to produce certain records for some defendants in this litigation, Plaintiffs aver that the City's choice to keep records in hard copy "render[s] the NYPD unable to identify potential problems relating to misconduct-complaint investigations."  (Pls.' 56.1 Statement ¶ 222.)

But the City's recordkeeping practices have no bearing on Plaintiffs' underlying claims.  Their assertion that these practices impeded their ability to attain discovery has no nexus to their arrests and imprisonment.  See Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent the showing of a causal link between an official policy or custom and the plaintiff's injury, Monell prohibits a finding of liability . . . .")

Nor are triable issues of fact raised by Plaintiffs' proffer of two investigations previously performed on two Defendants that Plaintiffs allege were inadequately conducted.  The issues in those investigations (an alleged use of force and an alleged bribery) bear no relationship to this case.  "[A]t the summary judgment stage, plaintiffs must . . . establish that the deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation."  Green v. City of N.Y., 465 F.3d 65, 81 (2d Cir. 2006) (citation and quotation marks omitted).  Plaintiffs provide only "a handful of isolated incidents" which are "insufficient to create a material fact in dispute."  See Escobar v. City of N.Y., 766 F. Supp. 2d 415, 421 (E.D.N.Y. 2011).

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.  Defendants' motion is granted as to Plaintiffs' claims of (1) false arrest, (2) excessive detention, (3) fabrication of evidence as to Sanchez; (4) unlawful search as

to the second search of Plaintiffs' apartment, and (5) municipal liability.  Defendants' motion is

denied as to Plaintiffs' claims of (1) fabrication of evidence as to Zerafa, (2) unlawful search as

to the first search of Plaintiffs' apartment, and (3) failure to intervene specifically as to the

remaining claims.  The City of New York is therefore terminated from the case and the Clerk of

Court is directed to modify the case caption.

   The parties are directed to appear for a status conference on July 19, 2018 at

10:00 a.m.


Dated: June 28, 2018

   New York, New York

SO ORDERED:


_____

WILLIAM H. PAULEY III

U.S.D.J.


28